

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, NW<br>Washington, DC 20580<br><br>and<br><br>**COMMONWEALTH OF PENNSYLVANIA**<br>Strawberry Square<br>Harrisburg, Pennsylvania 17120<br><br>         Plaintiffs,<br><br>    v.<br><br>**THOMAS JEFFERSON UNIVERSITY**<br>1020 Walnut Street<br>Philadelphia, Pennsylvania 19107<br><br>and<br><br>**ALBERT EINSTEIN HEALTHCARE NETWORK**<br>5501 Old York Road<br>Philadelphia, Pennsylvania 19141<br><br>         Defendants. | No. 20-cv-1113<br><br><br><br>**PROVISIONALLY REDACTED** |

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission") and the

Commonwealth of Pennsylvania, acting by and through its Office of Attorney General, petition

this Court, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"),

15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, to enter a stipulated

-1-

temporary restraining order and grant a preliminary injunction enjoining Defendant Thomas Jefferson University ("Jefferson") and Defendant Albert Einstein Healthcare Network ("Einstein," and together with Jefferson, "Defendants"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships, or joint ventures, from consummating their proposed merger.  Jefferson and Einstein entered a System Integration Agreement dated September 14, 2018 ("Integration Agreement"), whereby Jefferson will become the sole member of Einstein and the ultimate parent entity of Einstein (the "Transaction").  Absent this Court's action, Defendants will be free to complete the Transaction on or after 11:59 p.m. EST on February 28, 2020.

Plaintiffs require the aid of this Court to maintain the *status quo* and prevent interim harm to competition during the pendency of an administrative trial on the merits.  The Commission has already initiated the administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45.  The Commission filed its administrative complaint on February 27, 2020.  Pursuant to FTC regulations, the administrative trial on the merits will begin on September 1, 2020.  The administrative trial will determine the legality of the Transaction and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Transaction.

## I.

## NATURE OF THE CASE

1.      The FTC and the Commonwealth of Pennsylvania ask this Court to enjoin preliminarily the anticompetitive merger between Jefferson and Einstein.  Jefferson and Einstein are two of the leading providers of inpatient general acute care ("GAC") hospital services and

inpatient acute rehabilitation services in Philadelphia and Montgomery Counties. The proposed Transaction would combine the Jefferson and Einstein systems to create the largest hospital system in Philadelphia County and by far the largest hospital system in Montgomery County and in the greater Philadelphia region.

2.      Einstein and Jefferson hospitals offer a broad range of medical and surgical diagnostic and treatment services that require an overnight hospital stay. Today, Defendants compete to sell these inpatient GAC hospital services to commercial insurers and to provide inpatient GAC hospital services to those insurers' members.

3.      Einstein operates GAC hospitals that compete directly and significantly with Jefferson's GAC hospitals. Located in North Philadelphia, Einstein's flagship hospital, Einstein Medical Center Philadelphia ("EMCP"), significantly competes with Jefferson's Abington Hospital ("Abington"), located in eastern Montgomery County, and Jefferson Frankford Hospital, located in northeast Philadelphia. Einstein Medical Center Elkins Park ("EMCEP"), a GAC hospital inside a larger inpatient rehabilitation facility in eastern Montgomery County, likewise significantly competes with Jefferson's Abington Hospital and Jefferson Frankford Hospital. In Montgomery County, Einstein Medical Center Montgomery ("EMCM") significantly competes with both Jefferson's Abington Hospital and Jefferson's Abington-Lansdale Hospital ("Lansdale"). The relevant geographic markets to assess the competitive impact of the Transaction include GAC hospitals in the area around EMCP in North Philadelphia (the "Northern Philadelphia Area") and GAC hospitals in the area around EMCM in Montgomery County (the "Montgomery Area").

4.      Jefferson and Einstein are close competitors for inpatient GAC hospital services.



5.      Post-Transaction, Defendants would control at least 60% of the inpatient GAC hospital services market, as measured by commercially insured patient admissions in the Northern Philadelphia Area, with only one other hospital system providing inpatient GAC hospital services with any meaningful presence.  Post-Transaction, Defendants also would become the market leader in the Montgomery Area, controlling at least 45% of the inpatient GAC hospital services market, as measured by commercially insured patient admissions, in the Montgomery Area.

6.      The U.S. antitrust enforcement agencies promulgated the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") to "assist the courts in developing an appropriate framework for interpreting and applying the antitrust laws."  Under the Merger Guidelines, a post-acquisition market concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders an acquisition presumptively unlawful. Based on commercially insured patient admissions, the Transaction would significantly increase concentration in already highly concentrated markets for inpatient GAC hospital services, well beyond the thresholds set forth in the Merger Guidelines.  Thus, under the Merger Guidelines,

the Transaction is presumptively unlawful in the inpatient GAC hospital services product market in both the Northern Philadelphia Area and the Montgomery Area.

7.      In addition to providing inpatient GAC hospital services, Defendants also operate nationally renowned inpatient rehabilitation facilities ("IRFs") that compete against each other today.  Einstein operates several IRFs under the name MossRehab ("Moss") throughout the greater Philadelphia region, and Jefferson operates Magee Rehabilitation Hospital ("Magee") in the Center City neighborhood of Philadelphia and two other IRFs in the greater Philadelphia region.

8.      Einstein and Jefferson IRFs provide advanced post-acute rehabilitation care for patients treated at GAC hospitals for conditions such as stroke, traumatic brain injury, or spinal cord injury.  IRFs provide such inpatient acute rehabilitation services to only those patients who can withstand and benefit from them.  The relevant geographic market in which to analyze the effects of the Transaction for inpatient acute rehabilitation services is the area around Einstein's Moss at Elkins Park (the "Philadelphia Area").  Together, Defendants operate six of the eight IRFs in the Philadelphia Area.

9.      Both Einstein and Jefferson compete vigorously for rehabilitation patients.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████

10.     The Transaction will substantially lessen competition in the market for inpatient acute rehabilitation services in the Philadelphia Area.  Defendants are the largest providers of inpatient acute rehabilitation services in the Philadelphia Area.  Post-Transaction, Defendants would control at least 70% of the inpatient acute rehabilitation services market by commercially

insured patient admissions in the Philadelphia Area, with only one other IRF providing inpatient acute rehabilitation services with any meaningful presence.

11.     In the Philadelphia Area, the Transaction would significantly increase market concentration in an already highly concentrated market for inpatient acute rehabilitation services such that the Transaction is presumptively unlawful under the Merger Guidelines.

12.     Today, Jefferson and Einstein compete for inclusion in commercial insurers' hospital networks.  A commercial insurer would find it difficult to market a health plan to employers and their employees living or working in the Northern Philadelphia Area or the Montgomery Area that excluded all of the GAC hospitals owned by Einstein and Jefferson. Likewise, a commercial insurer would find it difficult to market a health plan to employers and their employees living or working in the Philadelphia Area that excluded all of the IRFs owned by Defendants.

13.     Hence, by eliminating competition between Defendants, the Transaction is likely to increase Defendants' bargaining leverage with commercial insurers and enhance Defendants' ability to negotiate more favorable reimbursement terms, including reimbursement rates (i.e., prices).  Faced with higher reimbursement rates and other less favorable terms, commercial insurers will have to pass on at least some of those higher healthcare costs to employers and their employees in the form of increased premiums, co-pays, deductibles, and other out-of-pocket expenses.  "Self-insured" employers that pay the cost of their employees' healthcare claims directly will bear the full and immediate burden of higher reimbursement rates and other less favorable terms.

14.     Jefferson and Einstein have a history of upgrading medical facilities, improving patient access, and offering more competitive reimbursement rates and terms to commercial insurers because of competition from each other that will be lost if the Transaction goes forward.

15.     The Transaction will substantially lessen competition and cause significant harm to consumers.  If Defendants consummate the Transaction, healthcare costs will rise, and the incentive for Defendants to increase service offerings and improve the quality of healthcare will diminish.

16.     Entry or expansion by other GAC hospitals or IRFs will not be likely, timely, or sufficient to offset the adverse competitive effects that likely will result from the Transaction. Potential entrants would need to devote significant time and resources to conduct studies, develop plans, acquire land or repurpose a facility, and construct and open a competitive GAC hospital or IRF.  Defendants' reputations, size, and the breadth and depth of the inpatient GAC hospital services and inpatient acute rehabilitation services they provide make it unlikely that there will be entry on a sufficient scale to counteract or constrain post-Transaction price increases.

17.     Defendants have not substantiated any verifiable, merger-specific efficiencies. Even if Defendants could identify some cognizable efficiencies resulting from the Transaction, any savings likely to be passed on to patients are far outweighed by the Transaction's potential harm and thus would not be sufficient to justify the Transaction.

18.     Preliminary injunctive relief restraining Defendants from proceeding with their Transaction is necessary to prevent interim harm to competition during the Commission's ongoing administrative proceeding.  Absent preliminary relief, Defendants can close the Transaction and combine their operations, and the Commission and Commonwealth of

Pennsylvania's ability to fashion effective relief would be significantly impaired, or perhaps even precluded, if the Transaction is found to be unlawful after a full administrative trial on the merits and any subsequent appeals.

19.     The parties have stipulated to the Court's entry of a temporary restraining order preventing Defendants from consummating the acquisition until after 11:59 p.m. EST on the seventh calendar day after this Court rules on a motion for a preliminary injunction or until after a date set by the Court.  Such a temporary restraining order is necessary to preserve the *status quo* and protect competition while the Court considers Plaintiffs' application for a preliminary injunction.

## II.

## JURISDICTION AND VENUE

20.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies and is brought by an agency of the United States authorized by an Act of Congress to bring this action.  Jefferson and Einstein, and their relevant operating entities and subsidiaries, are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.  Defendants also are, and at all relevant times have been, engaged in commerce in the Commonwealth of Pennsylvania.

21.     Jefferson and Einstein transact business in the Eastern District of Pennsylvania and are subject to personal jurisdiction therein.  Venue, therefore, is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

22.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

(b)     Whenever the Commission has reason to believe –

>    (1) that any person, partnership, or corporation is violating,
>    or is about to violate, any provision of law enforced by the
>    Federal Trade Commission, and
>    (2) that the enjoining thereof pending the issuance of a
>    complaint by the Commission and until such complaint is
>    dismissed by the Commission or set aside by the court on
>    review, or until the order of the Commission made thereon
>    has become final, would be in the interest of the public –
>    the Commission by any of its attorneys designated by it for
>    such purpose may bring suit in a district court of the United
>    States to enjoin any such act or practice.  Upon a proper
>    showing that, weighing the equities and considering the
>    Commission's likelihood of ultimate success, such action
>    would be in the public interest, and after notice to the
>    defendant, a temporary restraining order or a preliminary
>    injunction may be granted without bond . . . .

23.     In conjunction with the Commission, the Commonwealth of Pennsylvania brings this action for a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Jefferson and Einstein from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, pending the Commission's administrative trial.  The Commonwealth of Pennsylvania has the requisite standing to bring this action because the Transaction would cause antitrust injury in Pennsylvania for inpatient GAC hospital services and inpatient acute rehabilitation services.

24.     Section 16 of the Clayton Act, 15 U.S.C § 26, provides in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including section 13, 14, 18 and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . .

25.     The Transaction constitutes a transaction subject to Section 7 of the Clayton Act, 15 U.S.C § 18.

### III.

### BACKGROUND

#### A.

#### The Parties

26.     Plaintiff, the Commission, is an administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, NW, Washington, District of Columbia 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

27.     Plaintiff, the Commonwealth of Pennsylvania, is a sovereign state of the United States.  This action is brought by and through its Attorney General, who is the chief law enforcement officer of the Commonwealth, with the authority to bring this action on behalf of the Commonwealth pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 and Section 732-204(c) of the Commonwealth Attorneys Act, 71 P.S. § 732-204(c).  The Office of the Attorney General of the Commonwealth of Pennsylvania has its principal offices at Strawberry Square, Harrisburg, Pennsylvania 17120.

28.     Defendant Jefferson, a Pennsylvania not-for-profit corporation, operates an academic health system headquartered in Philadelphia that is the largest health system by hospital beds in the greater Philadelphia region.  It is also the second-largest employer in Philadelphia, employing over 30,000 people, including approximately 6,100 physicians and

-10-

practitioners and 7,400 nurses. For fiscal year 2019, Jefferson generated $5.2 billion in revenues.

29.     Jefferson operates 11 GAC hospitals in Pennsylvania and New Jersey and three IRFs in Pennsylvania. Across all of its inpatient facilities, Jefferson discharges approximately 130,000 inpatients a year. Jefferson also operates over 50 outpatient and urgent care locations in Pennsylvania and New Jersey.

30.     Jefferson operates four GAC hospitals in the City of Philadelphia—Thomas Jefferson University Hospital ("TJUH"), Methodist Hospital, Jefferson Frankford Hospital (f/k/a Aria Frankford Hospital), and Jefferson Torresdale Hospital (f/k/a Aria Torresdale Hospital)— and two GAC hospitals in Montgomery County—Abington and Lansdale (together, f/k/a Abington Health).

31.     Jefferson has acquired a number of hospital systems and IRFs in recent years. Since 2015, Jefferson has merged with Abington Health, Aria Health System, Kennedy Health, and Magee. By virtue of its merger with Aria Health System, Jefferson also has a partial ownership stake in Health Partners Plans, a not-for-profit health maintenance organization that offers managed government insurance, including Medicaid and Medicare plans, to members in Southeastern Pennsylvania. In December 2019, Jefferson signed definitive agreements to acquire Temple University's Fox Chase Cancer Center, Temple's Bone Marrow Transplant program, and Temple's partial ownership interest in Health Partners Plans. Jefferson operates 12 colleges, schools, and institutes, including Sidney Kimmel Medical College, the fifth-largest medical school in the country.

32.     After merging with Abington Health in 2015, Jefferson now owns and operates two hospitals in Montgomery County. Abington is a 665-bed regional referral center and

teaching hospital located in Abington Township in eastern Montgomery County, near the border with Philadelphia County.[1] Lansdale is a 140-bed hospital in Lansdale, which is located in the northern part of central Montgomery County. Subsequent to its merger with Aria Health System in 2016, Jefferson gained control over three additional hospitals in the greater Philadelphia region, including Jefferson Frankford, a 115-bed hospital in northeast Philadelphia.

33.     Jefferson merged with Magee in 2018. Magee is located in the City of Philadelphia and is currently undergoing a renovation that will bring its hospital beds down from 96 to 82. Jefferson also operates two IRF units within larger GAC hospitals—one at TJUH named the Jefferson Acute Rehabilitation Unit and one at Abington named the Abington Acute Rehabilitation Unit. Both have 23 beds.

34.     Defendant Einstein, a Pennsylvania not-for-profit corporation, operates an academic health system headquartered in North Philadelphia. Einstein operates three GAC hospitals—one in Philadelphia and two in Montgomery County—and five IRFs. Einstein also operates 15 outpatient centers. Einstein discharges over 30,000 inpatients a year and employs over 8,800 people, including over 500 physicians. Like Jefferson, Einstein has a partial ownership stake in Health Partners Plans. For fiscal year 2019, Einstein generated $1.2 billion in revenues.

35.     Einstein provides inpatient GAC hospital services at two main locations. EMCP, Einstein's largest GAC hospital with 485 licensed acute care beds, is located in North Philadelphia. EMCP is a tertiary care teaching hospital and a Level 1 Trauma Center. EMCP is the largest independent academic medical center in the greater Philadelphia region and trains more than 400 residents and fellows each year in graduate medical education programs.

---

[1] This includes 23 hospital beds for inpatient acute rehabilitation services, as discussed *supra*.

Einstein's second GAC hospital is EMCM, a 191-bed hospital in East Norriton in central Montgomery County.  Einstein also owns and operates EMCEP, a 67-bed GAC hospital in eastern Montgomery County that is located inside the larger Moss at Elkins Park IRF.

36.     Einstein's Moss provides inpatient acute rehabilitation services at five IRFs in the greater Philadelphia region.  Moss at Elkins Park is a freestanding IRF with 130 licensed beds. Moss also owns and operates an IRF unit at EMCP with 19 beds.  Moss currently operates three 12-bed IRF units at non-Einstein hospitals.  Two are at Jefferson hospitals—Jefferson Frankford Hospital and Jefferson Bucks Hospital—and one is at Doylestown Hospital.

## B.

## The Transaction and the Commission's Response

37.     After several years of discussions between Jefferson and Einstein, Defendants entered into the Integration Agreement on September 14, 2018, whereby Jefferson would become the sole member and ultimate parent entity of Einstein.  The Defendants value the Transaction at ████████.  The combined entity would operate 14 GAC hospitals, including 11 in Pennsylvania, and eight IRFs in Pennsylvania.  The Transaction would make Jefferson— already the largest health system by hospital beds in the greater Philadelphia region—even larger, with over 1,000 more hospital beds than the next largest health system in the greater Philadelphia region.

38.     Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, and a timing agreement entered into between Defendants and Commission staff, absent this Court's action, Defendants would be free to close the Transaction on or after 11:59 p.m. EST on February 28, 2020.

-13-

39.     Following a thorough investigation, the Commission, on February 27, 2020, and by a 4-0-1 vote, with Chairman Joseph Simons recused, found reason to believe that the Transaction would violate Section 7 of the Clayton Act by substantially lessening competition. That same day, the Commission initiated an administrative proceeding on the antitrust merits of the Transaction before an Administrative Law Judge, and a merits trial will begin on September 1, 2020.  The administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

40.     On February 27, 2020, the Commission also authorized its staff to pursue this federal court proceeding to obtain preliminary injunctive relief under Section 13(b) of the FTC Act.

### III.

### THE RELEVANT SERVICE MARKETS

41.     The Transaction threatens substantial harm to competition in two service markets: (i) inpatient GAC hospital services sold and provided to commercial insurers and their insured members; and (ii) inpatient acute rehabilitation services at IRFs sold and provided to commercial insurers and their insured members.  For each service market, a hypothetical monopolist could profitably impose a small but significant and non-transitory increase in price ("SSNIP"). Because commercial insurers would accept a SSNIP rather than market a network that omitted inpatient GAC hospital services, and would accept a SSNIP rather than market a network that omitted inpatient acute rehabilitation services at IRFs, each of these service markets constitutes a relevant market for analyzing the Transaction.

-14-

## A.

### Inpatient GAC Hospital Services

42.     Inpatient GAC hospital services sold and provided to commercial insurers and their insured members is a relevant service market for assessing the Transaction's effects on competition.  This service market encompasses a broad cluster of medical and surgical diagnostic and treatment services offered by both Einstein and Jefferson that require an overnight hospital stay.  Inpatient GAC hospital services include, but are not limited to, many emergency services, internal medicine services, and surgical procedures offered by both Defendants under similar competitive conditions.

43.     Although the Transaction's likely effect on competition could be analyzed separately for each individual inpatient service, it is appropriate to evaluate the Transaction's likely effects across this cluster of inpatient GAC hospital services because these services are offered to patients in the Northern Philadelphia Area and the Montgomery Area under similar competitive conditions.  Thus, grouping the hundreds of individual inpatient GAC hospital services into a cluster for analytical convenience enables the efficient evaluation of competitive effects with no loss of analytic power.

44.     Outpatient services are not included in the inpatient GAC hospital services market because commercial insurers and patients cannot substitute outpatient services in response to a price increase for inpatient GAC hospital services.  Additionally, outpatient services are offered by a different set of competitors under different competitive conditions than inpatient GAC hospital services.

45.     Finally, the inpatient GAC hospital services market does not include services related to psychiatric care, substance abuse, and rehabilitation services.  These services also are

offered by a different set of competitors under different competitive conditions than, and are not substitutes for, inpatient GAC hospital services.

## B.

### Inpatient Acute Rehabilitation Services

46.    Inpatient acute rehabilitation services at IRFs sold and provided to commercial insurers and their insured members also is a relevant service market for assessing the Transaction's effects on competition.  This service market encompasses a cluster of acute rehabilitation services provided under similar competitive conditions to patients that require an overnight stay and were previously treated at a GAC hospital (i.e., post-acute patients).  Inpatient acute rehabilitation services include, at a minimum, intensive multi-disciplinary rehabilitation therapies at least three hours a day for five days per week, three face-to-face visits with a physician per week, and 24-hour nursing care, *inter alia.*

47.    Although the Transaction's likely effect on competition could be analyzed separately for each inpatient acute rehabilitation service, it is appropriate to evaluate the Transaction's likely effects across this cluster of inpatient acute rehabilitation services because these services are offered to patients in the Philadelphia Area under similar competitive conditions.

48.    IRFs, which operate under a hospital license, provide inpatient acute rehabilitation services.  IRFs can exist either as units housed in larger hospitals providing inpatient GAC hospital services ("IRF units") or as standalone hospitals ("freestanding IRFs").  Freestanding IRFs may house departments providing other services as well.  For instance, a freestanding IRF like Moss at Elkins Park can have a department—in this case, EMCEP—that offers inpatient GAC hospital services.  To obtain certification for reimbursement as an IRF by the Centers for

-16-

Medicare and Medicaid Services, 60% of all patient discharges (Medicare or other) must have as a primary diagnosis or comorbidity one of 13 specified conditions that typically require inpatient acute rehabilitation services.

49.     Other post-acute care services like subacute rehabilitation services provided at skilled nursing facilities are not included in the market for inpatient acute rehabilitation services because commercial insurers and patients cannot substitute these services for inpatient acute rehabilitation services.  Subacute rehabilitation services are offered by a different set of competitors under different competitive conditions than inpatient acute rehabilitation services. In fact, subacute rehabilitation services are often complementary to inpatient acute rehabilitation services.

## IV.

## THE RELEVANT GEOGRAPHIC MARKETS

50.     The relevant geographic markets in which to analyze the effects of the Transaction for inpatient GAC hospital services are the Northern Philadelphia Area and the Montgomery Area.  For inpatient acute rehabilitation services, the relevant geographic market is the Philadelphia Area.

51.     As with determining the appropriate service markets to analyze the Transaction, the appropriate geographic markets in which to analyze the Transaction are the areas where a hypothetical monopolist of the hospitals located in these areas could profitably impose a SSNIP on the relevant services.  Because commercial insurers would accept a SSNIP rather than market insurance plans that exclude all hospitals providing inpatient GAC hospital services in the Northern Philadelphia Area, all hospitals providing inpatient GAC hospital services in the

Montgomery Area, or all IRFs providing inpatient acute rehabilitation services in the Philadelphia Area, these are relevant geographic markets in which to analyze the Transaction.

### A.

### Inpatient GAC Hospital Services Geographic Markets

52.     The Northern Philadelphia Area is approximately the area that includes the following GAC hospitals in Philadelphia—EMCP, Jefferson Frankford Hospital, Temple University Hospital, Temple's Jeanes Hospital, Prime Healthcare's Roxborough Memorial Hospital, and Tower Health's Chestnut Hill Hospital—and in eastern Montgomery County— EMCEP (housed inside Moss at Elkins Park) and Jefferson's Abington.  The Northern Philadelphia Area also includes the following specialty hospitals in Philadelphia that provide select inpatient GAC hospital services—St. Christopher's Hospital for Children, Temple's Fox Chase Cancer Center, and Cancer Treatment Centers of America's Philadelphia Comprehensive Care and Research Center.  The Northern Philadelphia Area is the main area of competition between Einstein's EMCP and EMCEP and the Jefferson hospitals with which they most directly compete—Abington and Jefferson Frankford.

53.     The Montgomery Area is approximately the area that includes the following GAC hospitals in Montgomery County—EMCM, Jefferson's Abington, Jefferson's Lansdale, Main Line Health's Bryn Mawr Hospital, and Prime Healthcare's Suburban Community Hospital— and just outside Montgomery County—Main Line Health's Paoli Hospital, Tower Health's Chestnut Hill Hospital, Tower Health's Phoenixville Hospital, and Prime Healthcare's Roxborough Memorial Hospital.  The Montgomery Area also includes a hospital in Montgomery County that provides specialty surgical services—Physicians Care Surgical Hospital.  The Montgomery Area is the main area of competition between Einstein's EMCM and the two

Jefferson hospitals with which EMCM most directly competes—Abington and Lansdale.  A hospital can be in more than one relevant geographic market if it competes, as Abington does, in more than one geographic area within which a hypothetical monopolist could profitably impose a SSNIP.

54.     Patients who receive inpatient GAC hospital services in the Northern Philadelphia Area strongly prefer to obtain inpatient GAC hospital services close to where they live.  It would be very difficult for a commercial insurer to market successfully a health plan provider network that excluded all hospitals located within the Northern Philadelphia Area.  Hence, because a significant number of patients within this geographic market would not view hospitals outside of the market as practical alternatives, a hypothetical monopolist of all of the GAC hospitals within the Northern Philadelphia Area could profitably impose a SSNIP.

55.     Likewise, patients who receive inpatient GAC hospital services in the Montgomery Area strongly prefer to obtain inpatient GAC hospital services close to where they live.  It would be very difficult for a commercial insurer to market successfully a health plan provider network that excluded all hospitals located within the Montgomery Area.  Hence, because a significant number of patients within this geographic market would not view hospitals outside of the market as practical alternatives, a hypothetical monopolist of all of the GAC hospitals within the Montgomery Area could profitably impose a SSNIP.

**B.**

**Inpatient Acute Rehabilitation Services Geographic Market**

56.     The Philadelphia Area is approximately the area that includes the following IRFs in Philadelphia—Einstein's Moss at EMCP, Einstein's Moss at Jefferson Frankford Hospital, Jefferson's Magee, Jefferson Acute Rehabilitation Unit at TJUH, the Penn Institute for

Rehabilitation Medicine, and Trinity Health's Nazareth Hospital Acute Rehabilitation Unit—and in eastern Montgomery County—Einstein's Moss at Elkins Park and Jefferson's Abington Acute Rehabilitation Unit. The Philadelphia Area is the main area of competition between Einstein's Moss at Elkins Park, Moss at EMCP, and Moss at Frankford Hospital, and Jefferson's Magee, Jefferson Acute Rehabilitation Unit at TJUH, and Abington Acute Rehabilitation Unit.

57.     As with inpatient GAC hospital services, patients who receive inpatient acute rehabilitation services in the Philadelphia Area strongly prefer to obtain these services close to where they live. It would be very difficult for a commercial insurer to market successfully a health plan provider network that excluded all IRFs located within the Philadelphia Area. Hence, because a significant number of patients within the Philadelphia Area would not view IRFs outside of the area as practical alternatives, a hypothetical monopolist of all of the IRFs within the Philadelphia Area could profitably impose a SSNIP.

## V.

## MARKET STRUCTURE AND THE TRANSACTION'S PRESUMPTIVE ILLEGALITY

58.     Jefferson and Einstein are two of the largest providers, by commercially insured patient admissions, of inpatient GAC hospital services in the Northern Philadelphia Area and the Montgomery Area. Likewise, Jefferson and Einstein are the two largest providers, by commercially insured patient admissions, of inpatient acute rehabilitation services in the Philadelphia Area. The Transaction will significantly increase concentration in already highly concentrated markets for inpatient GAC hospital services and inpatient acute rehabilitation services in the relevant geographies. These levels of concentration render the Transaction presumptively unlawful under the Merger Guidelines.

59.     Under the Merger Guidelines, a merger or acquisition is presumed likely to create or enhance market power—and is presumptively unlawful—when it increases the HHI by more than 200 points and results in a post-acquisition HHI above 2,500 points. Here, in each of the three relevant markets, the Transaction exceeds this concentration threshold.

60.     Based on commercial inpatient GAC admissions of patients seeking care in the Northern Philadelphia Area, Defendants would control at least 60% of this market post-Transaction. The Transaction would increase the HHI by at least 1,200 points in the Northern Philadelphia Area, resulting in a post-Transaction HHI of at least 4,500, exceeding the threshold over which the Transaction is presumed likely to create or enhance market power—and is presumptively unlawful.

61.     Based on commercial inpatient GAC admissions of patients seeking care in the Montgomery Area, Defendants would control at least 45% of this market post-Transaction. The Transaction would increase the HHI in the Montgomery Area by at least 700 points, resulting in a post-Transaction HHI of at least 3,500. These concentration measures make the Transaction presumptively unlawful.

62.     Post-Transaction, Defendants also would control at least 70% of the market for inpatient acute rehabilitation services in the Philadelphia Area. The Transaction would increase the HHI in the Philadelphia Area by at least 2,500 points, resulting in a post-Transaction HHI of at least 5,900. These market concentration measures make the Transaction presumptively unlawful.

-21-

# VI.

## ANTICOMPETITIVE EFFECTS

### A.

### Competition Between Hospitals Benefits Consumers

63.     Competition between hospitals (including IRFs) occurs in two distinct but related stages.  First, hospitals compete for inclusion in commercial insurers' health plan provider networks.  Second, in-network hospitals compete to attract patients, including commercial insurers' health plan members.

64.     In the first stage of hospital competition, hospitals compete to be included in commercial insurers' health plan provider networks.  To become an in-network provider, a hospital negotiates with a commercial insurer and, if mutually agreeable terms can be reached, enters into a contract.  The financial terms under which a hospital is reimbursed for services rendered to a health plan's members are a central component of those negotiations, regardless of whether reimbursements are based on fee-for-service contracts, risk-based contracts, or other types of contracts.

65.     In-network status benefits a hospital by giving it preferential access to the health plan's members.  Health plan members typically pay far less to access in-network hospitals than those that are out-of-network.  All else being equal, an in-network hospital will attract more patients from a particular health plan than an out-of-network one.  This dynamic motivates hospitals to offer lower rates and other more favorable terms to commercial insurers to win inclusion in their networks.

66.     From the insurers' perspective, having hospitals in-network is beneficial because it enables the insurer to create a health plan provider network in a particular geographic area that is attractive to current and prospective members, typically local employers and their employees.

67.     A critical determinant of the relative bargaining positions of a hospital and a commercial insurer during contract negotiations is whether other, nearby comparable hospitals are available to the commercial insurer and its health plan members as alternatives in the event of a negotiating impasse.  Alternative hospitals limit a hospital's bargaining leverage and constrain its ability to obtain more favorable reimbursement terms from commercial insurers.  The more attractive alternative hospitals are to a commercial insurer's health plan members in a local area, the greater the constraint on a hospital's bargaining leverage.  Where there are fewer meaningful alternatives, a hospital will have greater bargaining leverage to demand and obtain higher reimbursement rates and other more favorable reimbursement terms.

68.     A merger between hospitals that are close substitutes in the eyes of commercial insurers and their health plan members tends to increase the merged entity's bargaining leverage. Such mergers lead to higher reimbursement rates by eliminating an available alternative for commercial insurers.  This increase in leverage is greater when the merging hospitals are closer substitutes for (and competitors to) each other.  This is true even where other factors, such as an insurer's leverage, may impact the pre-merger bargaining dynamic.  Preexisting leverage for the insurer does not eliminate the concern about an increase in the post-merger bargaining leverage of the merged entity.

69.     Changes in the reimbursement terms negotiated between a hospital and a commercial insurer, including increases in reimbursement rates, significantly impact the commercial insurer's health plan members.  "Self-insured" employers rely on a commercial

-23-

insurer for access to its health plan provider network and negotiated rates, but these employers pay the cost of their employees' healthcare claims directly and bear the full and immediate burden of any rate increase in the healthcare services used by their employees. Employees may bear some portion of the increased cost through increased premiums, co-pays, and deductibles. "Fully-insured" employers pay premiums to commercial insurers—and employees pay premiums, co-pays, and deductibles—in exchange for the commercial insurer assuming financial responsibility for paying hospital costs generated by the employees' use of hospital services. When hospital rates increase, commercial insurers generally pass on a significant portion of these increases to their fully insured customers in the form of higher premiums, co-pays, and deductibles.

70.   In the second stage of hospital competition, hospitals compete to attract patients to their facilities. Because health plan members often face similar out-of-pocket costs for in-network hospitals, hospitals in the same network compete to attract patients on non-price features such as location, quality of care, access to services and technology, reputation, physicians and faculty members, amenities, convenience, and patient satisfaction. Hospitals compete on these non-price dimensions to attract all patients, regardless of whether they are covered by commercial insurance (including Medicare Advantage and Medicaid Managed Care), traditional Medicare and Medicaid, or are patients without commercial insurance. A merger of competing hospitals eliminates this non-price competition and reduces the merged entity's incentive to improve and maintain service and quality. Providers also compete on price terms in this second stage of competition in circumstances when patients pay the full cost of the procedure out of pocket, regardless of whether they are commercially insured.

**B.**

**The Transaction Would Eliminate Beneficial Head-to-Head Competition and Increase Bargaining Leverage**

71.    Jefferson and Einstein are close competitors for inpatient GAC hospital services.

███████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████    Because Einstein and Jefferson offer close substitutes for inpatient

GAC hospital services, the Transaction would eliminate significant head-to-head competition

between Defendants post-merger.

72.    Diversion analysis, a standard economic tool that uses data on where patients

receive hospital services to determine the extent to which hospitals are substitutes, confirms that

Einstein and Jefferson are close competitors for inpatient GAC hospital services.  Diversion

analysis shows that if Einstein hospitals were to become unavailable to patients for inpatient

-25-

GAC hospital services, at least 30% of EMCP's patients, 35% of EMCEP's patients, and 17% of EMCM's patients, respectively, would seek care at a Jefferson hospital.  Diversion analysis similarly shows that if Jefferson hospitals were unavailable to patients for inpatient GAC hospital services, at least 11% of Abington patients, 7% of Lansdale patients, and 7% of Jefferson Frankford patients, respectively, would seek care at an Einstein hospital.  These diversion analyses lead to predictions of significant post-Transaction price increases.

73.     Similarly, Jefferson and Einstein are close competitors for inpatient acute rehabilitation services. ███████████████████████████

████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
████████████████████████████████
███████████████████████████████████
█████████████████████

74.     Diversion analysis indicates that if Einstein's Moss at Elkins Park were to become unavailable to patients for inpatient acute rehabilitation services, at least 30% of Moss at Elkins Park's patients would seek care at a Jefferson IRF.  Likewise, if Jefferson's Magee were to become unavailable to patients for inpatient acute rehabilitation services, at least 18% of Magee's patients would seek care at an Einstein IRF.  These diversion analyses also lead to predictions of significant post-Transaction price increases.

75.     Offering hospital coverage in the Northern Philadelphia Area and the Montgomery Area and IRF coverage in the Philadelphia Area is important for a commercial insurer to market a health plan provider network successfully to employers with employees in

-26-

these areas.  Other hospitals and IRFs outside of these geographic markets are not adequate substitutes for Jefferson and Einstein.  Today, Jefferson and Einstein serve as key providers of inpatient GAC hospital services and inpatient acute rehabilitation services for healthcare consumers in these areas.

76.    The Transaction would increase Defendants' bargaining leverage in contract negotiations with commercial insurers.  This increase in bargaining leverage would cause the Defendants to negotiate higher reimbursement rates and more favorable reimbursement terms.

███████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████████████████████

████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████

77.    The growth of "narrow network" and "tiered" health insurance products—which, in contrast to "broad networks," include less than all of the hospitals in a geographic market— can be informative about alternative options within an insurer network.  Such networks offer a tradeoff to consumers by including fewer participating hospitals (or fewer participating hospitals in a preferred benefit tier), but at often significantly discounted prices relative to other available provider networks.  Hospitals are willing to accept the lower reimbursement terms required to participate in narrow and tiered networks with the expectation that they will gain increased volumes of patients and procedures.  Today, commercial insurers treat Defendants as substitutes

when constructing narrow network or tiered network products for patients in the Northern Philadelphia, Montgomery, and Philadelphia Areas.

78.     By eliminating competition between Einstein and Jefferson, the Transaction will give Defendants leverage to negotiate more favorable terms to participate in narrow and tiered networks, including securing higher reimbursement rates.

## C.

### The Transaction Would Eliminate Vital Quality and Service Competition

79.     Competition drives hospitals to invest in quality initiatives, new technologies, amenities, equipment, and service offerings to differentiate themselves from competitors. Jefferson and Einstein compete with one another across other various non-price dimensions.  The Transaction would eliminate this competition, which has provided GAC patients in the Northern Philadelphia and Montgomery Areas, and IRF patients in the Philadelphia Area, with higher quality care and more extensive healthcare service offerings.  Jefferson and Einstein closely track each other's quality and brand recognition, and Defendants have substantially invested in improving and expanding their services and facilities to compete against one another.

80.     Patients benefit from this direct competition in the quality of care and services that Defendants offer them.  The Transaction will dampen the merged firm's incentive to compete on quality of care and service offerings to the detriment of all patients who use these hospitals, including commercially insured, Medicare, Medicaid, and self-pay patients.

## VII.

### ENTRY BARRIERS

81.     Neither entry by new market participants nor expansion by current market participants would deter or counteract the Transaction's likely harm to competition for inpatient

GAC hospital services in the Northern Philadelphia or Montgomery Areas, or to inpatient acute rehabilitation services in the Philadelphia Area.

82.    New entry or expansion into the relevant markets would not be likely or timely enough to offset the Transaction's likely harmful competitive effects.  Construction of a new hospital (including an IRF) involves high costs and significant financial risk, including the time and resources it would take to conduct studies, develop plans, acquire land or repurpose a facility, garner community support, obtain regulatory approvals, and build and open the facility. Expansion of existing hospitals and repositioning by non-hospital providers to become hospitals would encounter similar barriers, including substantial expense and time associated with planning, receiving regulatory approvals, and construction.

83.    Potential entry or expansion also would be insufficient to counteract the anticompetitive effects of the Transaction.  Entrants would face significant challenges in replicating the competitiveness and reputation of either Einstein or Jefferson.  Both Einstein and Jefferson have established reputations for and substantial expertise in providing quality care, have multiple hospitals in the relevant markets, generate a billion dollars or more in annual revenue, provide healthcare services to tens of thousands of inpatients per year, and offer broad clusters of both inpatient GAC hospital services and inpatient acute rehabilitation services.

## VIII.

## EFFICIENCIES

84.    Defendants have not substantiated verifiable, merger-specific efficiencies that would be sufficient to rebut the strong presumption and evidence of the Transaction's likely significant anticompetitive effects in the relevant markets.

## IX.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

85.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative proceeding.  Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes the Commonwealth of Pennsylvania to sue for and have injunctive relief to prevent threatened loss or damage from Defendants' consummation of the Transaction.

86.     In deciding whether to grant relief pursuant to 15 U.S.C. § 53(b), this Court should balance the likelihood of the Commission's ultimate success on the merits against the equities.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public's interest in effective enforcement of the antitrust laws.

87.     The Commission voted 4-0-1 that it has reason to believe that the Transaction would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.  In particular, the Commission is likely to succeed in demonstrating in the administrative proceeding, among other things, that:

> a.     The Transaction would have anticompetitive effects in a market for inpatient GAC hospital services in the Northern Philadelphia Area;
>
> b.     The Transaction would have anticompetitive effects in a market for inpatient GAC hospital services in the Montgomery Area;
>
> c.     The Transaction would have anticompetitive effects in a market for inpatient acute rehabilitation services in the Philadelphia Area;

    d.      Substantial and effective entry or expansion into the relevant service and geographic markets is difficult, and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Transaction; and

    e.      The efficiencies that Defendants assert as resulting from the Transaction are speculative, not merger-specific, and are, in any event, insufficient as a matter of law to justify the Transaction.

88.     Preliminary relief is warranted and necessary. The Commission voted 4-0-1 to issue an administrative complaint. Should the Commission rule, after the full administrative trial, that the Transaction is unlawful, reestablishing the *status quo ante* of competition would be difficult, if not impossible, in the absence of preliminary injunctive relief from this Court. The integration of Jefferson's and Einstein's operations, including the implementation of higher prices and potential staff changes, would substantially impair any attempt to restore competition to pre-Transaction levels.

89.     In the absence of relief from this Court, substantial harm to competition could occur immediately, including an increase in the costs that employers, their employees, and other individuals in the Philadelphia region incur for their healthcare and a reduction in the quality of healthcare administered. Because any meaningful pro-competitive benefits of the Transaction do not outweigh the significant interim harm to competition and consumers, the equities weigh strongly in favor of Plaintiffs' request for preliminary injunctive relief.

90.     Accordingly, the equitable relief requested here is in the public interest.

WHEREFORE, the Commission and the Commonwealth of Pennsylvania respectfully request that the Court:

    a.      Enter the parties' stipulated temporary restraining order;

b.   Preliminarily enjoin Defendants from taking any further steps to consummate the Transaction, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

c.   Retain jurisdiction and maintain the *status quo* until the administrative proceeding, including all appeals, that the Commission has initiated concludes;

d.   Award costs of this action to Plaintiffs, including attorneys' fees to the Commonwealth of Pennsylvania; and

e.   Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated:  February 27, 2020

Of counsel:

IAN CONNER
Director
Federal Trade Commission
Bureau of Competition

DANIEL FRANCIS
Deputy Director

ALDEN ABBOTT
General Counsel

KEVIN HAHM
Assistant Director

MARK SEIDMAN
Deputy Assistant Director

CHARLES DICKINSON
JAMES WEINGARTEN
JAMIE FRANCE
GUSTAV CHIARELLO
GUIA DIXON
RYAN ANDREWS
CHRISTOPHER HARRIS
ALBERT TENG
JONATHAN WRIGHT

*Attorneys*
*Federal Trade Commission*
*Bureau of Competition*

Respectfully Submitted,

MARK SEIDMAN
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3296
Email: mseidman@ftc.gov

*Attorney for Plaintiff*
*Federal Trade Commission*

Dated: February 27, 2020

Respectfully submitted,

COMMONWEALTH OF
PENNSYLVANIA
Office of the Attorney General

JOSH SHAPIRO
ATTORNEY GENERAL

JAMES DONAHUE, III
Executive Deputy Attorney General
Public Protection Division
jdonahue@attorneygeneral.gov
PA 42624

By: _____
Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
(717) 787-4530 (phone)
(717) 705-1190 (Fax)
twertz@attorneygeneral.gov
PA 69164

Jennifer Thomson
Senior Deputy Attorney General
Antitrust Section
jthomson@attorneygeneral.gov
PA 89360

Abigail Wood
Deputy Attorney General
Antitrust Section
awood@attorneygeneral.gov
PA 325273

*Attorneys for the Commonwealth
of Pennsylvania*

-34-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th day of February, 2020, I filed the foregoing with the Clerk of the Court.

CHARLES DICKINSON
Attorney for Plaintiff Federal Trade Commission

I HEREBY CERTIFY that on the 27th day of February, 2020, I served the foregoing on the following counsel via electronic mail:

Kenneth Vorrasi, Esq.
Faegre Drinker Biddle & Reath LLP
1500 K Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 842-8800
Email: Kenneth.Vorrasi@faegredrinker.com

*Counsel for Defendant Thomas Jefferson University*

Leigh Oliver, Esq.
Robert Leibenluft, Esq.
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Email: Leigh.Oliver@hoganlovells.com
Email: Robert.Leibenluft@hoganlovells.com

*Counsel for Defendant Albert Einstein Healthcare Network*

CHARLES DICKINSON
Attorney for Plaintiff Federal Trade Commission

-35-