Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Federal Trade Commission, et al. : | |
| Plaintiff, : | |
| : | Civil Action No. 2:20-cv-01113-GJP |
| v. : | |
| Thomas Jefferson University, et al. : | |
| Defendant. : | |

## ATTESTATION OF DAN FREED

I, the undersigned, Dan Freed, being duly sworn and intending to be legally bound, say that the facts herein set forth are true and correct based upon my personal knowledge, information and belief:

1. I, Dan Freed, am an adult individual and the Vice President, Health Services at Shannondell, Inc., ("Shannondell"), which is a nonparty in the above-referenced matter.

2. The Federal Trade Commission ("Plaintiff") and Albert Einstein Healthcare Network ("Defendant") each served a subpoena to produce documents upon Shannondell on March 30, 2020, which subpoenas provided that the requested documents were to be submitted by April 20, 2020.

3. Defendant's counsel indicated that it would extend the response deadline to the subpoena request through April 30, 2020; and Plaintiff's counsel indicated that it would extend the response deadline to the subpoena request through May 15, 2020. On Monday, April 27, 2020, counsel for Defendant provided an additional extension until May 15, 2020 for Shannondell to provide all documents responsive to the subpoena requests.

4. Counsel for Shannondell submitted Objections to Plaintiff's counsel and Defendant's counsel on the basis that the subpoenas fail to allow a reasonable time to comply; the subpoenas subject Shannondell to an undue burden and expense; and the subpoenas seek disclosure of confidential, proprietary and/or trade secret information and the subpoena requests are overly broad, unduly burdensome and expensive.

5. Shannondell, Inc., is a Pennsylvania corporation that operates: (a) a continuing care retirement community with approximately one thousand (1000) independent living units ("CCRC") licensed by the Pennsylvania Department of Insurance, located at 10000 Shannondell

15216021v2 —1—

Drive, Audubon, Pennsylvania, known as "Shannondell at Valley Forge"; (b) a 184 person personal care home with a 34 person Secure Dementia Unit ("PCH") licensed by the Pennsylvania Department of Human Services, located at 6000 Shannondell Drive, Audubon, Pennsylvania, known as "The Meadows at Shannondell,"; and a 120 bed skilled nursing facility ("SNF") licensed by the Pennsylvania Department of Health, located at 5000 Shannondell Drive, Audubon, Pennsylvania known as "Rehab at Shannondell" (Collectively, the CCRC, PCH, and SNF are herein referred to as "Facilities."). In total, Shannondell serves approximately 1,400 elderly residents at its Facilities.

6. Shannondell is not a direct competitor of Defendant. Shannondell does not provide general acute care or inpatient hospital services like Defendant. Rather, Shannondell through its SNF admits patients and provides post-acute care and rehabilitation services, skilled nursing care services, therapy and social services. The services provided by Shannondell's SNF are not in the same competitive market as those services provided by Defendants hospitals and their direct competitors in the Greater Philadelphia and Montgomery County area. Rather the services provided by Shannondell's SNF are complementary in nature to the services provided by Defendant. In fact, Shannondell regularly receives patients and accepts referrals of patients from Defendant's hospitals as well as other healthcare providers who provide acute care or hospital services.

7. Since the outbreak of the COVID-19 crisis, Shannondell's staff has been working tirelessly to address the care needs of its residents and to test, prevent, and control the spread of COVID-19. The staff at Shannondell has been working around the clock to ensure the safety and protection of their residents.

8. Residents in retirement communities, independent living facilities, personal care homes and in skilled nursing facilities are the most vulnerable and considered to be the highest risk of being affected by COVID-19 and of resultant severe COVID-19 outcomes due to the congregate nature and age of such elderly populations and also because those individuals may have underlying health conditions and/or may be more susceptible to disease and infection due to compromised immune systems.

9. Further, given the high risk of spread once COVID-19 enters a CCRC, PCH, or SNF, the Centers for Disease Control and Prevention ('CDC") and the Pennsylvania Department of Health ('DOH") have issued and continued to issue evolving and dynamic standards of clinical care and guidance to facilities like Shannondell regarding infection prevention and control for patients with suspected or confirmed cases of COVID-19.

10. In responding to this unprecedented global outbreak, Shannondell is closely following recommendations from the CDC which is frequently and rapidly changing as the virus spreads in the United States. In compliance with this ever-changing and evolving guidance, Shannondell has been working incessantly and responding immediately and exclusively to the meet the care needs and ensure the safety of its residents and to protect its residents, their families, and its staff from serious illness, complications and death associated with COVID-19.

11. In addition to closely monitoring CDC guidelines, Shannondell is also

communicating frequently with its medical directors and DOH in order to update its protocols and safeguards as necessary for the safety of those who live and work at Shannondell's Facilities.

12. The efforts, undertaken by Shannondell, in addition to the personal and health care services it already must provide to its elderly residents, now includes, but is not limited to the following measures:
   a. implementing COVID-19 preparedness recommendations, even before cases are identified in their Facilities;
   b. preventing unrecognized COVID-19 from entering its Facilities;
   c. implementing source control including isolation measures;
   d. addressing asymptomatic and pre-symptomatic transmissions,
   e. testing of all patients, residents and employees including those who are asymptomatic;
   f. identifying infections early and taking action to prevent spreading;
   g. assessing current supply of personal protective equipment and initiating measures to distribute and optimize supply; and
   h. recognizing and managing severe illness of its current residents to prevent the spread of COVID-19 to those individuals most highly susceptible to contracting the disease.

13. Due to staffing shortages, either because of illness or staff members having to care for children at home due to school closures, Shannondell has had to utilize some of its administrative staff to serve as nurse aides. Specifically, the primary staff member who oversees the medical records department is currently working as a nurse aide to help meet the care needs of the residents and there is no staff member at present who would be available to compile the documents requested in the subpoenas, which documents requested are overly broad and require the compilation of documents dating as far back as January 1, 2015 to present.

14. Shannondell's first priority is the safety of its residents and employees. Due to the increasing demands placed upon its Facilities in light of the impact of the COVID-19 crisis, and the manpower required to appropriately address the safety and care needs of the populations served by Shannondell, the May 15th deadline does not allow a reasonable time to comply with the subpoenas and Shannondell does not foresee having the staff available to respond to the subpoenas for at least another ninety (90) days, if not more depending on the continued impact of the COVID-19 crisis.

15. The documents requested would require Shannondell to compile information for the time period of January 1, 2016 to present (a time period of (four) 4 years); and in other instances, the subpoenas request information dating back to January 1, 2015 (a time period of five (5) years). Responding to the subpoenas would be extremely burdensome, time consuming, labor intensive and expensive for Shannondell, which as noted earlier, is a nonparty to the above-referenced matter.

16. Responding to the subpoena requests during the COVID-19 crisis subjects Shannondell to an undue burden as it would require staff to spend a significant amount of time compiling documents as opposed to meeting the care needs of its residents to prevent the spread of COVID-19.

17. Shannondell's primary focus at present is to ensure the health and safety of its residents during the COVID-19 crisis, and requiring Shannondell to respond to the subpoenas during this pandemic, where there is already a staffing shortage, poses a threat to the health and safety of its residents as staff would be required to spend hours gathering documents which diverts from the time needed to meet the care needs of the residents.

18. The subpoenas impose an undue burden and expense on Shannondell and would negatively impact its ability to meet the care needs of its residents.

19. In my capacity as Vice President, Health Services at Shannondell, I am also familiar with the documents requested in the subpoena. More specifically, as is requested in Requests Nos. 4,5, 6, 7, 8, 10, 12, 15, 16, 18, and 19, the subpoena ask for production of various types of documents, data, plans, presentations, reports, research, development, analysis, strategies and other commercial information and trade secrets (collectively these documents are referred to as "Information" herein).

20. The Information requested in the subpoenas is highly confidential, privileged, and proprietary in nature and includes trade secrets that if disclosed to third parties would cause severe and permanent damage to Shannondell's business.

21. The subpoenas also ask for the underlying documents for the Information, including any notes, drafts and materials used to prepare the Information. It would be time-consuming and unduly burdensome for Shannondell to try to collect and produce all "Documents" as defined in the subpoenas that might be construed to fit this overly broad request. More importantly, however, the production of the underlying notes and materials would likely lead to the disclosure of privileged communications, and sources of information obtained by Shannondell in its research and strategy efforts.

22. The Information requested contains highly confidential information including Shannondell's distinctive business structure, operational model, and organizational plans and strategies designed to maintain its competitive position in the marketplace as well as expand or enhance the services Shannondell already provides.

23. The Information requested also seeks highly confidential information including financial terms and data regarding the use and operation of Shannondell's Facilities, and financial and pricing information and rates that drive each Facility's competitive business model.

24. The Information requested, as a whole, is treated as highly confidential, is not publicly accessible, is not readily available from other sources, and has not been disclosed to third parties.

25. In order to protect the trade secrets contained within the Information as well as the confidential and proprietary nature of the Information, the Information is not made available to the public. The Information is also not subject to access by almost all of the individual employees of Shannondell. Only management, executive officers, and members

(individuals) with an ownership interest in Shannondell are in possession and have access to the Information. The Information has only been shared with our legal counsel or regulatory and governmental agencies to the extent that Information may be required for compliance and/or licensing purposes.

26. Shannondell has also employed additional protective measures to ensure the secrecy and confidentiality of its Information and protect it from disclosure. Shannondell's employees are required to abide by applicable non-disclosure agreements, contractual confidentiality requirements and company privacy requirements and expectations to maintain the confidentiality of its Information.

27. The Information sought includes confidential and proprietary information including exclusive, fact-specific terms, provisions, and rates, negotiated by Shannondell, in conjunction with its legal counsel, to participate in health care plans with commercial payors and which are part of binding contractual arrangements with those payors as well as other entities, agencies or organization(s) who were party to the specific agreements.

28. The particular data, methods, pricing models, rates, and strategies contained in the Information are the collective result of creative and collaborative process between Shannondell, its ownership and executive personnel, and its legal counsel. The Information is uniquely designed to provide the business model or "blueprint" for the orderly operation of each facility owned and operated by Shannondell.

29. Collectively, the Information is an organizational blueprint that has been designed to attempt to ensure that each facility owned and operated by Shannondell obtains and maintains appropriate licenses to operate its Facilities in the Commonwealth of Pennsylvania.

30. The Information is also part of a larger competitive game plan. Terms are negotiated in the agreements that not only fulfill regulatory requirements, but also allow Shannondell to gain a strategic and competitive advantage in the specific geographical area where each Shannondell operates.

31. Shannondell has invested significant time, funds, and resources, in obtaining consulting reports, analysis, in developing and negotiating the terms, conditions, and provisions contained in the Information documents. As such, each type of Information sought in the subpoenas have independent economic value which comprise an overall business formula designed to attempt to ensure the success and viability of each Shannondell facility.

32. The healthcare industry is a highly competitive environment where each provider is attempting to gain a competitive edge over other facilities.

33. Release of the Information would cause the publication of Information that has yet to made public.

34. Disclosure of the Information will likely cause Shannondell to suffer substantial competitive harm because the Shannondell's competitors would have access to our uniquely negotiated terms, rates, business strategies and operational plans.

35. The data and documentation requested which comprise the Information, if disclosed, would also reveal confidential information and trade secrets about Shannondell and each of its Facilities, including their business methods, systems, and processes, including how each facility has devised a formula or business plan to allocate resources, finances and labor to develop and manage its operations.

36. Our competitors would then be able to use the data and documents contained in the Information adversely against Shannondell and its Facilities to their disadvantage and undercut any competitive edge Shannondell and its Facilities have been able to attain in their respective relevant markets.

37. Moreover, if our competitors obtain these "trade secrets" and confidential, proprietary information, our competitors will use the Information and copy each Facility's distinct business model to improve their competitive position. They can also adjust their operational plans and business strategies to take business and business opportunities away from our Facilities.

38. I am competent to testify to the facts set forth in this Attestation.

39. I verify that the statements made in this Attestation are true and correct based upon my personal knowledge, information, and belief, and understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to Unsworn Falsification to Authorities.

Dated: 4/29/20

_____
DAN FREED