# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION and COMMONWEALTH OF PENNSYLVANIA**<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**THOMAS JEFFERSON UNIVERSITY and ALBERT EINSTEIN HEALTHCARE NETWORK**<br><br>        **Defendants.** | **No. 2:20-cv-01113-GJP** |

## NON-PARTY PROSPECT MEDICAL HOLDINGS, INC.'S MOTION FOR A PROTECIVE ORDER AND SANCTIONS AGAINST DEFENDANT ALBERT EINSTEIN HEALTHCARE NETWORK

Non-Party Prospect Medical Holdings, Inc. ("Non-Party Prospect") by and through its undersigned counsel, hereby moves for a protective order preventing defendant Albert Einstein Healthcare Network ("Einstein") from continuing to seek discovery responsive to requests it made in an email received on July 23, 2020, after the discovery period closed in this matter, because the requests seek irrelevant information and are solely designed to be punitive, impose undue burden, harass, annoy and/or embarrass a non-party in violation of Federal Rule of Civil Procedure 26(c). Non-Party Prospect also moves for sanctions against Einstein in the form of its expenses and attorneys' fees incurred in bringing this motion pursuant to Federal Rule of Civil Procedure 37(a)(5).

Dated August 18, 2020

By: /s/ *Carl W. Hittinger*
BAKER & HOSTETLER LLP
Carl W. Hittinger (PA 30250)
Alyse F. Stach
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 564-2898
chittinger@bakerlaw.com
astach@bakerlaw.com

*Counsel for Non-Party Prospect Medical Holdings*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION and COMMONWEALTH OF PENNSYLVANIA** | |
| **Plaintiffs,** | |
| **v.** | **No. 2:20-cv-01113-GJP** |
| **THOMAS JEFFERSON UNIVERSITY and ALBERT EINSTEIN HEALTHCARE NETWORK** | |
| **Defendants.** | |

**NON-PARTY PROSPECT MEDICAL HOLDINGS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PROTECIVE ORDER AND SANCTIONS AGAINST DEFENDANT ALBERT EINSTEIN HEALTHCARE NETWORK**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND................................................. 3

    A.   The Non-Parties, this Matter and the FTC Investigation ................................ 3

    B.   Einstein's Discovery Requests and Representations about the Subpoena to Non-Party Prospect.......................................................................................................... 4

    C.   Einstein and Non-Party Prospect's Joint Letter to the Court and Discovery Teleconference ................................................................................................ 7

    D.   Non-Party Prospect Withdraws Its Interest and Einstein Represents that Non-Party Prospect's Financial Ability to Acquire It is No Longer Relevant ................... 8

    E.   The Non-Parties' Production ........................................................................... 9

    F.   The Reardon Deposition ............................................................................... 10

    G.   The Late Discovery Requests ....................................................................... 14

    H.   The Instant Motion........................................................................................ 16

LEGAL STANDARD........................................................................................... 16

ARGUMENT ....................................................................................................... 18

I.    NON-PARTY PROSPECT SHOULD BE GRANTED A PROTECTIVE ORDER PROHIBITING THE LATE DISCOVERY REQUESTS ............................... 18

    A.   Einstein Seeks the Late Document Requests Solely So that It Can Disparage Non-Party Prospect's Financial Ability to Acquire It .................................... 18

    B.   Non-Party Prospect Withdrew its Interest in Acquiring Einstein and So it Cannot be a Reasonable Alternative Buyer under the Failing Firm Defense .................... 19

    C.   Einstein Cannot Assert the Failing Firm Defense Because It has Not Made a Good Faith Effort to Solicit an Offer from Non-Party Prospect ....................................... 20

    D.   Mr. Reardon Did Not "Open the Door" to Non-Party Prospect's Financial Information in his Deposition ........................................................................................... 23

II.   NON-PARTY PROSPECT IS ENTITLED TO ITS EXPENSES AND LEGAL FEES . 25

CONCLUSION.................................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Avago Techs. U.S., Inc. v. IPtronics, Inc.*,
    309 F.R.D. 294 (E.D. Pa. 2015)..........................................................................17

*Bayer AG v. Betachem, Inc.*,
    173 F.3d 188 (3d Cir. 1999)..............................................................................17

*Cipollone v. Liggett Grp., Inc.*,
    785 F.2d 1108 (3d Cir. 1986)............................................................................16

*In re Domestic Drywall*,
    300 F.R.D. 234 (E.D. Pa. 2014).........................................................................17

*First Sealord Sur. v. Durkin & Devries Ins. Agency*,
    918 F. Supp. 2d 362 (E.D. Pa. 2013) ................................................................17

*Frank Brunckhorst Co. v. Ihm*,
    2012 U.S. Dist. LEXIS 151816 (E.D. Pa. Oct. 23, 2012).................................19

*Frank v. Honeywell Int'l, Inc.*,
    No. 15-mc-00172, 2015 U.S. Dist. LEXIS 106453 (E.D. Pa. Aug. 13, 2015) ...............17

*FTC v. Harbour Group Invest., L.P.*,
    1990 U.S. Dist. LEXIS 15542 (D.D.C. Nov. 19, 1990) ..............................20, 21

*Gallas v. Supreme Court of Pa.*,
    211 F.3d 760 (3d Cir. 2000)..............................................................................17

*Garden City Emples. Ret. Sys. v. Psychiatric Solutions, Inc.*,
    2014 U.S. Dist. LEXIS 8857 (E.D. Pa. Jan. 24, 2014) .............................16, 17

*Taggart v. Wells Fargo Home Mortg., Inc.*,
    No. 10-cv-00843, 2012 U.S. Dist. LEXIS 139469 (E.D. Pa. Sept. 27, 2012) .................17

*U.S. v. M.P.M., Inc.*,
    397 F. Supp. 78 (D. Colorado 1975).................................................................21

*United States v. EnergySolutions et al.*,
    Civ. No. 16-1056-SLR, slip op. (D. Del. June 21, 2017) ..................................20

**Rules**

F.R.C.P. 26(b)(1) ...........................................................................................................16

F.R.C.P. 26(c)(1)..........................................................................................................17

F.R.C.P. 26(c)(3)..........................................................................................................25

F.R.C.P. 37(a)(5)..........................................................................................................25

**Other Sources**

DOJ/FTC Horizontal Merger Guidelines.......................................................................18

FTC.GOV.................................................................................................................20, 21

Non-Party Prospect Medical Holdings, Inc. ("Non-Party Prospect") respectfully submits this motion for a protective order prohibiting defendant Einstein Healthcare Network ("Einstein") from continuing to seek discovery responsive to its requests for Non-Party Prospect's nationwide financial and strategic information received on July 23 and again requested on July 28, 2020 (the "Late Document Requests") (attached as Exhibit ("Ex.") A to the Declaration of Carl W. Hittinger ("Hittinger Decl.")) pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 26(c) and for sanctions against Einstein in the form of Non-Party Prospect's expenses and fees necessitated in bringing this motion under F.R.C.P. 37(a)(5) (the "Motion").

## PRELIMINARY STATEMENT

On July 23, 2020, six days after the deposition of Non-Party Prospect's 30(b)(6) witness Thomas Reardon and three days after the discovery deadline in this litigation had passed, Non-Party Prospect received the Late Document Requests from Einstein. After Non-Party Prospect refused to comply with the Late Document requests because it had already produced everything it uniquely had in its possession for two of the requests and the nationwide financial and strategic documents sought were irrelevant to this case. Einstein responded by dropping its late if the law requests but insisting that Non-Party Prospect produce the confidential and proprietary financial and strategic information because Mr. Reardon had "opened the door" to those documents at his deposition. The facts here show that Mr. Reardon could not have possibly opened the door to Non-Party Prospect's financial and strategic information, but even if he did, that information is wholly irrelevant to this case.

Each of the Late Document Requests relate back to original document requests in Einstein's May 28, document subpoena to Non-Party Prospect and the fact that those documents are not relevant to this litigation has been discussed, written and testified about *ad nauseam* since that time. Einstein has consistently only provided one basis for why it subpoenaed Non-Party

Prospect in the first place: it wants to show that Non-Party Prospect could not be a reasonable alternative buyer of its assets to its current merger partner under the failing firm defense. In support of its discovery, Einstein pointed to a statement in Mr. Reardon's January 7, 2020 declaration provided to Federal Trade Commission ("FTC"), during its investigation of the merger, that Non-Party Prospect would be interested in re-engaging in discussions with Einstein should the merger-at-issue fall through.

However, Non-Party Prospect has expressly withdrawn its present interest in acquiring the assets of Einstein and thereby amended that statement in Mr. Reardon's declaration, and thus, it is not a potential alternative buyer. Also, Mr. Reardon testified unequivocally that Non-Party Prospect had no present interest in acquiring Einstein. Despite these statements, and Einstein's previous representations that if Non-Party Prospect had no interest in acquiring Einstein that its financial ability to do so would be moot, counsel for Einstein asked Mr. Reardon multiple questions about Non-Party Prospect's finances and strategies with respect to its facilities outside the Greater Philadelphia area. But questions cannot open the door to otherwise irrelevant subject matter and Mr. Reardon said nothing that entitles Einstein to seek burdensome and intrusive discovery into Non-Party Prospect's nationwide finances and strategies.

Moreover, the failing firm defense requires a company to prove, among other things, that it has undertaken a *good faith effort* to find a reasonable alternative buyer for its assets. Einstein has not undertaken any serious effort at all to solicit Non-Party Prospect's offer to purchase the assets for Einstein because its clear purpose in seeking information from Non-Party Prospect is so that it can *knock it down* as a potential buyer, not obtain an offer, it has not attempted to seek or provide the information it would need in order to begin a negotiation process with Non-Party

Prospect and, most importantly, *Einstein's counsel told counsel for Non-Party Prospect that Einstein was not interested in exploring an acquisition with Einstein*.

Thus, there can be no doubt that Einstein's requests for Non-Party Prospect's financial and strategic information is not part of a good faith effort to determine whether Non-Party Prospect is a reasonable alternative buyer. Rather, Einstein seeks to use Non-Party Prospect for a litigation tactic aimed at denigrating Non-Party Prospect's financial ability. The discovery rules are designed to protect non-parties from such baseless and punitive discovery requests. Accordingly, this Court should prohibit Einstein from continuing to seek discovery responsive to the Late Document Requests from Non-Party Prospect and award Non-Party Prospect its expenses and fees necessitated in connection with this Motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Non-Parties, this Matter and the FTC Investigation

In February of this year, plaintiffs the FTC and Commonwealth of Pennsylvania, through its Office of Attorney General ("PA AG") (together, "Plaintiffs") sued to enjoin the proposed merger between defendants Jefferson Health System ("Jefferson") and Einstein. In alleging that the proposed merger is anticompetitive, Plaintiffs defined the relevant geographic market as inpatient general acute care hospital services in Northern Philadelphia and Montgomery Counties and inpatient acute rehabilitation services in the Philadelphia area. (*See* Dkt. 7 at 17.)

Non-Party Prospect and its subsidiary Crozer-Keystone Health System ("Non-Party Crozer") (together, the "Non-Parties") were first drawn into this matter when the FTC served them with discovery requests in connection with its investigation of the proposed merger (the "FTC Investigation"). Non-Party Prospect is a national medical holdings company based in California that provides coordinated regional healthcare services across the country – not just in the Greater Philadelphia area at issue in this litigation – including in Southern California,

Connecticut, New Jersey and Rhode Island. Non-Party Crozer, operates two licensed GAC hospitals and one inpatient rehab facility, all in Delaware County. None of Non-Party Prospect's facilities compete in the geographic area defined by Plaintiffs as the relevant geographic market.

As part of the FTC's investigation, the Non-Parties produced documents with the signifier "CROZER" and produced declarations in lieu of deposition testimony. Thomas Reardon, President of Prospect East Holdings Inc., a subsidiary of Non-Party Prospect that owns Non-Party Crozer, provided a declaration to the FTC for Non-Party Prospect (the "Reardon Declaration") and Sharif Omar, then CEO of Non-Party Crozer, provided a declaration for Non-Party Crozer.

Mr. Reardon stated in his January 2020 Declaration that his responsibilities include "overseeing the business development for Prospect East, including exploring and evaluating strategic transactions and collaborations." (Declaration of Carl W. Hittinger ("Hittinger Decl.") Exhibit ("Ex.") B (Reardon Declaration) ¶ 1.) The Reardon Declaration also said:

> Prospect discussed a strategic partnership with Einstein in 2017. Einstein told Prospect that it was interested in exploring a strategic partnership with Prospect if a transaction currently under discussion (it turned out that the discussion was with Jefferson) fell through. However, due to the announcement of the Jefferson-Einstein merger in 2018, discussions between Einstein and Prospect ceased. Prospect is interested in re-engaging in discussions with Einstein regarding a strategic partnership involving some or all of Einstein's assets if the proposed Jefferson-Einstein merger does not go forward.

(*Id.* ¶ 4.)

## B. Einstein's Discovery Requests and Representations about the Subpoena to Non-Party Prospect

On April 10, 2020 Einstein served a subpoena for the production of documents to Non-Party Crozer. Counsels for Non-Party Crozer and Einstein negotiated Non-Party Crozer's responses to that subpoena for several weeks. Then, on May 28, Einstein served a subpoena on

Non-Party Prospect, which contained many requests that were identical to the requests to its subsidiary, with one key difference: the subpoena to Non-Party Prospect requested a significant amount of information about Non-Party Prospect's historical and current financial capabilities and operations of health systems around the country, not just in the Greater Philadelphia area.

The Late Document Requests refer to certain requests in the subpoena to Non-Party Prospect, specifically Request Nos., 4 and 8, which read:

**REQUEST NO. 4:**

One copy of each of Your annual and quarterly consolidating and consolidated financial statements (income statements and balance sheets) from Fiscal Year 2015 to present.

**REQUEST NO. 8:**

Documents sufficient to show all expansion or reduction in services at Your facilities from 2016 to present.

(Ex. C (Responses and Objections to Document Subpoena).)

During a meet and confer call on June 5, 2020 where counsel for the FTC and PA AG were also present, counsel for Non-Party Prospect told counsel for Einstein that it was objecting to the subpoena as overbroad in seeking information from Non-Party Crozer's parent company and because it sought highly confidential and proprietary information about a non-party without a justifiable reason.  Counsel for Einstein, Virginia Gibson, said that it would be serving 30(b)(6) subpoenas to Non-Parties Crozer and Prospect, which it then did that day, but represented that the subpoenas to Non-Party Prospect would be "moot" if Non-Party Prospect was no longer interested re-engaging in discussions about acquiring Einstein as stated Paragraph 4 of the Reardon Declaration.  (Hittinger Decl. ¶ 7.)  Einstein's counsel then asked counsel for Non-Party Prospect to inquire about whether such an interest remained.  (*Id.*)  After inquiring of its clients, Non-Party Prospect's counsel told counsel for Einstein on the evening of June 10 that Non-Party Prospect was still interested in acquiring all or part of Einstein and asked Einstein's counsel

whether her client shared an interest in re-engaging in such discussions and providing further information about Einstein. (*Id.* at ¶ 8) Hearing no response, on June 19, counsel for Non-Party Prospect asked counsel for Einstein whether her client had any answer to Non-Party Prospect's expressed interest. Counsel for Einstein on that call apologized for the delay and said that Einstein had no present interest. (*Id.* ¶ 9.)

With the document subpoena back on the table, Non-Party Prospect provided written responses to the document subpoena to it on June 22. (Ex. C (Responses and Objections to Document Subpoena).) Relevant here, Non-Party Prospect objected to producing documents in response to Request Nos. 4 and 8 in their entirety. (*Id.* at 7-9.) Specifically, Non-Party Prospect objected to each of those requests on the ground that the information sought was "not relevant to the claims or defenses in this matter" and "overbroad in seeking information from Non-Party Prospect" which operates around the country, not just in the Greater Philadelphia area. (*Id.*) Also, Non-Party Prospect responded that "because it is a privately held company and does not make its financial information available to the public" it would not produce documents in response to those requests. (*Id.*)

Non-Party Prospect provided written responses to the 30(b)(6) subpoena on June 26. (Ex. D (Responses and Objections to 30(b)(6) Topics).) In response to Topic No. 4, concerning Non-Party Prospect's "financial condition, including the impact of the COVID-19 pandemic on [its] current and future financial condition and [its] interest and/or ability to partner with and/or acquire Einstein[,]" Non-Prospect responded that "it will produce a witness to testify about Non-Party Prospect's financial condition *generally* and whether or not the COVID-19 pandemic has impacted its interest and/or ability to partner with and/or acquire Einstein." (*Id.* at 7-8 (emphasis

added).)  Notably, Einstein did not propose in its subpoena a 30(b)(6) topic concerning Non-Party Prospect's nationwide strategic plans for expanding or reducing its facilities.

### C. Einstein and Non-Party Prospect's Joint Letter to the Court and Discovery Teleconference

The parties continued to meet and confer on the document subpoenas to Non-Parties Crozer and Prospect until an impasse was reached and the parties sent a joint letter to the Court on June 30 outlining the dispute.  (Ex. D (June 30 Joint Letter).)  With respect to Non-Party Prospect, Einstein requested that the Court order it to produce documents in response to a number of requests, including the requests at issue here, Nos. 4 and 8.

In its portion of the Joint Letter, Einstein did not explain why it needed documents from Non-Party Prospect as it was required to do under this Court's rules and the only connection Einstein made between Non-Party Prospect and the current litigation was Mr. Reardon's statement in his declaration that Non-Party Prospect "is interested in re-engaging in discussions with Einstein regarding a strategic partnership involving some or all of Einstein's assets if the proposed Jefferson-Einstein merger does not go forward."  (*Id.* at 12.)  Einstein did not provide any other reason for why it served Non-Party Prospect with a subpoena.  In the June 30 Joint Letter, Einstein said it was seeking information about Non-Party Prospect's "interest in acquiring Einstein and characterized Request Nos. 4 and 8 as "its ability to do so."  (*Id.*)

Non-Party Prospect responded to Request Nos. 4 and 8 stating that:

> These requests are stunningly overbroad and seek highly confidential financial information of a non-party which only has a small portion of its business in the relevant geographic area and therefore has no bearing on this case.  Moreover, Non-Party Prospect is a privately held company and does not make its financial information available to the public.  Accordingly, these requests to Non-Party Prospect are unlikely to lead to information relevant to this matter and are simply designed to harass a non-party, and are frankly sought in bad faith.

(*Id.* at 13.)

On July 7, the Court held a non-transcribed lengthy discovery teleconference in order to resolve the discovery disputes between the Non-Parties and Einstein. (Hittinger Decl. ¶ 12.) The Court ordered Non-Party Crozer to produce a number of documents while Non-Party Prospect was ordered to produce just a single document: its 2019 consolidated financial statement. (*Id.*) That order limited Einstein's Request No. 4, which had sought all consolidated financial statements since 2015. The Court did not order Non-Party Prospect to produce any documents in response to Einstein's Request No. 8 or any other Request, but said that Einstein could come back to the Court if the deposition of Mr. Reardon indicated a need for additional discovery. (*Id.*)

The reason Einstein and the FTC gave on the July 7 teleconference for why Non-Party Prospect should be ordered to produce its financial information was so that the parties could determine whether Non-Party Prospect was a reasonable alternative buyer for Einstein under the failing firm defense. (*Id.* at ¶ 13.) That is, if Non-Party Prospect was not actually financially capable of acquiring Einstein, it could not be considered a realistic alternative buyer despite its current expressed interest. (*Id.*)

**D. Non-Party Prospect Withdraws Its Interest and Einstein Represents that Non-Party Prospect's Financial Ability to Acquire It is No Longer Relevant**

On July 13, counsel for Non-Party Prospect sent counsel for Einstein a letter informing them that Non-Party Prospect was amending the Reardon Declaration to state that Non-Party Prospect had no present interest in acquiring Einstein. (Ex. F (July 13 Letter).) That e-mailed letter read in full:

> This is to inform you that Non-Party Prospect Medical Holdings, Inc. is amending the January 7, 2020 declaration of Tom Reardon to state that it has no present interest in acquiring the assets of Einstein. Therefore, it will not be producing its current consolidated financial statement, as was discussed with the Court in our July 7 call, because there is no need to do so.

(*Id.*)

On July 14, counsel for Non-Party Prospect spoke to Ms. Gibson, counsel for Einstein, on the phone about the upcoming deposition of Mr. Reardon. (Hittinger Decl. ¶ 15.) When asked how long the Reardon deposition would last, Ms. Gibson said that she believed it would end by noon because she no longer needed to ask questions about Prospect's financials because "they were off the table" in light of the July 13 Letter withdrawing Non-Party Prospect's interest in Einstein. (*Id.*)

On July 15, counsel for Einstein sent an email asking when they would receive the amended Reardon Declaration. (Ex. G (July 15 Emails).) Counsel for Non-Party Prospect responded that they were not formally amending the declaration but rather, the July 13 "letter was our way of notifying you on behalf of our clients how Mr. Reardon's declaration was changing on that issue. He will testify about that change at his deposition." (*Id.*)

### E. The Non-Parties' Production

On July 14, the Non-Parties made a production of documents designated Highly Confidential that were responsive to Einstein's subpoenas as limited by this Court's order. (Hittinger Decl. ¶ 17.) The production added to the Non-Parties' already substantial production to the FTC and included: highly confidential and proprietary strategic documents concerning Non-Party Crozer's efforts to expand its services through a neuroscience center that is in the strategic planning phase, documents sufficient to show the market where Non-Party Crozer draws its patients and the places where it obtains referrals for its patients, and all of the documents in its possession concerning Non-Party Prospects former interest in acquiring Einstein. (*Id.*)

Non-Party Prospect did not produce its 2019 consolidated financial statement under Request No. 4 because it had expressly withdrawn its interest in acquiring Einstein and so its financial ability to acquire Einstein was no longer at issue. In making that determination, Non-

Party Prospect relied upon statements made by Einstein during the June 5 meet and confer, in the June 30 Joint Letter, and during the July 7 discovery teleconference. (*Id.* ¶ 18.)  In addition, the July 13 letter withdrawing interest expressly stated that "it will not be producing its current consolidated financial statement, as was discussed with the Court in our July 7 call, because there is no need to do so."  (Ex. F (July 13 Letter).)  Einstein never raised any objection to that statement.  Non-Party Prospect also did not produce documents in response to Request No. 8. concerning expansions or reductions at all Non-Party Prospect's facilities, for the same reason and because it had objected to that request and it was not addressed in the Court's July 7 order.

## F.  The Reardon Deposition

On July 17, Mr. Reardon was virtually deposed for nearly six-and-a-half hours (the "Reardon Deposition").  Both attorneys for Einstein and the FTC asked questions of Mr. Reardon.

In blatant disregard for its previous representations and promises, counsel for Einstein asked multiple questions about Non-Party Prospect's nationwide finances and strategies. This happened even though counsel for Einstein directly asked Mr. Reardon if he was designated to testify about "the financial condition of Prospect Medical Holdings" and counsel for Non-Party Prospect said that  Mr. Reardon was not produced to testify about Non-Party Prospect financials and strategies nationwide but rather, could testify about those matters as it related to its facilities in the Greater Philadelphia area.  (Ex. H (Reardon Transcript ("Tr.")) at 44-47.).  Nevertheless, counsel for Einstein continued to press this line of questioning, asking multiple questions which Mr. Reardon was instructed not to answer, including about the financial status and impact of the COVID-19 pandemic on facilities nationwide (*id.* at 176-77), the dividends paid by Non-Party Prospect's private equity owner (*id.* at 182), and the strategies and financial status of facilities in

Northern New Jersey (*id.* at 59-62, 76-80), Connecticut (*id.* at 62, 73-75, 79, 88, 276-79); and

Rhode Island (*id.* at 62, 75, 79, 85-87, 276-79) and Texas (*id.* at 276-79).

During the deposition, the only reason counsel for Einstein gave for why it was entitled to

ask questions about Non-Party Prospect's business nationwide was that "this is a highly relevant

topic about whether Prospect is an appropriate partner for Albert Einstein Health Network" (*id.*

at 59-60), and "[i]t has relevance to the financial capabilities of Prospect in relation to the

various statements that Prospect has made about an interest in acquiring my client." (*id.* at 184).

However, Mr. Reardon testified, consistent with the July 13 Letter sent to Einstein's

counsel, that Non-Party Prospect had completely withdrawn its present interest in discussing the

acquisition of some or all of Einstein's assets.  Mr. Reardon was crystal clear about Non-Party

Prospect's withdrawn interest:

> Q:    Highlight the next sentence, please. This declaration states, "Prospect is interested in re-engaging in discussions with Einstein regarding a strategic partnership involving some or all of Einstein's assets if the proposed Jefferson-Einstein merger does not go forward." Is that statement accurate, sir?
> A:     It was accurate at the time. We've withdrawn our interest at present.
> Q:    And how have you withdrawn that interest?
> A:    What do you mean, how?
> Q:    Did you tell Mr. Freedman you've withdrawn your interest?
> A:    I communicated -- we communicated it to our lawyer, who in turn communicated it to you folks.
> Q:    So this statement is no longer true as of at the present time?
> A:    At the present time, no, we have no current interest.

(*Id.* at 104-05.)  And:

> Q:    So are you withdrawing the statement that is now highlighted in yellow that Prospect is is interested in re-engaging in discussions with 9 Einstein regarding a strategic partnership?
> A:    We have no current interest, yes.

(*Id*. at 108.)

When asked what had changed, Mr. Reardon explained that it had become clear that Einstein was not planning to engage in good faith negotiations so that Non-Party Prospect could make a formal offer for the purchase of some or all of Einstein's assets. Rather Einstein's counsel was *using* Non-Party Prospect to make a legal argument – specifically, that Non-Party Prospect was financially unfit to acquire some of all of Einstein's assets and so it was not a reasonable alternative buyer to Jefferson. Mr. Reardon characterized this sharp tactic by Einstein's counsel as a "smear campaign" (*id.* at 225-26) and said he realized that Einstein was improperly using Non-Party Prospect as "a bowling pin to be knocked down" (*id.* at 105, 225). Mr. Reardon explained that if Non-Party Prospect were to make a formal offer, its financial ability to acquire Einstein would not be reflected in its consolidated financial statements, in any event, because it would engage with a financing partner. However, Mr. Reardon said that Non-Party Prospect could not and would not engage with a financing partner to get its commitment to partner to acquire Einstein unless and until it believed Einstein was *actually interested* in selling itself to Non-Party Prospect, which would be shown by Einstein providing due diligence to Non-Party Prospect. It was clear to Mr. Reardon that was not the case, and so Non-Party Prospect's interest was being withdrawn. Specifically, Mr. Reardon testified:

> Q:    What has changed?
>
> A:    Well, several things. Number one, when -- I assume it's you who asked the question of our counsel are we interested currently. I don't know if it was you. I know Einstein's counsel, so probably you. I assumed that the question was sincere, and that, in fact, Jefferson and Einstein were possibly contemplating some kind of a settlement, and we would be part of it. I later learned -- I came to understand that it wasn't that way at all. We were being set up as a bowling pin to be knocked down. It was asked that we start producing financials. No matter what financials we produced, they would have been attacked as inadequate. And again, when we go – when Jefferson acquires an Abington – or not Abington -- they simply merge assets. There's no money that changes hand. When we acquire a nonprofit, there are hundreds of millions of dollars, and we finance it. Nobody sits around with a half a billion dollars sitting in a cash drawer to finance things. So we finance these things, and we

would have had to ask -- since our financials would be attacked, we would
have had to ask a financial partner like MPT, with which we just did a $1.5
billion deal, to say, yeah, we back Prospect.  So the second thing was this:
MPT would have said to us, properly so, what are we backing you on? Is it
Moss? Is it Montgomery? Is it the whole system? What is it? And what do you
have? What do you have by way of due diligence? And the idea of dragging
MPT, a valued financial partner into this morass, frankly, where we've spent
thousands of dollars on legal fees, we've spent hundreds of manhours trying to
comply with subpoenas, was anathema to us. We had no data, we had nothing
to bid on, and so we decided to withdraw.  We decided that we had many
opportunities out there, and we wanted to limit the brain damage and focus on
those opportunities at this point.

(*Id.* at 106-07.)  Mr. Reardon also said that his initial belief that Einstein was serious about

pursuing a deal with Non-Party Prospect was through "rose-colored glasses" but that "when we

saw that they wanted to start asking questions about financials and the like, we realized what was

going to happen is what happened today, which is a smear campaign, and we want nothing to do

with it.  We've withdrawn our interest."  (*Id.* at 221, 224).  Also, Mr. Reardon emphasized in

questioning by the FTC that:

> Q:      So can you just describe what you're talking about when you say being
> set up like a bowling pin and a smear campaign?
>         MS. GIBSON: Objection to form.
> THE WITNESS:  The minute we heard that financials were being requested.
> As I said earlier, the financial statements don't show anything about our ability
> to acquire a hospital, and so we thought there was an ulterior motive. It was to
> denigrate our financial statements.  And as I listen to the testimony today -- or
> the questions today about the letter from Congress with no mention of the
> response, and all the rest of the stuff, it confirmed that it is, in my opinion, a
> smear campaign going on here.

(*Id.* at 225-26.)

Mr. Reardon made clear that "[w]e withdrew our current interest in Einstein, as I said

earlier, because, frankly, once we started getting into financials and everything else, [I] knew that

it would not be serious conversation" (*id.* at 226) and that a serious effort to engage in a process

for the sale of Einstein would first require an non-disclosure agreement ("NDA") signed between

the parties, extensive due diligence by Non-Party Prospect of Einstein and *then*, possibly, a

formal offer with a financing proposal (*id.* at 84, 106-107, 115, 202, 226 241-44; *see also, id.* at 114 ("We wouldn't proceed without due diligence. It's a necessary predicate to any deal.").)  Mr. Reardon testified that the parties never got to that point either in 2017 or during the recent expression of interest (*id.* at 107-08, 245).

### G.  The Late Discovery Requests

Pursuant to the scheduling order entered in this case, discovery, including discovery of non-parties, was to be completed by July 20.  (Dkt. 54 at 1.)   However, on July 23, six days after Mr. Reardon's deposition and three days after the discovery deadline, Non-Party Prospect received an email from Einstein requesting that additional documents be produced, specifically:

- [Subpoena request No. 4:] Prospect's 2017, 2018, and 2019 Consolidated Financial Statements.

- Subpoena request No. 1: All documents relating to the Proposed Transaction, the Merger Review, the Administrative Proceeding, or this Litigation, including but not limited to, all documents that form the basis for the statements in the Declaration of Thomas Reardon, Prospect's communications with Plaintiffs, or any efforts by Prospect to oppose, prevent, delay, or terminate the Proposed Transaction.

- Subpoena request No. 2: All documents concerning Prospect's consideration of a merger, acquisition, joint venture, or affiliation with Einstein, including but not limited to, any documents that form the basis for the statements made in Paragraph 4 of the Declaration of Thomas Reardon.

- Subpoena request No. 8: Documents sufficient to show any expansion or reduction in services at Prospect's facilities located in Southeast Pennsylvania, Delaware, or New Jersey (other than Crozer-Keystone) from 2016 to present

(Ex. A (Emails with Late Document Requests).)

Non-Party Prospect responded on July 24 explaining that, as they already told Einstein, they already produced all of the documents uniquely in their possession in response to Request Nos. 1 and 2.  Also, it would not be producing documents in response to Request Nos. 4 and 8 because they were no longer relevant to this litigation given its withdrawn interest and because

Einstein's litigation tactics would belie its use of the failing firm defense, which is its only purported basis for need that information. Further, Non-Party Prospect said that nothing in the Reardon Declaration, the Court's July 7 order or Mr. Reardon's deposition testimony required them to produce nationwide financial and strategic information and that Non-Party Prospect reserved its right to seek sanctions if Einstein further pressed the issue. (*Id.*)

Einstein responded on July 28, now over a week after the discovery deadline, first stating that it is taking Non-Party Prospect's word that it does not have any additional documents to produce in response to Request Nos. 1 and 2, but that Einstein and Non-Party Prospect have a dispute on Request Nos. 4 and 8. (Ex. A (Late Document Request Emails).)

All Einstein was able to muster from the Reardon Deposition that purportedly "opened the door" to Non-Party Prospect's confidential consolidated financial statements was:

- "[Q]uestions" by the FTC about Non-Party Prospect's interest in acquiring Einstein;

- Mr. Reardon's admission that Non-Party Prospect was interested in acquiring Einstein before it withdrew its interest (hardly a shocking admission);

- Mr. Reardon's agreement that the synergies between Non-Party Prospect and Einstein mentioned in the Reardon Declaration "hypothetically still exist;"

- Mr. Reardon's statement, when pressed about whether, hypothetically, at an undisclosed future time, Non-Party Prospect could be interested in acquiring Einstein, that Non-Party Prospect "would have to evaluate it at the time" (Mr. Reardon repeatedly said that Non-Party Prospect "has no current interest" before this answer was solicited (Ex. H (Reardon Tr.) at 229)); and

- Mr. Reardon's statement that, generally, Non-Party Prospect's current strategies included acquisitions, that it was looking nationwide, including in the Philadelphia Area, and that a recent investment enabled them to do so.

(Ex. A (Late Document Request Emails).) Einstein claims that Mr. Reardon testimony "paints an incomplete picture of Prospect's access to capital" and that Einstein "need[s] Prospect's Consolidated Financial Statements to rebut [it]." (*Id.*)

Einstein also claims, with respect to Request No. 8, "testimony elicited from Mr. Reardon by Plaintiffs has made clear that Prospect's expansion or reduction of services at its facilities is at issue[,]" but did not cite to any testimony in support of that position. Rather, Einstein said that "[a]ctions or plans to expand or reduce services are relevant to Prospect's willingness and ability to continue Einstein's commitment to the people of North Philadelphia." (*Id.*)

## H. The Instant Motion

Einstein has admitted that it and Non-Party Prospect are at a "impasse" and Non-Party Prospect now seeks intervention from this Court for the entry of a protective order so that it does not need to turn over its highly confidential and proprietary financial and operating information to Einstein in a matter for which it is not a party and where there is no arguable need for that information now that Non-Party Prospect has withdrawn its interest in acquiring Einstein. Non-Party Prospect further seeks sanctions in the form of its legal fees necessarily incurred in bringing this motion because Non-Party Prospect's Late Document Requests are inconsistent with its prior position that it does not need Non-Party Prospect's financial information if it is not interested in acquiring Einstein but rather is solely designed as punitive, in order to unduly burden, harass and embarrass a non-party.

## LEGAL STANDARD

A party seeking a protective order bears the burden of showing that there is good cause to limit or foreclose discovery. *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). Federal Rule of Civil Procedure 26 sets forth the general scope of discovery in civil suits: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." F.R.C.P. 26(b)(1). "[E]ven if the information sought is relevant, discovery is not allowed where no need is shown." *Garden City Emples. Ret. Sys. v. Psychiatric Solutions, Inc.*, 2014 U.S. Dist. LEXIS 8857 at *11 (E.D. Pa. Jan. 24, 2014) (citing *First Sealord Sur. v.*

*Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 383 (E.D. Pa. 2013)). "Although the scope of discovery under the Federal Rules is unquestionably broad, this right is not unlimited and may be circumscribed." *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999). Courts have significant discretion when resolving discovery disputes. *Taggart v. Wells Fargo Home Mortg., Inc.*, No. 10-cv-00843, 2012 U.S. Dist. LEXIS 139469 at *2 (E.D. Pa. Sept. 27, 2012) (citing *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 778 (3d Cir. 2000)).

Also, according to this Court's rules, "[d]iscovery must be proportional to the needs of the case and should focus specifically on obtaining information *truly necessary to resolve the litigation.* Counsel must carefully and realistically assess the actual need for the information sought." (Judge Pappert's Rules at C.2 (emphasis added).)

Generally, discovery requests may be curtailed to protect a person from whom discovery is sought from "annoyance, embarrassment, oppression, or undue burden or expense." F.R.C.P. 26(c)(1). Furthermore, a "court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on a non-party." *In re Domestic Drywall*, 300 F.R.D. 234, 239 (E.D. Pa. 2014) (quotation omitted). In particular, when discovery is sought from a non-party, "[b]roader restrictions may be necessary to prevent a non-party from suffering harassment or inconvenience." *Avago Techs. U.S., Inc. v. IPtronics, Inc.*, 309 F.R.D. 294, 297 (E.D. Pa. 2015), citing *Frank v. Honeywell Int'l, Inc.*, No. 15-mc-00172, 2015 U.S. Dist. LEXIS 106453 at *4 (E.D. Pa. Aug. 13, 2015).

Rule 26(c)(1) further provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters[.]"

<u>**ARGUMENT**</u>

I. **NON-PARTY PROSPECT SHOULD BE GRANTED A PROTECTIVE ORDER PROHIBITING THE LATE DISCOVERY REQUESTS**

   A. **Einstein Seeks the Late Document Requests Solely So that It Can Disparage Non-Party Prospect's Financial Ability to Acquire It**

   In order to successfully utilize the failing firm defense, a party is required to prove that:

   1. the company is unable to meet its obligations as they come due;
   2. it would not be able to reorganize successfully in bankruptcy; and
   3. it has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its assets in the relevant market and pose a less severe danger to competition than does the proposed merger.

(DOJ/FTC Horizontal Merger Guidelines § 11.)  In seeking Non-Party Prospect's financial information, Einstein hopes to show that, despite its one-time interest, Non-Party Prospect is *not* a reasonable alternative buyer under requirement number three.  That is, Einstein hopes to obtain burdensome and highly proprietary information from Non-Party Prospect that enables it to both *disparage* Non-Party Prospect's financial ability and, in turn, push it away as an alternative buyer by imposing onerous discovery demands on it.

Einstein has not provided *any other basis* for needing Non-Party Prospect's nationwide financial and strategic information.  (*See* Ex. E (June 30 Joint Letter) at 12 (characterizing Request Nos. 4 and 8 as about Non-Party Prospects "ability to" acquire Einstein); Ex. H (Reardon Tr.) at 59-60 ("this is a highly relevant topic about whether Prospect is an appropriate partner for Albert Einstein Health Network"); 184 ("[i]t has relevance to the financial capabilities of Prospect in relation to the various statements that Prospect has made about an interest in acquiring my client.").  As discussed below, seeking to strike or push away potential alternative buyers by disparaging their financial ability flies in the face of what is required under the failing firm defense.  Thus, that defense does not provide Einstein with cover to go on its costly and intrusive foray into Non-Party Prospect's confidential and proprietary documents.

It is well-settled that non-parties in particular should be protected from unnecessary harassment and embarrassment through discovery. *Frank Brunckhorst Co. v. Ihm*, 2012 U.S. Dist. LEXIS 151816 at *13 (E.D. Pa. Oct. 23, 2012) (for nonparty deponents "courts recognize that '[d]iscovery should be more limited to protect nonparty deponents from harassment, inconvenience or disclosure of confidential documents.'"). This Court should prohibit Einstein from obtaining Non-Party Prospect's nationwide financial and strategic information solely so that it may harass, annoy and embarrass Non-Party Prospect by smearing it and disparaging its financial information and operations around the country and thereby drive it away as an alternative buyer.

**B. Non-Party Prospect Withdrew its Interest in Acquiring Einstein and So it Cannot be a Reasonable Alternative Buyer under the Failing Firm Defense**

Non-Party Prospect has clearly withdrawn its interest in acquiring Einstein and amended the only statement in the Reardon Declaration that Einstein has relied upon for why it sent Non-Party Prospect a subpoena in the first place. (*See* Ex. F (July 13 Letter); Ex. H (Reardon Tr.) at 104-05, 08.) That withdrawal has rendered Einstein's need for Non-Party Prospect's nationwide financial and strategic documents moot. Notably, prior to the Reardon Deposition, Einstein's counsel represented that same view to Non-Party Prospect and the FTC and PA AG (*see* Hittinger Decl. ¶¶ 7, 13; Ex. D (June 30 Joint Letter) at 13; Ex. G (Reardon Tr.) at 60, 176-77).

Regardless, an uninterested party cannot be considered a reasonable alternative buyer and so Non-Party Prospect's ability to acquire it is not relevant to or needed for this litigation. For example, in the FTC investigation of Scott & White Healthcare's merger with King's Daughter hospital in Temple, Texas, King's Daughter asserted the failing firm defense. The FTC learned that another buyer had been interested in acquiring King's Daughter, but that its opportunity to acquire the hospital was unnecessarily cut short by the agreement with Scott & White. As a result, the FTC and the parties agreed that Scott & White *would offer to sell King's Daughter to*

*the alternative buyer*.  After conducting due diligence, however, the alternative buyer decided

not to acquire King's Daughter, which ultimately led the FTC to close its investigation.[1]

The facts here are similar:  Non-Party Prospect was previously interested in re-engaging

in discussions to possibly acquire Einstein, but Einstein's deal with Jefferson foreclosed that

possibility.  Now, Non-Party Prospect has determined that it is no longer interested in acquiring

Einstein and so Non-Party Prospect's former expression of interest should not serve as an

impediment to Defendants' merger.  Thus, there is no reason why Non-Party Prospect should be

forced to hand over its highly confidential, sensitive and proprietary financial and strategic

information just so that Einstein can make additional arguments about why Non-Party Prospect

is not a reasonable alternative buyer – a label Non-Party Prospect has now disavowed for the

reasons stated by Mr. Reardon at his deposition.

## C.  Einstein Cannot Assert the Failing Firm Defense Because It has Not Made a Good Faith Effort to Solicit an Offer from Non-Party Prospect

Einstein has utterly failed to undertake a "good faith effort" to sell itself to Non-Party

Prospect and so the failing firm defense is not a basis for seeking its financials.  Courts have

found that companies seeking to use the failing firm defense must show that they undertook a

genuine search for an alternative buyer.  *See United States v. EnergySolutions et al.*, Civ. No. 16-

1056-SLR, slip op. at 49-50 (D. Del. June 21, 2017) (finding that the parties did not undertake a

good faith effort to find an alternative buyer); *FTC v. Harbour Group Invest., L.P.*, 1990 U.S.

Dist. LEXIS 15542, *9-10 (D.D.C. Nov. 19, 1990) (rejecting a failing firm defense where the

_____

[1] *See* Statement of Bureau of Competition Director Richard Feinstein on the FTC's Closure of Its Investigation of Consummated Hospital Merger in Temple, Texas, December 23, 2009, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/ftcs-closure-its-investigation-consummated-hospital-merger-temple-texas/091223scottwhitestmt.pdf.

financial firm searching for an alternative buyer made minimal effort over a truncated time frame and the parties rejected three potential buyers identified by the FTC).

Further, the FTC has said that a good faith effort requires more than a "cursory search for an alternative buyer. Even the most financially challenged firms must do more than window shop the assets."[2] To show that a genuine effort, "[t]he Agencies require the following: that a number and variety of companies be contacted, including investment groups or companies from related industries; that sufficient information be provided to companies expressing interest; and that legitimate expressions of interest be pursued seriously." (*Id.*)  In *U.S. v. M.P.M., Inc.*, the District Court found that the failing company defense had been established by the acquiring company where it had explored "virtually every potential source of funding." 397 F. Supp. 78 (D. Colorado 1975).  The company's president had contacted numerous firms, government agencies, and persons.  The Court found that the "officers of Mobile conducted an earnest, wide-ranging, and good faith effort to locate potential investors or purchasers in order to maintain Mobile as a going concern. The contacts were numerous and varied during time when Mobile faced a grave probability of business failure."  *Id.* at 102.  Moreover, authorities analyzing the failing firm defense have said that "[t]he solicitation of alternative offers ought to be such as to *avoid discouraging* any offers above the assets' liquidation value."[3]

Here, the record shows that Einstein has not undertaken a good faith effort to sell itself to Non-Party Prospect and, indeed, Einstein's counsel's punitive discovery tactics have actually

---

[2] FTC.GOV, "Power Shopping for an alternative buyer," Debbie Feinstein and Alexis Gilman, Bureau of Competition, Mar 31, 2015, *available at* https://www.ftc.gov/news-events/blogs/competition-matters/2015/03/power-shopping-alternative-buyer?page=1.

[3] Contribution by the United States, OECD Roundtable on Failing Firm Defence at 6 (Oct. 6, 2009), *available at* https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2000-2009/failingfirm.pdf (emphasis added).

discouraged Non-Party Prospect from wanting to engage in further due diligence and possibly making an offer.  First, as Mr. Reardon testified, the onerous requests by Einstein led him to quickly believe that they "were being set up as a bowling pin to be knocked down" and that it was nothing more than an attempted "smear campaign."  (*Id.* 106-07, 221, 224, 226-27.) Einstein's own representations about why it needs information about Non-Party Prospect's financial abilities, detailed above, show that to be the case.

Second, Mr. Reardon testified that the process by for making a potential formal offer (which it never did), would first require an NDA signed between the parties, extensive due diligence by Non-Party Prospect of Einstein and then a possible formal offer with a financing proposal (*id.* at 84, 106-107, 115, 202, 226 241-44; *see also,* 114 ("We wouldn't proceed without due diligence. It's a necessary predicate to any deal.").)  None of that occurred here.

Third, Mr. Reardon explained that Non-Party Prospect's consolidated financials would not show whether it was capable of acquiring Einstein because, as is typical, it would obtain the commitment of a financing partner, which would also require due diligence of Einstein to obtain. (*Id.* at 106-07.)  Despite that testimony, the Late Document Requests reflect that Einstein is *still* not interested in determining whether Non-Party Prospect is capable of acquiring Einstein because it has not offered to provide or sought the information actually needed to do so.

Finally, on June 19, when counsel for Non-Party Prospect asked counsel for Einstein if Einstein was interested in re-engaging with Non-Party Prospect, *Einstein's counsel said that it was not presently interested.*  (Hittinger Decl. ¶ 9.)  There can be no doubt that Einstein could not possibly assert the failing firm defense when flatly rejected an offer to engage in discussions with an interested party.  Thus, because Einstein has not undertaken a good-faith (or any) effort to determine whether Non-Party Prospect was a reasonable alternative buyer, the failing firm

defense does not provide a basis for Einstein seeking Non-Party Prospect's confidential and proprietary financial and strategic information.

### D. Mr. Reardon Did Not "Open the Door" to Non-Party Prospect's Financial Information in his Deposition

Einstein cherry picks select quotes from the Reardon deposition that it says "opens the door" to Non-Party Prospect's financial statements, (Ex. A (Late Document Request Emails)), none of which is convincing. Indeed, all Einstein was able to extract from the deposition transcript was (i) "questions" by the FTC about Non-Party Prospect's interest in acquiring Einstein; (ii) Mr. Reardon's admission that Non-Party Prospect was interested in acquiring Einstein before it withdrew its interest (hardly a shocking admission); (iii) Mr. Reardon's agreement that the synergies between Non-Party Prospect and Einstein mentioned in the Reardon Declaration "hypothetically still exist;" (iv) Mr. Reardon's statement, when pressed about whether, hypothetically, at an undisclosed future time, Non-Party Prospect could be interested in acquiring Einstein, that Non-Party Prospect "would have to evaluate it at the time" (Mr. Reardon repeatedly said that Non-Party Prospect "has no current interest" before this answer was solicited (Ex. H (Reardon Tr.) at 229)); and (v) Mr. Reardon's statement that, generally, Non-Party Prospect current strategies included acquisitions, that it was looking nationwide, including in the Philadelphia Area, and that a recent investment enabled them to do so. (*Id.*)

None of this changes the fact that Non-Party Prospect has no interest in acquiring Einstein and thus cannot be an alternative buyer, rendering its financial ability to acquire it irrelevant. Yet, Einstein insists that Mr. Reardon testimony "paints an incomplete picture of Prospect's access to capital" and that Einstein "need[s] Prospect's Consolidated Financial Statements to rebut [it]." First, Mr. Reardon did not volunteer any information about Non-Party Prospect's financials, he only responded to questions, which he answered generally, because he

was instructed not to answer specific questions. And second, Einstein no longer needs a complete picture of Non-Party Prospect's financial situation because it is not an alternative buyer and so the alleged "incomplete" view it got at Mr. Reardon's deposition does not prejudice it in any way. It has no bearing on this case.

Einstein also claims, with respect to Request No. 8, that "testimony elicited from Mr. Reardon by Plaintiffs has made clear that Prospect's expansion or reduction of services at its facilities is at issue[,]" (*id.*) but did not cite to any testimony in support. Rather, Einstein said that "[a]ctions or plans to expand or reduce services are relevant to Prospect's willingness and ability to continue Einstein's commitment to the people of North Philadelphia." (*Id.*) This purported reason falls completely flat because Non-Party Prospect has no interest in acquiring Einstein and so its hypothetical "commitment to the people of North Philadelphia" is inapposite.

Finally, it is egregious that Einstein claims that Mr. Reardon "opened the door" to Non-Party Prospect's nationwide financials and strategies when: (1) Non-Party Prospect plainly withdrew its interest in acquiring Einstein, (2) Einstein represented that Non-Party Prospect's finances would not be at issue if it had no present interest (Hittinger Decl. ¶¶ 7, 15), (3) Non-Party Prospect has been consistent since it served its responses and objections on June 22 that it completely objects to Request Nos. 4 and 8 as not relevant to this case and it is harassing to seek confidential and proprietary financial and strategic information from a non-party where it has minimal or no relevance (Ex. C), (4) the Court did not address Request No. 8 it during the July 7 teleconference and there was no 30(b)(6) topic designated to that subject (Ex. D), (5) Non-Party Prospect specifically said in the July 13 Letter – four days before the Reardon Deposition – that "it will not be producing its current consolidated financial statement, as was discussed with the Court in our July 7 call, because there is no need to do so" (Ex. F) and Einstein never took issue

with that statement, and (6) at the Reardon Deposition, Non-Party Prospect's counsel stated, on the record, that Mr. Reardon was only to testify to financial and strategic questions as they relate to its facilities in the Greater Philadelphia area – not nationwide – and he was instructed not to answer any specific questions on those subjects (Ex. H (Reardon Tr.) at 44-47). Given these facts, Mr. Reardon could not have possibly "opened the door" to Non-Party Prospect's nationwide financial and strategic documents, in fact, his testimony plainly shows why its financial ability to acquire Einstein is not at issue in this case.

## II. NON-PARTY PROSPECT IS ENTITLED TO ITS EXPENSES AND LEGAL FEES

F.R.C.P. 26(c)(3) provides that expenses in connection with a motion for a protective order should be awarded pursuant to F.R.C.P. 37(a)(5), which provides "[i]f the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."

Non-Party Prospect believes its expenses on this Motion, including reasonable attorneys' fees, should be awarded here because Einstein continues to seek information that it knows is no longer relevant or necessary to this litigation, but rather, it continues to do so for purely punitive and baseless reasons.

## CONCLUSION

For the reasons stated above and in the accompanying Hittinger Declaration, Non-Party Prospect respectfully asks that the relief it seeks in its Motion be granted along with any other relief deemed proper by this Court.

Dated August 18, 2020

By: /s/ *Carl W. Hittinger*
BAKER & HOSTETLER LLP
Carl W. Hittinger (PA 30250)
Alyse F. Stach
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 564-2898
chittinger@bakerlaw.com
astach@bakerlaw.com

*Counsel for Non-Party Prospect Medical
Holdings*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of Non-Party Prospect's Motion for

a Protective order and Sanctions Against Defendant Einstein, Memorandum of Law in Support

and the accompanying Hittinger Declaration with Exhibits and Proposed Order to be served on

counsel for the parties in this matter via E-Mail as follows:

Paul H. Saint-Antoine
FAEGRE DRINKER BIDDLE & REATH
LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
paul.saint-antoine@faegredrinker.com
*Counsel for Defendant Thomas Jefferson*
*University*

Gustave Chiarello
FEDERAL TRADE COMMISSION
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
(202) 326-3296
gchiarello@ftc.gov
*Attorneys for Plaintiff Federal Trade*
*Commission*

Virginia A. Gibson
HOGAN LOVELLS US LLP
1735 Market Street, Floor 23
Philadelphia, PA 19103
Telephone: 267-675-4600
Facsimile: 267-675-4601
virginia.gibson@hoganlovells.com
*Counsel for Defendant Albert Einstein*
*Healthcare Network*

Abigail Wood
OFFICE OF THE ATTORNEY GENERAL
COMMONWEALTH OF PENNSYLVANIA
Strawberry Square
Harrisburg, PA 17120
(717) 787-4530
awood@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of*
*Pennsylvania*

Dated: August 18, 2020

By: /s/ *Carl W. Hittinger*
      Carl W. Hittinger

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION and COMMONWEALTH OF PENNSYLVANIA** | |
| **Plaintiffs,** | |
| **v.** | **No. 2:20-cv-01113-GJP** |
| **THOMAS JEFFERSON UNIVERSITY and ALBERT EINSTEIN HEALTHCARE NETWORK** | |
| **Defendants.** | |

**DECLARATION OF CARL. W. HITTINGER IN SUPPORT OF NON-PARTY PROSPECT MEDICAL HOLDINGS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PROTECIVE ORDER AND SANCTIONS AGAINST DEFENDANT ALBERT EINSTEIN HEALTHCARE NETWORK**

1.       My name is Carl W. Hittinger, and I am a senior partner at Baker & Hostetler LLP in Philadelphia, Pennsylvania. I am the lead counsel of record for Prospect Medical Holdings, Inc., which is not a party to the above litigation ("Non-Party Prospect").  I am also lead counsel of record for Crozer-Keystone Health System, a subsidiary of Non-Party Prospect that operates medical facilities in Delaware County, which is also not a party to this litigation ("Non-Party Crozer").

2.       I am executing this Declaration in support of Non-Party Prospect's Motion for a Protective Order and Sanctions against Defendant Albert Einstein Healthcare Network ("Einstein") (the "Motion").

3.       I am over the age of 18 and affirm that the statements in this Declaration, to the best of my knowledge, are true and correct under penalty of perjury.

4.      Attached as Exhibit A is a true and correct copy of an email I received on July 23, 2020 containing requests for documents from counsel for Einstein (the "Late Document Requests"), my July 24 response, counsel for Einstein's July 28 response acknowledging that the parties are at an "impasse," and my July 29 response informing Einstein that we would be filing this Motion.

5.      Attached as Exhibit B is a true and correct copy of the declaration of Thomas Reardon, President of Prospect East Holdings Inc., a subsidiary of Non-Party Prospect that owns Non-Party Crozer, dated January 7, 2020, which was provided to plaintiff the Federal Trade Commission (the "FTC") in connection with its investigation of the merger.

6.      Attached as Exhibit C is a true and correct copy of Non-Party Prospect's responses and objections to the document subpoena Einstein served to it on May 28, 2020.

7.      During a meet and confer call on June 5, 2020 where counsel for the FTC and PA AG were also present, I told counsel for Einstein, Virginia Gibson, that Non-Party Prospect was objecting to the subpoena as overbroad in seeking information from Non-Party Crozer's parent company and because it sought highly confidential and proprietary information about a non-party without a justifiable reason.  Ms. Gibson said that Einstein would also be serving 30(b)(6) subpoenas to Non-Parties Crozer and Prospect, which it then did that day, but represented that the subpoenas to Non-Party Prospect would be "moot" if Non-Party Prospect was no longer interested re-engaging in discussions about acquiring Einstein as stated Paragraph 4 of the Reardon Declaration.  Ms. Gibson then asked me to inquire of my clients about whether such an interest remained.

8.      After inquiring of my clients, I told counsel for Einstein on the evening of June 10 that Non-Party Prospect was still interested in acquiring all or part of Einstein and asked Ms.

Gibson whether her client shared an interest in re-engaging in such discussions and providing further information about Einstein.

9. Hearing no response, on June 19, I asked Ms. Gibson whether her client had any answer to Non-Party Prospect's expressed interest. Counsel for Einstein on that call apologized for the delay and said that Einstein had no present interest.

10. Attached as Exhibit D is a true and correct copy of Non-Party Prospect's responses and objections to the Rule 30(b)(6) subpoena Einstein served to it on June 5, 2020.

11. The parties continued to meet and confer on the document subpoenas to Non-Parties Crozer and Prospect until an impasse was reached and Einstein and the Non-Parties sent a joint letter to the Court on June 30 outlining the dispute. Attached as Ex. E is a true and correct copy of the June 30 joint letter to the Court.

12. On July 7, the Court held a non-transcribed lengthy discovery teleconference in order to resolve the discovery disputes between the Non-Parties and Einstein. The Court ordered Non-Party Crozer to produce a number of documents while Non-Party Prospect was ordered to produce just a single document: its 2019 consolidated financial statement. The Court did not order Non-Party Prospect to produce any documents in response to Einstein's Request Nos. 1, 2 or 8 or any other Request, but said that Non-Party Prospect could come back to the Court if the deposition of Mr. Reardon indicated a need for additional documents.

13. The reason Einstein and the FTC gave on the July 7 teleconference for why Non-Party Prospect should be ordered to produce its financial information was so that the parties could determine whether Non-Party Prospect was a reasonable alternative buyer for Einstein under the failing firm defense. That is, if Non-Party Prospect was not actually financially

capable of acquiring Einstein, it could not be considered a realistic alternative buyer despite its current expressed interest.

14.     On July 13, I emailed counsel for Einstein a letter addressed to Ms. Gibson informing them that Non-Party Prospect was amending the Reardon Declaration to state that Non-Party Prospect had no present interest in acquiring Einstein.  Attached as Exhibit F is a true and correct copy of the July 13 letter from me to Ms. Gibson.

15.     On July 14, I spoke to Ms. Gibson on the phone about the deposition of Mr. Reardon scheduled for July 17.  When I asked how long the Reardon deposition would last, Ms. Gibson said that she believed it would end by noon because she no longer needed to ask questions about Prospect's financials because "they were off the table" in light of the July 13 Letter withdrawing Non-Party Prospect's interest in Einstein.

16.     On July 15, counsel for Einstein sent an email asking when they would receive the amended Reardon Declaration.  I responded that Non-Party Prospect was not formally amending the declaration and rather, the July 13 "letter was our way of notifying you on behalf of our clients how Mr. Reardon's declaration was changing on that issue. He will testify about that change at his deposition."  Attached as exhibit G is a true and correct copy of the July 15 emails.

17.     On July 14, the Non-Parties made a production of documents designated Highly Confidential.

18.     Non-Party Prospect did not produce its 2019 consolidated financial statement under Request No. 4 because it had expressly withdrawn its interest in acquiring Einstein and so its financial ability to acquire Einstein was no longer at issue.  In making that determination,

Non-Party Prospect relied upon statements made by Einstein's counsel during the June 5 meet and confer, in the June 30 Joint Letter and during the July 7 discovery teleconference.

19.     On July 17, Mr. Reardon was virtually deposed.  Attached as Exhibit H is a true and correct copy of the portions of the transcript of Mr. Reardon's deposition which has been designated Highly Confidential.

20.     Pursuant to F.R.C.P. 37(a)(5), on July 24, I responded to Einstein's Late Document Requests stating that Non-Party Prospect would not be complying with those requests and that Non-Party Prospect "reserve[s] the right to seek sanctions against Einstein for engaging in bad faith discovery conduct against a non-party."  On July 28, Einstein responded, confirming that the parties were at an "impasse" and recommending court intervention.  I responded on July 29 that Non-Party Prospect intended to file this Motion.  (*See* Exhibit A.)  Accordingly, I certify that Non-Party Prospect has complied with the requirements of F.R.C.P. 37(a)(5).

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States of America.

Dated:  August 18, 2020

By: /s/ *Carl W. Hittinger*
Carl W. Hittinger

# EXHIBIT A

| | |
|---|---|
| **From:** | Hittinger, Carl W. |
| **To:** | Gibson, Virginia A. |
| **Cc:** | Hamilton, John; Chiarello, Gustav; Wood, Abigail; Stach, Alyse F. |
| **Subject:** | RE: FTC v. TJU and Albert Einstein Health Network: Discovery response from Prospect Holdings |
| **Date:** | Friday, July 24, 2020 5:57:23 PM |
| **Attachments:** | image009.jpg |
| | image010.jpg |
| | image003.jpg |
| | image006.jpg |
| | image008.jpg |

Ginny,

Writing in response to your email below seeking additional documents from Non-Party Prospect past the July 20 discovery deadline. Non-Party Prospect has already produced all of the documents in its possession that it has agreed to produce and that were ordered to be produced by the Court following our July 7 conference. Foremost, you have not set out what you think Mr. Reardon testified to that "opened the door" to these requests, which is clearly not the case. Non-Party Prospect's position has been consistent that if and when Non-Party Prospect withdrew its present interest in acquiring Einstein, its financial capabilities were no longer at issue in this case. In fact, you had represented that same view: first during the June 5 meet and confer when you represented to us (and the FTC and PA AG who were also on that call) that Einstein's subpoena for documents and testimony to Non-Party Prospect would be "moot" if Non-Party Prospect no longer had a present interest in acquiring Einstein. You made that same representation on the July 14 call, when we spoke directly and you told me, in response to my question about how long Mr. Reardon's deposition would last, that it should be completed by noon, because you said Non-Party Prospect's financials were no longer on the table now that its interest has been withdrawn. There is no dispute that Non-Party Prospect withdrew its current interest, first in a letter to you on July 13 and then again during Mr. Reardon's deposition (*see* Reardon Transcript at 104-05).

Nevertheless, you insisted on asking specific questions in bad faith and contrary to your prior representations about Prospect's financials and its operations around the country, outside the Greater Philadelphia area, despite the fact that Non-Party Prospect had withdrawn its interest and there being no 30(b)(6) topic covering Non-Party Prospect's operations outside the Greater Philadelphia Area. After it was clear that your questions were only intended to elicit specifics about Non-Party Prospect's financial abilities (Non-Party Prospect had agreed in its responses and objections to the 30(b)(6) subpoena to answer questions about its financials generally), Mr. Reardon was instructed not to answer those questions (*see* Reardon Transcript at 59-60). You have not

pointed to and there is nothing in Mr. Reardon's testimony that has changed what Einstein is entitled to under its subpoenas or order by the Court.

Also, at the July 7 discovery teleconference with Judge Pappert, the reason given by you for seeking Non-Party Prospect's financials was so that Einstein could assert the failing firm defense. We note that defense requires a "genuine search" and "good faith efforts to elicit" alternative buyers. Einstein's counsel's own course of conduct in this litigation will belie Einstein's use of that defense. Regardless, Non-Party Prospect has withdrawn its present interest, and so cannot be considered an alternative buyer and Non-Party Prospect's prior interest does not make it a current alternative. Thus, Einstein has no need for Non-Party Prospect's financial information.

With respect to your requests for further documents in response to Subpoena Request Nos. 1 and 2, Non-Party Prospect has already produced all non-privileged documents in its possession in response to those requests. You have not indicated what makes you believe it has any additional documents and nothing said by Mr. Reardon at his deposition indicates otherwise.

Finally, your request for documents responsive to Request No. 8 (documents concerning Non-Party Prospect's operations outside the Greater Philadelphia Area) is particularly egregious and harassing. Non-Party Prospect responded to that request stating that it would not search for such documents and Judge Pappert did not order Non-Party Prospect to produce any such documents despite Request No. 8 being in the June 30 joint letter. You have not pointed to anything in Mr. Reardon's testimony that allows you to resurrect that baseless request. Also, for the reasons stated above about Non-Party Prospect not having a present interest in acquiring Einstein, it is difficult to see how these documents are relevant in any way to your case.

Accordingly, Non-Party Prospect will not be producing any additional documents. If you are still inclined to seek relief from the court, we will request a full briefing schedule and ask that any teleconferences be transcribed by a court reporter. We also reserve the right to seek sanctions against Einstein for engaging in bad faith discovery conduct against a non-party.

Carl

**Carl W. Hittinger**
Partner

_____



Cira Centre
2929 Arch Street | 12th Floor
Philadelphia, PA 19104-2891
T +1.215.564.2898
M +1.215.840.7293

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
T +1. 202.861.1774

chittinger@bakerlaw.com
bakerlaw.com



---

**From:** Gibson, Virginia A. <virginia.gibson@hoganlovells.com>
**Sent:** Wednesday, July 22, 2020 11:03 PM
**To:** Hittinger, Carl W. <chittinger@bakerlaw.com>; Stach, Alyse F. <astach@bakerlaw.com>
**Cc:** Hamilton, John <john.hamilton@hoganlovells.com>
**Subject:** FTC v. TJU and Albert Einstein Health Network: Discovery response from Prospect Holdings

[External Email: Use caution when clicking on links or opening attachments.]

Carl and Alyse,

I write on behalf of Albert Einstein Health Network ("AEHN") to request that you produce additional documents from your client, Prospect Medical Holdings, Inc. ("Prospect"), in accordance with the subpoena served upon it and Judge Pappert's order to produce during the teleconference held July 7, 2020, enforcing that subpoena.  It is clear following Mr. Reardon's testimony that these documents (1) are subject to the ruling by Judge Pappert to be produced  yet were not produced, while at the same time Mr. Reardon testified to Prospect's financial ability to acquire a network like AEHN, or (2) should be produced because Mr. Reardon's declaration and testimony at his deposition opened the door to the subject matter and therefore give AEHN the right to explore the basis for Reardon's statements.  This includes the topics of (1) Prospect's ability and willingness to acquire the entirety of AEHN in 2017-2018 and in 2020, (2) Prospect's use of corporate funds to issue dividends to shareholders and the impact of those dividends on its financial condition, and (3) the manner in which Prospect manages and operates the hospitals and health systems it acquires and owns.

Therefore, Albert Einstein Healthcare Network requests that Prospect and Crozer search for and produce the following documents by **July 24**, 2020 or we will seek further relief from the Court:

- Prospect's 2017, 2018, and 2019 Consolidated Financial Statements.

- Subpoena request No. 1: All documents relating to the Proposed Transaction, the Merger Review, the Administrative Proceeding, or this Litigation, including but not limited to, all

documents that form the basis for the statements in the Declaration of Thomas Reardon, Prospect's communications with Plaintiffs, or any efforts by Prospect to oppose, prevent, delay, or terminate the Proposed Transaction.

- Subpoena request No. 2: All documents concerning Prospect's consideration of a merger, acquisition, joint venture, or affiliation with Einstein, including but not limited to, any documents that form the basis for the statements made in Paragraph 4 of the Declaration of Thomas Reardon.

- Subpoena request No. 8: Documents sufficient to show any expansion or reduction in services at Prospect's facilities located in Southeast Pennsylvania, Delaware, or New Jersey (other than Crozer-Keystone) from 2016 to present

Please advise your intent to search for and produce these documents immediately so that we may adequately explore issues you injected into this litigation and preserve our ability seek further relief from the Court.

Regards,
Ginny
**Virginia Gibson**
Partner

**Hogan Lovells US LLP**
1735 Market Street, Suite 2300
Philadelphia, PA 19103

Tel:      +1 267 675 4600
Direct:   +1 267 675 4635
Mobile:  +1 215 260 9028
Email:    virginia.gibson@hoganlovells.com
          www.hoganlovells.com
*Please consider the environment before printing this e-mail.*

Follow Hogan Lovells Life Sciences and Health Care
for the latest industry news and updates:



If you would like to know more about how we are managing the impact of the COVID-19 pandemic on our firm then take a look at our brief Q&A. If you would like to know more about how to handle the COVID-19 issues facing your business then take a look at our information hub.

**About Hogan Lovells**

Hogan Lovells is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP. For more information, see www.hoganlovells.com.


CONFIDENTIALITY. This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system.

| From: | Hittinger, Carl W. |
| To: | Gibson, Virginia A. |
| Cc: | Hamilton, John; Chiarello, Gustav; Wood, Abigail; Stach, Alyse F. |
| Subject: | RE: FTC, et al. v. Thomas Jefferson University, et al., Case No. 2:20-cv-0113 (E.D. Pa.) |
| Date: | Wednesday, July 29, 2020 7:29:03 AM |
| Attachments: | image009.jpg |
| | image010.jpg |
| | image002.jpg |
| | image004.jpg |
| | image008.jpg |

Ginny:  We do not agree with your email draft asking for a joint letter submission and a call. The matters at issue necessitate the filing of a motion in our view under the circumstances.  We will be filing with the Court a motion for a protective order and for sanctions in that regard. Carl

**Carl W. Hittinger**
Partner



Cira Centre
2929 Arch Street | 12th Floor
Philadelphia, PA 19104-2891
T +1.215.564.2898
M +1.215.840.7293

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
T +1. 202.861.1774

chittinger@bakerlaw.com
bakerlaw.com



**From:** Gibson, Virginia A. <virginia.gibson@hoganlovells.com>
**Sent:** Tuesday, July 28, 2020 4:59 PM
**To:** Hittinger, Carl W. <chittinger@bakerlaw.com>; Stach, Alyse F. <astach@bakerlaw.com>
**Cc:** Hamilton, John <john.hamilton@hoganlovells.com>
**Subject:** FTC, et al. v. Thomas Jefferson University, et al., Case No. 2:20-cv-0113 (E.D. Pa.)

[External Email: Use caution when clicking on links or opening attachments.]

Carl,

I write in response to your July 24 email regarding Defendant Albert Einstein Healthcare Network's ("Einstein") subpoena to Prospect Medical Holdings, Inc. ("Prospect").

I am willing to take your word that Prospect has produced all non-privileged documents in its possession in response to Subpoena Requests Nos. 1 and 2.

But we do have a dispute on Requests No. 4 and 8, which topics were testified to by your client in response to questions by the Plaintiff Federal Trade Commission, specifically:

> **Request No. 4 –** After narrowing its original request, Einstein requested the following: Prospect's 2017, 2018, and 2019 Consolidated Financial Statements.

Despite your claims that we no longer need Prospect's Consolidated Financial Statements because Prospect withdrew its interest in Einstein, questions like the following make our need for the Financial Statements clear:

- Plaintiffs asked Mr. Reardon various questions about whether Prospect was still interested in acquiring Einstein as recently as a few months ago, (*Id.* at 211-220) and whether the synergies Mr. Reardon identified between Prospect and Einstein "hypothetically still exist today", which Mr. Reardon answered affirmatively. *Id.* at 224. Plaintiffs proceeded to ask Mr. Reardon whether if, hypothetically, "the proposed Jefferson-Einstein merger does not go forward, would Prospect be open to re-engaging in discussions with Einstein regarding the strategic partnership involving some or all of Einstein's assets?" *Id.* at 227. Mr. Reardon agreed that "if the opportunity presented itself" Prospect would "evaluate it at the time." *Id.* at 228-29.
- Mr. Reardon also stated that he has been told by Prospect's CEO to "get out there again and start acquiring." Id. at 195.
- Plaintiffs questioned Mr. Reardon about the MPT article, asking if it was "accurate that MPT invested $1.55 billion in Prospect," which he answered affirmatively. Reardon Deposition at 193-194, Exhibit PX4217. Plaintiffs then asked if having the MPT funds available gave Prospect long-term capital and funds for acquisitions, including hospital acquisitions, to which Mr. Reardon agreed. *Id.* at 194.
- Plaintiffs further asked if Prospect had funding to acquire hospitals today, to which Mr. Reardon replied, "yes." *Id.* at 194. Reardon also testified that Prospect is "interested in expanding its footprint in the Greater Philadelphia Area" and is currently "in acquisition mode," and "would consider Philadelphia." *Id.* at 133. But this article alone presents an incomplete picture of Prospect's access to capital, which Defendants need Prospect's Consolidated Financial Statements to rebut. Moreover, Mr. Reardon opened the door to the topic in testifying "that [since July 2019] Sam Lee, our CEO, has said that we're in a better liquidity position than we've ever been, and that we're back on the acquisition trail." *Id.* at 176.

Plaintiffs have kept in issue Prospect's ability to acquire Einstein, its present intention to do so, and the seriousness of its intent to do so.

**Request No. 8 –** After narrowing its requests during discussion with counsel to Prospect, Einstein requests documents sufficient to show any expansion or reduction in services at Prospect's facilities located in Southeast Pennsylvania, Delaware, or New Jersey (other than Crozer-Keystone) from 2016 to present.  This includes, but is not limited to, expansion that would attract patients from the Philadelphia area.

Einstein never abandoned this request, and testimony elicited from Mr. Reardon by Plaintiffs has made clear that Prospect's expansion or reduction of services at its facilities is at issue. Actions or plans to expand or reduce services are relevant to Prospect's willingness and ability to continue Einstein's commitment to the people of North Philadelphia.

Given that we are at an impasse on Requests Nos. 4 (financial statements) and 8 (documents showing expansion or reduction of services at Prospect facilities) of Prospect's subpoena, we intend to email Judge Pappert's chambers **tomorrow morning at 9:00 am** to request a teleconference to resolve our dispute, consistent with Judge Pappert's policies and procedures.  Below is the communication we intend to submit to the Court:

> *Dear Judge Pappert:*
>
> *Pursuant to the Court's policies and procedures, Defendant Albert Einstein Healthcare Network ("Einstein") requests a telephone conference to resolve its discovery disputes with third party Prospect Medical Holdings, Inc., who is represented by Mr. Carl Hittinger, copied here.  Einstein proposes submitting a joint letter to chambers, briefly explaining the parties' respective positions, in advance of a telephone conference with the Court.*
>
> *If the Court is amenable to scheduling such a conference and receiving a joint letter please let us know if there is a date and time in the coming days when the Court will be available.*
>
> *Respectfully,*

Best,
Ginny

**Virginia Gibson**
Partner

**Hogan Lovells US LLP**
1735 Market Street, Suite 2300
Philadelphia, PA 19103

Tel:        +1 267 675 4600
Direct:   +1 267 675 4635
Fax:       +1 267 675 4601
Email:    virginia.gibson@hoganlovells.com
             www.hoganlovells.com
*Please consider the environment before printing this e-mail.*

Follow Hogan Lovells Life Sciences and Health Care
for the latest industry news and updates:


12398_EUs_LinkedIn email_SIG sml (2)

---

If you would like to know more about how we are managing the impact of the COVID-19 pandemic on our firm then take a look at our brief Q&A. If you would like to know more about how to handle the COVID-19 issues facing your business then take a look at our information hub.

**About Hogan Lovells**
Hogan Lovells is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP. For more information, see www.hoganlovells.com.

CONFIDENTIALITY. This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system.

# EXHIBIT B

## DECLARATION OF THOMAS REARDON

Commonwealth of Massachusetts )
)
City of Ipswich )

Thomas Reardon declares as follows:

1. I am President of Prospect East Holdings Inc. ("Prospect East"), a subsidiary of Prospect Medical Holdings ("Prospect"). I have been President of Prospect East for over seven years. My responsibilities include overseeing the establishment of Prospect's footprint in the Northeast including acquisitions of hospitals and affiliated health care organizations as well as acquisitions of, and/or collaboration with, physician groups in order to implement Prospect's "Coordinated Regional Care" population management model. Prospect currently owns and operates ten hospitals in the Northeast United States (CharterCARE, which consists of Roger Williams Medical Center and Our Lady of Fatima Hospital in Rhode Island, is a joint venture with Prospect owning 85%), including the hospitals in Crozer-Keystone Health System ("Crozer") in Pennsylvania. I am also responsible for overseeing business development for Prospect East, including exploring and evaluating strategic transactions and collaborations. Previously, I worked as a healthcare lawyer and also served as CEO of Cambio Health Solutions, a healthcare consulting business focused on hospital turnarounds.

2. Established in 1996, Prospect has grown into a provider of Coordinated Regional Care healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania, Rhode Island, and South Central Texas. Prospect is a for-profit healthcare company that owns and operates hospitals and also works with and manages affiliated medical groups, including independent physician associations. Prospect owns and operates 20 acute and behavioral hospitals (see the explanation of the joint venture involving CharterCARE above), many of which are safety net hospitals. Prospect's Coordinated Regional Care healthcare model emphasizes population health management and coordinated care through integrated networks of primary and specialty physicians, in affiliation with hospitals, clinics, other community-based providers, and health plans.

3. In 2016, Prospect acquired Crozer, a four-hospital health system in Delaware County, Pennsylvania. Prospect has also acquired three hospitals in Connecticut, the 85% interest in the CharterCARE joint venture in Rhode Island, and a hospital in New Jersey. Today, Prospect continues to focus on the development of its core operations and markets, but also evaluates opportunities to further expand its operations to improve its Coordinated Regional Care healthcare services.

4. Prospect discussed a strategic partnership with Einstein in 2017. Einstein told Prospect that it was interested in exploring a strategic partnership with Prospect if a transaction currently under discussion (it turned out that the discussion was with Jefferson) fell through. However, due to the announcement of the Jefferson-Einstein merger in 2018, discussions between Einstein and Prospect ceased. Prospect is interested in re-engaging

in discussions with Einstein regarding a strategic partnership involving some or all of Einstein's assets if the proposed Jefferson-Einstein merger does not go forward. In particular, Crozer and Einstein both serve large Medicaid populations, and Prospect anticipates there would be significant population health management synergies in combining the two systems' Medicaid populations. Prospect is also developing a world-class neurosciences effort at Crozer, which creates synergies for coordinated care with Einstein's MossRehab.

This declaration is being provided to the Federal Trade Commission voluntarily, in lieu of a subpoena, and I hereby request that my identity, my company's identity, and the contents of this declaration be kept confidential and exempt from public disclosure as provided by applicable law.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

1/7/20
Date

Thomas Reardon

# EXHIBIT C

| | |
|---|---|
| **FEDERAL TRADE COMMISSION and COMMONWEALTH OF PENNSYLVANIA** <br><br>         **Plaintiffs,** <br><br> **v.** <br><br> **THOMAS JEFFERSON UNIVERSITY and ALBERT EINSTEIN HEALTHCARE NETWORK** <br><br>         **Defendants.** | **No. 2:20-cv-01113-GJP** |

### NON-PARTY PROSPECT MEDICAL HOLDINGS, INC.'S RESPONSES AND OBJECTIONS TO SUBPOENA FOR PRODUCTION OF DOCUMENTS BY DEFENDANT ALBERT EINSTEIN HEALTHCARE NETWORK

In accordance with the Federal Rules of Civil Procedure, including Fed. R. Civ. P. 45, non-party Prospect Medical Holdings, Inc. ("Non-Party Prospect") hereby provides the following responses and objections to the Subpoena to it by Defendant Albert Einstein Healthcare Network ("Einstein") served on May 28, 2020 (the "Einstein Subpoena"), which contains requests for documents (the "Requests") and all Subpoenas that seek to adopt the Einstein Subpoena by reference or that seek the production of the same items.

### GENERAL OBJECTIONS

Non-Party Prospect sets forth the following General Responses and Objections ("General Objections") to the Einstein Subpoena. These General Objections are hereby fully incorporated into each and every numbered response below, as if fully written therein.

1.     Non-Party Prospect's Responses and Objections are based on information presently available after good faith investigation. Non-Party Prospect responds to the Requests

subject to, and without waiving, the right to change, modify, supplement, or clarify the objections and responses contained herein.

2.      Non-Party Prospect objects to these Requests to the extent that they seek to enlarge, expand, and/or are inconsistent with the scope of discovery as set forth by the Federal Rules or Local Rules.  Non-Party Prospect will respond to these Requests consistent with those rules.

3.      Non-Party Prospect objects to the Einstein Subpoena, and each and every Request, because compliance with the Einstein Subpoena creates significant expense for a non-party, especially here, where neither Non-Party Prospect nor its subsidiary Crozer-Keystone Health System ("Non-Party Crozer" or "Crozer") competes with Einstein or Defendant Thomas Jefferson University ("Jefferson").  Non-Party Prospect submitted the declaration of Thomas Reardon (the "Reardon Declaration") and Non-Party Crozer submitted the declaration of Sharif Omar (the "Omar Declaration") which provide information responsive to the Requests herein. Therefore, to the extent compliance is required, Einstein should bear the cost of production incurred by Non-Party Prospect to comply with the Einstein Subpoena.

4.      Non-Party Prospect objects to the Einstein Subpoena to the extent it seeks documents also sought by the subpoena Einstein served to Non-Party Crozer in this matter ("Einstein's Subpoena to Crozer").

5.      Non-Party Prospect further objects to the Einstein Subpoena to the extent it is overbroad in seeking information from Non-Party Prospect, which is a provider of coordinated regional healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania and Rhode Island, and therefore does not have information relevant to this this matter.

6.      Non-Party Prospect objects to these Requests to the extent they impose an undue burden on Non-Party Prospect to produce documents that it cannot locate in the course of a reasonable search of files that it maintains in the ordinary course of business.

7.      Non-Party Prospect objects to the Requests to the extent that they seek documents that are protected by the attorney-client privilege, work product doctrine, or any other, similar privilege or protection.  To the extent Non-Party Prospect identifies any documents protected by any applicable privilege that is responsive to these Requests as limited by Non-Party Prospect's objections and responses, Non-Party Prospect will identify any such category of documents on a categorical privilege log.

8.      Non-Party Prospect objects to the Requests to the extent they seek documents protected from disclosure by certain federal rules and laws protecting patient medical information.

9.      Non-Party Prospect objects to the Requests to the extent they seek documents already in Einstein's possession through the documents produced to Plaintiff the Federal Trade Commission (the "FTC") by Non-Party Crozer in its investigation preceding the filing of the Complaint in this matter.  It is Non-Party Prospect's understanding that Einstein has been provided access to the documents produced by Non-Party Crozer beginning at Bates number CROZER0000001.  Document produced to the FTC by Crozer were not withheld on the basis that they were solely in the possession of Non-Party Prospect.

10.     Non-Party Prospect objects to the definition of  "You" (or "you") or "Yours" (or "yours") as meaning Prospect Medical Holdings *and* "its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, including all healthcare facilities (e.g., hospitals, outpatient facilities, clinics, etc.), its employees, attorneys,

accountants, economists, staff, consultants, experts, agents, and representatives, and specifically includes any third party representative or agent, wherever located, acting or purporting to act on behalf of or assisting Prospect in its involvement with the FTC's Investigation or the Litigation." Non-Party Prospect will respond to the Einstein Subpoena on behalf of itself.

11.     Non-Party Prospect objects to producing any documents that are not in its possession, custody, or control.  Non-Party Prospect objects to the Requests to the extent that they request information that is public, or otherwise available to Einstein from sources other than Non-Party Prospect that are more convenient, less burdensome, or less expensive.

12.     Non-Party Prospect reserves the right to supplement with additional objections or responses as necessary and to make all appropriate objections at any hearing related to the Einstein Subpoena.

13.     The foregoing General Objections are incorporated by reference into each and all of the following responses. By setting forth specific objections below, Non-Party Prospect does not, and does not intend to, limit or restrict these General Objections; however, Non-Party Prospect may reiterate specific objections to any of the document requests below without waiver of any objection not specifically stated.

## SPECIFIC OBJECTIONS

**REQUEST NO. 1:**

All documents relating to the Proposed Transaction, the Merger Review, the Administrative Proceeding, or this Litigation, including but not limited to, all documents and communications relating to, referenced in, or that form the basis for the statements in Your declaration (including drafts) or investigational hearing testimony, Your communications with Plaintiffs, the potential effect of the Transaction on Your business or the business of any other healthcare provider, and/or any efforts by You to oppose, prevent, delay, or terminate the Proposed Transaction.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents "relating to" a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Request to the extent it seeks the production of documents protected by the attorney-client privilege and/or work-product doctrine, and any other applicable privileges.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds Non-Party Prospect does not have any internal analysis documents concerning the Proposed Transaction or its potential effect on Non-Party Prospect's business or the business of any other healthcare provider. Non-Party Prospect further responds that the Reardon Declaration speaks for itself. To the extent Einstein seeks communications between Non-Party Prospect and Plaintiffs, Non-Party Prospect believes that Einstein should exhaust all discovery efforts with the parties to this matter before turning to a non-party.

**REQUEST NO. 2:**

All documents concerning any consideration of any theoretical, contemplated, or actual merger, acquisition, joint venture, or affiliation between You and Your facilities and Einstein or its facilities from January 1, 2011 to the present, including but not limited to any documents relied upon to support the statements in Paragraph 4 of the declaration of Thomas Reardon dated January 7, 2020 provided to the FTC, including but not limited to all documents discussing potential synergies related to population and health and between Crozer-Keystone Health System's neurosciences program and MossRehab, and any documents that contradict these statements.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents "concerning" a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Request to the extent it seeks the production of documents protected by the attorney-client privilege and/or work-product doctrine, and any other applicable privileges.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds

that the Reardon Declaration states "Prospect discussed a strategic partnership with Einstein in

2017.  Einstein told Prospect it was interested in exploring a strategic partnership with Prospect

if a transaction currently under discussion (it turned out that the discussion was with Jefferson)

fell through.  However, due to the announcement of the Jefferson-Einstein merger in 2018,

discussions between Einstein and Prospect ceased."  Non-Party Prospect further responds that it

does not have any internal analysis documents discussing this potential partnership.  With respect

to any documents concerning "potential synergies related to population and health and between

Crozer's neurosciences program and MossRehab," Non-Party Prospect responds that the

Reardon Declaration and documents produced by Non-Party Crozer to the FTC are sufficient to

satisfy this Request.

**REQUEST NO. 3:**

All communications between You and the Pennsylvania Office of the Attorney General's
Charitable Trust Division from January 1, 2016 to present.
**RESPONSE:**

Non-Party Prospect responds that to the extent Einstein seeks communications between

Non-Party Prospect and a plaintiff in this matter, Non-Party Prospect believes that Einstein

should exhaust all discovery efforts with the parties to this matter before turning to a non-party.

**REQUEST NO. 4:**

One copy of each of Your annual and quarterly consolidating and consolidated financial
statements (income statements and balance sheets) from Fiscal Year 2015 to present.

**RESPONSE:**

Non-Party Prospect objects to this Request on the ground that information sought by this

Request is not relevant to the claims or defenses in this matter.  Non-Party Prospect further

objects to this request as overbroad in seeking information from Non-Party Prospect, which is a

provider of coordinated regional healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania and Rhode Island, and thus information sought by this request has no bearing on this matter.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that it is a privately held company and does not make its financial information available to the public and will not produce documents responsive to this request.

**REQUEST NO. 5:**

All documents regarding any prospective financial forecast for Prospect and/or Prospect East, including but not limited to all details on supporting assumptions, from January 1, 2016 to present.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents "regarding" a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Request on the ground that information sought by this Request is not relevant to the claims or defenses in this matter. Non-Party Prospect further objects to this request as overbroad in seeking information from Non-Party Prospect, which is a provider of coordinated regional healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania and Rhode Island, and thus information sought by this request has no bearing on this matter. Non-Party Prospect further objects to this Request because it seeks highly confidential financial documents without being narrowly tailored towards the claims or defenses in this matter.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that it is a privately held company and does not make its financial information available to the public and will not produce documents responsive to this request.

**REQUEST NO. 6:**

Documents sufficient to show historical and deferred capital expenditures at Your facilities, including but not limited to maintenance and growth expenditures, from January 1, 2016 to present.

**RESPONSE:**

Non-Party Prospect objects to this Request on the ground that information sought by this Request is not relevant to the claims or defenses in this matter. Non-Party Prospect further objects to this request as overbroad in seeking information from Non-Party Prospect, which is a provider of coordinated regional healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania and Rhode Island, and thus information sought by this request has no bearing on this matter. Non-Party Prospect further objects to this Request because it seeks highly confidential strategic documents without being narrowly tailored towards the claims or defenses in this matter.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that it is a privately held company and does not make its financial information available to the public and will not produce documents responsive to this request

**REQUEST NO. 7:**

All documents discussing the impact of the COVID-19 pandemic on Your current and future financials.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents "discussing" a broad subject as vague, overbroad and reflects that Einstein has not taken

reasonable steps to limit the burden and expense inflicted on a non-party.  Non-Party Prospect

further objects to this Request on the ground that information sought by this Request is not

relevant to the claims or defenses in this matter.  Non-Party Prospect further objects to this

request as overbroad in seeking information from Non-Party Prospect, which is a provider of

coordinated regional healthcare services in Southern California, Connecticut, New Jersey,

Pennsylvania and Rhode Island, and thus information sought by this request has no bearing on

this matter.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds

that it is a privately held company and does not make its financial information available to the

public and will not produce documents responsive to this request

**REQUEST NO. 8:**

Documents sufficient to show all expansion or reduction in services at Your facilities from 2016
to present.

**RESPONSE:**

Non-Party Prospect objects to this Request on the ground that information sought by this

Request is not relevant to the claims or defenses in this matter.  Non-Party Prospect further

objects to this request as overbroad in seeking information from Non-Party Prospect, which is a

provider of coordinated regional healthcare services in Southern California, Connecticut, New

Jersey, Pennsylvania and Rhode Island, and thus information sought by this request has no

bearing on this matter.  Non-Party Prospect further objects to this Request because it seeks

highly confidential strategic documents without being narrowly tailored towards the claims or

defenses in this matter.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds

that it will not search for or produce documents responsive to this Request.

**REQUEST NO. 9:**

All documents discussing competition between You and any Jefferson facility and/or any Einstein facility.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents "discussing" a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that the Omar Declaration states that Crozer "does not view Einstein as a competitor" (Omar Declaration at ¶ 5) and "does not view the . . . [Thomas Jefferson University Hospitals] as significant competitors for the vast majority of our services" (*Id.* at ¶ 4). The Omar Declaration also states that Non-Party Prospect "does not anticipate the proposed merger between Jefferson and Einstein will affect Crozer's ability to attract patients, because Crozer serves different geographic areas than Jefferson and Einstein." (*Id.* at ¶ 11). The Omar Declaration also discussed which geographic areas its facilities draw their patients. It would be extremely burdensome and unnecessary for Non-Party Prospect to search for, redact for confidentiality and produce "[a]ll documents discussing competition between [Non-Party Prospect] and any Jefferson facility and/or any Einstein facility" over a four plus year period when this subject was already discussed in the Omar Declaration and confirmed by the document produced by Non-Party Crozer to the FTC at CROZER0000114.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that it will not search for or produce additional documents responsive to this Request.

**REQUEST NO. 10:**

All documents, including internal business plans, board/management presentations, consultant reports, or capital plans discussing or analyzing Your plans to provide, develop, expand, or

reduce the inpatient general acute care services, outpatient services, or Acute Rehab Services You offer patients in the Greater Philadelphia Area, including but not limited to the types of rehabilitation patients and conditions treated at Your facilities.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents "discussing or analyzing" a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Request to the extent it seeks the production of documents protected by the attorney-client privilege and/or work-product doctrine, and any other applicable privileges. Non-Party Prospectfurther objects to this Request because it seeks highly confidential strategic documents without being narrowly tailored towards the claims or defenses in this matter.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that the Reardon Declaration, which states that "Prospect is also developing a world-class neurosciences effort at Crozer" (Reardon Declaration ¶ 4), speaks for itself, and it will not search for or produce additional documents or information responsive to this Request.

**REQUEST NO. 11:**

All strategic and business planning documents, marketing plans, advertising, market studies, forecasts, surveys, consultant reports, or other strategic documents that discuss, analyze or describe competition, competitors, or market share for inpatient general acute care services, outpatient services, or Acute Rehab Services in the Greater Philadelphia Area.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents that "discuss, analyze or describe" a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that the Omar Declaration states that Prospect's subsidiary Crozer "does not view Einstein as a competitor" (Omar Declaration at ¶ 5) and "does not view the . . . [Thomas Jefferson University Hospitals] as significant competitors for the vast majority of our services" (*Id.* at ¶ 4). The Omar Declaration also states that Non-Party Prospect "does not anticipate the proposed merger between Jefferson and Einstein will affect Crozer's ability to attract patients, because Crozer serves different geographic areas than Jefferson and Einstein." (*Id.* at ¶ 11). The Omar Declaration also discussed which geographic areas its facilities draw their patients. It would be extremely burdensome and unnecessary for Non-Party Prospect to search for, redact for confidentiality and produce documents responsive to this request over a four plus year period when this subject was already discussed in the Omar Declaration and confirmed by the document produced by Non-Party Crozer to the FTC at CROZER0000114. Non-Party Prospect will not search for or produce additional documents or information responsive to this Request.

**REQUEST NO. 12:**

All documents concerning the strategy and rationale for Crozer-Keystone Health System's partnership with Kindred Healthcare for Acute Rehab Services.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents "concerning" a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Request to the extent it seeks the production of documents protected by the attorney-client privilege and/or work-product doctrine, and any other applicable privileges. Non-Party Prospect further objects to this Request because it seeks highly confidential strategic documents without being narrowly tailored towards the claims or defenses in this matter.

Subject to and without waiving the foregoing objections, Non-Party Prospect understands that Einstein has issued a subpoena to Kindred. Non-Party Prospect believes that Kindred could have information responsive to this Request that only can be obtained directly from Kindred.

**REQUEST NO. 13:**

All documents and communications discussing negotiations with, rates at which You will participate with, or the possible or actual termination of Your participation in any health plan product offered by a payor in the Greater Philadelphia Area.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks documents also sought Einstein's Subpoena to Crozer.

Subject to and without waiving the foregoing objections, Non-Party Prospect refers Einstein to Crozer's responses and objections to the Einstein Subpoena served on June 12, 2020 and responds that Non-Party Prospect has no additional information responsive to this Request.

**REQUEST NO. 14:**

All documents discussing, describing, or analyzing actual or proposed changes in Medicare reimbursement for Acute Rehab Services from January 1, 2015 to the present, and Your assessment of how any such changes might impact the provision of Acute Rehab Services at inpatient rehabilitation hospitals, inpatient rehabilitation units within hospitals, and/or skilled nursing facilities.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks documents also sought Einstein's Subpoena to Crozer.

Subject to and without waiving the foregoing objections, Non-Party Prospect refers Einstein to Crozer's responses and objections to the Einstein Subpoena served on June 12, 2020 and responds that Non-Party Prospect has no additional information responsive to this Request.

**REQUEST NO. 15:**

All documents discussing, describing, or analyzing the entry or expansion of inpatient rehabilitation hospitals, inpatient rehabilitation units within hospitals, and/or skilled nursing facilities by any other healthcare provider within the Greater Philadelphia Area from January 1, 2016 to the present.

**RESPONSE:**

Non-Party Prospect objects to this Request to the extent it seeks "[a]ll" documents "discussing, describing or analyzing" a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Request to the extent it seeks the production of documents protected by the attorney-client privilege and/or work-product doctrine, and any other applicable privileges. Non-Party Prospect further objects to this Request because it seeks highly confidential strategic documents without being narrowly tailored towards the claims or defenses in this matter.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that it will not search for or produce additional documents responsive to this Request.

Dated June 22, 2020

Respectfully submitted,

By: /s/ *Carl W. Hittinger*
BAKER & HOSTETLER LLP
Carl W. Hittinger
Alyse F. Stach
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 564-2898
chittinger@bakerlaw.com
astach@bakerlaw.com
*Counsel for Non-Party Prospect-Keystone*
*Health System*

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION and COMMONWEALTH OF PENNSYLVANIA**<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**THOMAS JEFFERSON UNIVERSITY and ALBERT EINSTEIN HEALTHCARE NETWORK**<br><br>        **Defendants.** | **No. 2:20-cv-01113-GJP** |

### NON-PARTY PROSPECT MEDICAL HOLDINGS, INC.'S RESPONSES AND OBJECTIONS TO SUBPOENA FOR A RULE 30(b)(6) DEPOSITION BY DEFENDANT ALBERT EINSTEIN HEALTHCARE NETWORK

In accordance with the Federal Rules of Civil Procedure, including Fed. R. Civ. P. 30, non-party Prospect Medical Holdings, Inc. ("Non-Party Prospect") hereby provides the following responses and objections to the Subpoena to it by Defendant Albert Einstein Healthcare Network ("Einstein") served on June 5, 2020 (the "Einstein Subpoena") for a Rule 30(b)(6) deposition, which contains topics for deposition (the "Topics") and all Subpoenas that seek to adopt the Einstein Subpoena by reference or that seek testimony on the same topics.

### GENERAL OBJECTIONS

Non-Party Prospect sets forth the following General Responses and Objections ("General Objections") to the Einstein Subpoena. These General Objections are hereby fully incorporated into each and every numbered response below, as if fully written therein.

1.      Non-Party Prospect's Responses and Objections are based on information presently available after good faith investigation. Non-Party Prospect responds to the Topics

subject to, and without waiving, the right to change, modify, supplement, or clarify the objections and responses contained herein.

2. Non-Party Prospect objects to these Topics to the extent that they seek to enlarge, expand, and/or are inconsistent with the scope of discovery as set forth by the Federal Rules or Local Rules. Non-Party Prospect will respond to these Topics consistent with those rules.

3. Non-Party Prospect objects to the date, June 29, 2020, by which responsive information is to be provided to the Einstein Subpoena. Non-Party Prospect will provide a witness to virtually testify in response to the Einstein Subpoena, as limited by these responses and objections, at a date mutually agreed on by Non-Party Prospect and Einstein.

4. Non-Party Prospect objects to the Einstein Subpoena, and each and every Topic, because compliance with the Einstein Subpoena creates significant expense for a non-party, especially here, where neither Non-Party Prospect nor its subsidiary Crozer-Keystone Health System ("Non-Party Crozer" or "Crozer") competes with Einstein or Defendant Thomas Jefferson University ("Jefferson"). Non-Party Prospect submitted the declaration of Thomas Reardon (the "Reardon Declaration") and Non-Party Crozer submitted the declaration of Sharif Omar (the "Omar Declaration") which provide information responsive to the Topics herein. Therefore, to the extent compliance is required, Einstein should bear the cost of educating witnesses on the Topics incurred by Non-Party Prospect to comply with the Einstein Subpoena.

5. Non-Party Prospect objects to the Einstein Subpoena to the extent it seeks documents also sought by the subpoena Einstein served to Non-Party Crozer in this matter ("Subpoena to Non-Party Crozer").

6. Non-Party Prospect further objects to the Einstein Subpoena to the extent it is overbroad in seeking information from Non-Party Prospect, which is a provider of coordinated

regional healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania and Rhode Island, and therefore does not have information relevant to this this matter.

7.      Non-Party Prospect objects to the Topics to the extent they impose an undue burden on Non-Party Prospect to educate a witness on a topic that is not readily knowable by Non-Party Prospect because it cannot locate responsive information in the course of a reasonable search of files that it maintains in the ordinary course of business.

8.      Non-Party Prospect further objects to the Einstein Subpoena to the extent it seeks information not in its possession, custody or control or that is not knowable by Non-Party Prospect.

9.      Non-Party Prospect objects to the Topics to the extent that they seek information that is protected by the attorney-client privilege, work product doctrine, or any other, similar privilege or protection.

10.     Non-Party Prospect objects to the Topics to the extent they seek information protected from disclosure by certain federal rules and laws protecting patient medical information.

11.     Non-Party Prospect objects to the Topics to the extent they seek information that is kept by Kindred Healthcare ("Kindred") in the ordinary course of business.  Non-Party Prospect will not undertake efforts to educate itself about information that is collected and maintained by Kindred.

12.     Non-Party Prospect objects to the Topics to the extent they seek information already in Einstein's possession through the documents produced to Plaintiff the Federal Trade Commission (the "FTC") by Non-Party Crozer in its investigation preceding the filing of the Complaint in this matter.  It is Non-Party Prospect's understanding that Einstein has been

provided access to the documents produced by Non-Party Crozer beginning at Bates number CROZER0000001. Documents produced to the FTC by Crozer were not withheld on the basis that they were solely in the possession of Non-Party Prospect.

13. Non-Party Prospect objects to the definition of "You" (or "you") or "Yours" (or "yours") as meaning Prospect Medical Holdings *and* "its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, including all healthcare facilities (e.g., hospitals, outpatient facilities, clinics, etc.), its employees, attorneys, accountants, economists, staff, consultants, experts, agents, and representatives, and specifically includes any third party representative or agent, wherever located, acting or purporting to act on behalf of or assisting Prospect in its involvement with the FTC's Investigation or the Litigation." Non-Party Prospect will respond to the Einstein Subpoena on behalf of itself.

14. Non-Party Prospect reserves the right to supplement with additional objections or responses as necessary and to make all appropriate objections at any hearing related to the Einstein Subpoena.

15. The foregoing General Objections are incorporated by reference into each and all of the following responses. By setting forth specific objections below, Non-Party Prospect does not, and does not intend to, limit or restrict these General Objections; however, Non-Party Prospect may reiterate specific objections to any of the document Topics below without waiver of any objection not specifically stated.

## **SPECIFIC OBJECTIONS**

**TOPIC NO. 1:**

The Proposed Transaction, the Merger Review, the Administrative Proceeding, or this Litigation, including any efforts or actions taken by You to oppose, prevent, delay, or terminate the Proposed Transaction.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent it seeks information protected by the attorney-client privilege and/or work-product doctrine, and any other applicable privileges. Non-Party Prospect further objects to this Topic to the extent it seeks information not in its possession, custody or control or that is not knowable by Non-Party Prospect.  Non-Party Prospect further objects to this Topic to the extent it is identical to a Topic in the Subpoena to Non-Party Crozer.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that either it or Non-Party Crozer will produce a witness to testify about information that either has in response to this Topic.

**TOPIC NO. 2:**

The Declaration, all statements and allegations contained therein, and all related communications exchanged by or on behalf of Thomas Reardon with the Plaintiffs, including any drafts of the Declaration.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent it seeks information protected by the attorney-client privilege and/or work-product doctrine, and any other applicable privileges. Non-Party Crozer further objects to this Topic to the extent it seeks information about communications with a party in this matter and can seek that information from a party without burdening a non-party.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that it will produce Thomas Reardon to testify about statements and allegations contained in the Reardon Declaration.

**TOPIC NO. 3:**

Any proposed, discussed, or attempted merger, acquisition, affiliation, or potential relationship between You and any hospital or hospital system in the Greater Philadelphia Area from January 1, 2011 to the present, including but not limited to Einstein.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent it seeks information protected by the attorney-client privilege and/or work-product doctrine, and any other applicable privileges. Non-Party Prospect further objects to this Topic to the extent it seeks highly confidential and proprietary information about "any hospital or hospital system in the Greater Philadelphia Area from January 1, 2011 to the present" and is therefore overbroad, unduly burdensome and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to the date range beginning "January 1, 2011" because Non-Party Prospect acquired Non-Party Crozer in 2016 and therefore does not have information responsive to this Topic from before that date. Non-Party Prospect further objects to this Topic to the extent it is identical to a Topic in the Subpoena to Non-Party Crozer.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that either it or Non-Party Crozer will produce a witness to testify about information that either has in response to this Topic.

**TOPIC NO. 4:**

Your financial condition, including the impact of the COVID-19 pandemic on Your current and future financial condition and Your interest and/or ability to partner with and/or acquire Einstein.

**RESPONSE:**

Non-Party Prospect objects to this Topic on the ground that information sought by this Topic is not relevant to the claims or defenses in this matter and seeks highly confidential and proprietary information. Non-Party Prospect further objects to this Topic as overbroad in seeking information from Non-Party Prospect, which is a provider of coordinated regional

healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania and Rhode Island, and thus information sought by this Topic has absolutely no bearing on this matter. Non-Party Prospect further objects to this Topic on the ground that Non-Party Prospect is a privately held company that does not make its financial information available to the public and therefore information responsive to this Topic is highly confidential and could harm the business of Non-Party Prospect if it were made public.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that it will produce a witness to testify about Non-Party Prospect's financial condition generally and whether or not the COVID-19 pandemic has impacted its interest and/or ability to partner with and/or acquire Einstein.

**TOPIC NO. 5:**

Competition between You and any Jefferson facility, any Einstein facility, or any other inpatient GAC hospital facility or provider of Acute Rehab Services in the Greater Philadelphia Area, including, but not limited to, the market share or competitive position of providers of such services.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent it seeks information about competition with "any other inpatient FAC hospital facility or provide of Acute Rehab Services in the Greater Philadelphia Area" and is therefore overbroad, unduly burdensome and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Topic to the extent it is identical to a Topic in the Subpoena to Non-Party Crozer. Non-Party Prospect further objects to this Topic to the extent it highly confidential and proprietary information. Non-Party Prospect objects to this Topic to the extent it is not limited by temporal scope.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that either it or Non-Party Crozer will produce a witness to testify about non-confidential information that either has concerning any current competition as described in this Topic.

**TOPIC NO. 6:**

Your plans or strategies for increasing the patient volume at Your facilities, including, but not limited to, Your Plans to open, acquire, develop, construct, or expand new or existing facilities or physician practices.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent the terms "plans" and "strategies" are vague, ambiguous or overbroad. Non-Party Prospect further objects to this Topic to the extent it seeks highly confidential and proprietary information about Non-Party Prospect's facilities outside the Greater Philadelphia Area and is therefore overbroad, unduly burdensome and not narrowly tailored to claims or defenses in this matter and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Topic to the extent it is identical to a Topic in the Subpoena to Non-Party Crozer. Non-Party Prospect objects to this Topic to the extent it is not limited by temporal scope.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that either it or Non-Party Crozer will produce a witness to testify in general about non-confidential information that either has concerning current plans and strategies as described in this Topic for the Greater Philadelphia Area.

**TOPIC NO. 7:**

Your plans and strategies for participating in commercial health insurance plans in the Greater Philadelphia Area, including, but not limited to, trends and plans for risk sharing with insurers, narrow network products, and tiered network products.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent it seeks "plans and strategies" on a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Topic to the extent information sought by this Topic is not relevant to the claims or defenses in this matter and is highly confidential and proprietaary. Non-Party Prospect further objects to this Topic to the extent it is identical to a Topic in the Subpoena to Non-Party Crozer. Non-Party Prospect further objects to this Topic to the extent it is not limited by temporal scope.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that either it or Non-Party Crozer will produce a witness to testify about non-confidential information that either has about any current trends and plans for risk sharing with insurers, narrow network products, and tiered network products for its facilities in the Greater Philadelphia Area.

**TOPIC NO. 8:**

Your negotiations with payors for Your healthcare facilities in the Greater Philadelphia Area, including but not limited to negotiations related to (a) any narrow network or tiered products, including, but not limited to, requests to exclude provider competitors from any such network or place such competitors in a less favorable tier, (b) Your inclusion or exclusion from managed care contracts; and (c) Acute Rehab Services, including the degree to which those negotiations impact your negotiations with payors regarding inpatient services generally.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent it seeks "negotiations with payors" on a broad subject as vague, overbroad and reflects that Einstein has not taken reasonable steps to limit the burden and expense inflicted on a non-party. Non-Party Prospect further objects to this Topic to the extent information sought by this Topic is not relevant to the claims or defenses in this matter and is highly confidential and proprietary. Non-Party Prospect further objects to

this Topic to the extent it is identical to a Topic in the Subpoena to Non-Party Crozer.  Non-Party Prospect further objects to this Topic to the extent it is not limited by temporal scope.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that either it or Non-Party Crozer will produce a witness to testify in general about recent, non-confidential negotiations with payors and the impact of those negotiations on competitors that either Non-Party Prospect or Non-Party Crozer has as it relates to Non-Party Crozer's facilities in the Greater Philadelphia Area.

**TOPIC NO. 9:**

Your hospital campuses in the Greater Philadelphia Area and the investments required to sustain safe facilities that are attractive to patients.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent the phrase "Your hospital campuses" and term "investments"  are vague, ambiguous and overbroad.  Non-Party Prospect further objects to this Topic to the extent information sought by this Topic is not relevant to the claims or defenses in this matter and is highly confidential and proprietary.  Non-Party Prospect further objects to this Topic to the extent it is identical to a Topic in the Subpoena to Non-Party Crozer.  Non-Party Prospect further objects to this Topic to the extent it is not limited by temporal scope.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that either it or Non-Party Crozer will produce a witness to testify about current, non-confidential information on this Topic.

**TOPIC NO. 10:**

The impact of payor mix on the financial viability or success of Your hospital(s) and/or facilities that provide Acute Rehab Services.

**RESPONSE:**

Non-Party Prospect objects to this Topic to the extent the term "impact" is vague, ambiguous and/or overbroad.  Non-Party Prospect further objects to this Topic to the extent information sought by this Topic is not relevant to the claims or defenses in this matter and is highly confidential and proprietary.  Non-Party Prospect further objects to this Topic to the extent it is identical to a Topic in the Subpoena to Non-Party Crozer.  Non-Party Prospect further objects to this Topic to the extent it is not limited by temporal scope.

Subject to and without waiving the foregoing objections, Non-Party Prospect responds that either it or Non-Party Crozer will produce a witness to testify about current, non-confidential information that either Non-Party Prospect or Non-Party Crozer has in general about this Topic as it relates to Non-Party Crozer's facilities in the Greater Philadelphia Area.

Dated June 26, 2020

Respectfully submitted,

By: /s/ *Carl W. Hittinger*
BAKER & HOSTETLER LLP
Carl W. Hittinger
Alyse F. Stach
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 564-2898
chittinger@bakerlaw.com
astach@bakerlaw.com
*Counsel for Non-Party Prospect-Keystone Health System*

# EXHIBIT E



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

June 30, 2020

**CONFIDENTIAL**

**VIA EMAIL**

The Honorable Gerald J. Pappert
James A. Byrne U.S. Courthouse
601 Market Street
Room 5614
Philadelphia, PA 19106-1745

**Re:**   ***Federal Trade Commission, et al. v. Thomas Jefferson University, et al.,***
            **2:20-cv-01113-GJP (E.D. Pa.)**

Dear Judge Pappert:

Defendant Albert Einstein Healthcare Network ("Einstein") and non-parties Crozer-Keystone Health System ("Non-Party Crozer" or "Crozer") and Prospect Medical Holdings, Inc. ("Non-Party Prospect" or "Prospect") submit this joint letter in advance of a telephone conference with the Court to addressdiscovery disputes regarding compliance with subpoenas Einstein served on Non-Party Crozer and Non-Party Prospect in this matter.

> **1. Defendant Einstein's Subpoena to Third Party Crozer**

**Defendant Einstein's Position**

During the course of the Federal Trade Commission's ("FTC") lengthy investigation of Defendants' proposed merger, the FTC conducted extensive discovery, including from third party Crozer.  During that investigation, Crozer produced a handful of documents and some data to the FTC.  Crozer's then Chief Executive Officer, Mr. Sharif Omar, also signed a declaration, originally drafted by the FTC, regarding multiple issues that are disputed in this case, including the degree to which Crozer competes with Thomas Jefferson University Hospital ("TJUH"), the degree to which the Regional Rehabilitation Center at Taylor Hospital ("Taylor Rehab") competes with MossRehab ("Moss") and Magee Rehabilitation Hospital ("Magee"), and the extent to which inpatient rehabilitation facilities ("IRFs") compete with skilled nursing facilities ("SNFs").

Einstein served a subpoena on Crozer on April 10, 2020, seeking documents and data relating to the assertions made in Mr. Omar's declaration and the claims and defenses in this case. Notwithstanding multiple meet and confers with Crozer's counsel, including on April 17, May 1, May 19, and June 19, and an offer to substantially narrow the scope of Einstein's subpoena from 24 requests to 10 requests, and further narrowing of those requests, Crozer has refused to produce a

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante Amsterdam Baltimore Beijing Birmingham Boston Brussels Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Moscow Munich New York Northern Virginia Paris Perth Philadelphia Rio de Janeiro Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Warsaw Washington DC Associated offices: Budapest Jakarta Shanghai FTZ Ulaanbaatar Zagreb. Business Service Centers: Johannesburg Louisville. For more information see www.hoganlovells.com

single document in response to Einstein's subpoena.[1]  The parties' present dispute concerns Request Nos. 5, 7, 9, 10, 20, and 24.

**Request No. 5** – After substantial narrowing, Einstein requested the following: (1) Crozer's most recent market assessment or strategic plan, since the only market assessment Crozer previously produced to the FTC is from April 2017 and (2) any documents relating to competition between Taylor Rehab and Moss or Magee.

With respect to Einstein's first request, Crozer claims that no such documents exist.  Crozer is a major for-profit hospital system in the Greater Philadelphia Area with four hospitals and four outpatient centers.  According to Mr. Omar's own declaration, it is "the leading GAC hospital provider in Delaware County."  It is, therefore, implausible that Crozer has not considered the state of competition even once in the last three years.

As for Einstein's second request, Crozer argues that no "*internal analysis* documents concerning *potential* competition" exist.  *See* Crozer's Response to Request No. 5 (emphasis added).  Einstein has requested *any* documents relating to competition with Moss or Magee, including past, present, or future competition, and any emails relating to this subject.  Not only is the geographic scope of competition a central issue in this case, Crozer has put competition with Taylor Rehab squarely in issue by signing a declaration for the FTC, attesting that it does not compete with Moss or Magee.  It is therefore proportional to the needs of this case that Einstein be able to obtain discovery relating to whether and to what extent Taylor Rehab competes with Defendants' rehab facilities.

**Request No. 7** – Einstein has requested documents sufficient to show: (1) the inpatient rehabilitation facilities with which Taylor Rehab competes, (2) the skilled nursing facilities with which Taylor Rehab competes, (3) the geographies in which Taylor Rehab markets and/or advertises its services, and (4) the hospitals to which Taylor Rehab sends nurse liaisons.

During the parties most recent meet and confer on May 19, Crozer objected to Einstein's narrowed request on burden grounds and stated that it would not search for or collect these materials without an order from the Court.  Crozer's burden objection is unfounded.  Einstein is asking for documents *sufficient to show* these narrow categories of information.  Further, the discovery Einstein is seeking is proportional to the needs of this case.  Crozer itself has acknowledged the relevance of this information, as the declaration of Mr. Omar contains various assertions about Taylor Rehab, marketing, and SNFs.

**Request No. 9** – Einstein requested referral and/or denial logs created in the ordinary course of business from January 1, 2016 to the present for Taylor Rehab and for the Regional Rehabilitation Center of Delaware County Memorial Hospital ("DCMH Rehab").  These logs are relevant to defining both the relevant geographic market and the relevant product market in this case, as they typically include information about the hospital or facility from which a patient was referred and/or the reason for denial, including whether a patient chose a different facility.

Crozer has never disputed that such logs exist.  Instead, it has repeatedly directed Einstein to seek this information from Kindred Healthcare ("Kindred") instead.  Kindred is Crozer's joint venture

---

[1] Crozer did not serve written objections until more than two months after the subpoena was served, and only after Einstein expressed its intent to seek relief from the Court.  Einstein served its subpoena on April 10, 2020 with an original return date of April 30, which Einstein agreed to extend once to May 15.  Crozer did not serve its written objections until June 12, 2020.  The Federal Rules of Civil Procedure state clearly that written objections to a subpoena "must be served before the earlier of the time specified for compliance or 14 days after the subpoena was served."  Fed. R. Civ. P. 45(d)(2)(B).

partner for Taylor Rehab.  However, even if Kindred maintains referral and/or denial logs for Taylor Rehab, it does not follow that Crozer would not have custody or control over these documents.  Crozer jointly operates Taylor Rehab, and Taylor Rehab is located in one of *Crozer's own hospitals*.

**Request No. 10** – Einstein requested documents sufficient to show Crozer's physician referral patterns in the Greater Philadelphia Area.  Specifically, Einstein requested (1) documents sufficient to identify Crozer's referring physicians, physician groups, or other healthcare providers and (2) the full document associated with CROZER0000003, a document previously produced by Crozer to the FTC, or documents sufficient to explain what Crozer's "enhanced primary care strategy" is, as referred to in that document.

In response to Einstein's first request, Crozer argues that it has no list of referring physicians, and has no obligation to generate such a document.  Einstein is not asking Crozer to generate a list.  It is asking for documents *sufficient to show* its referring physicians, physician groups, or other healthcare providers.  Clearly, Crozer has documents relating to this request, as it previously produced data to the FTC, containing a partial list of referring physicians.

In response to Einstein's second request, Crozer objects on confidentiality grounds.  This is not a valid objection, as a Protective Order has been entered in this case, which provides safeguards for confidential information produced in this case.  Indeed, this Court already concluded, in denying a motion to quash filed by another third party, that the Stipulated Protective Ordered entered in this case "serves as an adequate safeguard."  *Fed. Trade Comm'n v. Thomas Jefferson Univ.*, No. CV 20-01113, 2020 WL 3034809, at *2 (E.D. Pa. June 5, 2020).

**Request No. 20 –** Einstein requested documents sufficient to show any plans by Crozer to expand its acute rehab services at Taylor Rehab or to open new rehabilitation facilities in the Greater Philadelphia Area.  In antitrust cases, information relating to entry and expansion is especially relevant, as it may inform how the relevant market is defined, or counteract any potential anticompetitive effects.

Crozer refused to even look for such documents on confidentiality grounds.  Again, this is not a valid basis for refusing to comply with Einstein's subpoena, as a Protective Order has been entered in this case.  *See id.*

**Request No. 24 –** Einstein requested documents relating to Crozer's strategy and rationale for its partnership with Kindred.  Specifically, Einstein requested documents sufficient to show how Crozer's partnership with Kindred has impacted the scope of services it offers at Taylor Rehab, the service area of Taylor Rehab, and/or whether Crozer and Kindred have any plans to expand their joint venture.  This information is highly relevant, as it bears on the ease with which existing GAC providers can offer or expand acute rehab services through joint ventures or other arrangements.

Crozer objected to this Request on confidentiality grounds as well.  It also directed Einstein to seek these documents from Kindred instead.  But it defies logic, and good business sense, that Crozer would have no documents in its custody or control relating to the status and/or strategy of its joint venture with Kindred.

\*\*\*\*

Crozer has failed to provide a valid basis for refusing to produce a single document in response to Einstein's subpoena.  All of the information Einstein seeks is highly relevant to the claims and defenses in this case and is proportional to the needs of this case.  Einstein respectfully requests

that the Court order Crozer to comply with Request Nos. 5, 7, 9, 10, 20, and 24 by no later than July 10, 2020.

**Non-Party Crozer's Position**

Non-Party Crozer and Non-Party Prospect (together, the "Non-Parties") have been drawn into this litigation because Einstein has served broad subpoenas on them seeking burdensome, duplicative and highly confidential and proprietary competitive information for use in its defense.[2]  According to Your Honor's rules, "[d]iscovery must be proportional to the needs of the case and should focus specifically on obtaining information truly necessary to resolve the litigation. Counsel must carefully and realistically assess the actual need for the information sought." (Judge Pappert's Rules at C.2).  Here, entirely absent from Einstein's Position is a statement about why the particular documents it seeks are "truly necessary to resolve the litigation," instead, moving party Einstein simply takes issue with the Non-Parties' objections, and presents them as insufficient.

A statement about why Einstein "actually needs" the documents it seeks is particularly important here, where the Non-Parties have already: made a burdensome production of documents and produced two declarations in the FTC's investigation (the "Declarations"); offered the declarants Sharif Omar, former CEO of Non-Party Crozer, now residing in Saudi Arabia, and Thomas Reardon, President of Prospect East Holdings Inc., a subsidiary of Non-Party Prospect that owns Non-Party Crozer, as fact witnesses for virtual depositions on the subject matter covered in their declarations; and agreed to produce another witness in response to Rule 30(b)(6) subpoenas served to the Non-Parties.[3]  Einstein fails to mention why the information already produced or that has been offered through testimony that Einstein has also requested is insufficient to "resolve the litigation" and why it instead needs burdensome and/or highly confidential materials in addition.[4]

---

[2] Rule 26 requires that courts limit discovery that is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P.  26(b)(2)(C)(i).  Rule 45(d) requires that the court "must quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ.  P.  45(d)(1), (d)(3)(A)(iv).  Non-parties should be afforded greater protection from unduly burdensome and unnecessary document requests.  *See Avago Techs. U.S. Inc. v. IPtronics Inc.*, 309 F.R.D. 294, 297 (E.D. Pa.  2015) ("Broader restrictions may be necessary to prevent a non-party from suffering harassment or inconvenience."); *Zukoski v. Phila.  Elec. Co.*, No. 93-4780, 1994 WL 637345, at * 3 (E.D. Pa.  1994) ("It is a generally accepted rule that standards for non-party discovery require a stronger showing of relevance than for party discovery.")  *See also Kull v. Arrowood Indemnity Co.*, 2013 WL 5603924 (D.N.J. 2013) ("The Court notes that Petitioner is a non-party and therefore is afforded greater protection from discovery than a normal party."); *Chazanow v. Sussex Bank*, No 11-1094 (D.N.J Jul. 1, 2014) ("[Movant] is a non-party and therefore is afforded greater protection from discovery than a normal party").

[3] The Non-Parties have offered their witnesses to be deposed the instant week of July 6, 2020, but on May 26, Einstein rejected the dates offered because it claims it needs this dispute resolved first, before deposing any Non-Party witness and despite a July 20 discovery deadline.

[4] This dispute is unlike the one this Court resolved concerning non-party Shannondell's motion to quash (*see FTC, et al. v. Thomas Jefferson University, et al.*, Case No. 20-01113, Memorandum (June 5, 2020)), primarily because Non-Party Crozer has already produced documents and submitted declarations in the FTC Investigation that are sufficient to determine the market in which Non-Party Crozer competes and other information relevant to this matter.  Here, as explained below, Einstein is not seeking new

Plaintiffs in this matter have sued to enjoin the Jefferson-Einstein merger and have defined the relevant geographic market as inpatient general acute care ("GAC") hospital services in Northern Philadelphia and Montgomery Counties and inpatient acute rehabilitation services in the Philadelphia area. (*See* Dkt. 7 at 17.) Non-Party Crozer operates two licensed GAC hospitals and one inpatient rehab facility ("IRF"), all in Delaware County. Non-Party Crozer does not operate any facilities in the geographic area defined by Plaintiffs as the relevant geographic market. Non-Party Prospect is the parent company of Non-Party Crozer, based in California, and provides coordinated regional healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania and Rhode Island.

The Non-Parties first became involved with this matter when they were contacted by the FTC in connection with its investigation of the merger (the "FTC Investigation") and served with discovery requests. In response to those requests, Non-Party Crozer produced documents bearing bates numbers CROZER0000001-0000776 (the "Crozer FTC Production")[5] and the Declarations.

The Declarations produced by the Non-Parties, as requested by the FTC in lieu of formal depositions, cover several topics including the market in which Non-Party Crozer's facilities compete, the geographic area in which it draws its patients, and any plans to expand service offerings. Relevant here, the Omar Declaration states that Non-Party Crozer "does not view Einstein as a competitor" (Omar Declaration at ¶ 5) and "does not view the . . . [Thomas Jefferson University Hospitals] as significant competitors for the vast majority of our services" (*Id.* at ¶ 4). Moreover, the documents produced by Non-Party Crozer,[6] in particular, a document produced at CROZER0000012-114 titled "Market Assessment" confirms the statements made in the Declarations.

Despite documents and Declarations already produced and the testimony the Non-Parties have agreed to provide, Einstein still insists that the Non-Parties produce burdensome, duplicative and highly confidential, proprietary and strategic documents. Instead of explaining why, as the moving party, each particular document it seeks is "truly necessary" and proportional to the needs of this case, Einstein has cherry picked the Non-Parties' objections and claims they are insufficient. Accordingly, Einstein responds to Einstein's narrowed requests to Non-Party Crozer (the "Requests") as follows:

---

information it does not have, but simply seeking burdensome document discovery in order to disprove the information the Non-Parties have already provided.

[5] The "handful" of documents – as Einstein describes it – produced to the FTC include a marketing assessment, documents comparing Taylor Rehab with another rehab facility, marketing materials, patient-intake information, agreements with insurance providers and others, among other things. Those documents and the Declarations have been marked as Highly Confidential under the Protective Order in this litigation.

[6] The Non-Parties have informed Einstein that Non-Party Crozer did not withhold any information in the FTC Investigation on the ground that documents or information resided with Non-Party Prospect and not Non-Party Crozer.

**REQUEST TO NON-PARTY CROZER NO. 5[7]:**

**Einstein seeks:** "Crozer's most recent market assessment or strategic plan, since the only market assessment Crozer previously produced to the FTC is from April 2017[.]"

**Non-Party Crozer responds:** The "market assessment" Einstein refers to was produced by Non-Party Crozer at CROZER0000012-114. That document, titled "Market Assessment," is dated April 2017. During the meet and confer calls, Einstein asked Non-Party Crozer to produce any other recent market assessments, if any exist. Non-Party Crozer has informed Einstein that the 2017 market assessment is the most recent such document created by Non-Party Crozer and further explained to Einstein that when it was acquired by Non-Party Prospect in 2016, focuses shifted towards internal operating issues rather than market assessments and so no additional recent market assessments have been created.

In addition, in order to obtain information in response to this Request, Einstein may question Non-Party Crozer's witnesses at their depositions. In fact, several of the 30(b)(6) topics to Non-Party Crozer, to which it agreed to produce a witness, cover the type of information in the market assessment (*see, e.g.,* Responses and Objections to 30(b)(6) Topics to Non-Party Crozer (hereinafter, "Crozer Topics") and Non-Party Prospect (hereinafter, ("Prospect Topics") at Crozer Topic No. 4/Prospect Topic No. 5 (competition with Jefferson or Einstein or any other provider in the Greater Philadelphia area), Crozer Topic No. 5 (competition between inpatient rehab facilities), Crozer Topic No. 6 (service areas where patients are drawn), Crozer Topic No. 7/Prospect Topic No. 6 (strategies for increasing patient volume), Crozer Topic No. 8 (marketing, advertising, plans, strategies toward patients, consumers, employers, physicians, or referral sources), Crozer Topic No. 9 (physician referral patterns).)

Thus, Non-Party Crozer has no additional documents to produce in response to this Request, but nevertheless will produce witnesses who can testify about how Non-Party Crozer currently views the market differently from Einstein and more in line with the Plaintiffs.

**Einstein seeks:** "[A]ny documents relating to competition between Taylor Rehab and Moss or Magee[.]."

**Non-Party Crozer responds:** Einstein has failed to mention that the first document in the Crozer FTC Production, is a document that compares Taylor Rehab with another rehab facility in the area, Bryn Mawr Rehab (*see* CROZER0000001). Non-Party Crozer has informed Einstein that it does not have any similar documents comparing Taylor Rehab to Moss or Magee. *That is because Non-Party Crozer does not consider either Moss or Magee to be competitors of Taylor Rehab.* Indeed, Sharif Omar, former CEO of Non-Party Crozer, stated in his declaration to the FTC (the "Omar Declaration"):

> Crozer does not compete significantly with IRFs outside Delaware County, including Einstein's nationally recognized MossRehab ("Moss") and Jefferson's nationally recognized Magee Rehabilitation Hospital ("Magee"). In my experience, patients who live near Moss or Magee generally would not travel to the Taylor Rehab Unity for services as they would have to travel a longer distance to the Taylor Rehab Unit.

Omar Declaration at ¶ 7. And further:

---

[7] This Request is similar to Request to Non-Party Prospect No. 9.

> [I]n my estimation, an average of 90% of the patients in the Taylor Rehab Unit are discharged from Crozer's GAC hospitals.

*Id.* Again, Einstein is free to question former employee Mr. Omar (despite his being beyond the jurisdiction of this Court) about these statements, as Non-Party Crozer has offered him as a fact witness on his declaration (*see* Crozer Topic No. 2 (Omar Declaration), and has also offered a 30(b)(6) witness on this topic (*see* Crozer Topic No. 4 ("Competition between You and any Jefferson facility, any Einstein facility, or any other inpatient GAC hospital facility or provider of Acute Rehab Services in the Greater Philadelphia Area, including, but not limited to, the market share or competitive position of providers of such services").

Also, the Court's analysis of whether the relevant geographic market includes Non-Party Crozer depends primarily on the extent to which Non-Party Crozer is a competitive constraint on the merging parties.  *See* 1 U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 2 (2010) ("The Agencies typically obtain substantial information from the merging parties. . . . Documents describing industry conditions can be informative regarding the operation of the market and how a firm identifies and assesses its rivals, particularly when business decisions are made in reliance on the accuracy of those descriptions.").  Evidence of Non-Party Crozer's competitive constraint on the merging parties would be *the merging parties'* views of Non-Party Crozer, including the impact Non-Party Crozer has on *the merging parties* and whether *the merging parties* believe a customer could credibly rely on Non-Party Crozer as an alternative. That evidence would necessarily come from the merging parties' documents, not Non-Party Crozer's or other non-parties' documents.

Even if Non-Party Crozer competed with Defendants, Non-Party Crozer's views of the merging parties as competitors are not determinative. Such documents are not relevant to the merging parties' bargaining leverage or Non-Party Crozer's competitive constraint on the merging parties. Indeed, Courts have expressly rejected parties' attempts to seek non-party competitively sensitive information in order to challenge market definition, as Einstein is trying to do now.[8]

Finally, to the extent Einstein seeks *any* mention of either Jefferson, Einstein, Moss or Magee in *all* of Non-Party Crozer's files and documents, including emails, this request is overbroad and unduly burdensome, especially to a non-party healthcare provider, particularly in the midst of the COVID-19 pandemic.  It is insufficient for Einstein to conclusorily claim that it is "proportional to the needs of this case that Einstein be able to obtain discovery relating to whether and to what extent Taylor Rehab competes with Defendants' rehab facilities." This is especially true where Non-Party Crozer has provided sworn statements, has confirmed that it has no documents that were created for the

---

[8] In *In re Ebay Seller Antitrust Litigation*, a district court similarly analyzed an antitrust defendant's need for information from a non-party to show the non-party was part of the relevant product market.  In that case, the defendant eBay sought competitively sensitive information from a non-party (Amazon) in order to counter the plaintiff's narrow product market definition and establish that the relevant market included the non-party.  The court acknowledged that "there is little doubt that Amazon has information that is relevant in the antitrust litigation." Nevertheless, the court recognized that "[m]uch of the relevant evidence, however, comes from eBay itself, or is information about eBay's alleged competitors that is either publicly available or not competitively sensitive . . . .  Amazon's competitively sensitive information is likely to be, at best, marginally more valuable than the evidence already in eBay's possession.  The arguments and evidence in the antitrust litigation reveal that eBay has crafted a robust argument that Amazon competes with eBay in both the third-party sales market and the online payments market.  Even if Amazon's competitively sensitive information would assist eBay in making those arguments, there is no evidence that convinces the court that they would add more than marginal weight." No. C09-735RAJ, 2009 WL 5205961 at *1-3 (W.D. Wash. Dec. 23, 2009)

purpose of exploring this issue and has offered additional deposition testimony on this issue. Accordingly, a burdensome sweeping search across all documents for information that contradicts information that has already been provided is not warranted from a non-party and is manifestly unreasonably. Nor is it proportional to the needs of the case.

**REQUEST TO CROZER NO. 7[9]:**

**Einstein seeks**: Documents sufficient to show "(1) the inpatient rehabilitation facilities with which Taylor Rehab competes[.]"

**Non-Party Crozer responds:** As discussed above, Non-Party Crozer has already produced a document comparing Taylor Rehab to Bryn Mawr Rehab (CROZER0000001) and statements in the Omar Declaration on this subject. Non-Party Crozer has also agreed to produce a witness to testify about "Competition between You and any Jefferson facility, any Einstein facility, or any other inpatient GAC hospital facility or provider of Acute Rehab Services in the Greater Philadelphia Area, including, but not limited to, the market share or competitive position of providers of such services." (Crozer Topic No. 4). Accordingly, additional burdensome document searches from a non-party are not warranted, not necessary and not proportional to the needs of the case.

**Einstein seeks**: Documents sufficient to show "(2) the skilled nursing facilities [('SNFs")] with which Taylor Rehab competes"

**Non-Party Crozer responds:** The Omar Declaration specifically states that "[t]he Taylor Rehab Unit *does not* compete with SNFs" and goes on to explain the differences between IRFs and SNFs and the reason why Non-Party Crozer believes IRFs are not comparable with SNFs. (*See* Omar Declaration ¶ 10 (emphasis added).) In addition, the Market Assessment document does not mention any SNFs as competitors. (*See* CROZER00001012-114). Accordingly, Non-Party Crozer would not have any documents on this subject. Einstein is free to ask Mr. Omar about the statements in his declaration (*see* Crozer Topic No. 2) and, specifically as requested in their 30(b)(6) Subpoena, "[c]ompetition between inpatient rehab facilities and skilled nursing facilities for the provision of Acute Rehab Services" (Crozer Topic No. 5). Accordingly, there is no need for Non-Party Crozer to run wide-spread and burdensome searches for documents responsive to this Request.

**Einstein seeks**: Documents sufficient to show "(3) [t]he geographies in which Taylor Rehab markets and/or advertises its services[.]"

**Non-Party Crozer responds:** This vague Request is simply seeks in a clumsy and burdensome way to confirm the information that has already been provided to Einstein, namely, that Taylor Rehab *does not* compete with Moss or Magee. Indeed, in addition to saying this expressly (*see* Omar Declaration at ¶ 7), the Omar Declaration states that, "in my estimation, an average of 90% of the patients in the Taylor Rehab Unit are discharged from Crozer's GAC hospitals." *Id.* There is no reason for Non-Party Crozer to undertake a burdensome document search given what it has already provided. Moreover, Non-Party Crozer has agreed to have Mr. Omar testify about his declaration to the extent it addresses the 30(b)(6) Topic "[y]our marketing and advertising efforts, plans, and strategies targeted toward patients, consumers, employers, physicians, or referral sources in the Greater Philadelphia Area." (Crozer Topic No. 8.) Einstein's conclusory statement that documents responsive to this request are "proportional to the needs of the case" without explaining more is insufficient to warrant production.

---

[9] This Request is identical to Request to Non-Party Prospect No. 11.

**Einstein seeks**: Documents sufficient to show "(4) the hospitals to which Taylor Rehab sends nurse liaisons."

**Non-Party Crozer responds:** Just like above, this extremely broad request seeks in yet another burdensome way – now aimed at producing proprietary logs concerning nurse liaisons – to show whether Taylor Rehab competes with Moss and Magee. Non-Party Crozer has already stated that is does not (*see* Omar Declaration at ¶ 7). Moreover, Non-Party Crozer has agreed to have Mr. Omar testify about his declaration to the extent it addresses the 30(b)(6) Topic "The service areas in which you draw patients for inpatient, outpatient, and Acute Rehab Services in the Greater Philadelphia Area, including . . . (b) the hospitals to which Taylor Rehab sends nurse liaisons to evaluate patients for potential admissions . . . ." (Crozer Topic No. 6). Einstein's conclusory statement that documents responsive to this request are "proportional to the needs of the case" without explaining more is insufficient.

**REQUEST TO NON-PARTY CROZER NO 9:**

**Einstein seeks:** "referral and/or denial logs created in the ordinary course of business from January 1, 2016 to the present for Taylor Rehab and for the Regional Rehabilitation Center of Delaware County Memorial Hospital ("DCMH Rehab")."

**Non-Party Crozer responds:** Einstein admits that this request – seeking patient referral and/or denial logs is another way to determine "both the relevant geographic market and the relevant product market in this case[.]" Simply put, Einstein has not established why referral and/or denial logs for *all* patients over a *four year* period is required or proportional so that they can determine whether Non-Party Crozer competes in the defined market. This is especially true where Non-Party Crozer has already made statements on this subject, has provided its most recent market assessment (CROZER0000012-114) and has offered additional testimony concerning its views on the market.

Nevertheless, to the extent such logs are required to establish the relevant market, as Einstein admits, Non-Party Crozer has informed Einstein that Kindred – not Non-Party Crozer – may keep such logs in the ordinary course of business and that Non-Party Crozer does not. Einstein's counsel has said it has already subpoenaed Kindred for these and other documents.

**REQUEST TO NON-PARTY CROZER NO. 10:**

**Einstein seeks:** Documents sufficient to show "(1) documents sufficient to identify Crozer's referring physicians, physician groups, or other healthcare providers[.]"

**Non-Party Crozer responds:** Again, this is another fishing expedition-type request aimed at determining the geographic area and product market from which Non-Party Crozer obtains its patients, a subject Non-Party Crozer has addressed in the Omar Declaration, in produced documents and has agreed to provide through testimony. Einstein has also specifically requested testimony on the topic "Physician referral patterns in the Greater Philadelphia Area for inpatient, outpatient, physician, or Acute Rehab Services, including any analyses of trends in or the expected future of how these referral patterns may change." (Crozer Topic No. 9.) Non-Party Crozer responded that to the best of its knowledge, it does not have any information on that topic. That is, Non-Party Crozer has not recently analyzed "physician referral patterns."

As to documents sufficient to identify all of Non-Party Crozer's referral sources, Non-Party Crozer has said that it does not maintain such a discrete listing. It has also said that its referral sources are highly confidential and proprietary and that it has serious reservations

about sharing such information with facilities in the Greater Philadelphia Area.  Here, where Einstein already has information about where Non-Party Crozer draws its patients, it is particularly unnecessary for a non-party to produce competitively sensitive information.

Further, Einstein's conclusory statement that the Protective Order entered in this case is sufficient to protect any competitively sensitive information is simply wrong, and has been rejected by other courts in similar cases.[10]  Indeed, Your Honor's own rules state that even where a protective order has been entered, "Except in exceptional circumstances, documents or evidence that form the basis for judgment in a case are unlikely to be protected against disclosure." (Judge Pappert Rules at C.3.)

**Einstein seeks:** Documents sufficient to show "(2) the full document associated with CROZER0000003, a document previously produced by Crozer to the FTC, or documents sufficient to explain what Crozer's "enhanced primary care strategy" is, as referred to in that document[.]."

**Non-Party Crozer responds:** Non-Party Crozer produced the document at CROZER0000003 to the FTC in order to show its strategy with respect to the geographic area in which it draws its patients. The remainder of the document from where that page comes is a highly confidential strategic document concerning a variety of subjects, which have nothing to do with this matter.  Einstein has made no effort to explain why it needs the remainder of that document, other than the fact that it is curious about it because it saw one page.  Einstein has made no showing whatsoever that it "truly needs" the remainder of CROZER000003.  Nor has Einstein established why it "truly needs" documents showing Non-Party Crozer's strategies, especially where Non-Party Crozer has offered testimony on this subject (*see* Crozer Topic No. 7 ("Your plans or strategies for increasing the patient volume at Your facilities, including, but not limited to, Your Plans to open, acquire, develop, construct, or expand new or existing facilities or physician practices."), which is identical to Prospect Topic No. 6).  As discussed above, courts have rejected Einstein's conclusory argument that the Protective Order provides sufficient protection.  Accordingly, there is no basis for Einstein's curiosity request for the remainder of CROZER0000003 or its strategies as discussed in that document.

---

[10] The protective orders' protection in this case is further limited by this District's policy in favor of public hearings.  We understand that this Court has already indicated that hearings and a trial in this case will be on the public record concerning the highly publicized and the very public  subject of these proceedings. In *In re: ANC Rental Corporation*, Judge Bartle III responded to a party's argument that the non-party's interest "could be safeguarded under a protective order" by explaining that the non-party "would be handicapped in shielding such information from being widely disseminated.  It would not be continually present at the bankruptcy proceedings, and its interests would undoubtedly be subordinate to those of the parties who would be present." Misc.  Act No. 02-148, 2002 U.S.  Dist.  LEXIS 12260, at *4 (E.D. Pa. June 20, 2002) ("If the hearing takes place, as fully anticipated, the cat would really be out of the bag. While we recognize that there is a mechanism available to the bankruptcy court which might protect the confidential information .  .  .  there is no guarantee that it will be used or will be effective."); *see also Mannington Mills Inc.  v.  Armstrong World Industries Inc.*, 206 F.R.D. 525, 530 (D. Del.  2002) ("What happens with any information disclosed by [a non-party] in response to [plaintiff]'s subpoena, particularly at trial, is anyone's guess.  Although the protective order allows the designation by [the non-party] that such information is confidential and limits initial disclosure to outside counsel, the parties to this litigation are left with the option of how disclosure of such confidential information is handled at trial."); *In re Ebay Seller Antitrust Litigation*. No. C09-735RAJ, 2009 WL 5205961 *4 (W.D. Wash. Dec. 23, 2009) ("[N]o one has addressed how they would protect Amazon's confidential information if they wanted to rely on it at trial or in another public court proceeding.").

**REQUEST TO NON-PARTY CROZER NO. 20:**

**Einstein seeks:** "[D]ocuments sufficient to show any plans by Crozer to expand its acute rehab services at Taylor Rehab or to open new rehabilitation facilities in the Greater Philadelphia Area."

**Non-Party Crozer responds:**  Documents concerning future plans are inherently proprietary and so Einstein must show that it has a compelling reason for seeking such documents.  Einstein has not provided any reason and considering what Non-Party Crozer has already produced, it cannot. Indeed, far from expanding, the Omar Declaration states that "[f]rom February to March 2019, Crozer *consolidated* its rehabilitation beds at DCMH into the Taylor Rehab unit to improve efficiency, as the two facilities offered duplicative services at locations that were close to each other."  *Id.*  at 6 (emphasis added).  Also, the declaration of Thomas Reardon (the "Reardon Declaration") states that "Prospect is also developing a world-class neurosciences effort at Crozer,"  (*see* Reardon Declaration ¶ 4) and Non-Party Crozer has offered both declarants as witnesses on the topic of their deposition (*see* Crozer Topic No. 2 and Prospect Topic No. 2).  Mr. Reardon stated in his declaration that his responsibilities include "overseeing the business development for Prospect East, including exploring and evaluating strategic transactions and collaborations."  (Reardon Declaration ¶ 1.)  And so, Mr. Reardon will be able to provide information sufficient to allow Einstein to determine whether any expansion efforts (or consolidations) impacts the service area in which Non-Party Crozer competes.  Moreover, the Non-Parties have offered deponents on topics covering Non-Party Crozer's future plans and strategies in the Greater Philadelphia Area.  (*See* Crozer Topic No. 7 and Prospect Topic No. 6).).  Thus, there is no need for the Non-Parties to produce highly confidential strategy and planning documents in this litigation where it is not a party.  As discussed above, the Protective Order is insufficient to protect such information in a matter that is headed for a public hearing in September.

**REQUEST TO NON-PARTY CROZER NO. 24[11]:**

**Einstein seeks:** "Documents relating to Crozer's strategy and rationale for its partnership with Kindred.  Specifically, Einstein requested documents sufficient to show how Crozer's partnership with Kindred has impacted the scope of services it offers at Taylor Rehab, the service area of Taylor Rehab, and/or whether Crozer and Kindred have any plans to expand their joint venture"

**Non-Party Crozer responds:** As discussed above, documents concerning Non-Party Crozer's strategies and potential expansion are highly confidential and proprietary and testimony on this subject has already been provided or will be provided in the upcoming depositions.  Einstein has not provided any reason for why these documents are truly needed.  Moreover, the Non-Parties have informed Einstein that some information it seeks is kept in the ordinary course of business by Kindred and so Einstein should seek that information from Kindred, to which the Non-Parties understand has also received a subpoena from Einstein.

--- 

While Einstein claims that "[a]ll of the information Einstein seeks is highly relevant to the claims and defenses in this case and is proportional to the needs of this case," the applicable standard is whether it is "truly necessary to resolve the litigation."  Einstein has failed to establish why it seeks – from a non-party – confidential and burdensome documents when it already has information sufficient to satisfy its actual needs.  In addition, Non-Party Crozer rejects Einstein's apparent request that this Court rule on this discovery dispute at the proposed teleconference and requests full briefing on these issues under the Rules.

---

[11] This Request is identical to Request to Non-Party Prospect No. 12.

### 2. Defendant Einstein's Subpoena to Third Party Prospect

**<u>Defendant Einstein's Position</u>**

Prospect is a medical holdings company that owns and operates 17 hospitals throughout the United States, including Crozer-Keystone Health System. During the course of the FTC's investigation, Prospect also provided a declaration relating to Defendants' proposed transaction. That declaration, which was initially drafted by the FTC and signed by Mr. Thomas Reardon, the President of Prospect East Holdings, Inc., asserts that Prospect "is interested in re-engaging in discussions with Einstein regarding a strategic partnership involving some or all of Einstein's assets if the proposed Jefferson-Einstein merger does not go forward."

Accordingly, Einstein served Prospect with a subpoena on May 28, 2020, seeking documents relating to its interest in acquiring Einstein (Request No. 2), its ability to do so (Request Nos. 3, 4, 5, 6, 7, 8, ), and any documents related to Defendants' proposed transaction (Request No. 1). Because Prospect owns and operates various hospitals in the Greater Philadelphia Area, Einstein also sought documents relating to competition with Einstein or Jefferson (Request No. 9), plans to enter or expand in the Greater Philadelphia Area (Request No. 10, 15), competition for GAC or acute rehab services in the Greater Philadelphia Area (Request No. 11), the strategy or rationale for Crozer's partnership with Kindred (Request No. 12), negotiations with payers (Request Nos. 13), and the impact of proposed changes to Medicare reimbursement for acute rehab services (Request No. 14).

The return date on Einstein's subpoena was June 5, 2020. However, Einstein received no response to its subpoena by that date. During multiple meet and confers, including on June 5, June 9, and June 10, Einstein sought a response to its subpoena, or a reason for Prospect's failure to respond. In those discussions, the only basis Prospect asserted for not responding was its concern that Einstein was seeking confidential information from Prospect in a case in which Prospect is not a party. As Einstein explained during the parties' meet and confers, this objection is meritless, because a Protective Order has been entered in this case.

On June 22, Einstein sent a letter to Prospect, noting that Prospect had waived its right to object under the Federal Rules of Civil Procedure, and asked once more for a response to its subpoena, before it sought relief from the Court. In response, Prospect finally served written objections. These objections are untimely under the Federal Rules, as they were served weeks after the return date and more than fourteen days after service of Einstein's subpoena. *See* Fed. R. Civ. P. 45(d)(2)(B); *see also Health Robotics, LLC v. Bennett*, No. 09-cv-0627, 2009 WL 10687717, at *2 n.2 (E.D. Pa. Oct. 13, 2009) ("Non-Parties' failure to timely object to the subpoenas requested resulted in waiver of any objections."); *Barnes Found. v. Twp. of Lower Merion*, No. CIV. A. 96-372, 1997 WL 169442, at *2 (E.D. Pa. Apr. 7, 1997) (non-party waived objections where it served written objections more than 14 days after service of subpoena).

Because Prospect waived its right to object, and when it did, its objections were unfounded, Einstein respectfully requests that the Court order Prospect to comply with the subpoena in full by no later than July 10, 2020.

**Non-Party Prospect's Position**

Non-Party Prospect is the parent company of Non-Party Crozer, based in California, and provides coordinated regional healthcare services in Southern California, Connecticut, New Jersey, Pennsylvania and Rhode Island. During the meet and confer calls on this Subpoena, Einstein refused to narrow its Requests to Non-Party Prospect, and so its Position above is the first time Non-Party Prospect has seen how Einstein has narrowed and characterizes its Requests as allegedly necessary. In fact, on the first meet and confer call on this subpoena on June 5, Einstein's counsel said that its subpoena to Non-Party Prospect would not be necessary if Non-Party Prospect was no longer interested in acquiring some or all of the assets of Einstein, as stated in the Reardon Declaration ¶ 4. Given this admission about the narrow reason for why Einstein wants information from Non-Party Prospect, it is clear that the subpoena to Non-Party Prospect is entirely overbroad and not "truly needed" to resolve this litigation, that is, the merger between Jefferson and Einstein. As such, Einstein is not entitled to any of the information it seeks in the subpoena to Non-Party Prospect.

The majority of the Requests to Non-Party Prospect concern its corporate-wide confidential financial information. In its Position above, Einstein glosses over several requests as aimed at Non-Party Prospect's "ability to" acquire some or all of Einstein's assets, as it stated it was interested in doing (*see* Reardon Declaration ¶ 4). Einstein lists those requests as Nos. Nos. 3, 4, 5, 6, 7, and 8. In reality, those requests are overbroad and burdensome requests seeking confidential financial information from Non-Party Prospect, many of which seek "all documents" in certain categories, nationwide. Those requests are as follows:

- **REQUEST NO. 3:** All communications between You and the Pennsylvania Office of the Attorney General's Charitable Trust Division from January 1, 2016 to present.

- **REQUEST NO. 4:** One copy of each of Your annual and quarterly consolidating and consolidated financial statements (income statements and balance sheets) from Fiscal Year 2015 to present.

- **REQUEST NO. 5:** All documents regarding any prospective financial forecast for Prospect and/or Prospect East, including but not limited to all details on supporting assumptions, from January 1, 2016 to present.

- **REQUEST NO. 6:** Documents sufficient to show historical and deferred capital expenditures at Your facilities, including but not limited to maintenance and growth expenditures, from January 1, 2016 to present.

- **REQUEST NO. 7:** All documents discussing the impact of the COVID-19 pandemic on Your current and future financials.

- **REQUEST NO. 8:** Documents sufficient to show all expansion or reduction in services at Your facilities from 2016 to present.

These requests are stunningly overbroad and seek highly confidential financial information of a non-party which only has a small portion of its business in the relevant geographic area and therefore has no bearing on this case. Moreover, Non-Party Prospect is a privately held company and does not make its financial information available to the public. Accordingly, these requests to Non-Party Prospect are unlikely to lead to information relevant to this matter and are simply designed to harass a non-party, and are frankly sought in bad faith.

These Requests for confidential financial documents are even more outrageous in light of Non-Party Prospect's offer to produce a witness, Thomas Reardon, to testify on these same subjects (*see* Prospect Topic No. 4 ("Your financial condition, including the impact of the COVID-19 pandemic on Your current and future financial condition and Your interest and/or ability to partner with and/or acquire Einstein.").  Einstein admits that what it is seeking through these Requests are "documents relating to its interest in acquiring Einstein (Request No. 2) its ability to do so," and yet that is precisely what it is getting through Topic No. 4.  Einstein does not need Non-Party Prospect to produce a vast array of highly confidential financial documents in order to meet its claimed needs.

Non-Party Prospect responds to the remainder of the Requests addressed in Einstein's position as follows:

**Request No. 1**: "any documents related to Defendants' proposed transaction[.]"

Einstein has abandoned this Request as to Non-Party Crozer (see Request to Crozer No. 2), likely because any document responsive to this Request would either be privileged, such as attorney-drafts of the Declarations, or could be obtained from a party in this matter, *e.g.*, communications with Plaintiffs.  Non-Party Prospect therefore has no non-privileged documents to produce in response to this Request.

**Request No. 9**: "[d]ocuments relating to competition with Einstein or Jefferson[.]"

This Request overlaps with Request No. 5 to Non-Party Crozer and, as discussed above in Non-Party Crozer's Position, the Non-Parties have produced documents and made statements in the sworn Declarations and have offered 30(b)(6) testimony on this subject, specifically through Non-Party Prospect Topic No. 5 (competition with Jefferson or Einstein or any other provider in the Greater Philadelphia area).

**Request Nos. 10 and 15**: "plans to enter or expand in the Greater Philadelphia Area."

It is unclear whether Einstein intends to narrow these Requests through its description of them.  In the event it does not, these Requests are entirely overbroad.  Request No. 10 seeks "[a]ll documents, including internal business plans, board/management presentations, consultant reports, or capital plans discussing or analyzing Your plans to provide, develop, expand, or reduce the inpatient general acute care services, outpatient services, or Acute Rehab Services You offer patients in the Greater Philadelphia Area, including but not limited to the types of rehabilitation patients and conditions treated at Your facilities."  Notably, Einstein has abandoned this same Request as to Non-Party Crozer (*see* Request to Non-Party Crozer No. 6).  Request No. 15 seeks "All documents discussing, describing, or analyzing the entry or expansion of inpatient rehabilitation hospitals, inpatient rehabilitation units within hospitals, and/or skilled nursing facilities by any other healthcare provider within the Greater Philadelphia Area from January 1, 2016 to the present."  This Request is identical to Request to Non-Party Crozer No. 20.  As discussed above in Non-Party Crozer's Position, Einstein has not provided a compelling reason for discovering highly confidential strategic documents where the Non-Parties have produced statements in the Declarations on this subject and have agreed to produce deposition testimony on the same.  Again, as discussed above, Mr. Reardon stated in his declaration that his responsibilities include "overseeing the business development for Prospect East, including exploring and evaluating strategic transactions and collaborations."  (Reardon Declaration ¶ 1).  And so, Mr. Reardon will be able to provide information at his deposition sufficient to allow Einstein to determine whether any expansion efforts (or consolidations) impacts the service area in which Non-Party Crozer competes.  Moreover, the Non-Parties have offered deponents on topics covering Non-Party Crozer's future plans and strategies in the Greater Philadelphia Area.  (*See*  Crozer Topic No. 7 and Prospect Topic No. 6).).  Thus, there is

no good faith need for the Non-Parties to produce highly confidential strategy and planning documents in this litigation where it is not a party.  As discussed above, the Protective Order is insufficient to protect such information in a matter that may be headed for a public hearing in Septemeber.

**Request No. 11:** "competition for GAC or acute rehab services in the Greater Philadelphia Area[.]"

This Request is identical to Request to Non-Party Crozer No. 7.  As discussed above, the Non-Parties have already produced its most recent market assessment and a document comparing Taylor Rehab to another rehab facility in the Greater Philadelphia Area.  The Non-Parties have further produced sworn Declarations discussing competition and have agreed to produce deposition testimony on that subject.  (*See* Prospect Topic No. 5 ("Competition between You and any Jefferson facility, any Einstein facility, or any other inpatient GAC hospital facility or provider of Acute Rehab Services in the Greater Philadelphia Area, including, but not limited to, the market share or competitive position of providers of such services.").  Accordingly, additional burdensome document searches from a non-party are not warranted or necessary.

**Request No. 12:** "the strategy or rationale for Crozer's partnership with Kindred."

This Request is identical to Request to Non-Party Crozer No. 24.  As discussed above, documents concerning Non-Party Crozer's strategies and potential expansion are highly confidential and proprietary and testimony on this subject has already been provided or will be provided in the upcoming depositions.  Einstein has not provided any reason for why these documents are needed.  Moreover, the Non-Parties have informed Einstein that some information it seeks is kept in the ordinary course of business by Kindred and so Einstein should seek that information from Kindred, to which the Non-Parties understand has also received a subpoena from Einstein.

**Request No. 13:** "negotiations with payers[.]"

Einstein's Requests to Non-Party Crozer include several requests concerning payers (*see* Request Nos. 14-18).  Einstein has already abandoned those Requests as to Non-Party Crozer and Non-Party Prospect has no unique information on this subject.  The Non-Parties have already produced documents containing information about the healthcare plans with which Non-Party Crozer participates, including the agreements themselves. Regardless, Einstein has not articulated any good faith reason why Non-Party Prospect's confidential negotiations with payers is at all "truly necessary" to resolve this litigation.

**Request No. 14** "the impact of proposed changes to Medicare reimbursement for acute rehab services."

This Request is identical to Request to Non-Party Crozer No. 19.  Non-Party Crozer and Non-Party Prospect informed Einstein in their respective responses and objections that they do not have any documents in response to this Request.

---

**The Non-Parties have not Waived their Objections**

Einstein's attempt to obtain wholesale compliance to its Subpoenas because it alleges the Non-Parties' responses and objections were served after the return date is truly outrageous and made in bad faith as detailed below.  From the time the first subpoena was served (there are now four), the Non-Parties and Einstein agreed to work together in good faith to negotiate, narrow and timely

respond to the Subpoenas. The need for cooperation and timing flexibility was particularly important because the COVID-19 pandemic has stretched resources at the Non-Parties and all healthcare facilities.

With respect to the Subpoena to Non-Party Crozer, the parties began negotiating in good faith immediately after service of the subpoena on April 10. Non-Party Crozer provided detailed oral responses and objections over the multiple meet and confer calls held in the weeks after and, notably, Einstein recorded those responses and objections in letters sent to Non-Party Crozer. Einstein cannot in good faith claim that Non-Party Crozer's responses were untimely or that it did not respond within the 14 days proscribed by Rule 45 when Non-Party Crozer's written responses, and Einstein's own letters, contain specific references to the conversations and oral responses it gave on the multiple meet and confer calls.

With respect to the Subpoena to Non-Party Prospect, Einstein's counsel asked if counsel for California-based Prospect would accept service of a document subpoena without a waiver of any jurisdictional or other objections. Counsel for Non-Party Prospect stated on May 26 in an email to counsel for Einstein that it would only agree to accept service on behalf of Non-Party Prospect "with the understanding that [Einstein] will extend [Non-Party Prospect's] time flexibility in responding under the present circumstances." Counsel for Einstein so agreed in an email dated May 27 and stated that, "[w]e are sensitive to the restraints imposed by the ongoing health crisis and the court's deadlines in this case, so we are committed to working with" Non-Party Prospect regarding the timing of responses. Einstein's counsel conveniently makes no mention of this agreement in its discussion above. After so agreeing, Einstein then served its subpoena on Non-Party Prospect on May 28, 2020 but with a return date of June 5, *just one week later*. The parties met and conferred only one time about the subpoena to Non-Party Prospect, on June 5. In fact, that meet and confer call was delayed because of the mass power and internet outages in the Philadelphia area that directly impacted all local counsel.

During that first meet and confer call, which also included representatives of the FTC and the Pennsylvania Attorney General's office, Einstein did not narrow its requests at all but rather asked whether Non-Party Prospect was still interested in acquiring some or all of the assets of Einstein as it had stated in the prior Reardon Declaration. Einstein's counsel said that if Non-Party Prospect was not interested, then its Subpoena was moot. Non-Party Prospect's counsel agreed to go back to its client to get an answer. During the June 5 meet and confer, the parties also discussed the persons Einstein wanted to depose and the Non-Parties agreed to try to produce Sharif Omar despite the fact that he is no longer the CEO of Non-Party Crozer and resides in Saudi Arabia. Counsel for Non-Party Prospect and Einstein then had a discussion on the night of June 10 in which Non-Party Prospect's counsel indicated in response to Einstein's inquiry that the Non-Parties were still interested in acquiring some or all of the assets of Einstein. Counsel for Einstein responded that she would speak to her clients about the Non-Parties' continued interest and get back promptly with an answer. Non-Party Prospect heard nothing in response from Einstein until June 19 during another meet and confer call about the subpoena to Non-Party Crozer. During that meet and confer on June 19, Einstein made no mention of the Subpoena to Non-Party Prospect. The Non-Parties' counsel asked Einstein's counsel about her client's response to the Non-Parties' recently expressed interest in a possible acquisition. Counsel for Einstein apologized for the delay and said her client had no present interest. Accordingly, Non-Party Prospect then assumed the subpoena to it was back on the table. Non-Party Prospect served its conforming written responses on June 23, two business days after that call.

Therefore, for both document Subpoenas at issue here, the Non-Parties were operating in good faith that there were understood extensions to the return dates to the subpoenas due to the subject matter of the meet and confers as well as the pandemic crises facing the healthcare industry.

Also, the Non-Parties' written responses were not untimely because the understandings and course of dealing between the Non-Parties and Einstein fit squarely within the exceptions for consideration of untimely objections.  "Examples of situations where courts have found that unusual circumstances warrant consideration of untimely objections include "where: (1) the subpoena is overbroad on its face and exceeds the bounds of fair discovery; (2) the subpoenaed witness is a non-party acting in good faith; and (3) counsel for the witness and counsel for the subpoenaing party were in contact concerning the witness' compliance prior to the time the witness challenged the legal basis for the subpoena." *R.B. v. Hollibaugh*, No. 1:16-CV-01075, 2017 WL 1196507 *5 (M.D. Pa. Mar. 31 2017). The circumstances of this dispute consist of at least situations (2) and (3) (and (1) as well, as the Non-Parties have articulated above) identified by the court in *Hollibaugh*.   As is evident from the frequent communications between the Non-Parties and Defendant Einstein, the Non-Parties have been acting in good faith in trying to work with Einstein to limit the scope of an extraordinarily broad subpoenas, and Einstein has not alleged otherwise.  And like in *Hollibaugh*, counsel have been in frequent "contact concerning the witness' compliance prior to the time the witness challenged the legal basis for the subpoena." *Id.*

Moreover, district courts frequently reject waiver arguments in situations like here where a non-party's counsel works in good faith to negotiate a subpoena but those negotiations break down. For instance, in *Concord Boat Corp. v. Brunswick Corp.*, the court found the subpoenaed party's "status as a non-party relevant to determining whether [non-party]'s untimely action under Rule 45 bars this Court's consideration of [the non-party]'s objections to the [subpoena]." The court held that the non-party did not waive objections in large part because "[non-party]'s and plaintiffs' respective counsels were in frequent contact concerning [non-party]'s compliance with the [subpoena] prior to the time non-party filed the instant motion. The facts presented by the parties demonstrate that, until just before [the non-party] filed the instant motion, the parties course of conduct regarding the [subpoena] was one of cooperation, not contention. Based on such a course of conduct, [the non-party] reasonably expected that plaintiffs would continue to afford [the non-party] an opportunity to informally negotiate the scope of plaintiffs' document request." 169 F.R.D. 44, 52 (S.D.N.Y. 1996).[12]

---

[12] The cases Einstein cites above are inapposite, as they do involve regular negotiations between the parties nor do they involve the extraordinary circumstances the parties here currently face.  *See Barnes Found. v. Twp. of Lower Merion*, No. CIV. A. 96-372, 1997 WL 169442, at *2 (E.D. Pa. Apr. 7, 1997) (finding that objections were waived only because the parties did not have an agreement regarding the timing of objections to document production and the producing party "neither demonstrated nor alleged any unusual circumstances or good cause for her failure to act timely"); *Health Robotics, LLC v. Bennett*, No. 09-cv-0627, 2009 WL 10687717, at *2 n.2 (E.D. Pa. Oct. 13, 2009) (describing a different order where the Court found waiver applied (with no factual context discussed by the Court), but still considered the subpoenaed party's objections).

Respectfully submitted,


/s/ *Virginia A. Gibson*                              /s/ *Carl W. Hittinger*
Virginia A. Gibson                                   Carl W. Hittinger
Counsel for Defendant Albert Einstein                Counsel for Non-Parties Crozer
Healthcare Network                                   Keystone Health Center and Prospect Medical
                                                     Holdings, Inc.


cc:     All counsel of record

# EXHIBIT F

# BakerHostetler

Baker&Hostetler LLP

2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104-2891

T 215.568.3100
F 215.568.3439
www.bakerlaw.com

Carl W. Hittinger
direct dial: 215.564.2898
chittinger@bakerlaw.com

July 13, 2020

**VIA E-MAIL**

Virginia A. Gibson, Esq.
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004

*Re:*   **Federal Trade Commission, et al. v. Thomas Jefferson University, et
       al.,Case No. 2:20-cv-01113-GJP (E.D. Pa.)**

Dear Ginny:

This is to inform you that Non-Party Prospect Medical Holdings, Inc. is amending
the January 7, 2020 declaration of Tom Reardon to state that it has no present
interest in acquiring the assets of Einstein. Therefore, it will not be producing its
current consolidated financial statement, as was discussed with the Court in our
July 7 call, because there is no need to do so.

Sincerely,

Carl W. Hittinger


Copied via email:

Abigail Wood (awood@attorneygeneral.gov)
Gus Chiarello (gchiarello@ftc.gov)

# EXHIBIT G

| | |
|---|---|
| **From:** | Gibson, Virginia A. |
| **To:** | Hittinger, Carl W. |
| **Cc:** | Rancour, Kimberly D.; Chiarello, Gustav; Wood, Abigail; Stach, Alyse F.; Hamilton, John |
| **Subject:** | RE: Einstein/Jefferson Merger Litigation |
| **Date:** | Wednesday, July 15, 2020 5:51:57 PM |
| **Attachments:** | image001.jpg |
| | image002.jpg |
| | image003.jpg |
| | image004.jpg |
| | image005.jpg |

Thank you

---

**From:** Hittinger, Carl W. [mailto:chittinger@bakerlaw.com]
**Sent:** Wednesday, July 15, 2020 5:48 PM
**To:** Gibson, Virginia A.
**Cc:** Rancour, Kimberly D.; Chiarello, Gustav; Wood, Abigail; Stach, Alyse F.; Hamilton, John
**Subject:** RE: Einstein/Jefferson Merger Litigation

Ginny. Yes, my letter was our way of notifying you on behalf of our clients how Mr. Reardon's declaration was changing on that issue. He will testify about that change at his deposition. Carl


Carl W. Hittinger
Partner
BakerHostetler LLP
(215) 564-2898 (work office)
(215) 840-7293 (mobile)
(215) 572-0208 (home office)

On Jul 15, 2020 5:30 PM, "Gibson, Virginia A." <virginia.gibson@hoganlovells.com> wrote:
Carl,
I'm confused. Your letter stated his declaration was changing. Please clarify.
Thank you,
Ginny

---

**From:** Hittinger, Carl W. [mailto:chittinger@bakerlaw.com]
**Sent:** Wednesday, July 15, 2020 5:05 PM
**To:** Gibson, Virginia A.
**Cc:** Rancour, Kimberly D.; Chiarello, Gustav; Wood, Abigail; Stach, Alyse F.; Hamilton, John
**Subject:** RE: Einstein/Jefferson Merger Litigation

Ginny. We were not intending to revise Mr. Reardon's declaration with his deposition taking place on Friday, at which he will explain. Carl

Carl W. Hittinger
Partner
BakerHostetler LLP
(215) 564-2898 (work office)
(215) 840-7293 (mobile)
(215) 572-0208 (home office)

On Jul 15, 2020 4:14 PM, "Gibson, Virginia A." <virginia.gibson@hoganlovells.com> wrote:

[External Email: Use caution when clicking on links or opening attachments.]

Dear Carl,

When might we expect the revised declaration from Mr. Reardon?  With his deposition on Friday, we ask that we receive it no later than noon tomorrow.

Best regards,

Ginny

**Virginia Gibson**
Partner

**Hogan Lovells US LLP**
1735 Market Street, Suite 2300
Philadelphia, PA 19103

Tel:        +1 267 675 4600
Direct:    +1 267 675 4635
Mobile:   +1 215 260 9028
Email:     virginia.gibson@hoganlovells.com
              www.hoganlovells.com
*Please consider the environment before printing this e-mail.*

Follow Hogan Lovells Life Sciences and Health Care
for the latest industry news and updates:



12398_EUs_LinkedIn email_SIG sml (2)

---

**From:** Hittinger, Carl W. [mailto:chittinger@bakerlaw.com]
**Sent:** Monday, July 13, 2020 9:12 PM
**To:** Gibson, Virginia A.
**Cc:** Rancour, Kimberly D.; Chiarello, Gustav; Wood, Abigail; Stach, Alyse F.
**Subject:** Einstein/Jefferson Merger Litigation

Ginny, please find the attached letter.   Carl

**Carl W. Hittinger**
Partner



Cira Centre
2929 Arch Street | 12th Floor
Philadelphia, PA 19104-2891
T +1.215.564.2898
M +1.215.840.7293

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
T +1. 202.861.1774

chittinger@bakerlaw.com
bakerlaw.com

 

This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law. If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content
of this email is limited to the matters specifically addressed herein
and may not contain a full description of all relevant facts or a
complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.

If you would like to know more about how we are managing the impact of the COVID-19 pandemic on our firm then take a look at our brief Q&A. If you would like to know more about how to handle the COVID-19 issues facing your business then take a look at our information hub.

**About Hogan Lovells**
Hogan Lovells is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP. For more information, see www.hoganlovells.com.

CONFIDENTIALITY. This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system.

# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-----------------------------x

FEDERAL TRADE COMMISSION and  :

COMMONWEALTH OF PENNSYLVANIA,  :

  :

       Plaintiffs,     :

  :  Civil Action No.

   vs.           :

  :  2:20-cv-01113

THOMAS JEFFERSON UNIVERSITY  :

and ALBERT EINSTEIN      :

HEALTHCARE NETWORK,      :

  :

       Defendants.    :

-----------------------------x


HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER


VIRTUAL VIDEOTAPED DEPOSITION OF

PROSPECT MEDICAL 30(b)(6) CORPORATE REPRESENTATIVE

THOMAS M. REARDON

Friday, July 17, 2020

9:06 a.m. Eastern Standard Time


REPORTER:  Dawn A. Jaques, CSR, CLR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

```
 1    APPEARANCES:
 2
 3    On behalf of Plaintiff Federal Trade Commission:
             GUSTAV P. CHIARELLO, ESQ.
 4           Federal Trade Commission
             Mergers IV Division
 5           Bureau of Competition
             400 7th Street, SW
 6           Washington, D.C.  20024
             PHONE:   (202) 326-3100
 7           EMAIL:   gchiarello@ftc.gov
 8
 9    On behalf of Plaintiff Commonwealth of
10    Pennsylvania:
             STEPHEN SCANNELL, ESQ.
11           Commonwealth of Pennsylvania
             Office of the Attorney General
12           Chief Deputy Attorney General
             Antitrust Section
13           14th Floor Strawberry Square
             Harrisburg, Pennsylvania  17120
14           PHONE:   (717) 787-4530
             EMAIL:   sscannell@attorneygeneral.gov
15
16    On behalf of Defendant Albert Einstein
17    Healthcare Network:
             VIRGINIA (GINNY) A. GIBSON, ESQ. (Philly)
18           JOHN HAMILTON, ESQ.
             Hogan Lovells US LLP
19           555 13th Street, NW
             Washington, D.C.  20004
20           PHONE:   (267) 675-4635  (Ms. Gibson)
                      (202) 804-7898  (Mr. Hamilton)
21           EMAIL:  virginia.gibson@hoganlovells.com
22                   john.hamilton@hoganlovells.com
```

Page 3

1     APPEARANCES (Continued):

2

3     On behalf of the Witness and Prospect Medical:

      CARL W. HITTINGER, ESQ.

4     ALYSE F. STACH, ESQ.

      BakerHostetler

5     Cira Centre, 12th Floor

      2929 Arch Street

6     Philadelphia, Pennsylvania  19104-2891

      PHONE:   (215) 564-2898  (Mr. Hittinger)

7              (215) 564-5728  (Ms. Stach)

8     EMAIL:   chittinger@bakerlaw.com

9              astach@bakerlaw.com

10

11

12    VIDEOGRAPHER:

13        Andy Mortensen, Digital Evidence Group

14

15

16

17

18

19

20

21

22

Page 4

1                  I-N-D-E-X

2   WITNESS:                          PAGE:

3   THOMAS REARDON

4        Examination by Ms. Gibson    ...... 11, 270

5        Examination by Mr. Chiarello    ......   190

6

7                E-X-H-I-B-I-T-S

8   EXHIBIT NUMBER:                   PAGE:

9   DX1401       Subpoena   ...................    12

10   DX1402       Consolidated Financial Statements
                  for Albert Einstein Healthcare
11                   Network
                  CROZER0000980 - 0001024    ......   88

12   DX1403       November 2014 PowerPoint
                  Crozer-Keystone, Springfield,
13                   Pennsylvania CONFIDENTIAL
                  CROZER0000778 - 0000852    .....   117

14   DX1404       May 20, 2020, PowerPoint
                  Neurosciences Strategic Plan
15                   CROZER0000968 - 0000977    .....   139

16   DX1405       April 28, 2020, PowerPoint
                  Neurosciences Hospital
17                   Final Report
                  CROZER0000878 - 0000931     150, 263

18   DX1406       November 1, 2018, Updated
                  March 21, 2019, Executive Summary
19                   Crozer-Keystone Health System and
                  Kindred Hospital Rehabilitation
20                   Services
21                   CROZER0000932 - 0000936    .....   165

22

Page 5

1                      INDEX (Continued)

2                      E-X-H-I-B-I-T-S

3   EXHIBIT NUMBER:                     PAGE:

4   DX1407      July 16, 2017, Moody's Investors

                 Service Announcement, "Prospect's

5                  Medical's sale-leaseback improves

                 liquidity, however operating

6                  challenges remain"

7                  (No Bates number) ........... 177

8   DX1408      June 4, 2020, letter to Leonard

                 Green & Partners from members of

9                  Congress

                 (No Bates number) ...... 178, 274

10   DX1409      July 13, 2020, letter to Virginia

                 Gibson from Carl Hittinger

11                  (No Bates number) ....... 189, 246

12   DX1410      July 13-15, 2020, email chain

                 between Virginia Gibson and

13                  Carl Hittinger

                 (No Bates number) (1 page) ... 189

14

15

16              *** PX EXHIBITS ***

17   EXHIBIT NUMBER:                     PAGE:

18   PX4117      Text message exchange between

                 Tom Reardon and Barry Freedman   211

19   PX4127      July 15, 2019, Business Wire

                 article, "Prospect to Receive

20                  $1.55 Billion Investment from

21                  Medical Properties Trust, Inc.

22                  CROZER0000960 - 0000962 ..... 192

Page 6

1                    INDEX (Continued)

2              ***    PX EXHIBITS   ***

3    EXHIBIT NUMBER:                              PAGE:

4    PX4130      June 30, 2020, joint letter to

                 Judge Pappert   .....   232, 250, 270

5    PX4131      July 9, 2020, letter to Carl

                 Hittinger from Virginia Gibson

6                (Document not provided)     240, 272

7    PX5012      Declaration of Thomas Reardon

                 PX5012-001 through 002   ..  23, 197

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1             P R O C E E D I N G S

2         THE VIDEOGRAPHER:  This begins the

3  media of the videotaped deposition of Thomas

4  Reardon as corporate representative for Prospect

5  Medical Holdings Incorporated, taken by counsel

6  for the defendants in the matter of Federal Trade

7  Commission and Commonwealth of Pennsylvania vs.

8  Thomas Jefferson University and Albert Einstein

9  Healthcare Network, in the United States

10  District Court for the Eastern District of

11  Pennsylvania, Case No. 20-01113.

12         This deposition is being conducted by

13  Zoom and recorded in Irving, Texas, on July 17th,

14  2020.  The time on the video screen is 9:06 a.m.

15         My name is Andy Mortensen; I am the

16  legal videographer from Digital Evidence Group.

17  The court reporter is Dawn Jaques, in association

18  with Digital Evidence Group.

19         Due to the nature of remote reporting,

20  please pause briefly before speaking to ensure all

21  parties are heard completely.

22         Will counsel please introduce

7/17/2020               FTC, et al. v. Thomas Jefferson University, et al.     Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

Page 8

1  themselves for the record?

2        MS. GIBSON:  Yes, good morning.

3  Virginia Gibson from Hogan Lovells, representing

4  Defendant Albert Einstein Health Network.

5        And with me is my colleague,

6  Mr. Hamilton.

7        MR. HAMILTON:  Yes, good morning.

8  John Hamilton with Hogan Lovells for Albert

9  Einstein Healthcare Network.

10       MR. CHIARELLO:  And I am Gus

11  Chiarello, representing Plaintiff Federal Trade

12  Commission.

13       MR. SCANNELL:  And Steve Scannell,

14  representing the Plaintiff Commonwealth of

15  Pennsylvania.

16       THE VIDEOGRAPHER:  All right, will the

17  court reporter please swear in the witness?

18       MR. HITTINGER:  I don't think I

19  identified myself.  This is Carl Hittinger at

20  BakerHostetler.  I'll be representing the witness,

21  Tom Reardon, and I'm also representing Non-Parties

22  Prospect Medical Holdings, Inc., and

Page 9

1   Crozer-Keystone Health System.

2              THE REPORTER:  Okay.

3              MS. GIBSON:  One more -- one more

4   counsel.

5              MS. STACH:  And Alyse Stach, also for

6   the witness.

7              THE VIDEOGRAPHER:  Okay, will the

8   court reporter please swear in the witness?

9              THE REPORTER:  Yes.  The attorneys

10  participating in this deposition acknowledge that

11  due to the severity of COVID-19 and following the

12  practice of social distancing, I am not physically

13  present in the deposition room and that I will be

14  swearing in the witness and reporting this

15  deposition remotely.

16             Do all parties stipulate to the

17  validity of this remote swearing and remote

18  reporting via video conference and that it will be

19  admissible in the courtroom as if it had been

20  taken following Rule 30 and other rules of the

21  Federal Rules of Civil Procedures?

22             Please indicate your agreement by

Page 10

1    stating your name and your agreement on the

2    record.

3              MS. GIBSON:  Virginia Gibson for

4    Defendant Albert Einstein Healthcare Network, we

5    agree.

6              MR. HITTINGER:  Carl Hittinger for the

7    witness, we agree as well.

8              MR. CHIARELLO:  Gus Chiarello for the

9    Plaintiff Federal Trade Commission, and we agree.

10             MR. SCANNELL:  Steven Scannell for the

11   Plaintiff Commonwealth of Pennsylvania, and we

12   agree.

13             THE REPORTER:  Okay, Mr. Reardon, will

14   you raise your right hand to be sworn, please?

15        (The witness was administered the oath.)

16   Whereupon,

17             THOMAS M. REARDON,

18        was called as a witness, after having been

19        first duly sworn by the Notary Public,

20        was examined and testified as follows:

21

22

Page 44

1    role, and I think I made edits that talked about

2    coordinated regional care, as I recall.

3          Q    And no other edits, sir?

4          A    I don't recall.  I don't recall any.

5          Q    Okay.  Looking at paragraph 3 of

6    DX1401, it states that you've been designated --

7    have you been designated, sir, to testify on the

8    topics in paragraph 3, any proposed, discussed, or

9    attempted merger, acquisition, affiliation, or

10   potential relationship between you and any

11   hospital or hospital system in the Greater

12   Philadelphia Area from January 1, 2011?

13         A    Sorry.  Yes.

14         Q    We'll go into that in a little more

15   detail later.

16              Paragraph 4, you may read that and

17   answer the question whether you've been designated

18   to testify on the financial condition of Prospect

19   Medical Holdings.

20              MR. HITTINGER:  Don't answer that

21   question.

22              Ms. Gibson, you know we've objected to

Page 45

1    that, you know that the Court has addressed that,

2    and I think all the other -- well, not all of

3    them, but many of these subjects have been

4    objected to, not ruled upon.  I think you

5    indicated you weren't going to ask questions

6    about.

7              So the witness really can't answer

8    that question.  I can, and that's my answer, and

9    I'm instructing him not to answer any questions

10   about number 4.

11             MS. GIBSON:  I do not agree with your

12   statement, Mr. Hittinger.  I've just asked if

13   you -- other than Mr. Reardon, do you know of

14   anyone else who's been designated to testify on

15   these topics?

16             THE WITNESS:  No.

17             MS. GIBSON:  All right.  The court

18   order does speak for itself.

19             MR. HITTINGER:  He can answer

20   questions about Einstein to the extent it's

21   covered by paragraph 4, but he's not going to

22   answer questions about how the pandemic has

7/17/2020        FTC, et al. v. Thomas Jefferson University, et al.     Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

Page 46

1   affected Prospect nationwide.

2          MS. GIBSON:  We'll get to those

3   questions.  Thank you, sir.

4          BY MS. GIBSON:

5      Q   Paragraph 5, Mr. Reardon, the topic is

6   competition between you and any Jefferson

7   facility, any Einstein facility, or any other

8   inpatient general acute care hospital facility or

9   provider of acute rehab services in the Greater

10  Philadelphia Area.

11         MR. HITTINGER:  You can answer that,

12  Mr. Reardon.

13         THE WITNESS:  Yes.

14         BY MS. GIBSON:

15     Q   And paragraph 6, have you been

16  designated to testify on behalf of Prospect on

17  your plans or strategies for increasing patient

18  volume at your facilities?

19         MR. HITTINGER:  Objection.  Same

20  objection.  That was addressed by the Court.

21  That's a nationwide request.  To the extent it

22  relates to Philadelphia, he'll answer the

1    question; otherwise, he won't.

2            BY MS. GIBSON:

3        Q    Are you designated to testify on

4    behalf of these -- about these issues, sir, in the

5    Greater Philadelphia Region?

6        A    Yes.

7        Q    Paragraph 7, your plans and strategies

8    for participating in commercial health insurance

9    plans in the Greater Philadelphia Area, are you

10   authorized to testify on these issues?

11       A    Yes.

12       Q    Paragraph 8, same question, sir.  Are

13   you authorized to testify about your

14   negotiations -- Prospect's negotiations with

15   payors for healthcare facilities in the Greater

16   Philadelphia Area?

17       A    Yes.

18       Q    Paragraph 9, have you been authorized

19   to testify on behalf of Prospect for your hospital

20   campuses in the Greater Philadelphia Area and the

21   investments required to sustain them as safe

22   facilities to attract patients?

Page 59

1          Q      Are there other hospitals for which

2     Prospect has been unable to make a go of it?

3          A      There is one current hospital which

4     we're having a lot of trouble with, which is in

5     New Jersey.

6                 MR. HITTINGER:  Mr. Reardon, I really

7     don't want you to talk about that.  That's not

8     relevant to this case.  Unless it's in Southern

9     New Jersey, it might be relevant, but if it's not,

10    you shouldn't talk about it.

11                THE WITNESS:  It is not.  It is not.

12                MS. GIBSON:  Are you instructing the

13    witness not to answer, Mr. Hittinger?

14                MR. HITTINGER:  Yes, I am.  You're

15    going far afield.  You're asking about Prospect's

16    business all over the country, which you know you

17    can't do in this deposition.  So why don't you

18    focus on Philadelphia?

19                MS. GIBSON:  That was not the Court's

20    order, sir.  I'm able to -- this is a highly

21    relevant topic about whether Prospect is an

22    appropriate partner for Albert Einstein Health

Page 60

1  Network.

2          MR. HITTINGER:  No, it's not.  We've

3  withdrawn that interest, you know that, and

4  therefore you've backed off those questions and

5  that onerous subpoena, and the Court's order is

6  now modified because of that, so you're getting

7  into areas that you said you would not get into.

8  Now you're getting into areas you promised you

9  wouldn't do, and that's unfair.

10         I'm not going to let the witness talk

11  about the country because you're interested in

12  knowing about that.

13         MS. GIBSON:  I've made no such

14  commitment, sir, and we haven't even gotten to --

15  the declaration -- I haven't even asked the

16  witness yet about those topics, so we will get to

17  that shortly.

18         MR. HITTINGER:  Please.  Thank you.

19         BY MS. GIBSON:

20     Q   So, Mr. Reardon, the New Jersey

21  hospital you mentioned of the 17 is one under

22  consideration for either closure or sale; is that

7/17/2020             FTC, et al. v. Thomas Jefferson University, et al.     Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

Page 61

1   correct?

2        A    I have no answer to that.  It's not

3   relevant.  It's Northern New Jersey.

4        Q    Are you refusing to answer my

5   question, sir?

6        A    I've been instructed not to.

7             MR. HITTINGER:  Yes, exactly.

8             MS. GIBSON:  I reserve the right to

9   call the witness back to ask that same question.

10            BY MS. GIBSON:

11       Q    In Pennsylvania, sir -- I believe this

12  is in the next paragraph, I believe.  Move to

13  paragraph 3, please.  Please read paragraph 3 to

14  yourself.  I'll be asking you about that.

15       A    Okay.

16       Q    So -- (long pause.)

17       A    If someone's talking, I can't hear

18  them.

19            MR. HITTINGER:  Is there a question

20  pending?

21            MS. GIBSON:  I asked him to read.

22            Have you finished reading paragraph 3,

Page 62

1   sir?

2            THE WITNESS:  Yes.

3            BY MS. GIBSON:

4      Q   All right.  So you testified in your

5   declaration -- well, first let me ask, is the

6   state- -- are the statements in paragraph 3 still

7   correct today?

8      A   Yes.

9      Q   And does Prospect still own the

10  hospitals referenced: the four hospitals in

11  Delaware County, three hospitals in Connecticut,

12  the 85% interest in CharterCARE in Rhode Island,

13  and the hospital in New Jersey?

14     A   Yes.

15     Q   What are the four hospitals in

16  Delaware County?

17     A   Well, actually, there are -- there's

18  one license for three hospitals, and there's

19  another license for a separate one, but there are

20  four hospitals, four acute care facilities.  It's

21  Crozer-Chester, it's Springfield Hospital, Taylor

22  Hospital, and Delaware County Memorial Hospital.

Page 73

1          A     Possible.  I don't know the answer.

2          Q     How might we learn that information,

3     sir?

4          A     I don't have the information.

5          Q     Would Mr. Sharif have that

6     information?

7          A     Yes, he would.  Yeah, he would.

8          Q     Does Prospect employ physicians in the

9     Crozer-Keystone system?

10          A     Well, actually, it isn't Prospect

11     per se.  It is a -- it is a -- it's

12     Crozer-Keystone that employs them.

13          Q     Okay.  Looking at the paragraph 3 of

14     Exhibit DX5012, you stated here that Prospect has

15     acquired three hospitals in Connecticut.

16                When did it acquire those hospitals,

17     sir?

18          A     2016.

19          Q     I'm sorry?

20          A     2016.

21          Q     Okay.  And has Prospect reduced the

22     number of general acute care beds in those

Page 74

1    hospitals since 2016?

2        A    I don't believe so.  Once again, we're

3    outside Philadelphia, aren't we?

4        Q    You gave testimony, Mr. Reardon, in

5    this case, which is pending in the Eastern

6    District of Pennsylvania in Philadelphia, about

7    your acquisition of three hospitals in

8    Connecticut.  I'm asking --

9              MR. HITTINGER:  No, that's not true.

10   That's not true.  He gave a declaration to the FTC

11   in an investigation.  He did not give a

12   declaration in this case.

13             So you're really being unfair to the

14   witness.

15             MS. GIBSON:  Are you instructing him

16   not to answer any question about the three

17   hospitals in Connecticut?

18             MR. HITTINGER:  If you're going to

19   start diving into those hospitals and what they do

20   and how they're operating and all that, yes, then

21   you're far afield, absolutely far afield.

22             Why are you wasting time on this?  Why

Page 75

1   don't you get to the Philadelphia hospitals, which

2   you need for your litigation.

3          MS. GIBSON:  I think it's -- I think

4   I'll decide what we need for the litigation,

5   Mr. Hittinger.

6          MR. HITTINGER:  Well, you're allowed

7   to do that, but you're wasting our time, frankly,

8   because it's an hour and a half in, and you've

9   barely touched on Philadelphia.

10          BY MS. GIBSON:

11     Q    Has Prospect -- are any of Prospect's

12   hospitals in Connecticut closed now, sir?

13          MR. CHIARELLO:  Objection to form.

14          MR. HITTINGER:  I'm going to instruct

15   the witness not to answer questions about

16   hospitals in Connecticut and what's going on up

17   there, or Rhode Island, or any other hospital

18   outside of the Philadelphia area, even as you

19   define it.

20          BY MS. GIBSON:

21     Q    Mr. Reardon, are any of the facilities

22   at the CharterCARE Joint Venture in Rhode Island

7/17/2020        FTC, et al. v. Thomas Jefferson University, et al.      Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

1    currently closed?

2           MR. HITTINGER: Don't answer that

3    question for the same objection.

4           BY MS. GIBSON:

5       Q    Mr. Reardon, is the hospital -- what

6    is the name of the hospital in New Jersey that

7    Prospect owns?

8           MR. HITTINGER: You can answer that.

9           THE WITNESS: East Orange General

10   Hospital.

11          BY MS. GIBSON:

12      Q    And is East Orange open today?

13      A    It is.

14      Q    Have services been curtailed at

15   East Orange Hospital?

16      A    Again, this is outside --

17          MR. HITTINGER: This is the hospital

18   in Northern Jersey, Mr. Reardon?

19          THE WITNESS: Yes.

20          MR. HITTINGER: Right. That's not

21   part of your market definition, the last I

22   checked, unless it's expanded up to Northern

7/17/2020           FTC, et al. v. Thomas Jefferson University, et al.      Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

1   New Jersey.

2          MS. GIBSON:  Are you instructing the

3   witness not to answer?

4          MR. HITTINGER:  Yes, I'm instructing

5   him not to answer that question about whether the

6   hospital shut down or what's going on at that

7   hospital, which is irrelevant to this case.

8          This is the first time you raised

9   anything about the East Orange Hospital.  You can

10   check online and see what's going on up there.

11   I'm sure you have.

12          MS. GIBSON:  Your client gave a broad

13   declaration, Mr. Hittinger.  I reserve the right

14   to resume the deposition on these topics.

15          Will you reconsider your instruction

16   to the witness?

17          MR. HITTINGER:  What are your

18   questions about the hospital in Jersey?  Why don't

19   you state them on the record so we have them for

20   the court, if he needs to rule on this.

21          MS. GIBSON:  Okay.

22

Page 78

1          BY MS. GIBSON:

2          Q    Is the hospital in East Orange

3    New Jersey referenced in paragraph 3 of your

4    declaration open for services to patients?

5          MR. HITTINGER:  I think he said yes.

6    Is that correct?

7          THE WITNESS:  Yes.

8          BY MS. GIBSON:

9          Q    Has the East Orange Hospital reduced

10   services to patients in 2020?

11         MR. HITTINGER:  Don't answer that

12   question.

13         MR. CHIARELLO:  Objection, vague.

14         MR. HITTINGER:  Don't answer that

15   question.  It's vague, too.

16         BY MS. GIBSON:

17         Q    Has East Orange Hospital in New Jersey

18   stopped elective surgeries in 2020?

19         MR. HITTINGER:  Same objection.  Do

20   not answer.

21         BY MS. GIBSON:

22         Q    Have revenues at East Orange Hospital

Page 79

1    in New Jersey declined in 2020?

2             MR. HITTINGER:  Objection.  Don't

3    answer that either.

4             BY MS. GIBSON:

5        Q    Have revenues at CharterCARE Joint

6    Venture in Rhode Island declined in 2020?

7             MR. HITTINGER:  Same objection.  Don't

8    answer.

9             BY MS. GIBSON:

10       Q    Have revenues at the three hospitals

11   owned by Prospect in Connecticut declined in 2020?

12            MR. HITTINGER:  Same objection.  Don't

13   answer.

14            BY MS. GIBSON:

15       Q    Is Prospect considering either closure

16   or sale of the hospital it owns in East Orange,

17   New Jersey?

18            MR. HITTINGER:  Ms. Gibson, can you

19   tell me why those questions are relevant to these

20   proceedings?

21            MS. GIBSON:  They're -- yes.  They're

22   relevant, which is not your concern, sir, but

7/17/2020         FTC, et al. v. Thomas Jefferson University, et al.      Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

Page 80

1    they're certainly relevant to whether Prospect was

2    an appropriate partner for Einstein in 2017-18.

3              MR. HITTINGER:  Appropriate partner

4    for purposes of the rehab center?  Is that what

5    you're talking about?  I don't know where you're

6    going with this.  Perhaps we --

7              MS. GIBSON:  I'm going with the

8    declaration your client gave, and we'll get to his

9    paragraph as to what he said about his strategic

10   interest in Einstein.

11             MR. HITTINGER:  Perhaps if we talk

12   about that subject, then these other questions may

13   have some relevance, but in the abstract, they

14   just seem to have no relevance at all other than

15   your interest in knowing for some reason.

16             MS. GIBSON:  Dawn, would you read back

17   my question, please?

18             (The reporter read back the following

19              question:)

20             THE REPORTER:  Is Prospect considering

21              either closure or sale of the hospital it

22              owns in East Orange, New Jersey?

Page 84

1    have heard it as well.

2         Q    Do you know a person named

3    Scott Latimer?

4         A    It's possible.  I just don't remember

5    the name.

6         Q    And where was that meeting held?

7         A    We had dinner at one of the downtown

8    restaurants.

9         Q    And do you recall discussing at that

10   dinner, sir, that Prospect had capital committed

11   elsewhere, including in New England, at that time?

12             MR. CHIARELLO:  Objection to form.

13             THE WITNESS:  I don't recall that.

14   What do you mean, capital committed?

15             Oh, here's what I remember.

16             They asked me how do we approach a

17   deal?  And I talked about due diligence and all

18   that kind of stuff, NDAs.  And because we're a

19   for-profit, we have to defease bonds, which could

20   be hundreds of millions of dollars, and we either

21   retire or otherwise assume other debt, and then we

22   make a capital commitment to invest going forward.

Page 85

1   It's normally the way we do this.

2           That's what I recall.

3           BY MS. GIBSON:

4      Q   Do you recall that at or near that

5   time you were in the process of acquiring the

6   New England assets that were referenced in

7   paragraph 3 of your declaration?

8      A   We acquired the New England -- well,

9   we acquired CharterCARE in 2014, we acquired the

10  three hospitals in Connecticut in 2016.

11      Q   And do you recall discussing a

12  potential acquisition or a strategic partnership

13  with an entity in Rhode Island in 2017?

14      A   I don't recall.

15      Q   Is it the case that in 2017 is when

16  the Rhode Island acquisition was happening for

17  Prospect?

18      A   No.  Rhode Island acquisition was

19  2014.

20      Q   Was there an effort to acquire another

21  entity in Rhode Island in 2017?

22      A   Again, we're outside of Philadelphia.

Page 86

1    Am I supposed to be answering this, Carl?

2              MR. HITTINGER:  The only -- I'm not

3    sure what the -- what is your question, Ginny?

4    What are you trying to find out here?

5              MS. GIBSON:  I'm trying to find out

6    whether there was a present intent to do what your

7    witness has said he was going to do, and that is

8    whether there was capital available at Prospect

9    for him to do what he's talking about at that

10   moment in time.

11             MR. HITTINGER:  You can answer that,

12   Mr. Reardon, generally, if you know.

13             THE WITNESS:  Yes, we tried to make an

14   acquisition in Rhode Island, and we had the

15   capital to do it.

16             BY MS. GIBSON:

17        Q    And that was in 2017?

18        A    I'm not certain.

19        Q    It was at the same time you were

20   discussing a potential strategic partnership with

21   Einstein, was it not?

22        A    It's very possible.  I just don't

Page 87

1    remember the timing.

2         Q    And isn't it the case, Mr. Reardon,

3    that at the time you were speaking with

4    Mr. Freedman and Mr. Latimer, that you had capital

5    commitments going on in the Rhode Island deal that

6    would delay any strategic partnership with

7    Einstein?

8         A    I do not recall that.  I don't think

9    that's accurate.

10        Q    You don't know though?  You're saying

11   you don't remember?

12        A    I do not remember that, and I don't

13   think it's accurate.

14        Q    Why do you think it's not accurate?

15        A    Because we were in acquisition mode

16   still.

17        Q    Did you make any written proposal to

18   Albert Einstein --

19        A    We did not.

20        Q    -- after that deal -- after that

21   dinner?

22        A    We did not.

Page 88

1    Q    If you can do this, Andy, I'd like to

2    have you put up Tab Q.  That might refresh the

3    witness's recollection.  I'd ask that this be

4    marked DX1402.

5           Mr. Reardon, do you recall receiving

6    this document that's been marked Crozer -- I can't

7    see the number -- 000980 I believe is the number.

8    A    I do.

9    Q    And this document, for the record, was

10   produced to Einstein in connection with the

11   subpoena served upon Prospect.  You can drop the

12   number, thank you.

13          And Mr. Reardon, this is a set of

14   consolidated financial statements for Albert

15   Einstein Healthcare Network, is it not?

16   A    It is.

17   Q    And those were provided to you around

18   the time of those discussions that you recalled

19   with Mr. Freedman and Mr. -- well, with

20   Mr. Freedman?

21   A    Yes.

22   Q    And after you received these

Page 104

1    told me that they cut a deal with Thomas

2    Jefferson.

3          Q     Highlight the next sentence, please.

4    This declaration states, "Prospect is interested

5    in re-engaging in discussions with Einstein

6    regarding a strategic partnership involving some

7    or all of Einstein's assets if the proposed

8    Jefferson-Einstein merger does not go forward."

9                Is that statement accurate, sir?

10         A     It was accurate at the time.  We've

11   withdrawn our interest at present.

12         Q     And how have you withdrawn that

13   interest?

14         A     What do you mean, how?

15         Q     Did you tell Mr. Freedman you've

16   withdrawn your interest?

17         A     I communicated -- we communicated it

18   to our lawyer, who in turn communicated it to you

19   folks.

20         Q     So this statement is no longer true as

21   of at the present time?

22         A     At the present time, no, we have no

Page 105

1　current interest.

2　　　　Q　　What has changed?

3　　　　A　　Well, several things.

4　　　　　　Number one, when -- I assume it's you

5　who asked the question of our counsel are we

6　interested currently.  I don't know if it was you.

7　I know Einstein's counsel, so probably you.  I

8　assumed that the question was sincere, and that,

9　in fact, Jefferson and Einstein were possibly

10　contemplating some kind of a settlement, and we

11　would be part of it.

12　　　　　　I later learned -- I came to

13　understand that it wasn't that way at all.  We

14　were being set up as a bowling pin to be knocked

15　down.  It was asked that we start producing

16　financials.  No matter what financials we

17　produced, they would have been attacked as

18　inadequate.

19　　　　　　And again, when we go -- when

20　Jefferson acquires an Abington -- or

21　not Abington -- they simply merge assets.  There's

22　no money that changes hand.

Page 106

1          When we acquire a nonprofit, there are

2     hundreds of millions of dollars, and we finance

3     it.  Nobody sits around with a half a billion

4     dollars sitting in a cash drawer to finance

5     things.

6          So we finance these things, and we

7     would have had to ask -- since our financials

8     would be attacked, we would have had to ask a

9     financial partner like MPT, with which we just did

10    a $1.5 billion deal, to say, yeah, we back

11    Prospect.

12         So the second thing was this: MPT

13    would have said to us, properly so, what are we

14    backing you on?  Is it Moss?  Is it Montgomery?

15    Is it the whole system?  What is it?  And what do

16    you have?  What do you have by way of due

17    diligence?

18         And the idea of dragging MPT, a valued

19    financial partner into this morass, frankly, where

20    we've spent thousands of dollars on legal fees,

21    we've spent hundreds of manhours trying to comply

22    with subpoenas, was anathema to us.  We had no

1    data, we had nothing to bid on, and so we decided

2    to withdraw.

3          We decided that we had many

4    opportunities out there, and we wanted to limit

5    the brain damage and focus on those opportunities

6    at this point.

7        Q    What due diligence did you seek from

8    Einstein?

9        A    My understanding is that our counsel,

10   when you asked whether we would be interested,

11   asked whether we could have some due diligence.  I

12   don't know what the extent of that discussion was,

13   and I understand it was denied.

14       Q    What due diligence did you seek from

15   Einstein in 2017 beyond the statements that

16   Einstein gave to you?

17       A    We didn't seek any at that point, but

18   when we go in and do due diligence, we have a

19   checklist that goes on for page after page after

20   page.  We look at the IT system, we look at

21   revenue cycle.  We look at everything.  It's a

22   long --

Page 108

1        Q    You did not do that in 2017?

2        A    Did not.  We did not get to that

3  stage.  We didn't even sign an NDA.  We had gotten

4  nowhere at that point.  It was just a very

5  preliminary conversation.

6        Q    So are you withdrawing the statement

7  that is now highlighted in yellow that Prospect is

8  interested in re-engaging in discussions with

9  Einstein regarding a strategic partnership?

10       A    We have no current interest, yes.

11       Q    Directing your attention to the last

12  sentence, "In particular, Crozer" -- well, can you

13  highlight it?  Can you read that sentence for the

14  record, sir?

15       A    Do you want me to read it out loud?

16       Q    Yes.

17       A    "In particular, Crozer and Einstein

18  both serve large Medicaid populations, and

19  Prospect anticipates there would be significant

20  population health management synergies in

21  combining the two systems' Medicaid populations."

22       Q    What did you mean by "population

7/17/2020       FTC, et al. v. Thomas Jefferson University, et al.       Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

Page 114

1    true that Prospect would not proceed to make an

2    offer for any acquisition or merger with Einstein?

3         A     Would you repeat that, please?

4         MS. GIBSON:   Dawn, could you read it

5    back, please?

6           (The reporter read back the record.)

7         THE WITNESS:   That's correct.

8         BY MS. GIBSON:

9         Q     So the sentence that's highlighted

10   here, Prospect is interested -- I'm looking again

11   at Exhibit PX5012, the sentence, "Prospect is

12   interested in re-engaging in discussions with

13   Einstein," a declaration of interest is not the

14   same thing as engaging in due diligence and making

15   an offer, is it, sir?

16         A     We wouldn't proceed without due

17   diligence.   It's a necessary predicate to any

18   deal.

19         Q     But you never got to the point with

20   Einstein of doing any due diligence, right?

21         A     We did not.

22         Q     And isn't it the case that your

Page 115

1    statement here -- I think the highlighting needs

2    to be changed, Andy.  Can you take out the

3    highlighting that starts with the sentence "in

4    particular"?  Thank you.  And go back to the

5    sentence that starts "Prospect is interested in"

6    and highlight that sentence.

7              So in January of 2020, when you signed

8    this declaration with this sentence in it,

9    Mr. Reardon, isn't it the case that you had not

10   committed to an interest in all of Einstein's

11   assets if this proposed merger did not go forward?

12        A    We had expressed an interest in all

13   assets of Einstein, but we had not gotten to

14   stage one.  We hadn't even signed an NDA.  We

15   sought no due diligence and all that would have

16   been necessary.

17        Q    And you had expressed an interest in

18   some kind of joint venture with Moss?

19        A    I don't know whether it's a joint

20   venture.  What we're talking about is at the

21   neurosciences institute, whether we joint venture

22   with them on the rehab space, whether we have them

Page 176

1   July of 2019?

2          A    What I do know is that Sam Lee, our

3   CEO, has said that we're in a better liquidity

4   position than we've ever been, and that we're back

5   on the acquisition trail.  That's all I know.

6          Q    Do you know whether the -- do you know

7   what a B3 meeting [sic] means -- a B3 rating

8   means?

9          A    I do not.

10         Q    Do you agree that Prospect faces

11  continuing operating challenges?

12         A    Everybody takes --

13              MR. CHIARELLO:  Objection to form.

14              THE WITNESS:  Everybody faces

15  operating challenges.

16              BY MS. GIBSON:

17         Q    Does Prospect?

18         A    Everybody does, we included.

19         Q    What has been the financial impact of

20  COVID-19 on Prospect's financial situation?

21              MR. HITTINGER:  Don't answer that

22  question.  Don't answer that question for the

Page 177

1    reasons I stated earlier.  That's not a subject of

2    his deposition based upon our withdrawal of our

3    interest, as the Court order dealt with, as you

4    agreed.  Now you're getting into something that

5    you agreed not to get into with me.  That's really

6    unfair, and we're not going to answer that

7    question today.

8              MS. GIBSON:  And you're instructing

9    the witness not to answer?

10             MR. HITTINGER:  Absolutely.

11             MS. GIBSON:  Tab G, Andy, if you'd

12   pull that up.

13             THE REPORTER:  Ms. Gibson, this is the

14   court reporter.  You didn't request marking Tab F,

15   the letter we were just looking at, as Exhibit

16   1407.  Did you want to do that?

17             MS. GIBSON:  Oh, yes.  Apologies, yes,

18   please mark it.

19             THE VIDEOGRAPHER:  And the next number

20   is DX1406.

21             THE REPORTER:  1406 was Tab K.

22             THE VIDEOGRAPHER:  1407, apologies.

Page 182

1    underfunded pensions and have faced regulatory

2    scrutiny both before and during the coronavirus

3    pandemic."  Do you see this statement, sir?

4              THE WITNESS:  I do.

5              BY MS. GIBSON:

6         Q    Do you have an understanding of the

7    $658 million in fees and dividends that have been

8    taken from Prospect Medical by the Leonard Green

9    group?

10             MR. HITTINGER:  Objection.  Same

11   instruction, do not answer that question.

12             And this document is dated over a

13   month ago, so you've been sitting on this document

14   for how long before you produced -- you're using

15   it?

16             MS. GIBSON:  I was waiting for you to

17   give me evidence, Mr. Hittinger, and you've not,

18   so I'm showing this to your client.

19             MR. CHIARELLO:  Frankly, that's a

20   question, Virginia, from the FTC.

21             How long have you had this document?

22             MS. GIBSON:  I got it yesterday.

Page 183

1          MR. CHIARELLO:  And did you intend to

2     produce it to the FTC?

3          MS. GIBSON:  Yes, we will.  I just

4     got -- I just heard from Mr. -- for the record, we

5     can go off the record, if you will --

6          MR. HITTINGER:  No, I want this on the

7     record.  I want it on the record.

8          MS. GIBSON:  I want it on the record,

9     too.  I did not learn of a change in Mr. Reardon's

10    declaration until late in the day two days ago,

11    and I asked Mr. Hittinger for a copy of a revised

12    declaration, and he declined and said that I would

13    have to learn about the change in the declaration

14    at the deposition.

15          MR. HITTINGER:  That's a bit

16    ridiculous.  You know I sent you a letter on that.

17    I explained to you that that was our way of

18    communicating with you about the change in

19    Mr. Reardon's declaration, and he would testify

20    about it.

21          This use of this document is a totally

22    dirty trick under the table kind of thing.  I'm

Page 184

1   really shocked that you would do something like

2   this, Ginny.  I really am.

3          MS. GIBSON:  I am happy to introduce

4   and make a part of the record Mr. Hittinger's

5   letter.

6          MR. HITTINGER:  Please mark that.  You

7   should.

8          MS. GIBSON:  Okay.

9          MR. CHIARELLO:  Before we move off

10  this letter, though, with all due respect,

11  whatever conversations you had with Mr. Hittinger,

12  what relevance does this letter have to our

13  litigation and whether or not it's been produced

14  to the FTC?

15         MS. GIBSON:  It has relevance to the

16  financial capabilities of Prospect in relation to

17  the various statements that Prospect has made

18  about an interest in acquiring my client.

19         MR. CHIARELLO:  I didn't mean the

20  subject matter.  I meant the actual document

21  itself.  We have an agreement as to how we are

22  exchanging documents through the ordinary course

Page 202

1          A     A week or two.  Not much time.

2          Q     Okay.  And what was said over that

3    second meeting where the deal man was present?

4          A     Well, again, they asked me how we

5    approach a deal, and I talked about due diligence,

6    and then I also talked about how we normally

7    approach an acquisition of a nonprofit, how we'd

8    have to defease the bonds, how we'd either retire

9    or assume debt, how we'd make a capital commitment

10   going forward.

11         Q     Okay.  And then after that second

12   dinner, what happened next?

13         A     What happened next is Barry Freedman

14   let me know -- he didn't let me know at the

15   dinner, he let me know afterwards, that they were

16   in discussions with another party, and that if

17   that did not gel, they would come back to us.

18         Q     Okay.

19         A     And then sometime thereafter, he let

20   me know that they cut a deal with Thomas

21   Jefferson.

22         Q     So breaking that down, so there were

7/17/2020       FTC, et al. v. Thomas Jefferson University, et al.      Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

Page 221

1          THE WITNESS: The gist was that

2 Einstein's counsel had talked to our counsel and

3 asked whether we had an interest, and I thought,

4 through my rose-colored glasses, I admit now, I

5 thought maybe a settlement was brewing. And when

6 I said that, I said I don't know what's -- what's

7 going to be possible here. Are they going to spin

8 off MossRehab? Are they going to spin off

9 Montgomery Hospital? Are they going to spin out

10 anything? I don't know, but I think we should

11 pursue it, and they agreed.

12          BY MR. CHIARELLO:

13     Q    To be clear, did lawyers from Einstein

14 communicate possible spin-offs or possible --

15 proposed possible deals with you?

16     A    No.

17          MS. GIBSON: Objection, Gus,

18 foundation. What are you talking about? The

19 witness didn't speak to the lawyers. Objection.

20          THE WITNESS: I'm sorry, am I supposed

21 to answer a question? What was the question?

22

Page 222

```
 1              BY MR. CHIARELLO:

 2         Q    My question was, was anything

 3    proposed?  You said you thought through

 4    rose-colored glasses that there might be

 5    opportunities or possible spin-offs, and I'm

 6    simply asking you the question of whether or not

 7    someone from Einstein had that communicated to

 8    you?

 9         A    Not to me.

10              MS. GIBSON:  Objection to the form.

11              THE WITNESS:  My understanding is that

12    they communicated to Carl Hittinger, were we still

13    interested in all or part of the assets of

14    Einstein.

15              MS. GIBSON:  Objection, ask the

16    motion -- that the answer be stricken.

17              BY MR. CHIARELLO:

18         Q    Okay.  So you testified that, to your

19    understanding, you had this conference call which

20    you referred to, that was how you ran it up the

21    flagpole; is that correct?

22         A    That's correct.
```

Page 223

1          MS. GIBSON:  Objection.

2          BY MR. CHIARELLO:

3     Q    And then you communicated through this

4   text back to Mr. Freedman that there was an

5   enthusiastic yes, correct?

6     A    Correct.

7     Q    And again, this goes to the question I

8   was asking before about the gist of the

9   conversation without specifics.

10          Why did you come to that conclusion

11   that there was an enthusiastic yes from the

12   leadership of Prospect and an opportunity -- a

13   potential opportunity with Einstein?

14     A    Well, if there were an opportunity to,

15   for example, acquire MossRehab, we think it would

16   be incredibly synergic with what we're trying to

17   do.  We just didn't know what was involved.  The

18   fact that it was mentioned "all or part" suggested

19   to us that parts might be spun off.

20     Q    Okay.  And those synergistic

21   opportunities that existed four weeks ago when you

22   ran it up the flagpole, do those synergistic

Page 224

1　　opportunities potentially exist today?

2　　　　　　　MS. GIBSON:　Objection.

3　　　　　　　THE WITNESS:　We've withdrawn our

4　　interest.　We didn't -- when we saw that they

5　　wanted to start asking questions about financials

6　　and the like, we realized that what was going to

7　　happen is what happened today, which is a smear

8　　campaign, and we want nothing to do with it.

9　　We've withdrawn our interest.

10　　　　　　　BY MR. CHIARELLO:

11　　　　Q　I understand that you've withdrawn

12　　your interest.　What I'm asking, though, is did

13　　those synergistic opportunities that you just

14　　testified about a moment ago, do they

15　　hypothetically still exist today even though

16　　you've withdrawn your interest?

17　　　　　　　MS. GIBSON:　Objection to the form.

18　　　　　　　THE WITNESS:　Hypothetically, yes.

19　　　　　　　BY MR. CHIARELLO:

20　　　　Q　So you testified earlier about -- I

21　　believe you used the term when Ms. Gibson was

22　　asking a question about being set up like a

Page 225

1    bowling pin.  Do you remember that testimony?

2          A    Yes, I do.

3          Q    And you just used the term "smear

4    campaign" a few moments ago.

5               Do you remember that?

6          A    I do.

7               MS. GIBSON:  Objection to the form.

8               BY MR. CHIARELLO:

9          Q    So can you just describe what you're

10   talking about when you say being set up like a

11   bowling pin and a smear campaign?

12              MS. GIBSON:  Objection to form.

13              THE WITNESS:  The minute we heard that

14   financials were being requested.  As I said

15   earlier, the financial statements don't show

16   anything about our ability to acquire a hospital,

17   and so we thought there was an ulterior motive.

18   It was to denigrate our financial statements.

19              And as I listen to the testimony

20   today -- or the questions today about the letter

21   from Congress with no mention of the response, and

22   all the rest of the stuff, it confirmed that it

Page 226

1    is, in my opinion, a smear campaign going on here.

2              BY MR. CHIARELLO:

3        Q    And so did you withdraw your current

4    interest in Einstein to end the smear campaign?

5        A    No.

6              MS. GIBSON:  Objection to the form.

7              BY MR. CHIARELLO:

8        Q    Why did you withdraw your current

9    interest in Einstein?

10       A    We withdrew our current interest in

11   Einstein, as I said earlier, because, frankly,

12   once we started getting into financials and

13   everything else, knew that it would not be serious

14   conversation.

15             We were spending thousands of dollars

16   on lawyers, lots and lots of manpower, and it

17   wasn't going anywhere except downward.  It was

18   just going to be a smear campaign.  Furthermore,

19   we had no due diligence about the various

20   opportunities.

21             And third, we have other opportunities

22   to pursue.  As I said earlier, we don't need the

Page 241

1          MS. GIBSON:  Objection.

2          THE WITNESS:  We think so.  We're

3   privately held, and we don't share it unless

4   compelled to.

5          BY MR. CHIARELLO:

6      Q    I understand.  I'm not asking you the

7   details about Prospect's -- what's in the contents

8   of those consolidated financial statements, but

9   from your experience in business and doing

10  transactions, what are the types of information

11  that someone would look for that are contained in

12  the financial statements?

13     A    I'm sorry, what was the question

14  again?

15     Q    In your experience, why are

16  consolidated financial statements important?

17  Meaning what information do they contain that

18  would be relevant to a Proposed Transaction?

19     A    Well, I think anybody who was going to

20  be acquired wants to do reverse due diligence and

21  find out whether they're bankrupt, but that's not

22  how we construct a proposal or an offer.

7/17/2020      FTC, et al. v. Thomas Jefferson University, et al.      Thomas M. Reardon 30(b)(6)

Highly Confidential - Pursuant to Protective Order

Page 242

1      We would construct it with financing,

2  so you can't learn much from a consolidated

3  financial statement because, as I said before,

4  nobody keeps a half a billion dollars sitting

5  around in a cash drawer in order to do a deal.  We

6  finance it.  We would seek a partner, whether it's

7  MPT or someone else.

8      Q    In your experience in doing hospital

9  mergers, are there transactions where the buyer

10  does not need to supply --

11      THE REPORTER:  I'm sorry, Mr.

12  Chiarello, you dropped off the first part of your

13  question.  Could you please start over?

14      MR. CHIARELLO:  Can you hear me now?

15      THE REPORTER:  Yes.  Thank you.

16      BY MR. CHIARELLO:

17      Q    In your experience in doing hospital

18  mergers, are there transactions where the buyer

19  does not need to supply consolidated financial

20  statements?

21      MS. GIBSON:  Objection to the form.

22      THE WITNESS:  I think they're usually

Page 243

1    included, but only within the context of reverse

2    due diligence where a proposal has been made, how

3    would we -- one of the questions that an RFP or a

4    potential seller would ask for is how do you plan

5    to finance this?  And so financial statements may

6    well be included in that, but within the context

7    of the broader issue, how would you do this?  How

8    would you finance it?

9                BY MR. CHIARELLO:

10       Q    So in your experience doing hospital

11   transactions, at what point does that question

12   arise?  Is it one the initial questions, or does

13   that happen after an RFP has been sent out and

14   other due diligence has been -- the buyer is

15   engaged in other due diligence?

16               MS. GIBSON:  Objection to the form.

17               THE WITNESS:  First you sign a

18   Non-Disclosure Agreement, and then we would put

19   out as an acquirer a long list of due diligence

20   items.  We'd ask the buyer -- I mean the seller to

21   create a data room where we could access all that

22   data.

1                    BY MR. CHIARELLO:

2          Q     Okay.

3          A     And at some point, they would -- and

4    there's usually a process letter, and they want to

5    make sure that you can actually do the deal, and

6    they do ask you to provide details as to how you

7    would finance this.

8                    Now, having said that, since nobody

9    has come to a price yet, you don't supply it until

10   later on.  You do your due diligence, you try to

11   evaluate what something is worth, and then try to

12   put together a proposal, and then you have to

13   indicate how you would finance that proposal.

14                   So it's not right up front.  It's down

15   the line --

16         Q     Okay.

17         A     -- in my experience.

18         Q     I think you just testified that

19   there's an NDA, but before you enter into a -- and

20   by NDA, you meant a Non-Disclosure Agreement?

21         A     I do.

22         Q     Okay.  Before you enter into a

Page 245

1    Non-Disclosure Agreement, is there usually some

2    sort of request or invitation to bid or engage in

3    discussions toward acquiring the property or an

4    asset?

5          A     I'm sorry.  There usually is, but not

6    always.  Sometimes it's just a personal

7    relationship and a discussion.

8               At some point, since we're acquiring a

9    nonprofit, they're going to have to do an RFP and

10   an invitation to have others in so that the

11   Attorney General would know that, in fact, they've

12   looked at all alternatives.

13         Q     I see.  And so, again, you testified

14   about this earlier, but just to make certain, that

15   at no time, despite your conversations and dinners

16   with Mr. Freedman, did Prospect -- did Einstein

17   ever send an RFP to Prospect.

18               MS. GIBSON:  Objection to the form.

19               MR. CHIARELLO:  Is that correct?

20               MS. GIBSON:  Objection.

21               THE WITNESS:  That is correct.

22

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION and COMMONWEALTH OF PENNSYLVANIA** | |
| **Plaintiffs,** | |
| **v.** | **No. 2:20-cv-01113-GJP** |
| **THOMAS JEFFERSON UNIVERSITY and ALBERT EINSTEIN HEALTHCARE NETWORK** | |
| **Defendants.** | |

## [PROPOSED] ORDER

AND NOW, this ____ day of __, 2020, it is hereby ORDERED that Prospect Medical

Holdings, Inc.'s ("Non-Party Prospect") Motion for a Protective Order and Sanctions against

defendant Albert Einstein Healthcare Network ("Defendant Einstein") (the "Motion") is

GRANTED. Defendant Einstein is PROHIBITED from seeking documents concerning Non-Party

Prospect's nationwide financial and strategic information.  Sanctions pursuant to Federal Rule of

Civil Procedure 37(a)(5) shall be in the form of Non-Party Prospect's expenses and reasonable

attorneys' fees necessitated by bringing the Motion.

BY THE COURT

_____

HON. GERALD J. PAPPERT