# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------

FEDERAL TRADE COMMISSION
and COMMONWEALTH OF
PENNSYLVANIA,                              Cause No.
                                           20-01113
                    Plaintiffs,

v.

THOMAS JEFFERSON UNIVERSITY
and ALBERT EINSTEIN HEALTHCARE
NETWORK,

                    Defendants.
---------------------------------------

                              August 26, 2020
                              9:00 a.m.

****HIGHLY CONFIDENTIAL****

VIDEOTAPED DEPOSITION TAKEN REMOTELY VIA
ZOOM VIDEOCONFERENCE OF CHRISTINE M. HAMMER

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

1   Videotaped deposition of CHRISTINE M. HAMMER,
2   Expert witness in the above-captioned matter, taken
3   remotely via Zoom videoconference, on, Tuesday July
4   August 26, 2020, at approximately 10:00 a.m., before
5   Eileen Mulvenna, CSR/RMR/CRR, Certified Shorthand
6   Reporter, Certified Merit Reporter and Certified
7   Realtime Reporter, and Notary Public for the State
8   of New York.

```
 1   A P P E A R A N C E S:
 2
 3   FEDERAL TRADE COMMISSION
     Bureau of Competition
 4        600 Pennsylvania Avenue, NW --
          Washington, DC  20580
 5        202-326-3296
     BY:  RYAN ANDREWS, ESQ.
 6        randrews@ftc.gov
          GUIA DIXON, ESQ.
 7        gdixon@ftc.gov
          CHARLES DICKINSON, ESQ.
 8        cdickinson@ftc.gov
 9   HOGAN LOVELLS US LLP
     Attorneys for Defendant Albert Einstein
10   Healthcare Network
          555 13th Street
11        Washington, DC 20004
          202-637-4652
12   BY:  LEIGH OLIVER, ESQ.
          leigh.oliver@hoganlovells.com
13        DANIEL MADER, ESQ.
          daniel.mader@hoganlovells.com
14
15   FAEGRE DRINKER BIDDLE & REATH LLP
     ATTORNEYS FOR THOMAS JEFFERSON UNIVERSITY
16        1500 K Street NW, Suite 1100
          Washington, DC  20005
17        202-842-8800
     BY:  DANIEL DELANEY, ESQ.
18        daniel.delaney@faegredrinker.com
          CAROL TREVEY, ESQ.
19        carol.trever@faegredrinker.com
20
21   A L S O   P R E S E N T:
22        HENRY MARTE, VIDEOGRAPHER
```

Page 53

1           not to reveal the contents of any documents
2           selected by counsel.
3                   THE WITNESS:  All right.
4                   I don't believe I did other than
5           perhaps something that counsel selected, but
6           I don't actually recall that counsel provided
7           anything new.  I think the documents that are
8           relied upon in my report are the documents
9           that I would have reviewed.
10   BY MS. OLIVER:
11           Q.    Ms. Hammer, what was the initial
12   assignment for this engagement?
13           A.    The initial assignment is as it is
14   written, I believe.  Let me think.  Certainly it was
15   an efficiencies analysis.  I do not recall whether
16   the initial assignment included failing firm -- the
17   failing firm defense or not.  I just don't recall
18   that.
19           Q.    When do you recall that the failing
20   firm defense assignment was given to you?
21           A.    That's what I don't recall.
22           Q.    When do you recall you began working

Page 56

1   rebuttal report?

2        A.    Yes.

3        Q.    Did anyone other than Cornerstone

4   conduct any analysis that you're relying on in your

5   report and rebuttal report?

6        A.    No.

7        Q.    Okay.  Ms. Hammer, in your report at

8   paragraph 4, which is a section dealing with your

9   qualifications, you indicate that you've served as

10  an expert providing bankruptcy evaluations.

11             Do you see that?  What does -- matters

12  does this refer to?

13       A.    This refers to -- well, actually, a

14  number of different matters that -- in bankruptcy

15  court and evaluating the likelihood of a company to

16  emerge from bankruptcy and advising clients before

17  they go into bankruptcy as to what their situation

18  is, you know, is it likely that they need to go into

19  a bankruptcy protection.  So it involves many

20  things.  That's why I used the word "evaluations."

21       Q.    So have you represented parties in

22  bankruptcy court?

Page 57

1      A.      I have not represented -- I have not
2   represented the parties that are in bankruptcy.
3      Q.      Have you had a role representing a
4   party in a bankruptcy court proceeding?
5      A.      Yes.
6      Q.      How many times?
7      A.      In -- actually in court?
8      Q.      In a bankruptcy court proceeding, yes.
9      A.      In the bankruptcy court, I have
10  testified in bankruptcy court once.
11     Q.      And what was that matter?
12     A.      That was Temtex versus Temco, I
13  believe -- and Temco.  It's a hyphenated name, and
14  I'm struggling with the second portion of the name.
15  So I'll say Temtex, because that part I'm positive
16  about.
17     Q.      So the one -- you testified in one
18  matter in bankruptcy court; that's correct?
19     A.      That's correct.
20     Q.      Was the Temco/Temtex matter in 2003?
21     A.      That sounds approximately right.
22  Without consulting a schedule, I can't be positive.

Page 58

1      Q.     And you indicated that you have worked
2  on matters evaluating the likelihood of a company to
3  emerge from bankruptcy.
4             How many times have you done that?
5      A.     I would think perhaps three or four.
6      Q.     Do you recall when those matters would
7  have been?
8      A.     They would have been subsequent to the
9  one in 2003.
10     Q.     Are those matters on your résumé?
11     A.     No, they are confidential.
12     Q.     So they were not matters in which you
13 presented testimony before a court or a deposition?
14     A.     That's correct.
15     Q.     Have you ever taken a company through
16 the bankruptcy or restructuring process?
17     A.     No.
18     Q.     Have you ever represented a bondholder
19 group or its bond trustee through an in- or
20 out-of-court restructuring?
21     A.     Give me a moment to think about that.
22            I'm struggling because in the WPPSS,

Page 59

1  the Washington Public Power Supply System, matter, I
2  worked for the Justice Department, not the antitrust
3  division.  And that was -- it had gone through
4  bankruptcy and the assets needed to be divided, what
5  few remaining assets there were.  So I think that
6  would also qualify, but I'm not certain.
7       Q.   So you were representing a bondholder
8  group or its bond trustee in that matter?
9       A.   Oh, I didn't understand you to say
10 representing.  No, I was working with the federal
11 government trying to determine how whatever amounts
12 might be left from that bankruptcy might be
13 available to be distributed.  And I believe
14 bondholders were a part of the group.
15      Q.   Okay.  So to answer to my question
16 have you ever represented a bondholder group or its
17 bond trustee during an in- or out-of-court
18 restructuring, the answer is no?
19      A.   The answer is no.
20      Q.   On how many bankruptcies have you
21 advised parties in interest or stakeholders?
22      A.   Four or five.

Page 60

1    Q.    And how many in the past ten years?

2    A.    I don't know that I've done any, but
3    I'm going to have to think back to where ten years
4    ago would be.  Let me just -- no, I believe that
5    since 2010 I've not worked on any bankruptcy
6    matters.

7    Q.    You said you haven't advised a company
8    through an in- or out-of-court restructuring
9    process, have you?

10   A.    You said in or out of a court.  Do you
11   mean have I advised companies prior to their filing
12   for bankruptcy?

13   Q.    I'm asking --

14   A.    I'm not sure about the "in" and "out."

15   Q.    -- whether you've taken a company
16   through a restructuring process, either through the
17   courts or outside of the courts.

18   A.    No.

19         MR. ANDREWS:  Ms. Oliver, we've been
20         going about an hour.  Whenever you're ready,
21         do you think we can take a break?

22         MS. OLIVER:  Sure.

Page 61

1            Do you want to take a break now,
2       Ms. Hammer?
3            THE WITNESS:  In the next minute or
4       two.  I know you're in the middle of a line
5       of questions, so why don't you complete that
6       so that we can take a break.
7  BY MS. OLIVER:
8       Q.     You've never evaluated whether a
9  hospital entity can reorganize successfully in
10 bankruptcy, have you?
11      A.     No.
12      Q.     Have you ever developed plans of
13 reorganization for a health care provider?
14      A.     No.
15      Q.     In paragraph 4 of your report, you say
16 bankruptcy work has focused -- your bankruptcy work
17 has focused on assessing the reliability of
18 management's profitability and cash flow projections
19 based on examining historical results and operating
20 strategic plans.
21             Is that a fair summary of your
22 bankruptcy experience?

Page 63

1   able to successfully emerge from bankruptcy.

2       Q.     So I'll just quote it.

3              "It would not be able to reorganize

4   successfully under Chapter 11 of the Bankruptcy

5   Act"; is that correct?

6       A.     That sounds correct.

7       Q.     Do you agree that this is the

8   guideline set down by the Federal Trade Commission

9   and the US Department of Justice in the Horizontal

10  Merger Guidelines for the second element of the

11  failing firm defense?

12      A.     Yes.

13      Q.     Have you conducted an analysis of

14  whether Einstein could successfully reorganize under

15  Chapter 11 of the Bankruptcy Act?

16      A.     No.

17      Q.     In your report, at paragraph 217, you

18  say, "Einstein has not ruled out the possibility

19  that it could reorganize successfully under

20  Chapter 11 of the Bankruptcy Act"; is that correct?

21      A.     I'm not sure what paragraph --

22      Q.     Paragraph 217.

Page 65

1   wasn't working.

2       Q.    And what would be the key elements of
3   a reorganization plan for a hospital entity?

4       A.    I would think the key elements for a
5   hospital entity would be the same as I would look at
6   in my role as a financial and managerial accountant
7   for any company coming out, just do they have a
8   business plan -- a strategic plan that is going to
9   allow them to have more success financially than
10  they would -- than they had prior to bankruptcy.

11      Q.    But you haven't analyzed whether
12  Einstein could successfully do such a reorganization
13  in bankruptcy?

14      A.    No.  I would need Einstein's own
15  analysis perhaps prepared with their bankruptcy
16  consultant and then I -- there's nothing to analyze
17  currently.  That's why I say that -- I conclude that
18  they have not ruled out the possibility that they
19  could reorganize successfully because they haven't
20  examined the possibility of entering bankruptcy, to
21  my knowledge.  The record does not indicate -- I've
22  not seen anything in the record to indicate they

Page 66

1   have seriously considered bankruptcy, nor have they
2   made a plan.
3        Q.    But the Merger Guidelines' second
4   element of the failing firm defense is not whether
5   the parties have considered a bankruptcy plan, it's
6   whether they could successfully reorganize; correct?
7        A.    That's correct.  And Einstein has
8   provided no data that would allow one to evaluate,
9   as an accountant, whether or not they could
10  successfully emerge.
11       Q.    So would an accountant be an
12  appropriate expert to advise a company on a
13  reorganization plan?
14       A.    An accountant would be a very
15  appropriate person to advise the court on whether
16  they believed the reorganization plan is likely to
17  be successful.
18       Q.    But an accountant would not be able to
19  put together a reorganization plan for a hospital
20  system.
21       A.    I would think that they would be one
22  of the advisors, but they would not be the sole

Page 97

1    included in your report; correct?
2         A.    I will offer an opinion on the period
3    from 2018 to the present as historical numbers.  And
4    in the forecasted numbers, I'll be looking back to
5    2016.
6         Q.    Okay.  You also haven't analyzed
7    Einstein's financial viability as a standalone
8    entity beyond FY 2021; is that correct?
9         A.    That's correct as of today.
10        Q.    Do you have plans to look at that at
11   any point in the future before the preliminary
12   injunction hearing?
13        A.    Well, assuming the preliminary
14   injunction hearing is in September, as I understand
15   it's going to be now, I will not because I doubt
16   there would be any additional financial information
17   available to me.
18              But as I pointed out in my report, I
19   don't even have year-end June 30th, 2020.  So if
20   that information were to become available, I would
21   most certainly want to review it.  Or if the hearing
22   were postponed and then the information became

Page 98

1   available, I would continue to evaluate all the
2   information that's available to me.
3       Q.   Okay.  So you don't know whether
4   Einstein's days cash on hand have increased or
5   decreased since 2015 year over year on a trend
6   basis, do you?
7       A.   I can picture an analysis that was
8   done and -- let me just check on my own thing to be
9   sure that it matches with what I'm picturing.
10              (Pause.)
11      A.   You asked about the days cash on hand?
12      Q.   I asked about -- I asked "You don't
13  know whether Einstein's days cash on hand had
14  increased or decreased since 2015 year over year on
15  a trend basis"?
16      A.   I don't -- as I sit here today, I do
17  not recall that.
18      Q.   Right.
19              You haven't analyzed Einstein's
20  capital expenditures as a percentage of depreciation
21  or amortization; correct?
22      A.   That's correct.  I've not looked at

Page 374

1  STATE OF NEW YORK              )
2                                 ss:
3  COUNTY OF WESTCHESTER          )
4
5           I, EILEEN MULVENNA, CSR/RMR/CRR, a
   Certified Court Reporter, Registered Merit Reporter,
6  Certified Realtime Reporter, and Notary Public in
   and for the State of New York, do hereby certify:
7
8           That I reported the taking of the
   deposition of the witness, CHRISTINE M. HAMMER,
9  commencing on the 26th day of August, 2020, at the
   hour of 10:00 a.m.
10          That prior to being examined, the witness
   was duly sworn by me to testify to the truth, the
11 whole truth, and nothing but the truth.
            That I thereafter transcribed my said
12 shorthand notes into typewriting and that the
   typewritten transcript of said deposition is a
13 complete, true and accurate transcription of my
   said shorthand notes taken down at said time, and
14 that a request has been made to review the
   transcript.
15          I further certify that I am not a relative
   or employee of an attorney or counsel of any of the
16 parties, nor a relative or employee of any attorney
   or counsel involved in said action, nor a person
17 financially interested in the action.
            IN WITNESS WHEREOF, I have hereunto
18 set my signature this 26th day of August, 2020.
19
20
21          _____
22          Eileen Mulvenna, CSR/RMR/CRR

Page 375

1    Christine Hammer, c/o
     FEDERAL TRADE COMMISSION
2    600 Pennsylvania Avenue, NW --
     Washington, DC  20580
3
4    Case: FTC, et al. v. Thomas Jefferson University, et al.
     Date of deposition: August 26, 2020
5    Deponent: Christine Hammer
6
7    Please be advised that the transcript in the above
8    referenced matter is now complete and ready for signature.
9    The deponent may come to this office to sign the transcript,
10   a copy may be purchased for the witness to review and sign,
11   or the deponent and/or counsel may waive the option of
12   signing. Please advise us of the option selected.
13   Please forward the errata sheet and the original signed
14   signature page to counsel noticing the deposition, noting the
15   applicable time period allowed for such by the governing
16   Rules of Procedure. If you have any questions, please do
17   not hesitate to call our office at (202)-232-0646.
18
19
20   Sincerely,
     Digital Evidence Group
21   Copyright 2020 Digital Evidence Group
     Copying is forbidden, including electronically, absent
22   express written consent.