**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br><br>and<br><br>**COMMONWEALTH OF PENNSYLVANIA**<br><br>Plaintiffs,<br><br>v.<br><br>**THOMAS JEFFERSON UNIVERSITY**<br><br>and<br><br>**ALBERT EINSTEIN HEALTHCARE NETWORK**<br><br>Defendants. | No. 2:20-cv-01113-GJP<br>Redacted Public Version |

**PLAINTIFFS FEDERAL TRADE COMMISSION AND COMMONWEALTH OF
PENNSYLVANIA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

PLAINTIFFS' PROPOSED FINDINGS OF FACT ........................................................ 1

I.      THE PARTIES TO THE PROPOSED TRANSACTION .................................. 1

II.     PROCEDURAL HISTORY ............................................................................. 2

III.    HEALTHCARE PROVIDER COMPETITION OCCURS IN TWO STAGES ............... 2

        A.    Providers Compete for Inclusion in Insurers' Networks, Leading to Lower Rates 2

        B.    In-Network Providers Compete for Patients, Leading to Improved Quality .......... 4

        C.    The Effect of Provider Mergers on Healthcare Competition ................................ 4

IV.     THE PROPOSED TRANSACTION IS PRESUMPTIVELY ILLEGAL IN EACH OF
        THREE SEPARATE RELEVANT ANTITRUST MARKETS ........................................ 5

        A.    GAC Services ........................................................................................... 5

              1. GAC Services Constitute a Relevant Product Market ........................................ 5

              2. The Northern Philadelphia Area and the Montgomery Area Are Relevant
                 Geographic Markets for GAC Services ............................................................. 6

              3. The Proposed Transaction Is Presumptively Illegal in the Markets for GAC
                 Services in both the Northern Philadelphia Area and the Montgomery Area . 9

        B.    Acute Rehab Services ............................................................................... 11

              1. Acute Rehab Services Constitute a Relevant Product Market ......................... 11

              2. The Philadelphia Area Is a Relevant Geographic Market for Acute Rehab
                 Services .......................................................................................................... 18

              3. The Proposed Transaction Is Presumptively Illegal in the Market for Acute
                 Rehab Services in the Philadelphia Area .................................................... 20

V.      THE PROPOSED TRANSACTION WOULD SUBSTANTIALLY LESSEN
        COMPETITION IN ALL OF THE RELEVANT ANTITRUST MARKETS ................. 20

        A.    GAC Services ........................................................................................... 21

              1. Jefferson and Einstein Are Close Competitors for the Provision of GAC
                 Services in the Northern Philadelphia Area and the Montgomery Area ..... 21

2. The Proposed Transaction Is Likely to Reduce First-Stage Competition and Result in Increased Prices for GAC Services in the Northern Philadelphia Area and the Montgomery Area ............................................................... 23

3. The Proposed Transaction Is Likely to Eliminate Beneficial Second-Stage Non-Price Competition for GAC Services in the Northern Philadelphia Area and the Montgomery Area.............................................................................. 26

B. Acute Rehab Services ........................................................................ 27

1. Jefferson and Einstein Are Close Competitors for the Provision of Acute Rehab Services In the Philadelphia Area............................................. 27

2. The Proposed Transaction Is Likely to Reduce First-Stage Competition and Result in Increased Prices for Acute Rehab Services in the Philadelphia Area .................................................................................................... 28

3. The Proposed Transaction Is Likely to Eliminate Beneficial Second-Stage Non-Price Competition for Acute Rehab Services in the Philadelphia Area . 30

VI.   DEFENDANTS FAILED TO REBUT PLAINTIFFS' PRIMA FACIE CASE............... 31

A. Einstein Is Not a "Flailing Firm" or "Weakened Competitor" ............................. 31

B. Entry or Repositioning into the GAC Services Markets Would Not Be Timely, Likely, or Sufficient to Deter or Counteract Competitive Harm .......................... 34

C. Entry or Repositioning into the Acute Rehab Services Market Would Not Be Timely, Likely, or Sufficient to Deter or Counteract Competitive Harm............. 35

D. Defendants' Claimed Efficiencies Do Not Offset the Proposed Transaction's Anticompetitive Harm ....................................................................... 37

1. The Vast Majority of Defendants' Estimated Efficiencies Are Not Cognizable .................................................................................................... 38

2. Claimed Efficiencies Relating to Clinical Services and Facility-Based Rationalization Arise from Anticompetitive Reductions in Service ............... 39

3. Defendants Have Provided No Evidence Demonstrating that Any Claimed Quality Improvements Are Cognizable Efficiencies........................................ 40

4. Jefferson's Past Experience Integrating Hospitals Does Not Demonstrate that It Is More Likely to Achieve Cognizable Efficiencies from the Proposed Transaction ........................................................................................ 40

5. Defendants' Experts Did Not Calculate Whether Defendants' Claimed Savings Would Sufficiently Offset Anticompetitive Harm .......................................... 41

iii

      E.    Einstein Is Not a Failing Firm ................................................................ 41

PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW ............................................. 42

I.      NATURE OF THE ACTION, JURISDICTION, AND VENUE ..................................... 42

II.    THE PROPOSED TRANSACTION SHOULD BE PRELIMINARILY ENJOINED
      PENDING THE OUTCOME OF THE FTC'S ADJUDICATIVE PROCEEDING ........ 42

III.   THE FTC IS LIKELY TO SUCCEED AT THE ADMINISTRATIVE PROCEEDING IN
      SHOWING THAT THE PROPOSED TRANSACTION IS UNLAWFUL UNDER
      SECTION 7 OF THE CLAYTON ACT ................................................................ 44

      A.    GAC Services and Acute Rehab Services Are Relevant Product Markets ........... 45

      B.    There Are Three Relevant Geographic Markets ................................................. 46

      C.    The Proposed Transaction Is Presumptively Unlawful in Each Relevant Market
            Based on Market Share and Market Concentration Thresholds .......................... 47

      D.    Competitive Effects Evidence Bolsters the Strong Presumption of Harm and
            Illegality ............................................................................................... 47

      E.    Defendants Cannot Rebut Plaintiffs' Prima Facie Case ...................................... 48

          1. Einstein Is Not a Weakened Competitor ........................................................ 48

          2. The Possibility of Entry or Repositioning Is Not Sufficient to Rebut Plaintiffs'
             Prima Facie Case ................................................................................... 48

          3. Defendants' Purported Efficiencies Do Not Outweigh the Harm to
             Competition ........................................................................................... 49

          4. Defendants' Argument that Einstein Is a Failing Firm Does Not Suffice to
             Rebut Plaintiffs' Prima Facie Case ........................................................... 50

IV.   THE EQUITIES FAVOR A PRELIMINARY INJUNCTION ....................................... 50

# TABLE OF AUTHORITIES

## CASES

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .................................................... 11, 45, 46

*Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ............................................. 36

*Citizen Publ'g Co. v. United States*, 394 U.S. 131 (1969)............................................................ 50

*United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415 (D. Del. 2017) .............................. 48, 49

*Ferring Pharm, Inc. v. Watson Pharm, Inc.* 765 F.3d 205 (3d Cir. 2014) ................................. 44

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016)....................................... 46

*FTC v. Advocate Health Care*, No. 15-cv-11473, 2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) .. 7

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ......................................... 48, 49

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ................................................................ 43

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) ......................................... 47

*FTC v. Peabody Energy Corp.*, No. 4:20-cv-00317-SEP, 2020 WL 5893806 (E.D. Mo. Oct. 5, 2020) ...................................................................................................................... 45, 46

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ................................... passim

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ................................................................... 49

*FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ................................................................................................................ 41, 48, 50

*FTC v. Sanford Health*, No. 1:17-cv-133, 2017 WL 10810016 (D.N.D. Dec. 15, 2017) ........... 22

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015).................................................................. 47

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018)...................................................... 45, 46

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)..................................................... 33, 48

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)............................... 47

*In re Otto Bock HealthCare N. Am, Inc.*, Dkt. No. 9378, 2019 WL 5957363 (FTC 2019).......... 49

*Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324 (7th Cir. 1981)................................... 48

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................... 33

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014)....................................... 46, 48

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ............................................ 46

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .............................................. 37, 46

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) .................................................... 45

*United States v. Baker Hughes, Inc.,* 908 F.2d 981 (D.C. Cir. 1990)........................................... 44

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) .................................................................. 10

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974) .............................................. 32, 48

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ......................... 39, 45, 47

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ...................................................... passim

*United States v. Visa, U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001) ................................. 49

## STATUTES

28 Pa. Code § 101.31 ........................................................................................................... 12, 13

28 Pa. Code § 101.4 ............................................................................................................. 12, 13

15 U.S.C. § 12 ............................................................................................................................ 42

15 U.S.C. § 18 ............................................................................................................................ 43

15 U.S.C. § 26 ..................................................................................................................... 42, 43

15 U.S.C. § 44 ............................................................................................................................ 42

15 U.S.C. § 53(b) ................................................................................................................. 42, 43

28 U.S.C. § 1391 ........................................................................................................................ 42

## OTHER AUTHORITIES

U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010) .................................... passim

## RULES

42 C.F.R. § 483.35(b)(1) ............................................................................................................ 13

**GLOSSARY OF ABBREVIATED TERMS, DEFINED TERMS, AND WITNESSES**

1. **Exhibits and Transcripts**

| Abbreviation | Meaning |
|---|---|
| Dep. | Deposition Transcript |
| Hrg. | Preliminary Injunction Hearing Transcript |
| IH | Investigational Hearing Transcript |
| JX | Joint Exhibit |
| PX | Plaintiffs' Exhibit |
| Rebuttal | Expert Rebuttal Report |
| Rpt. | Expert Report |

2. **Documents and Filings**

| Document | Full Reference |
|---|---|
| Compl. | Plaintiffs Federal Trade Commission and Commonwealth of Pennsylvania's Complaint for Temporary Restraining Order and Preliminary Injunction (ECF No. 7) |
| Einstein Ans. | Defendant Albert Einstein Healthcare Network's Answer to Complaint for Temporary Restraining Order and Preliminary Injunction (ECF No. 51) |
| Jefferson Ans. | Defendant Thomas Jefferson University's Answer to Complaint for Temporary Restraining Order and Preliminary Injunction (ECF No. 52) |
| Merger Guidelines | U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines (August 19, 2010) |

3. **Names and Terms**

| Shortened Form | Full Form |
|---|---|
| Abington | Jefferson's Abington Hospital |
| Acute Rehab Services | Inpatient acute rehabilitation services |
| Bryn Mawr | Bryn Mawr Rehab Hospital |
| Clayton Act | Clayton Antitrust Act |
| CMS | Centers for Medicare and Medicaid Services |
| Crozer-Keystone | Crozer-Keystone Health System |
| Defendants | Jefferson and Einstein |
| Einstein | Albert Einstein Healthcare Network |
| EMCEP | Einstein Medical Center Elkins Park |
| EMCM | Einstein Medical Center Montgomery |
| EMCP | Einstein Medical Center Philadelphia |
| FTC | Federal Trade Commission |
| FTC Act | Federal Trade Commission Act |
| GAC | General acute care |
| GAC Services | Inpatient general acute care services |
| Genesis | Genesis Healthcare |

| Shortened Form | Full Form |
|---|---|
| Good Shepherd | Good Shepherd Rehabilitation Network |
| Grant Thornton | Grant Thornton LLP |
| HHI | Herfindahl-Hirschman Index |
| HMT | Hypothetical monopolist test |
| HPP | Health Partners Plans |
| IBC | Independence Blue Cross |
| IRF | Inpatient rehabilitation facility |
| Jefferson | Thomas Jefferson University |
| Lansdale | Jefferson's Abington-Lansdale Hospital |
| Magee | Jefferson's Magee Rehabilitation Hospital |
| Main Line | Main Line Health |
| MossRehab | Einstein's MossRehab |
| Penn | University of Pennsylvania Health System |
| Penn Rehab | The Penn Institute for Rehabilitation Medicine |
| Prime | Prime Healthcare Services |
| Shannondell | Rehab at Shannondell |
| SNF | Skilled nursing facility |
| SSNIP | Small but significant and non-transitory increase in price |
| St. Mary | St. Mary Rehabilitation Hospital |
| Temple | Temple University Health System |
| Trinity | Trinity Health Mid-Atlantic |
| UPP | Upward pricing pressure |
| WTP | Willingness-to-pay |

**4. Hearing Witnesses (in order of appearance)**

| Name and Position | Affiliation |
|---|---|
| Keith Markowitz, Regional Director of Operations and Contracting | Cigna |
| Paul L. Staudenmeier, Vice President of Provider Contracting and Value-Based Contracting | IBC |
| Lisa Staback-Haney, Chief Executive Officer | St. Mary |
| Barbara Hauswald, Vice President of Strategic Development | Genesis |
| Peter DeAngelis, Chief Financial Officer | Jefferson |
| Dr. James J. Daley, Medical Director of Inpatient Operations | Good Shepherd |
| Dr. Loren Smith, Expert in Antitrust Economics, Industrial Organization, and Econometrics | FTC Expert |
| Barry Freedman, President and Chief Executive Officer | Einstein |
| Ruth Lefton, Former President and Chief Operating Officer of EMCP, EMCEP, MossRehab, Willowcrest, and Center One | Einstein |
| Andre Maksimow, Senior Vice President in the Partnerships, Mergers, and Acquisitions Group | Kaufman Hall |
| Todd Patnode | Defendants' Expert |

| Name and Position | Affiliation |
|---|---|
| Dr. Stephen Klasko, President of Thomas Jefferson University and Chief Executive Officer of Jefferson Health | Jefferson |
| Dr. Bruce Meyer, President of Jefferson Health and Senior Executive Vice President of Thomas Jefferson University | Jefferson |
| Dr. Cory Capps | Defendants' Expert |
| Margaret Seminara, Senior Director of Post-Acute Services at MossRehab | Einstein |
| Dr. Subramanian Ramanarayanan | Defendants' Expert |
| Christopher McTiernan, Former Vice President and Chief Payer Relations Officer | Einstein |
| Laurence Merlis, Executive Vice President for Strategic Partnerships, Strategic Ventures, and Innovation | Jefferson |
| Lisa Ahern | Defendants' Expert |
| Christine Hammer, Expert in Managerial and Financial Accounting | FTC Expert |

5. **Deponents Cited in Proposed Findings of Fact (in alphabetical order)**

| Name and Position | Affiliation |
|---|---|
| Barry Freedman, President and Chief Executive Officer | Einstein |
| Beth Duffy, President and COO of Einstein Montgomery and Einstein Physicians Montgomery | Einstein |
| Dan Freed, Vice President of Health Services | Shannondell |
| Dr. Alberto Esquenazi, Chief Medical Officer for MossRehab and Chair of the Department of Physical Medicine and Rehabilitation for Einstein Healthcare Network | Einstein |
| Dr. Jack Carroll, former President and CEO of Magee Rehabilitation Hospital | Jefferson |
| Dr. Stephen Klasko, President of Thomas Jefferson University and Chief Executive Officer of Jefferson Health | Jefferson |
| Gerard Blaney, Chief Financial Officer | Einstein |
| Lori Gustave, Senior Vice President of Business Development | Penn |
| Scott Latimer, Executive Vice President of Financial Planning and Strategic Transactions | Einstein |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

### I.   THE PARTIES TO THE PROPOSED TRANSACTION

**1.** Defendant Thomas Jefferson University ("Jefferson") operates eleven general acute care ("GAC") hospitals at which it provides inpatient GAC services. Jefferson's 665-bed Abington Hospital ("Abington") and Abington-Lansdale Hospital ("Lansdale") are located in Montgomery County, Pennsylvania. Jefferson also operates two inpatient rehabilitation facilities ("IRFs") with a total of 106 beds that provide inpatient acute rehabilitation services: the freestanding Magee Rehabilitation Hospital ("Magee") and an IRF unit at Abington. Def. Jefferson's Ans. ¶¶ 29, 32 (ECF No. 52); PX8000 (Smith Rpt.) ¶¶ 46, 47, 64.

**2.** Defendant Albert Einstein Healthcare Network ("Einstein") operates three GAC hospitals at which it provides inpatient GAC services: Einstein Medical Center Philadelphia ("EMCP"), a 485-bed facility located in North Philadelphia; Einstein Medical Center Montgomery ("EMCM"), a 191-bed hospital in Montgomery County; and Einstein Medical Center Elkins Park ("EMCEP"), a hospital located in Elkins Park. Einstein provides inpatient acute rehabilitation services at its nationally renowned MossRehab IRFs, including MossRehab at Elkins Park, which has 130 beds. MossRehab operates over 50 additional IRF beds in four IRF units at EMCP, Jefferson's Frankford and Bucks Hospitals, and Doylestown Hospital. Def. Einstein's Ans. ¶¶ 34-36 (ECF No. 51); PX8000 (Smith Rpt.) ¶¶ 67-69.

**3.** On September 14, 2018, Jefferson and Einstein signed a System Integration Agreement, whereby Jefferson would become the sole member and ultimate parent entity of Einstein (the "Proposed Transaction"). JX0078 (Jefferson). The agreement does not expire until the later of

December 31, 2021 or 60 days after a final decision by a U.S. Court of Appeals on any government action to block the Proposed Transaction. JX0078 (Jefferson) at 001, 014, 045-046.

## II.   PROCEDURAL HISTORY

**4.**      On February 27, 2020, the Federal Trade Commission ("FTC") commenced an administrative proceeding to permanently enjoin the Proposed Transaction. Compl. ¶ 39 (ECF No. 7). Plaintiffs filed this action seeking preliminary injunctive relief pending the outcome of the FTC's administrative proceeding. Compl. ¶ 23 (ECF No. 7). The FTC administrative proceeding is scheduled to begin on January 5, 2021. Scheduling Order at 4, *In re Thomas Jefferson University, et al.*, Dkt. No. 9392 (FTC July 13, 2020). Absent a preliminary injunction, Defendants may begin consolidating their operations.

## III.   HEALTHCARE PROVIDER COMPETITION OCCURS IN TWO STAGES

**5.**      Competition among healthcare providers like Defendants occurs in two separate but related stages. In the first stage, providers compete to be included as "in-network" providers in a health plan network. In the second stage, in-network providers compete to attract patients. Smith Hrg. Day 2: 73:15-74:15; *see FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016); PX8000 (Smith Rpt.) § II. C. 2.

### A.      Providers Compete for Inclusion in Insurers' Networks, Leading to Lower Rates

**6.**      A critical aspect of first-stage competition involves providers' negotiations with commercial insurers. Smith Hrg. Day 2: 73:15-74:15. Within a given geography, commercial insurers typically seek to contract with local healthcare providers whose services the insurer's current and prospective members demand. Markowitz (Cigna) Hrg. Day 1: 16:24-17:7; Staudenmeier (IBC) Hrg. Day 1: 81:11-20, 83:8-16. Contract negotiations determine the reimbursement rates and other terms for a provider treating the insurer's members. Markowitz

(Cigna) Hrg. Day 1: 18:1-8; Staudenmeier (IBC) Hrg. Day 1: 81:21-82:2. If a provider and an insurer reach an agreement, then the provider is in-network with the insurer; if not, the provider is out-of-network. PX8000 (Smith Rpt.) ¶ 80.

**7.**     Insurers' and providers' bargaining leverage in negotiations affects rates and contract terms. *See, e.g.*, Staudenmeier (IBC) Hrg. Day 1: 81:21-84:11. Bargaining leverage depends in part on how much the insurer wants to include the provider in its network, which reflects how much the insurer's members value in-network access to that provider. *See* Markowitz (Cigna) Hrg. Day 1: 19:15-21:12; Staudenmeier (IBC) Hrg. Day 1: 81:21-84:11. Leverage is also determined by the alternatives available to each party if no agreement is reached. Staudenmeier (IBC) Hrg. Day 1: 82:18-83:2, 83:24-84:11; Markowitz (Cigna) Hrg. Day 1: 21:3-12; Smith Hrg. Day 2: 76:3-77:14.

**8.**     A provider has greater bargaining leverage if its absence would make the insurer's health plan products substantially less attractive (and therefore less marketable) to its current and prospective members. *See* Staudenmeier (IBC) Hrg. Day 1: 83:8-84:11; Markowitz (Cigna) Hrg. Day 1: 19:21-20:24. Alternative providers offering a similar scope and quality of services in a similar geographic area limit the bargaining leverage of a provider and constrain its ability to negotiate higher reimbursement rates. Staudenmeier (IBC) Hrg. Day 1: 82:18-84:11.

**9.**     These bargaining dynamics exist regardless of the insurer's size. McTiernan (Einstein) Hrg. Day 5: 56:23-57:22; *see also Penn State Hershey*, 838 F.3d at 346. These bargaining dynamics also are the same regardless of whether a healthcare provider is a for-profit or non-profit entity, as both types of providers seek to negotiate the most favorable rates and terms. Markowitz (Cigna) Hrg. Day 1: 18:20-19:3; *see also* Capps Hrg. Day 4: 194:4-8.

3

### B.   In-Network Providers Compete for Patients, Leading to Improved Quality

10.   In the second stage of competition, in-network providers compete to attract patients, who face little or no variation in out-of-pocket costs among in-network providers. Smith Hrg. Day 2: 75:15-76:2; PX8000 (Smith Rpt.) ¶ 86. Second-stage competition, therefore, mainly occurs on the basis of non-price factors, such as access, innovation, quality of care, service breadth, and patient satisfaction. Smith Hrg. Day 2: 74: 75:15-76:2; PX8000 (Smith Rpt.) ¶ 86.

### C.   The Effect of Provider Mergers on Healthcare Competition

11.   A merger of providers that are close substitutes improves the combined entity's bargaining leverage vis-à-vis the insurer in contract negotiations. In the absence of sufficient alternatives, the closer the merging providers are as substitutes, the greater the likelihood of competitive harm. Smith Hrg. Day 2: 73:15-74:15, 76:3-77:14; PX8000 (Smith Rpt.) ¶¶ 87-95.

12.   A merger of providers that are close substitutes can lead to higher prices for insurers and their members. Smith Hrg. Day 2: 74:16-22, 76:3-77:14; Staudenmeier (IBC) Hrg. Day 1: 102:3-17; PX8000 (Smith Rpt.) ¶ 85. Self-insured employers are responsible for paying the claims of their employees, and increased rates immediately affect such employers. Smith Hrg. Day 2: 114:25-116:1. Fully insured employers may see an increase in their premiums because a portion of increased rates will be passed through to consumers. Markowitz (Cigna) Hrg. Day 1: 44:21-45:4; Smith Hrg. Day 3: 73:3-75:14. Individual consumers feel the burden of increased costs in the form of higher insurance premiums, co-pays, deductibles, or other out-of-pocket costs. Smith Hrg. Day 3: 73:3-19; Markowitz (Cigna) Hrg. Day 1: 44:21-45:4.

13.   An anticompetitive merger also may harm consumers by reducing the merged firm's incentive to improve quality, access, services, and technology. Such non-price effects harm all

patients regardless of what kind of insurance they have. Smith Hrg. Day 2: 86:21-87:5; PX8000 (Smith Rpt.) ¶¶ 11, 86.

## IV.   THE PROPOSED TRANSACTION IS PRESUMPTIVELY ILLEGAL IN EACH OF THREE SEPARATE RELEVANT ANTITRUST MARKETS

**14.**    There are three relevant antitrust markets in which to assess the competitive effects of the Proposed Transaction: (1) inpatient GAC services sold to commercial insurers and their members in the Northern Philadelphia Area, (2) inpatient GAC services sold to commercial insurers and their members in the Montgomery Area, and (3) inpatient acute rehabilitation services sold to commercial insurers and their members in the Philadelphia Area. The Proposed Transaction is presumptively illegal in each of the three markets.

### A.    GAC Services

#### 1.    GAC Services Constitute a Relevant Product Market

**15.**    One relevant product market in which to assess the competitive effects of the Proposed Transaction is inpatient GAC services sold to commercial insurers and their members ("GAC Services"). Smith Hrg. Day 2: 91:5-21; *see, e.g.*, *Penn State Hershey*, 838 F.3d at 338. GAC Services include a broad cluster of medical, surgical, and diagnostic services that require an overnight hospital stay. Smith Hrg. Day 2: 91:22-93:8, 129:14-130:3; *see generally* PX8000 (Smith Rpt.) § III. B. 1.

**16.**    Defendants' expert, Dr. Cory Capps, agreed that GAC Services is a relevant product market in this case. Capps Hrg. Day 4: 164:14-18; Smith Hrg. Day 2: 93:4-8.

**17.**    A hypothetical monopolist of GAC Services could profitably impose a small but significant and non-transitory increase in price ("SSNIP") in negotiations with commercial insurers. Smith Hrg. Day 2: 92:4-22. This is because other types of healthcare services, such as those offered in an outpatient setting, are not close enough substitutes for patients needing GAC

Services; thus, insurers could not replace GAC Services with other types of services in their networks. Smith Hrg. Day 2: 92:4-22; *see also* Markowitz (Cigna) Hrg. Day 1: 29:17-30:11; Klasko (Jefferson) Hrg. Day 4: 51:25-52:4.

### 2. The Northern Philadelphia Area and the Montgomery Area Are Relevant Geographic Markets for GAC Services

18.     The relevant geographic market around EMCP (the "Northern Philadelphia Area") and the relevant geographic market around EMCM (the "Montgomery Area") both satisfy the hypothetical monopolist test ("HMT") and therefore constitute relevant geographic markets for GAC Services within which to analyze the Proposed Transaction. Smith Hrg. Day 2: 93:17-95:15; Capps Hrg. Day 4: 165:25-167:8; *see generally* PX8000 (Smith Rpt.) § III. C. 1. Einstein's strategic consultant wrote that Einstein "serves two very different markets . . . Northern Philadelphia . . . [and] Montgomery County." PX2069 (Einstein) at 007-009; *see also* Smith Hrg. Day 2: 100:16-101:10.

19.     Defendants' expert, Dr. Capps, agreed that the Northern Philadelphia Area and the Montgomery Area each satisfy the HMT. Capps Hrg. Day 4: 165:25-167:8; PX8002 (Smith Rebuttal) ¶¶ 6, 98.

20.     In both geographic markets, Jefferson's Abington is the main competitive constraint on Einstein's hospitals. *See* Smith Hrg. Day 6: 15:1-11; Staudenmeier (IBC) Hrg. Day 1: 85:4-88:15; Markowitz (Cigna) Hrg. Day 1: 22:3-23:21, 27:8-28:12; PX8000 (Smith Rpt.) at 164, tbl.14.

21.     Insurers must include local GAC hospitals in their networks because patients prefer to receive GAC Services close to home. *See, e.g.*, Staudenmeier (IBC) Hrg. Day 1: 83:3-16; Meyer (Jefferson) Hrg. Day 4: 89:13-15, 93:12-23.

22.     Because GAC Services are provided to a commercial insurer's members at the hospital, geographic markets for those services are properly defined by the locations of the hospitals. *See* U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010) § 4.2.1 ("*Merger Guidelines*"); Ramanarayanan Hrg. Day 5: 26:6-12 (Defendants' expert agreed that defining geographic markets in hospital mergers by the location of hospitals is valid); Smith Hrg. Day 6: 11:9-14; *see also Penn State Hershey*, 838 F.3d at 347 (citing hospital-based shares); *FTC v. Advocate Health Care*, No. 15-cv-11473, 2017 WL 1022015, at *7 (N.D. Ill. Mar. 16, 2017) (relying on hospital-based shares).

> i.     *The Northern Philadelphia Area Is a Relevant Geographic Market for GAC Services*

23.     The Northern Philadelphia Area includes 11 hospitals: Einstein's EMCP and EMCEP; Jefferson's Abington and Frankford Hospitals; Prime's Roxborough Memorial Hospital; Temple's Jeanes Hospital, Temple University Hospital, and Fox Chase Cancer Center; St. Christopher's Hospital for Children; Cancer Treatment Centers of America, Philadelphia; and Tower Health's Chestnut Hill Hospital. Smith Hrg. Day 2: 94:24-97:2; PX8000 (Smith Rpt.) ¶ 141.

24.     Commercial insurers could not successfully market a health plan product in an area consistent with the Northern Philadelphia Area if their provider network excluded Jefferson and Einstein hospitals—let alone market a plan that excluded *all* hospitals in the Northern Philadelphia Area. Markowitz (Cigna) Hrg. Day 1: 28:1-5; Staudenmeier (IBC) Hrg. Day 1: 86:9-88:15. There are not sufficient alternative providers in close proximity to the areas served by EMCP and Abington that offer "the same acuity of service." Markowitz (Cigna) Hrg. Day 1: 28:9-12; *see also* Staudenmeier (IBC) Hrg. Day 1: 86:24-87:6. As a result, a hypothetical monopolist of GAC Services in the Northern Philadelphia Area could profitably impose a SSNIP

in negotiations with commercial insurers. Smith Hrg. Day 2: 95:16-97:2; PX8000 (Smith Rpt.) ¶¶ 141-42; Capps Hrg. Day 4: 166:23-167:8; *see Penn State Hershey*, 838 F.3d at 346 (if insurers "would accept a price increase rather than excluding the merged [firm] from their networks," this "answer[s] an even narrower question" than the one presented by the HMT and thus, "properly defines the relevant geographic market").

25.     Defendants recognize that they compete for patients in a geographic region consistent with the Northern Philadelphia Area. Laurence Merlis, Jefferson's Executive Vice President for Strategic Partnerships, confirmed that Einstein competes closely with Jefferson in what Jefferson calls "the Einstein Philadelphia" primary service area. Merlis (Jefferson) Hrg. Day 5: 118:24-119:2; *see also* PX1081 (Jefferson) at 003, 008-009. Jefferson controls a substantial portion of the inpatient discharges in Philadelphia County and defines its ███████████████ ████████████████████████ Merlis (Jefferson) Hrg. Day 5: 116:18-22; PX1074 (Jefferson) at 007; PX1261 (Jefferson) at 130. Mr. Merlis testified that Jefferson is the market share leader for inpatient services in Philadelphia, and Jefferson's documents show that Einstein has the second highest market share in Abington's service area. Merlis (Jefferson) Hrg. Day 5: 116:18-22, 146:21-147:8; PX1243 (Jefferson) at 012; *see also* DeAngelis (Jefferson) Hrg. Day 1: 263:23-264:8.

> ii.     *The Montgomery Area Is a Relevant Geographic Market for GAC Services*

26.     The Montgomery Area includes 10 hospitals: Einstein's EMCM; Jefferson's Abington and Lansdale Hospitals; Main Line's Bryn Mawr and Paoli Hospitals; Prime's Roxborough Memorial and Suburban Community Hospitals; Tower Health's Chestnut Hill and Phoenixville Hospitals; and Physicians Care Surgical Hospital. Smith Hrg. Day 2: 97:3-23; PX8000 (Smith Rpt.) ¶ 141.

27.     Commercial insurers could not successfully market a health plan product in an area

consistent with the Montgomery Area if their provider network excluded Jefferson and Einstein

hospitals—let alone market a plan that excluded *all* hospitals in the Montgomery Area.

Markowitz (Cigna) Hrg. Day 1: 23:9-21; Staudenmeier (IBC) Hrg. Day 1: 87:22-88:15; *see Penn*

*State Hershey*, 838 F.3d at 346. As a result, a hypothetical monopolist of GAC Services in the

Montgomery Area could profitably impose a SSNIP in negotiations with commercial insurers.

Smith Hrg. Day 2: 97:3-23; PX8000 (Smith Rpt.) ¶¶ 141-42; Capps Hrg. Day 4: 166:18-22.

28.     Testimony and documents from Defendants are consistent with defining the Montgomery

Area as a distinct geographic market for GAC Services. Jefferson's strategic profile of Einstein

stated that Einstein competed with Jefferson in EMCM's primary service area. Merlis (Jefferson)

Hrg. Day 5: 121:3-12, 123:5-17; *see also* PX1081 (Jefferson) at 003, 008, 009. Einstein's former

Vice President and Chief Payer Relations Officer testified that EMCM primarily serves patients

in Montgomery County. McTiernan (Einstein) Hrg. Day 5: 69:8-10. ███████████████

██████████████████████████████████ PX1261 (Jefferson) at 130. Part

of Jefferson's "vision" is to become essential to patients in Montgomery County. DeAngelis

(Jefferson) Hrg. Day 1: 263:23-264:11; *see also* JX0022 (Jefferson) at 012; Merlis (Jefferson)

Hrg. Day 5: 116:18-22.

>    **3.     The Proposed Transaction Is Presumptively Illegal in the Markets for**
>    **GAC Services in both the Northern Philadelphia Area and the**
>    **Montgomery Area**

29.     Defendants' merger is presumptively anticompetitive in the market for GAC Services in

the Northern Philadelphia Area. Smith Hrg. Day 2: 103:23-104:16; *see Penn State Hershey*, 838

F.3d at 346-47 (citing *Merger Guidelines* § 5.3). Within the Northern Philadelphia Area,

Jefferson and Einstein account for a combined 64.5% of inpatient GAC discharges of

commercially insured patients. Smith Hrg. Day 2: 103:4-7; PX8000 (Smith Rpt.) ¶ 160. The merger of Jefferson and Einstein would increase the Herfindahl-Hirschmann Index ("HHI") by 1,359 points, resulting in a post-merger HHI of 4,792 in the Northern Philadelphia Area. Smith Hrg. Day 2: 104:4-11; PX8000 (Smith Rpt.) ¶ 160.

**30.** Defendants' merger is presumptively anticompetitive in the market for GAC Services in the Montgomery Area. Smith Hrg. Day 2: 103:23-104:16; *see Penn State Hershey*, 838 F.3d at 346-47. In the Montgomery Area, Jefferson and Einstein account for a combined 49.9% of inpatient GAC discharges of commercially insured patients. Smith Hrg. Day 2: 103:8-11; PX8000 (Smith Rpt.) ¶ 160. The merger of Jefferson and Einstein would increase HHI by 887 points, resulting in a post-merger HHI of 3,827 in the Montgomery Area. Smith Hrg. Day 2: 104:4-11; PX8000 (Smith Rpt.) ¶ 160.

**31.** Defendants concede that their combined market shares for GAC Services in both the Northern Philadelphia Area and the Montgomery Area exceed 30%, which the Supreme Court has held is more than sufficient to show undue market concentration. Capps Hrg. Day 4: 180:11-22; *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363-65 (1963); *see also United States v. Cont'l Can Co.*, 378 U.S. 441, 461 (1964).

**32.** Because the relevant geographic markets for GAC Services are defined based on hospital locations, it is appropriate to calculate shares and concentration measures in these markets based on the commercial inpatient discharges from the hospitals in the markets. Smith Hrg. Day 6: 7:19-9:23; PX8002 (Smith Rebuttal) ¶¶ 21-22, 92-93; *Merger Guidelines* § 4.2.1 ("When the geographic market is defined based on supplier locations, sales made by suppliers located in the geographic market are counted, regardless of the location of the customer making the purchase.").

10

33. Defendants' merger would still be presumptively anticompetitive in both relevant markets for GAC Services if the geographic markets were expanded to include additional hospitals, or if shares were calculated based on patient locations rather than hospital locations. Smith Hrg. Day 2: 104:17-23, Day 6: 13:4-14:25; PX8000 (Smith Rpt.) ¶¶ 161-63; PX8002 (Smith Rebuttal) ¶ 94 & tbl.5; Capps Hrg. Day 4: 171:13-173:5, 178:16-180:22.

34. Jefferson recognizes that healthcare markets in Philadelphia are highly concentrated and that the Proposed Transaction will strengthen Jefferson's share in Philadelphia and Montgomery County. According to Jefferson's 2016 strategic roadmap, ████████████████████████ ████████████████████████████████████████████████████████ ██████████████████ PX1074 (Jefferson) at 006. Jefferson's Executive Vice President for Strategic Partnerships testified that Jefferson has the largest inpatient market share in Philadelphia and Montgomery County, with an opportunity to increase its share in several areas. Merlis (Jefferson) Hrg. Day 5: 116:18-22; PX1074 (Jefferson) at 007.

### B. Acute Rehab Services

#### 1. Acute Rehab Services Constitute a Relevant Product Market

35. Another relevant market in which to assess the competitive effects of the Proposed Transaction is inpatient acute rehabilitation services sold to commercial insurers and their members ("Acute Rehab Services"). Smith Hrg. Day 2: 91:5-21; PX8000 (Smith Rpt.) ¶¶ 118-32. The Acute Rehab Services market satisfies the criteria for a properly defined relevant product market through: (1) the "practical indicia" identified in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), and (2) the HMT.

36. Acute Rehab Services are a cluster of intensive inpatient rehabilitation therapy services that include, at a minimum, multi-disciplinary therapy at least three hours a day for five days per

week, three face-to-face visits with a physician per week, and 24-hour nursing care. Staudenmeier (IBC) Hrg. Day 1: 91:12-20; Staback-Haney (St. Mary) Hrg. Day 1: 141:21-143:13; Daley (Good Shepherd) Hrg. Day 2: 14:21-15:1; 28 Pa. Code §§ 101.4, 101.31. Clustering Acute Rehab Services is appropriate because competitive conditions are similar across service lines, meaning each service line has similar competitors, market shares, and entry conditions. Smith Hrg. Day 2: 127:16-128:20; Ramanarayanan Hrg. Day 4: 245:14-16; PX8000 (Smith Rpt.) ¶¶ 128-29.

**37.**     Acute Rehab Services are provided only at IRFs. Hauswald (Genesis) Hrg. Day 1: 183:5-18; Meyer (Jefferson) Hrg. Day 4: 88:8-17; PX9014 (CMS) at 002 ("[I]ntensive rehabilitation therapy services . . . are uniquely provided in IRFs."). Skilled nursing facilities ("SNFs") or "nursing homes" are non-hospital post-acute care settings that provide short-term and long-term nursing services and, at some SNFs, subacute rehabilitation services. Markowitz (Cigna) Hrg. Day 1: 34:24-35:17; Hauswald (Genesis) Hrg. Day 1: 180:18-181:14; Ramanarayanan Hrg. Day 5: 16:17-17:8. Patients who require Acute Rehab Services generally cannot and do not substitute those services for the subacute services provided at SNFs. Markowitz (Cigna) Hrg. Day 1: 35:18-37:2; Daley (Good Shepherd) Hrg. Day 2: 59:22-25.

> *i.   Acute Rehab Services Are Demanded by Distinct Customers and Have Distinct Characteristics Compared to the Services Provided at SNFs, Including So-Called "High-End" SNFs*

**38.**     Whether a patient requires post-acute care and, if so, which post-acute care setting the patient needs are medical decisions that a physician must approve. Markowitz (Cigna) Hrg. Day 1: 31:23-32:16; Staback-Haney (St. Mary) Hrg. Day 1: 141:21-143:13; Daley (Good Shepherd) Hrg. Day 2: 34:4-10. A physician must evaluate not only the patient's primary diagnosis, but also many other factors that can affect a patient's ability to succeed in a given post-acute care setting.

Daley (Good Shepherd) Hrg. Day 2: 35:20-37:7, 37:18-21; JX0033 Carroll (Jefferson) Dep.

114:22-115:11. Sending a patient to an inappropriate post-acute care setting can have serious

medical consequences. Daley (Good Shepherd) Hrg. Day 2: 35:3-19.

**39.** IRF patients are subject to a strict admissions process. Markowitz (Cigna) Hrg. Day 1:

31:23-32:16; Staback-Haney (St. Mary) Hrg. Day 1: 141:11-143:13. To be appropriate

candidates for admission to an IRF to receive Acute Rehab Services, patients must be able to

participate in and benefit from intensive multi-disciplinary therapy, require 24-hour a day on-site

nursing care, and require visits from physicians at least three times per week. Staback-Haney (St.

Mary) Hrg. Day 1: 141:11-143:13; Daley (Good Shepherd) Hrg. Day 2: 14:21-15:1, 17:11-20,

34:11-35:2; PX9044 (Cigna) at 001-002; 28 Pa. Code §§ 101.4, 101.31. Commercial insurers

generally follow Centers for Medicare and Medicaid Services ("CMS") regulations. Staback-

Haney (St. Mary) Hrg. Day 1: 143:18-25.

**40.** Before admission to an IRF, the insurer must pre-certify the admission for medical

necessity; this decision is based on medical criteria, not cost. Staudenmeier (IBC) Hrg. Day 1:

91:21-92:14, 94:4-13. IRFs and insurers will not approve a patient for Acute Rehab Services if a

patient would "be appropriate to receive medically necessary services in a less intense setting

(e.g., skilled nursing facility or outpatient)." PX9044 (Cigna) at 002; Seminara (Einstein) Hrg.

Day 4: 232:17-233:15; Daley (Good Shepherd) Hrg. Day 2: 34:19-35:2.

**41.** SNF patients are required to see a doctor only once every 30 days (compared to at least

three times per week at an IRF), are not required to receive therapy at least three hours a day,

five days per week, and are not required to have 24-hour-a-day on-site nursing care. Hauswald

(Genesis) Hrg. Day 1: 186:3-187:25, 189:5-24; 42 C.F.R. § 483.35(b)(1). Acute Rehab Services

provided at IRFs are higher in acuity and intensity than the subacute rehabilitation services

provided at SNFs, because the services at SNFs are designed to treat less medically complex patients or patients who are unable to withstand or benefit from Acute Rehab Services. Staudenmeier (IBC) Hrg. Day 1: 93:1-9; Hauswald (Genesis) Hrg. Day 1: 183:19-184:15, 186:3-20; Daley (Good Shepherd) Hrg. Day 2: 19:15-24; *see also* Seminara (Einstein) Hrg. Day 4: 233:14-15 (a SNF is a "lesser level of care than an IRF"). IRFs often provide more therapy and physician care than what is required by regulation. Staback-Haney (St. Mary) Hrg. Day 1: 141:21-143:13; Daley (Good Shepherd) Hrg. Day 2: 14:6-15; 34:11-18; Seminara (Einstein) Hrg. Day 4: 219:3-9. On the other hand, if a SNF patient required three physician visits a week "that would be an indication that they might need a higher level of care." Hauswald (Genesis) Hrg. Day 1: 189:25-190:6.

42.    Compared to IRFs, "the intensity of service and the types of patients that [SNFs] treat are often very different." Hauswald (Genesis) Hrg. Day 1: 184:8-185:10, 191:18-24. For instance, the highest level of therapy provided at PowerBack SNFs—identified by Defendants' expert as three of six so-called "high-end" SNFs—is only two hours a day. Hauswald (Genesis) Hrg. Day 1: 186:3-187:25. IRFs provide more hours of rehabilitation therapy than SNFs because SNF patients cannot tolerate the intense therapy provided at IRFs, and because under their reimbursement model, SNFs cannot financially sustain providing Acute Rehab Services. Hauswald (Genesis) Hrg. Day 1: 186:3-187:25; Staback-Haney (St. Mary) Hrg. Day 1: 146:20-147:9; Daley (Good Shepherd) Hrg. Day 2: 20:7-14.

43.    The higher intensity of Acute Rehab Services provided at IRFs compared to the subacute rehabilitation services provided at SNFs is also reflected in the higher quality and greater specialization of the rehabilitation services provided at IRFs. Hauswald (Genesis) Hrg. Day 1: 185:11-186:2; Daley (Good Shepherd) Hrg. Day 2 19:15-20:6, 21:12-22:8. IRFs have specialized

programs, overseen by physiatrists, that are dedicated to treating patients with certain diagnoses; such programs do not generally exist at SNFs, including so-called "high-end" SNFs. *Compare* Seminara (Einstein) Hrg. Day 4: 230:19-231:15 (MossRehab has specialized spinal cord and brain injury programs) *with* Hauswald (Genesis) Hrg. Day 1: 191:18-24 (PowerBack SNFs do not treat patients with traumatic spinal cord injury and do not commonly treat patients with brain injury); *see also* Daley (Good Shepherd) Hrg. Day 2: 21:12-24.

**44.**     A comparison of staffing and resources at IRFs and SNFs further illustrates differences in the services provided at each. Hauswald (Genesis) Hrg. Day 1: 185:11-186:2. IRFs hire more staff than SNFs, including medical professionals with specializations in rehabilitation—for instance, physiatrists and Certified Rehabilitation Registered Nurses. Hauswald (Genesis) Hrg. Day 1: 185:11-186:2; Staback-Haney (St. Mary) Hrg. Day 1: 145:5-14; Daley (Good Shepherd) Hrg. Day 2: 20:20-21:11; *compare* Hauswald (Genesis) Hrg. Day 1: 188:21-189:4, 190:7-12 *with* Seminara (Einstein) Hrg. Day 4: 230:19-231:15, *and* Daley (Good Shepherd) Hrg. Day 2: 15:2-9, 15:13-16:5. There is a lower nurse-to-patient ratio at IRFs than at SNFs. Daley (Good Shepherd) Hrg. Day 2: 22:13-23. IRFs have complex equipment and robotics for rehabilitation therapy, while SNFs generally do not. Daley (Good Shepherd) Hrg. Day 2: 58:11-20. As a result of these differences in services provided at IRFs and SNFs, patients treated with Acute Rehab Services at IRFs often have better outcomes than SNF patients. Staback-Haney (St. Mary) Hrg. Day 1: 153:16-154:10; Daley (Good Shepherd) Hrg. Day 2: 37:8-17, 60:23-61:12; *see also* PX9025 (Einstein) at 001.

**45.**     Under recent regulatory changes, SNFs are no longer reimbursed on the minutes of therapy provided to patients, leading SNFs to lay off therapists and "really decrease[]" their marketing toward rehabilitation patients. Staback-Haney (St. Mary) Hrg. Day 1: 147:22-148:16,

159:14-160:7; *see also* Hauswald (Genesis) Hrg. Day 1: 188:4-16 ("There's been a modest

decrease [in the hours of therapy provided]" at one so-called "high-end" SNF).

**46.**     As one Magee executive wrote, to the extent SNFs, including so-called "high end" SNFs,

"are presenting themselves as an alternative rehab site for an individual who meets IRF

admission criteria, I'd see that as an overreach across the board." PX1027 (Jefferson) at 001; *see*

*also* Smith Hrg. Day 2: 125:12-22. The Vice President of Health Services at Rehab at

Shannondell—another so-called "high-end" SNF—testified that ███████████████████

████████████████████████████████ JX0067 Freed (Shannondell) Dep. 26:5-

24. Due to the differences in the services provided at IRFs and SNFs, only a small percentage of

patients who are eligible for admission to an IRF choose instead to go to a SNF. Staback-Haney

(St. Mary) Hrg. Day 1: 176:4-11 (5% or less); Daley (Good Shepherd) Hrg. Day 2: 60:17-22

(less than 10%).

> ii.  *Industry Participants Recognize Acute Rehab Services as a Distinct*
> *Level of Post-Acute Care*

**47.**     Industry participants agree that services provided at SNFs are not a close substitute for

the Acute Rehab Services provided at IRFs because the two types of care are different. The CEO

of St. Mary Rehabilitation Hospital ("St. Mary") testified she would "never classify [SNFs] as

being competitive with IRFs, it's just a different level of care." Staback-Haney (St. Mary) Hrg.

Day 1: 160:21-161:6. Cigna's Regional Director of Operations and Contracting testified that

members who require Acute Rehab Services cannot receive those services at SNFs. Markowitz

(Cigna) Hrg. Day 1: 35:18-37:2. Independence Blue Cross's ("IBC's") Vice President of

Provider Contracting testified that the services provided at IRFs and SNFs are "apples and

oranges. The intensity of services provided at an inpatient rehab facility is much higher than

provided at a SNF." Staudenmeier (IBC) Hrg. Day 1: 93:23-94:3. Good Shepherd Rehabilitation

Network's Medical Director for Inpatient Operations testified that he was not aware of any SNFs that provide the same level of services as IRFs. Daley (Good Shepherd) Hrg. Day 2: 30:20-23; *see also id*. at 21:12-24 ("there is no comparison [between] the quality of care" provided at IRFs and SNFs). Genesis Healthcare's Senior Vice President of Strategic Development testified that PowerBack SNFs view other SNFs and home health providers, not Defendants' IRFs, as their competitors. Hauswald (Genesis) Hrg. Day 1: 181:15-22; 224:6-21.

        iii.    *Acute Rehab Services Are Provided at Unique Facilities by Specialized Vendors*

**48.**    Acute Rehab Services are provided only at IRFs, which are specialty hospitals licensed by state health departments and certified and regulated by CMS. Staback-Haney (St. Mary) Hrg. Day 1: 138:5-13. In contrast to IRFs, SNFs licensed as nursing homes and not as hospitals, and as a result, they are not required to provide the same "high level" of acute care as a hospital. Daley (Good Shepherd) Hrg. Day 2: 25:8-17; Ramanarayanan Hrg. Day 5: 16:17-17:8; Staback-Haney (St. Mary) Hrg. Day 1: 147:3-9.

        iv.    *Acute Rehab Services Have Distinct Prices from Other Services and Are Relatively Insensitive to Price Changes*

**49.**    Due to the higher level of care, more medically complex patients, greater regulatory requirements, and higher level of specialization and staffing at IRFs, "the rates at an inpatient rehab facility relative to those at a SNF would be multiples higher." Staudenmeier (IBC) Hrg. Day 1: 93:10-22. Despite the significantly higher rates at IRFs than at SNFs, commercial insurers could not steer patients from IRFs to SNFs in the event of a price increase because the IRF pre-approval process is based on medical criteria, not cost. Markowitz (Cigna) Hrg. Day 1: 37:24-38:5; Staudenmeier (IBC) Hrg. Day 1: 92:9-14; 94:4-13; Ramanarayanan Hrg. Day 5: 19:5-8.

v.   *A Market for Acute Rehab Services Satisfies the Hypothetical Monopolist Test*

**50.**   Due to all of these distinctions, commercial insurers and their members could not replace Acute Rehab Services provided at IRFs with the subacute rehabilitation services provided at SNFs. Staudenmeier (IBC) Hrg. Day 1: 93:10-22, 94:14-23, 96:20-97:11; Markowitz (Cigna) Hrg. Day 1: 37:11-23, 43:8-44:8. Insurers could not successfully market a health plan that excluded Defendants' IRFs from their network—let alone market a plan that excluded *all* Acute Rehab Services provided at IRFs—and they would likely pay higher reimbursement rates at Defendants' IRFs post-merger if Jefferson demanded them. Staudenmeier (IBC) Hrg. Day 1: 94:14-23, 96:20-97:11, 100:11-25; Markowitz (Cigna) Hrg. Day 1: 37:11-23, 43:8-44:8; *cf.* Ramanarayanan Hrg. Day 5: 17:15-22; *Penn State Hershey*, 838 F.3d at 346. Accordingly, a hypothetical monopolist of Acute Rehab Services could profitably impose a SSNIP in negotiations with insurers. *See* Smith Hrg. Day 2: 122:3-16; PX8000 (Smith Rpt.) ¶ 132.

### 2.   The Philadelphia Area Is a Relevant Geographic Market for Acute Rehab Services

**51.**   The relevant geographic market around MossRehab at Elkins Park (the "Philadelphia Area") satisfies the HMT and therefore constitutes a relevant geographic market for Acute Rehab Services within which to analyze the Proposed Transaction. Smith Hrg. Day 2: 130:11-131:21. The Philadelphia Area includes eight IRFs: Abington; Magee; MossRehab at Jefferson Frankford; MossRehab at EMCP; MossRehab at Elkins Park; Trinity's Nazareth Hospital; and Penn Rehab. Smith Hrg. Day 2: 130:11-131:21; PX8000 (Smith Rpt.) ¶ 147; *see generally* PX8000 (Smith Rpt.) § III. C. 2.

**52.**   Patients prefer to receive Acute Rehab Services close to home. Markowitz (Cigna) Hrg. Day 1: 42:6-19; Staudenmeier (IBC) Hrg. Day 1: 97:23-98:6. More distant providers of Acute

Rehab Services are not good alternatives for patients seeking care in the Philadelphia Area. Markowitz (Cigna) Hrg. Day 1: 39:17-43:7; Staudenmeier (IBC) Hrg. Day 1: 97:23-98:18. For instance, the majority of patients treated at St. Mary—a Bucks County IRF—reside in Bucks County. Staback-Haney (St. Mary) Hrg. Day 1: 150:17-151:5, 169:8-170:1 (patients referred to St. Mary from Philadelphia hospitals "are really Bucks County patients that go down into the city and want to come back home for their rehab").

53.     Insurers could not successfully market a health plan in an area consistent with the Philadelphia Area that excluded MossRehab Elkins Park and Magee from their provider network—let alone market a plan that excluded *all* IRFs in the Philadelphia Area. Markowitz (Cigna) Hrg. Day 1: 43:8-44:8; Staudenmeier (IBC) Hrg. Day 1: 96:20-97:11, 100:12-25; *see Penn State Hershey*, 838 F.3d at 346. Defendants' expert, Dr. Subramaniam Ramanarayanan, did not apply the HMT to the Philadelphia Area to determine whether the Philadelphia Area is a relevant geographic market. Ramanarayanan Hrg. Day 5: 25:24-26:2. IRFs outside the Philadelphia Area—including Bryn Mawr Rehab Hospital, St. Mary, and Kessler Institute for Rehabilitation - Marlton—would not be good alternatives in insurers' networks for Einstein's and Jefferson's IRFs. Markowitz (Cigna) Hrg. Day 1: 40:5-43:7; Staudenmeier (IBC) Hrg. Day 1: 97:23-98:18. As a result, a hypothetical monopolist of the IRFs in the Philadelphia Area could profitably impose a SSNIP in negotiations with commercial insurers. Smith Hrg. Day 2: 130:11-131:11; PX8000 (Smith Rpt.) ¶¶ 147-48.

54.     Defendants' ordinary course documents are consistent with defining the Philadelphia Area as a relevant geographic market. According to Magee's 2019 marketing plan, Bryn Mawr and St. Mary only had a 5.5% and 4.3% market share, respectively, among IRFs serving patients

in Philadelphia County, while Defendants' combined market share totaled 86.2%. JX0087

(Jefferson) at 010.

### 3. The Proposed Transaction Is Presumptively Illegal in the Market for Acute Rehab Services in the Philadelphia Area

**55.** Defendants' merger is presumptively anticompetitive in the market for Acute Rehab

Services in the Philadelphia Area. Smith Hrg. Day 2: 134:6-19; *see Penn State Hershey*, 838

F.3d at 346-47. In the Philadelphia Area, Jefferson and Einstein account for a combined 71.6%

of commercially insured IRF discharges. Smith Hrg. Day 2: 134:3-5; PX8002 (Smith Rebuttal)

¶ 79. The merger of Jefferson and Einstein would increase HHI by 2,469 points, resulting in a

post-merger HHI of 5,819 in the Philadelphia Area. Smith Hrg. Day 2: 134:6-19; PX8002 (Smith

Rebuttal) ¶ 79.

**56.** Defendants' merger would still be presumptively anticompetitive in the market for Acute

Rehab Services if the relevant market were expanded to include additional IRFs or so-called

"high-end" SNFs, or if shares were calculated based on patient locations rather than IRF

locations. Smith Hrg. Day 2: 134:20-135:7, Day 6: 30:24-31:21; 32:19-33:7; PX8000 (Smith

Rpt.) ¶ 165; PX8002 (Smith Rebuttal) ¶¶ 120-21 & tbl.6. Even in the broadest of markets

proposed by Defendants' expert, Defendants concede that their combined market share exceeds

30%, which is more than sufficient to show undue market concentration. Ramanarayanan Hrg.

Day 5: 29:6-10; *see Phila. Nat'l Bank*, 374 U.S. at 363-65.

## V. THE PROPOSED TRANSACTION WOULD SUBSTANTIALLY LESSEN COMPETITION IN ALL OF THE RELEVANT ANTITRUST MARKETS

**57.** Jefferson's Board approved "Strategic Imperatives" for the Proposed Transaction that

recognized acquiring Einstein as the "final major step" in Jefferson's vision of becoming

"essential" to patients and insurers. DeAngelis (Jefferson) Hrg. Day 1: 262:14-264:24; JX0022

(Jefferson) at 012. Becoming "essential" means being an essential partner for insurers and negotiating higher rates. DeAngelis (Jefferson) Hrg. Day 1: 264:22-265:4. Jefferson's strategic goal is to become a "must have" for IBC and other commercial insurers. DeAngelis (Jefferson) Hrg. Day 1: 243:10-244:7, 246:9-17; PX1141 (Jefferson) at 002. Insurers, including IBC, would "by definition" be "weaker" without Jefferson in their networks, and "would be even weaker without a combined Einstein/Jefferson." DeAngelis (Jefferson) Hrg. Day 1: 269:4-21.

### A. GAC Services

#### 1. Jefferson and Einstein Are Close Competitors for the Provision of GAC Services in the Northern Philadelphia Area and the Montgomery Area

**58.** Einstein recognizes Jefferson as a major competitor for GAC Services in Philadelphia and Montgomery counties. In a presentation to IBC from Einstein's Chief Financial Officer, Einstein described Abington as one of EMCM's "primary competitors for higher acuity/cost inpatient services," and nearly one-third of EMCM's market share growth came from Abington. PX2044 (Einstein) at 012. An Einstein strategic planning document explains "EMCM dominates the [obstetrics] market . . . [w]ith increased capacity at EMCM, there is further opportunity to reverse outmigration currently going to Abington and [Main Line Health]." PX2329 (Einstein) at 041. A planning document circulated among Einstein executives identified EMCP/EP and/or Jefferson hospitals as the number one and number two providers in "the EMCP/EP service area" for 11 out of 12 inpatient GAC service lines that were tracked. PX2225 (Einstein) at 009, 017; *see also* Smith Hrg. Day 2: 116:7-23.

**59.** Jefferson in turn recognizes Einstein as one of its closest competitors for GAC Services in Philadelphia and Montgomery counties. Abington's 2016 "Market Share Report" identified Einstein as a "top 3 health system" with the largest inpatient market share after Jefferson in both

Abington's primary service area and its total service area. Merlis (Jefferson) Hrg. Day 5: 144:16-147:8; PX1243 (Jefferson) at 010, 012; *see also* PX1100 (Jefferson) at 002, 008 (describing Jefferson as a "major competitor" to Einstein with the "second highest market share in [Einstein's primary service area] overall."). An email dated March 29, 2017 from Dr. Joel Sorosky, the chair of Abington's OB/GYN department, to Jefferson's senior leadership advised: "Einstein Montgomery is a great competitor for normal obstetrics. . . . If we do nothing, Abington will lose 1000 deliveries over the next few years to Einstein Montgomery. Thus, should I develop plans to move our practices closer to them to compete? If they become part of our system there is no need for me to do this." PX1079 (Jefferson) at 001-002; Merlis (Jefferson) Hrg. Day 5: 126:12-127:7; *see also id*. 128:1-6 (Dr. Sorosky is "an excellent clinician and a very good chair of his department" whose job includes "assessi[ing] what's going on with his service line area"); Smith Hrg. Day 2: 116:17-117:13; PX1243 (Jefferson) at 039 (identifying Einstein as top competitor to Jefferson measured by inpatient market share for Women's Health in Abington's service area). An email exchange between Jefferson's President and CEO, Dr. Stephen Klasko, and Jefferson's former Vice President of Payer Relations and Contracting, Debra Taylor, celebrates excluding Einstein from an IBC narrow network product: "We were successful! In Abington's IBC Agreement they excluded Einstein – well done!" PX1050 (Jefferson) at 001.

**60.**     Diversion ratios demonstrate close competition between Jefferson and Einstein hospitals. Smith Hrg. Day 2: 106:23-107:14; *see, e.g.*, *FTC v. Sanford Health*, No. 1:17-cv-133, 2017 WL 10810016, at *12 (D.N.D. Dec. 15, 2017) (analyzing diversion ratios as a measure of closeness of competition). If EMCP were no longer available, 35% of its patients would seek care at Jefferson; if EMCM were no longer available, 20.8% of its patients would seek care at Jefferson;

and if EMCEP were longer available, 40.7% of its patients would seek care at Jefferson. PX8000 (Smith Rpt.) at 164, tbl.14. If Abington were no longer available, 15% of its patients would seek care at Einstein. PX8000 (Smith Rpt.) at 165, tbl.14.

61.     Diversion ratios demonstrate that Abington is the closest competitor to both EMCP and EMCM. Smith Hrg. Day 2: 107:8-14; PX8000 (Smith Rpt.) at 164, tbl.14. If EMCP were not available, 20.3% of its patients would seek care at Abington, and if EMCM were not available, 15.7% of its patients would seek care at Abington. Smith Hrg. Day 2: 106:23-107:14; PX8000 (Smith Rpt.) at 164, tbl.14.

62.     These diversion ratios account for substitution between all hospitals in Pennsylvania and New Jersey, regardless of their inclusion in the relevant geographic markets for GAC Services. Smith Hrg. Day 6: 93:3-23; PX8000 (Smith Rpt.) ¶ 180. Defendants' expert, Dr. Capps, calculated diversion ratios that are nearly identical to the diversion ratios Plaintiffs' economic expert, Dr. Loren Smith, calculated. Capps Hrg. Day 4: 115:6-10; Smith Hrg. Day 2: 108:9-18, Day 6: 40:24-41:23; PX8002 (Smith Rebuttal) at 79, tbl.7.

### 2.    The Proposed Transaction Is Likely to Reduce First-Stage Competition and Result in Increased Prices for GAC Services in the Northern Philadelphia Area and the Montgomery Area

63.     The Proposed Transaction would combine two of the most significant health systems for GAC Services in the Northern Philadelphia and Montgomery Areas. The Proposed Transaction would increase the merged system's bargaining leverage, because a health plan network that excluded the combined system would not be marketable to members or potential members. Markowitz (Cigna) Hrg. Day 1: 23:13-21, 26:7-17, 28:1-29:4; Staudenmeier (IBC) Hrg. Day 1: 87:22-88:15. The Proposed Transaction would allow Jefferson to extract higher reimbursement rates in contract negotiations with commercial insurers. Markowitz (Cigna) Hrg. Day 1: 26:18-

27:1, 29:9-16; Staudenmeier (IBC) Hrg. Day 1: 89:15-90:16. Insurers, in turn, would likely pass

on any price increase to their members, resulting in higher premiums and other increased out-of-

pocket costs such as co-payments, co-insurance, and deductibles. Markowitz (Cigna) Hrg. Day 1:

44:14-45:4; Staudenmeier (IBC) Hrg. Day 1: 102:3-17.

64.     Defendants' argument that that the Proposed Transaction will have a downward effect on

the prices IBC pays EMCP due to IBC's non-profit mission and "pivotal buyer" status is

inconsistent with insurer testimony that the merger will increase Defendants' bargaining leverage

and ability to negotiate higher rates post-merger. *See* Staudenmeier (IBC) Hrg. Day 1: 102:3-17,

130:4-10; Markowitz (Cigna) Hrg. Day 1: 44:14-20; *see also* PX8002 (Smith Rpt.) ¶¶ 178-183.

If Jefferson and Einstein merge, the combined entity will negotiate future contracts with insurers,

including IBC, as one enterprise. DeAngelis (Jefferson) Hrg. Day 1: 258:3-7; Capps Hrg. Day 4:

191:12-15. At that point, the merged system could take advantage of the value Einstein brings to

IBC's network and exercise the increased market power it gained through the merger to negotiate

higher rates with IBC that would offset any rate decreases in IBC's current contract with

Einstein. *See* PX8002 (Smith Rpt.) ¶¶ 179-183; *see also* Staudenmeier (IBC) Hrg. Day 1: 101:5-

102:2, 130:4-131:6.

65.     Upward pricing pressure ("UPP") analysis predicts weighted average price increases for

GAC Services of 6.9% at Einstein's hospitals and 3.3% at Jefferson's hospitals, for an overall

weighted average price increase of 4% across Defendants' hospitals. Smith Hrg. Day 2: 109:25-

110:9; PX8000 (Smith Rpt.) at 113, tbl.4. Converting these percentages to dollar figures, the

Proposed Transaction is likely to result in a total of $23.3 million in annual price increases for

GAC Services at Defendants' hospitals, absent mitigating factors. PX8000 (Smith Rpt.) ¶ 185.

24

66.     Measuring the increase in insurers' "willingness-to-pay" ("WTP") demonstrates that the Proposed Transaction would result in an average post-merger price increase of 4.7% for GAC Services at Defendants' hospitals. *See* Smith Hrg. Day 2: 112:2-9; PX8000 (Smith Rpt.) ¶ 186. The estimated increase in WTP is within the range of estimated increases that Defendants' own expert calculated. Capps Hrg. Day 4: 181:21-182:5; Smith Hrg. Day 2: 112:19-113:11.

67.     The UPP and WTP estimates account for competition from all hospitals in Pennsylvania and New Jersey, even those outside the relevant geographic markets. Smith Hrg. Day 6: 93:3-23; PX8000 (Smith Rpt.) ¶ 180.

68.     Competition from GAC hospitals outside the relevant geographic markets is unlikely to defeat a post-merger price increase. Commercial insurers need to include local GAC hospitals in their provider networks to offer marketable health plan products to members or prospective members seeking care in the Northern Philadelphia and Montgomery Areas because patients generally prefer to receive care close to home. *See* Staudenmeier (IBC) Hrg. Day 1: 83:3-16, 85:15-25, 86:15-23, 87:22-88:15, 89:15-90:16; Markowitz (Cigna) Hrg. Day 1: 26:12-27:1, 28:1-12, 29:9-16; Smith Hrg. Day 2: 100:16-101:10; PX8000 (Smith Rpt.) ¶¶ 143-44. Hospitals outside the Northern Philadelphia Area and the Montgomery Area may be able to draw some patients from the areas around the Defendants' hospitals by opening or expanding outpatient facilities in those areas, but such competition would not mitigate Defendants' ability to negotiate a price increase with insurers post-transaction. PX8002 (Smith Rebuttal) ¶¶ 130-132, 241; *see* Smith Hrg. Day 3: 82:14-83:7; *Penn State Hershey*, 838 F.3d at 340 ("patient flow data . . . is particularly unhelpful in hospital merger cases"). Defendants introduced no evidence quantifying how, if at all, inpatient referrals would be impacted by hospitals outside the relevant geographic markets opening a physician office or outpatient facility near the hospitals in the Northern

25

Philadelphia or Montgomery Areas. Capps Hrg. Day 4: 186:9-15. To the extent that hospitals outside the relevant geographic markets have already opened a physician office or outpatient facility near the hospitals in the Northern Philadelphia or Montgomery Areas, Plaintiffs' expert, Dr. Smith, accounts for any effects of such "front doors" in his competitive effects analysis. Smith Hrg. Day 3: 54:9-55:6, 82:14-83:7; *see also* PX8002 (Smith Rebuttal) ¶¶ 105-08, 130-32.

### 3. The Proposed Transaction Is Likely to Eliminate Beneficial Second-Stage Non-Price Competition for GAC Services in the Northern Philadelphia Area and the Montgomery Area

**69.** Jefferson and Einstein's GAC hospitals compete across dimensions other than price, including service, technology, access, and convenience. The Proposed Transaction would reduce the Defendants' incentive to compete with one another to improve quality of care and patient experience. *See* Smith Hrg. Day 2: 144:13-25. For example, the chair of obstetrics at Abington explained that acquiring Einstein would eliminate his need to move practices closer to patients going to Einstein. Merlis (Jefferson) Hrg. Day 5: 128:22-129:10; PX1079 (Jefferson) at 001-002. For its part, Einstein has made investments in response to competition from Jefferson hospitals, particularly from Abington, including opening and expanding EMCM, and investing in improvements to a spine program at EMCP and EMCM to reduce outmigration to Jefferson hospitals. PX2144 (Einstein) at 006, 008; JX0046 Freedman (Einstein) Dep. 239:18-247:2. Einstein also tracks the reputation, service line strength, quality, and accessibility of its GAC hospitals in comparison to Jefferson's GAC hospitals, and has sought to improve its services to compete with Jefferson and attract patients. PX2146 (Einstein) at 009-011. Already, the possibility of the Proposed Transaction has reduced Jefferson's incentive to invest in outpatient facilities near EMCM. Meyer (Jefferson) Hrg. Day 4: 89:22-90:3.

B.      **Acute Rehab Services**

1.      **Jefferson and Einstein Are Close Competitors for the Provision of Acute Rehab Services In the Philadelphia Area**

70.      Jefferson and Einstein executives consider their IRFs "major" competitors to each other. *See* Meyer (Jefferson) Hrg. Day 4: 88:21-89:1; PX7001 Esquenazi (Einstein) IH 239:23-240:5; *see also* Seminara (Einstein) Hrg. Day 4: 237:10-24 (patients referred to MossRehab end up seeking inpatient acute rehabilitation at Magee "all the time"); Ramanarayanan Hrg. Day 5: 30:3-9. Einstein's MossRehab and Jefferson's Magee "compete head to head . . . for everything," including for the same patients. PX1105 (Jefferson) at 001; *see also* Markowitz (Cigna) Hrg. Day 1: 39:2-9; Staudenmeier (IBC) Hrg. Day 1: 95:22-25; Meyer (Jefferson) Hrg. Day 4: 89:2-5.

71.      MossRehab and Magee are close competitors in part because of their strong reputations and their ability to treat complex, higher-acuity patients. Markowitz (Cigna) Hrg. Day 1: 38:17-39:9; Staudenmeier (IBC) Hrg. Day 1: 95:15-21. For example, when Magee considered leasing beds from MossRehab it worried that it would be strengthening a competitor by doing so: "Lease beds from Moss — we need more than 'just beds'— will we be feeding a competitor if merger is denied?" PX1025 (Jefferson) at 003.

72.      Diversion ratios demonstrate that Defendants closely compete to provide Acute Rehab Services. Smith Hrg. Day 2: 135:23-136:9. Notably, diversion analysis shows that Magee is MossRehab at Elkins Park's most significant competitor. Smith Hrg. Day 2: 136:7-9. Of patients at Einstein IRFs, 25.6% would seek care at Jefferson IRFs if Einstein's IRFs were no longer available, and 34.1% of patients at Jefferson IRFs would seek care at Einstein IRFs if Jefferson's IRFs were no longer available. Smith Hrg. Day 2: 135:23-136:6; PX8002 (Smith Rebuttal) at 087, tbl.9 (for MossRehab at Elkins Park, the diversion ratio to Jefferson's IRFs is 29%; for Magee, the diversion ratio to Einstein IRFs is 25%). Defendants' expert, Dr. Ramanarayanan,

calculated diversion ratios that are nearly identical to those Plaintiffs' expert, Dr. Smith, calculated. Smith Hrg. Day 6: 40:24-41:23; PX8002 (Smith Rebuttal) ¶ 154, at 087, tbl.9.

### 2. The Proposed Transaction Is Likely to Reduce First-Stage Competition and Result in Increased Prices for Acute Rehab Services in the Philadelphia Area

73.     Insurers are able to negotiate lower reimbursement rates with Jefferson and Einstein because Defendants' IRFs are close substitutes in their provider networks. Staudenmeier (IBC) Hrg. Day 1: 96:5-15; Markowitz (Cigna) Hrg. Day 1: 39:10-16, 44:1-8. Insurers could not successfully market a network in the Philadelphia Area that excluded MossRehab and Magee because other providers are not sufficient alternatives. Staudenmeier (IBC) Hrg. Day 1: 96:20-99:5; Markowitz (Cigna) Hrg. Day 1: 43:8-25. As a result, the Proposed Transaction will enable Jefferson to negotiate higher reimbursement rates in negotiations with insurers. Markowitz (Cigna) Hrg. Day 1: 44:14:20; Staudenmeier (IBC) Hrg. Day 1: 100:12-25, 102:3-17. Insurers would likely pass any price increase through to their members, resulting in higher premiums and increases in other out-of-pocket costs. Markowitz (Cigna) Hrg. Day 1: 44:21-45:4; Staudenmeier (IBC) Hrg. Day 1: 102:3-17.

74.     Third-party providers in the greater Philadelphia region are inadequate alternatives for Defendants' IRFs. For example, commercial insurers could not replace MossRehab and Magee with Bryn Mawr and St. Mary because they are too far away for many patients living in Philadelphia County. Markowitz (Cigna) Hrg. Day 1: 40:1-22; 41:16-42:5; Staudenmeier (IBC) Hrg. Day 1: 97:12-98:18. Penn Rehab lacks the community reputation of Magee and MossRehab. Markowitz (Cigna) Hrg. Day 1: 41:7-12. Commercial insurers also could not replace IRFs with SNFs in their networks or steer patients from IRFs to SNFs to defeat a price increase. Staudenmeier (IBC) Hrg. Day 1: 94:4-23; Markowitz (Cigna) Hrg. Day 1: 37:11-38:5.

**75.** The merger of Defendants' IRFs is likely to cause anticompetitive effects even though Acute Rehab Services are a small percentage of an insurer's total spend. Insurers need to include Acute Rehab Services in their networks, regardless of what portion of an insurer's spend is on those services. Markowitz (Cigna) Hrg. Day 1: 44:1-13, 69:9-70:1; Staudenmeier (IBC) Hrg. Day 1: 95:22-97:11, 100:12-25. Insurers need to include either MossRehab or Magee in their provider networks in the Philadelphia Area due to their location, higher-quality services, and superior reputations. Markowitz (Cigna) Hrg. Day 1: 38:17-42:5, 43:8-44:8; Staudenmeier (IBC) Hrg. Day 1: 95:15-99:5. Insurers expect that Defendants could successfully demand higher rates in negotiations for Acute Rehab Services if Defendants merge and a single entity owns both MossRehab and Magee, as insurers could not form a marketable provider network that excluded both of those IRFs. Markowitz (Cigna) Hrg. Day 1: 44:1-13; Staudenmeier (IBC) Hrg. Day 1: 100:12-25, 102:3-17. Moreover, post-transaction Jefferson would be able to exercise its increased bargaining leverage in Acute Rehab Services in negotiations with insurers to extract higher reimbursement rates overall, including higher reimbursement rates in other service lines. *See* PX8000 (Smith Rpt.) ¶ 169 n.313, ¶ 219; *Penn State Hershey*, 838 F.3d at 346.

**76.** The Proposed Transaction is estimated to cause an overall weighted average price increase of 9% at Einstein's MossRehab IRFs and an overall weighted average price increase of 9.3% at Jefferson's IRFs. Smith Hrg. Day 2: 136:25-137:9; PX8002 (Smith Rebuttal) at 089, tbl.10. Across all of Defendants' IRFs, the average predicted price increase is 9.1%. PX8002 (Smith Rebuttal) 089, tbl.10. The Proposed Transaction would cause $2.8 million in annual price increases at Defendants' IRFs. PX8002 (Smith Rebuttal) ¶ 157. The predicted price increases based on diversion ratios calculated by Defendants' own expert, Dr. Ramanarayanan, are nearly identical. Smith Hrg. Day 2: 137:10-20; PX8002 (Smith Rebuttal) ¶ 157.

**77.**     Dr. Smith's UPP analysis accounts for competition from all IRFs in the eight-county

Philadelphia region, even those outside the relevant geographic market. Smith Hrg. Day 6:

93:24-94:9; PX8000 (Smith Rpt.) ¶ 188.

> **3.      The Proposed Transaction Is Likely to Eliminate Beneficial Second-Stage Non-Price Competition for Acute Rehab Services in the Philadelphia Area**

**78.**     Defendants' merger is likely to eliminate beneficial competition on factors other than

price for Acute Rehab Services in the Philadelphia Area. The Proposed Transaction also would

eliminate competition between Jefferson and Einstein to improve quality of care and patient

experience. Smith Hrg. Day 2: 140:9-141:9, 144:13-25.

**79.**     MossRehab and Magee compete on factors in addition to price. Magee's 2019 marketing

plan states that "Magee's current national ranking as a US News & World Report Best Hospital

in Rehabilitation presents an opportunity to elevate awareness of Magee among consumers and

compete head on with Moss Rehab." JX0087 (Jefferson) at 011. The plan also describes

MossRehab's model and ranking as a "threat" to Magee. JX0087 (Jefferson) at 017. Magee's

former President and CEO identified MossRehab as Magee's primary competitor for reputation,

brand, and services. JX0033 Carroll (Jefferson) Dep. 244:1-245:25.

**80.**     The Proposed Transaction has caused Jefferson to consider reducing access points for

Acute Rehab Services. Jefferson's President testified that Jefferson is planning to close the IRFs

at Abington and Jefferson Frankford following the Proposed Transaction. Meyer (Jefferson) Hrg.

Day 4: 91:14-21. This is consistent with Jefferson's behavior after prior transactions—Jefferson

closed Lansdale's IRF after acquiring Lansdale and closed Thomas Jefferson University

Hospital's IRF after acquiring Magee. Ramanarayanan Hrg. Day 5: 31:16-22.

## VI.    DEFENDANTS FAILED TO REBUT PLAINTIFFS' PRIMA FACIE CASE

### A.    Einstein Is Not a "Flailing Firm" or "Weakened Competitor"

81.    Einstein has been competing effectively for years, improving and maintaining its market share for the relevant services in the relevant markets. Smith Hrg. Day 2: 118:6-23. Demand at EMCM has outpaced capacity. Freedman (Einstein) Hrg. Day 3: 139:7-8. Between 2012 and 2019, EMCM's share increased by 7%. Capps Hrg. Day 4: 136:1-6. Einstein's own projections assume that Einstein will continue operating as a standalone entity through at least FY2024 without cutting any service lines. Patnode Hrg. Day 3: 306:16-24; PX7012 Blaney (Einstein) IH 101:1-103:21, 224:10-14. In early 2020, "Moody's identified [Einstein's] strengths such as: stable volumes and increased market share in both of our markets." PX2348 (Einstein) at 001; *see also* PX2177 (Einstein) at 003 ("Moderate volume growth is expected to continue as AEHN expands presence in Montgomery County.").

82.    Einstein's financial position is stable. Due diligence performed by Grant Thornton in 2018 on behalf of Jefferson showed that Einstein's management projected that Einstein will return to breakeven by FY2023. DeAngelis (Jefferson) Hrg. Day 1: 276:23-277:4. That 2018 financial projection accurately forecasted Einstein's actual financial performance in 2019 and 2020. Hammer Hrg. Day 5: 253:12-254:9; *see* Patnode Hrg. Day 3: 310:16-311:9. As Einstein's management predicted in 2018, Einstein has operated very close to breakeven since that time, with its total operating losses representing less than 0.5% of its revenue in FY2019 and FY2020. Hammer Hrg. Day 5: 254:1-8; *see* PX2485 (Rule 1006 summary of Einstein financials).

83.    Einstein continues to make strategic capital investments. Einstein invested $350 million to open EMCM in 2012. Freedman (Einstein) Hrg. Day 3: 162:7-19. EMCM is profitable and growing, going from 146 to 191 beds through four expansions since opening. Freedman

(Einstein) Hrg. Day 3: 114:21-115:16, 139:7-8, 141:10-15, 165:24-166:12; JX0032 Duffy

(Einstein) Dep. 32:13-23, 43:17-19, 136:24-137:2. EMCM's expansion projects were the result

of capacity constraints, with the hospital adding a 20-bed observation unit as recently as 2019.

Freedman (Einstein) Hrg. Day 3: 166:13-19; JX0032 Duffy (Einstein) Dep. 136:25-139:15.

Einstein recently expanded its NICU unit at EMCM for the second time. Freedman (Einstein)

Hrg. Day 3: 166:20-23. Einstein has made "[i]nvestment in 13 ambulatory sites" across the

region, with "[a]dditional more sites planned." PX2186 (Einstein) at 005.

**84.**     Einstein owns valuable assets. Einstein owns 25% of Health Partners Plans ("HPP"), a

health maintenance organization that Einstein considers "a valuable asset." Freedman (Einstein)

Hrg. Day 3: 142:3-8, 144:25-145:2; McTiernan (Einstein) Hrg. Day 5: 74:11-13. HPP was most

recently valued at $450 to $500 million. Freedman (Einstein) Hrg. Day 3: 144:10-24. In the

event that Einstein did not find a merger partner, Einstein analyzed selling HPP to "sustain

Einstein's operations." Freedman (Einstein) Hrg. Day 3: 143:6-144:6.

**85.**     Defendants offered no expert analysis demonstrating that Einstein is a "flailing firm" or

"weakened competitor." Defendants' financial expert, Mr. Todd Patnode, did not analyze

whether Einstein is a "weakened competitor." Patnode Hrg. Day 3: 308:23-25. Mr. Patnode did

not analyze the effects of Einstein's financial condition on quality or market shares. Patnode Hrg.

Day 3: 307:11-20. Defendants' economic expert, Dr. Capps, did not measure any effect of

Einstein's financial condition on its market share. Capps Hrg. Day 4: 186:24-187:19.

**86.**     Instances where courts have relied on the weakened competitor argument are inapposite.

In *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 508 (1974), the weakened competitor

was a coal company that had run out of coal reserves and thus could not compete for long-term

contracts. Einstein, however, is not in danger of ceasing to provide medical services and has no

plans to close any of its facilities or eliminate service lines. *See* JX0043 Latimer (Einstein) Dep.

36:24-37:9 ("[W]e have not, nor do we plan to" exit the healthcare market in Philadelphia.);

*supra* ¶ 81. In evaluating the recent merger between Sprint and T-Mobile, a district court found

that Sprint's "poor operational quality and negative customer perception" were so dismal that it

"drives away customers." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 218

(S.D.N.Y. 2020). By contrast, Einstein executives and customers (insurers) agree that Einstein

provides high-quality healthcare services that patients in the Philadelphia region demand. *See,*

*e.g.*, Freedman (Einstein) Hrg. Day 3: 136:4-137:9; Markowitz (Cigna) Hrg. Day 1: 45:11-13;

Seminara (Jefferson) Hrg. Day 4: 230: 14-18. Further, unlike Sprint, Einstein maintains an

excellent culture among its employees, who believe in Einstein's mission. Freedman (Einstein)

Hrg. Day 3: 138:17-139:2; *cf. Deutsche Telekom AG*, 439 F. Supp. 3d at 219 (Sprint employees'

poor perception of the company a factor in finding that Sprint was a weakened competitor).

Einstein's stable market shares and its financial projections further prove that Einstein has failed

to make a "substantial showing" that it is a weakened competitor. *FTC v. Univ. Health, Inc.*, 938

F.2d 1206, 1221 (11th Cir. 1991).

**87.**     The Proposed Transaction does not address Einstein's purported difficulties. Jefferson's

"capital commitments" to Einstein will be principally funded by the cash that Einstein generates.

DeAngelis (Einstein) Hrg. Day 1: 281:16-20. Einstein would need to fund its own capital

obligations for the first two or three years post-merger. DeAngelis (Einstein) Hrg. Day 1:

281:25-282:3. Moreover, Jefferson is concerned that COVID-19's financial effects could

undermine Jefferson's ability to execute the Proposed Transaction. Meyer (Jefferson) Hrg. Day

4: 90:9-19. Defendants' financial expert, Mr. Patnode, did not analyze how Jefferson's operating

loss of $300 million in FY2020 will affect Jefferson's ability to make capital investments into Einstein. Patnode Hrg. Day 3: 304:3-7.

> **B.     Entry or Repositioning into the GAC Services Markets Would Not Be Timely, Likely, or Sufficient to Deter or Counteract Competitive Harm**

**88.**     Entry or repositioning by GAC hospitals would not be timely, likely, or sufficient to deter or counteract the Proposed Transaction's competitive harm. Smith Hrg. Day 2: 120:7-18; PX8000 (Smith Rpt.) ¶¶ 242-47. Constructing a new GAC hospital is difficult, time consuming, and expensive; often taking multiple years, costing hundreds of millions of dollars, and involving many practical obstacles like training staff and obtaining licensing, zoning, and other permissions. *See* Freedman (Einstein) Hrg. Day 3: 162:7-163:14, 164:19-165:10; DeAngelis (Jefferson) Hrg. Day 1: 279:9-25.

**89.**     EMCM, completed in 2012, remains the most recent new GAC hospital construction in Southeastern Pennsylvania, and no new GAC hospitals were built in this area for at least a decade leading up to EMCM's construction. *See* PX1100 (Jefferson) at 003. The process of building EMCM took between six and seven years and cost $350 million. Freedman (Einstein) Hrg. Day 3: 162:7-19.

**90.**     Defendants have not identified any entities planning to build a new GAC hospital in either Philadelphia or Montgomery County. *See* Capps Hrg. Day 4: 139:17-141:14. Penn's recent expansion of the Hospital of the University of Pennsylvania did not entail building an entirely new hospital and further shows that hospital construction is a costly and lengthy process. *See* JX0065 Gustave (Penn) Dep. 185:5-186:12 (Penn expansion cost $1.5 billion and took roughly six years).

**91.**     Defendants' expert, Dr. Capps, references third-party health system investments, but those are ongoing or preexisting planned investments, not entry or expansion that would be

induced by the Proposed Transaction. Smith Hrg. Day 6: 18:5-19:3; *see also* Smith Hrg. Day 3: 78:4-79:8. Those investments, accordingly, do not mitigate the Proposed Transaction's harms to competition. *Merger Guidelines* § 9.

### C.   Entry or Repositioning into the Acute Rehab Services Market Would Not Be Timely, Likely, or Sufficient to Deter or Counteract Competitive Harm

**92.**     Entry or repositioning by IRFs would not be timely, likely, or sufficient to deter or counteract the Proposed Transaction's competitive harm. Smith Hrg. Day 2: 141:10-21; PX8000 (Smith Rpt.) ¶¶ 248-51. IRF entry is rare. No new IRFs have opened in the last five years in the five-county area, and Defendants have not identified any entities planning to open a new IRF. Ramanarayanan Hrg. Day 5: 31:3-5; Staback-Haney (St. Mary) Hrg. Day 1: 175:21-176:3; Seminara (Einstein) Hrg. Day 4: 235:8-10. The trend in the greater Philadelphia region has instead been towards consolidation of IRFs. For example, Temple, Jefferson (at Thomas Jefferson University Hospital and Lansdale), and Crozer-Keystone recently closed IRF units, and Defendants plan to close additional IRF units post-merger. Ramanarayanan Hrg. Day 5: 31:11-32:9.

**93.**     Expanding or opening a new IRF is time consuming, expensive, and challenging. *See* Seminara (Einstein) Hrg. Day 4: 235:11-236:6. St. Mary began planning the opening of its IRF before August 2011, but did not take possession until May 2014—the new IRF added only 20 beds to St. Mary's total capacity, at a cost of approximately $1 million per bed. Staback-Haney (St. Mary) Hrg. Day 1: 138:16-18, 152:7-153:2, 155:17-22. Magee's former President and CEO testified that it would take four to five years and cost $150-175 million to build a new hospital comparable to Magee, excluding staffing costs and non-obsolete equipment. JX0033 Carroll (Jefferson) Dep. 183:13-84:1, 187:22-189:14, 261:6-15; PX1108 (Jefferson) at 006; Smith Hrg. Day 2: 141:10-21. After considering new construction, Magee concluded that "[s]uch a plan is

cost prohibitive."  JX0033 Carroll (Jefferson) Dep. 189:6-14; PX1108 (Jefferson) at 006. There

are significant regulatory barriers to IRF entry. Obtaining licensure for IRF beds is "difficult,"

for example, CMS regulations permit IRFs to change or add new beds only once a year.

Seminara (Einstein) Hrg. Day 4: 236:1-6.

94.     Entry or expansion sufficient to replace the lost competition between Einstein's and

Jefferson's IRFs is also unlikely because MossRehab is the "most dominant rehab force in the

region" and MossRehab and Magee are the "two . . . best" IRFs in the Philadelphia region.

Freedman (Einstein) Hrg. Day 3: 141:6-9; Staudenmeier (IBC) Hrg. Day 1: 96:20-97:11.

"[L]ong-standing dominance in the relevant . . . markets gives [Defendants] a virtually

insurmountable advantage over newly entering competitors." *Chicago Bridge & Iron Co. v. FTC*,

534 F.3d 410, 421-22 (5th Cir. 2008).

95.     Entry or repositioning by SNFs also would not be timely, likely or sufficient to deter or

counteract the Proposed Transaction's competitive harm in the market for Acute Rehab Services.

Smith Hrg. Day 2: 141:22-142:3. "Most skilled nursing facility providers are moving in the

direction of home health and hospice type services, not moving in the direction of higher acuity

services." Hauswald (Genesis) Hrg. Day 1: 193:10-16. Genesis Healthcare, which operates three

of the six so-called "high-end" SNFs identified by Defendants, has no plans to provide Acute

Rehab Services. Hauswald (Genesis) Hrg. Day 1: 193:7-9. For SNFs to begin providing Acute

Rehab Services, "[i]t would take a great deal . . . . it would take an entire change in our

reimbursement services, the quality reporting that we provide, certainly to begin it would take an

evaluation of the feasibility of doing such a thing, an evaluation of the market need for such a

thing, licensing, applications, approval, facility reconfigurations, hiring new staff, developing

new training and education capabilities among other things." Hauswald (Genesis) Hrg. Day 1:

193:10-23. SNFs could not "fiscally sustain providing that comprehensiveness and that intensity of services based on their reimbursement" model. Staback-Haney (St. Mary) Hrg. Day 1: 146:20-147:9. Defendants' executives are not aware of any SNF in the greater Philadelphia region that has ever converted into an IRF or any plans for such a conversion. *See, e.g.*, Seminara (Einstein) Hrg. Day 4: 234:19-25; PX7007 Klasko (Jefferson) IH 310:18-21. For example, converting Einstein's SNF into an IRF would be a difficult process that would take several years and require a complete renovation of the facility. *See* Seminara (Einstein) Hrg. Day 4: 235:11-236:6.

### D. Defendants' Claimed Efficiencies Do Not Offset the Proposed Transaction's Anticompetitive Harm

96.     Defendants failed to substantiate cognizable efficiencies sufficient to offset the predicted anticompetitive harm from Defendants' merger. Smith Hrg. Day 2: 142:18-143:23, Day 6: 37:5-38:12; 82:15-22; 83:24-84:10; PX8002 (Smith Rebuttal) ¶¶ 249-250. Only a portion of any cognizable efficiencies will be passed on to consumers. Smith Hrg. Day 6: 86:8-87:1; *see also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 95 (D.D.C. 2017). Variable cost efficiencies are more likely than fixed cost efficiencies to be at least partially passed on to consumers and therefore are more likely to offset anticompetitive harm. Smith Hrg. Day 2: 142:18-24; *Aetna Inc.*, 240 F. Supp. 3d at 95 n.50. Annual variable cost efficiencies of more than $66 million would be required to offset the Proposed Transaction's predicted price increases. Smith Hrg. Day 2: 142:25-143:19, Day 6: 85:10-87:1. Less than $50,000 of Defendants' claimed efficiencies are cognizable efficiencies that result from variable cost savings and that could offset anticompetitive harm. Smith Hrg. Day 6: 39:17-40:12.

97.     Even assuming Defendants' entire claimed efficiencies of $58 million, which includes both fixed and variable costs, were cognizable, Defendants' total claimed efficiencies are still less than the $66 million of cognizable efficiencies required to offset the predicted

anticompetitive harm from the Proposed Transaction. Smith Hrg. Day 6: 85:20-25; PX8002 (Smith Rebuttal) ¶ 250.

### 1. The Vast Majority of Defendants' Estimated Efficiencies Are Not Cognizable

98.    The vast majority of Defendants' claimed efficiencies (72%) are not verifiable or merger-specific, and therefore are not cognizable efficiencies. Hammer Hrg. Day 5: 240:4-8, 248:23-249:3. For example, Defendants' estimated supply chain and laboratory services savings are not verifiable. Hammer Hrg. Day 5: 243:1-7. Defendants' efficiencies expert, Lisa Ahern assumed that, post-merger, Defendants would be able to buy items at the lowest prices currently offered across Defendants' separate contracts for those goods. Ahern Hrg. Day 5: 214:18-215:12; Hammer Hrg. Day 5: 243:11-244:5. But Ms. Ahern's assumption is inconsistent with Defendants' own Rationalization and Integration Plan, which plans for Einstein to switch to Jefferson's centralized purchasing post-merger and for Einstein to cease maintaining its own separate purchasing contracts. Hammer Hrg. Day 5: 299:21-300:15. Ms. Ahern also did not provide substantiation for the assumption that Defendants will have access to cherry-picked post-merger pricing. Ahern Hrg. Day 5: 215:13-216:22; Hammer Hrg. Day 5: 244:17-245:2; PX8003 (Hammer Rebuttal) §§ II. B. 2, II. B. 3.

99.    Defendants also failed to substantiate assumptions used to calculate cost savings from clinical services and facility-based rationalization. Hammer Hrg. Day 5: 245:3-20. Instead of performing the necessary factual analysis to determine the specific costs required to estimate these savings, Ms. Ahern cites statements made by Einstein's executives as the basis for assuming the amounts of costs that could be eliminated by consolidating facilities and clinical services. Hammer Hrg. Day 4: 245:3-246:12. "While reliance on the estimation and judgment of experienced executives about costs may be perfectly sensible as a business matter, the lack of a

verifiable method of factual analysis resulting in the cost estimates renders them not cognizable by the Court. If this were not so, then the efficiencies defense might well swallow the whole of Section 7 of the Clayton Act because management would be able to present large efficiencies based on its own judgment and the Court would be hard pressed to find otherwise." *United States v. H & R Block*, *Inc.*, 833 F. Supp. 2d 36, 91 (D.D.C. 2011).

**100.**    Other disputed efficiencies estimated by Defendants' expert relating to human resources and property insurance are also not verifiable, as Defendants did not provide sufficient substantiation to allow a third party to reasonably verify those estimates. Hammer Hrg. Day 5: 243:1-7; PX8003 (Hammer Rebuttal) §§ II. B. 4, II. B. 5, II. B. 10.

**101.**    Defendants fail to show that their claimed financial services savings are merger-specific. Hammer Hrg. Day 5: 246:13-247:21. Ms. Ahern assumes that Einstein will lower its financial services costs by consolidating its investment portfolio with Jefferson's. Hammer Hrg. Day 5: 246:13-247:2; Ahern Hrg. Day 5: 196:4-12, 218:7-13. But Ms. Ahern does not consider whether Einstein could realize some or all of those savings by independently consolidating its investment management services. Hammer Hrg. Day 5: 246:13-247:2; Ahern Hrg. Day 5: 219:3-8.

### 2.    Claimed Efficiencies Relating to Clinical Services and Facility-Based Rationalization Arise from Anticompetitive Reductions in Service

**102.**    Defendants' claimed efficiencies relating to clinical services and facility-based rationalization would arise from anticompetitive reductions in service. *See* Smith Hrg. Day 6: 37:5-38:12, 82:15-22, 83:24-84:10. Ms. Ahern did not calculate the harm caused if Defendants: 1) cease offering GAC Services at Einstein's EMCEP location; 2) cease offering emergency room services at Einstein's EMCEP location; and 3) cease offering Acute Rehab Services at Jefferson's Abington IRF and MossRehab's IRF at Jefferson Frankford. Ahern Hrg. Day 5: 221:8-21; Meyer (Jefferson) Hrg. Day 4: 91:4-92:3; Smith Hrg. Day 6: 37:5-38:12. The loss of

patients' preferred service locations as a result of a merger of competitors is an anticompetitive

reduction in service, meaning that Defendants' rationalization plans do not give rise to

cognizable efficiencies. Smith Hrg. Day 6: 37:5-38:12, 83:24-84-10; *Penn State Hershey*, 838

F.3d at 349 ("efficiencies must not arise from anticompetitive reductions in output or service").

### 3. Defendants Have Provided No Evidence Demonstrating that Any Claimed Quality Improvements Are Cognizable Efficiencies

**103.** While Defendants make general claims about quality improvement at Einstein post-

merger, *see, e.g.,* Meyer (Jefferson) Hrg. Day 4: 75:15-76:3, Ms. Ahern did not analyze whether

such quality improvements would be cognizable efficiencies resulting from the Proposed

Transaction. Ahern Hrg. Day 5: 221:22-25. Defendants do not claim additional inpatient bed

capacity as an efficiency that would result from the Proposed Transaction. *See* Ahern Hrg. Day

5: 165:4-166:13.

### 4. Jefferson's Past Experience Integrating Hospitals Does Not Demonstrate that It Is More Likely to Achieve Cognizable Efficiencies from the Proposed Transaction

**104.** Ms. Ahern acknowledged that estimated efficiencies, even when estimated reasonably

and in good faith, may not actually be realized. Ahern Hrg. Day 5: 206:7-10. And Dr. Capps

cautioned that "the empirical evidence on whether hospital consolidation leads to cost savings is

mixed at best." Capps Hrg. Day 4: 194:13-22.

**105.** Jefferson's past merger experiences do not substantiate any of the estimated efficiencies

from the Proposed Transaction. PX8003 (Hammer Rebuttal) ¶¶ 71-73. Jefferson's approach to

integration with Einstein has been vastly different from its approach in past mergers. Merlis

(Jefferson) Day 5: 114:17-23. Jefferson's cost savings from past mergers were tracked on an

enterprise-level and not on a hospital-level. Merlis (Jefferson) Day 5: 107:21-108:9. Jefferson

did not estimate merger-specific cost savings pre- or post-merger for its Abington, Aria, or

Magee acquisitions. Merlis (Jefferson) Day 5: 108:20-109:3, 111:6-9, 111:18-23, 113:6-14. Ms. Ahern did not quantify merger-specific efficiencies from any of Jefferson's past transactions. Ahern Hrg. Day 5: 203:9-204:3.

### 5. Defendants' Experts Did Not Calculate Whether Defendants' Claimed Savings Would Sufficiently Offset Anticompetitive Harm

**106.** Defendants' experts did not calculate whether Defendants' claimed cost savings or efficiencies would offset the estimated price increases post-merger. Capps Hrg. Day 4: 194:23-195:2; Ahern Hrg. Day 5: 222:4-8.

**107.** Defendants' outside counsel retained Ms. Ahern for this litigation, and she was not involved in Defendants' business planning for the Proposed Transaction. Ahern Hrg. Day 5: 198:9-21; Merlis (Jefferson) Hrg. Day 5: 103:24-104:2. Ms. Ahern's efficiency estimates differ from the cost savings estimates contained in Defendants' business plans. Ahern Hrg. 164:3-7, 237:11-239:9; *see FTC v. ProMedica Health Sys., Inc.*, No. 3:11-cv-47, 2011 WL 1219281, at *40 (N.D. Ohio Mar. 29, 2011) ("Projections of efficiencies may be viewed with skepticism, particularly if they are generated outside of the usual business planning process.").

### E. Einstein Is Not a Failing Firm

**108.** Einstein is not a "failing firm" under the Merger Guidelines. Hammer Hrg. Day 5: 261:5-262:7; PX8001 (Hammer Rpt.) § VI; *see Merger Guidelines* § 11. Einstein is not in imminent danger of financial failure, as evidenced by Einstein having substantially larger cash reserves than Hahnemann University Hospital (an actual example of a hospital in imminent danger of failure) in the years before Hahnemann closed. *See* Hammer Hrg. Day 5: 263:22-265:3. Einstein's management projects that Einstein will meet its financial obligations through at least FY2023. Patnode Hrg. Day 3: 299:11-21. Einstein's most recent budget does not contemplate Einstein closing any facilities or eliminating any service lines. Hammer Hrg. Day 5: 258:5-25;

Patnode Hrg. Day 3: 306:20-24; JX0035 Blaney (Einstein) Dep. at 42:18-44:23. Einstein has not taken any steps to consider whether it could successfully reorganize under bankruptcy law. Hammer Hrg. Day 5: 258:23-259:15; JX0035 Blaney (Einstein) Dep. at 130:12-131:1. Einstein did not solicit offers from certain health systems and refused to engage in due diligence efforts with potential alternative suitors that expressed interest. Hammer Hrg. Day 5: 259:19-260:5; Maksimow (Kaufman Hall) Hrg. Day 3: 232:9-12, 234:13-14, 234:24-235:2. Jefferson's exclusivity fee precluded Einstein from considering potential alternative offers from Trinity Health and Tower Health, among others. Freedman (Einstein) Hrg. Day 3: 146:3-10, 153:19-157:15; Maksimow (Kaufman Hall) Hrg. Day 3: 236:20-237:3.

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

### I.   NATURE OF THE ACTION, JURISDICTION, AND VENUE

**1.**   At all relevant times, Defendants have been engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12. Defendants transact business in the Eastern District of Pennsylvania and are subject to personal jurisdiction therein. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b). This Court has jurisdiction to issue a preliminary injunction pending the conclusion of an administrative trial that will determine whether the Proposed Transaction violates Section 7 of the Clayton Act. 15 U.S.C. § 53(b); *see also* 15 U.S.C. § 26.

### II.   THE PROPOSED TRANSACTION SHOULD BE PRELIMINARILY ENJOINED PENDING THE OUTCOME OF THE FTC'S ADJUDICATIVE PROCEEDING

**2.**   A preliminary injunction is warranted here under Section 13(b) of the FTC Act because, upon "weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b).

42

**3.**     The Court "first consider[s] the FTC's likelihood of success on the merits and then weigh[s] the equities." *Penn State Hershey*, 838 F.3d at 337. Plaintiffs' "showing of likelihood of success creates a presumption in favor of preliminary injunctive relief," though the Court "must still weigh the equities in order to decide whether enjoining the merger would be in the public interest." *Id*. at 352.

**4.**     To evaluate the FTC's "likelihood of success" on the merits, this Court need only "measure the probability that, after an administrative hearing on the merits, the Commission will succeed in proving that the effect of the [Proposed Transaction] '*may be* substantially to lessen competition or to tend to create a monopoly' in violation of section 7 of the Clayton Act." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (emphasis added) (quoting 15 U.S.C. § 18). At the preliminary injunction stage, the FTC "is not required to *establish* that the proposed merger would in fact violate section 7 of the Clayton Act . . . [a] certainty, even a high probability, need not be shown, and any doubts are to be resolved against the transaction." *Penn State Hershey*, 838 F.3d at 337 (citations and internal quotation marks omitted).

**5.**      The public interest in effective enforcement of the antitrust laws "weigh[s] in favor of issuance of" preliminary injunctive relief. *Id.* at 352 (citation and internal quotation marks omitted). Defendants have not satisfied the "difficult task [of] justifying the nonissuance of a preliminary injunction," for which private equities alone will not suffice. *Id*. (citations and internal quotation marks omitted).

**6.**     A preliminary injunction is also warranted under Section 16 of the Clayton Act, which authorizes the Commonwealth of Pennsylvania to sue for injunctive relief when there is a threatened antitrust violation. 15 U.S.C. § 26.

**7.**     Section 13(b) of the FTC Act and Section 16 of the Clayton Act, 15 U.S.C. § 26, have

different standards for preliminary relief—Section 16 requires the Commonwealth also to show it is likely to suffer irreparable harm without relief. *Ferring Pharm, Inc. v. Watson Pharm, Inc.* 765 F.3d 205, 210 (3d Cir. 2014). Both standards are met here because, absent a preliminary injunction, Defendants may consolidate assets, service lines, and facilities while the FTC's administrative proceeding and any appeals are pending.

### III. THE FTC IS LIKELY TO SUCCEED AT THE ADMINISTRATIVE PROCEEDING IN SHOWING THAT THE PROPOSED TRANSACTION IS UNLAWFUL UNDER SECTION 7 OF THE CLAYTON ACT

**8.** Pursuant to the burden-shifting framework for violations of Section 7 of the Clayton Act, Plaintiffs have established a *prima facie* case and that the Proposed Transaction is presumptively anticompetitive. *See Penn State Hershey*, 838 F.3d at 337-38; *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990); *see also* PFF § IV. An acquisition that causes undue market share and significantly increases concentration "is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that [it] is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363. Defendants have failed to proffer evidence sufficient to rebut the presumption that the Proposed Transaction is anticompetitive, and the burden of producing additional evidence of anticompetitive effects does not shift back to Plaintiffs. *See Penn State Hershey*, 838 F.3d at 337. Even if Defendants had rebutted the presumption, Plaintiffs have produced additional evidence of anticompetitive effects—this burden merges with Plaintiffs' ultimate burden on persuasion and remains with Plaintiffs. *Id.*; PFF § V.

**9.** Plaintiffs need to demonstrate that the FTC is likely to succeed in proving the Proposed Transaction's effect may be to substantially lessen competition in only one relevant antitrust

market, *see United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017), but they have done so with respect to all three of the markets alleged.

### A.    GAC Services and Acute Rehab Services Are Relevant Product Markets

**10.**    A relevant product market is the line of commerce in which competition may be substantially lessened because of the merger. *See Phila. Nat'l Bank*, 374 U.S. at 355-56. In evaluating whether products should be included, "the relevant question concerns not just the hypothetical possibility of substitution, but whether customers do in fact exhibit a willingness to substitute." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 200-01 (D.D.C. 2018); *Merger Guidelines* § 4 (product market definition focuses on "demand substitution factors, *i.e.*, on customers' ability and willingness to substitute away from one product to another in response to a price increase or . . . reduction in product quality or service.").

**11.**    The HMT is an appropriate analytical method to define a relevant product market. *See H & R Block*, 833 F. Supp. 2d at 51; *see also Penn State Hershey*, 838 F.3d at 338. The HMT states that if a hypothetical monopolist could profitably impose a SSNIP, generally 5%, over particular products or services, then those products or services constitute a relevant product market. *H & R Block*, 833 F. Supp. 2d at 51-52; Merger *Guidelines* §§ 4.1.1-4.2.2.

**12.**    Practical indicia, including "industry or public recognition of the [candidate market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors," also inform product market analysis. *Brown Shoe*, 370 U.S. at 325.

**13.**    "[B]ecause potential harms to competition will likely be less apparent in a broader, less concentrated market than in a narrower included market, this Court's task is to identify the narrowest market within which the defendant companies compete that qualifies as a relevant

product market." *FTC v. Peabody Energy Corp.*, No. 4:20-cv-00317, 2020 WL 5893806, at *11 (E.D. Mo. Oct. 5, 2020) (*citing Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953)); *see also Merger Guidelines* § 4.1.1.

14.     Relevant product markets also regularly include distinct or targeted categories of customers, here commercial insurers, when a firm can raise prices to certain customers but not to others. *See, e.g.*, *Penn State Hershey*, 838 F.3d at 338; *FTC v. Advocate Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016); *Merger Guidelines* §§ 3, 4.1.4.

15.     The two product markets in which to analyze the competitive effects of the Proposed Transaction are GAC Services and Acute Rehab Services sold to commercial insurers and their members, which are both properly analyzed as cluster markets. *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565-68 (6th Cir. 2014); PFF §§ IV A. 1, IV. B. 1.

## B.     There Are Three Relevant Geographic Markets

16.     A relevant geographic market reflects the "arena of competition affected by the merger." *Merger Guidelines* § 4.2; *see also Penn State Hershey*, 838 F. 3d at 338. The HMT is an appropriate method to determine whether a relevant geographic market exists. *Penn State Hershey*, 838 F.3d at 338. As with product market definition, "the narrowest market principle" applies to geographic market definition. *Tronox*, 332 F. Supp. 3d at 202 & n.11; *see also Aetna*, 240 F. Supp. 3d at 37-40.

17.     Each of the three geographic markets defined here "'correspond[s] to the commercial realities' of the industry." *Advocate*, 841 F.3d at 468 (quoting *Brown Shoe*, 370 U.S. at 336). In healthcare, the commercial realities dictate the application of the HMT "through the lens of the insurers." *Penn State Hershey*, 838 F.3d at 342. A hypothetical monopolist could impose a SSNIP in negotiations with commercial insurers in each of the three geographic markets; thus,

they are "properly defined." *Penn State Hershey*, 838 F.3d at 338 (citing *Merger Guidelines* § 4) (footnote omitted); PFF ¶¶ 24, 27, 53.

### C.   The Proposed Transaction Is Presumptively Unlawful in Each Relevant Market Based on Market Share and Market Concentration Thresholds

**18.**   The Supreme Court has held that market shares exceeding 30% are more than sufficient to show undue market concentration. *Phila. Nat'l Bank*, 374 U.S. at 364-65; *see also FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1078 (N.D. Ill. 2012).

**19.**   A merger is also presumptively anticompetitive if it increases HHI by more than 200 points and results in a post-merger HHI above 2,500. *Penn State Hershey*, 838 F.3d at 347 (citing *Merger Guidelines* § 5.3). Plaintiffs "can establish a prima facie case simply by showing a high market concentration based on HHI numbers." *Id*. Defendants' merger is presumptively anticompetitive in all three relevant markets. PFF §§ IV. A. 3, IV. B. 3.

### D.   Competitive Effects Evidence Bolsters the Strong Presumption of Harm and Illegality

**20.**   Defendants' testimony and documents show that head-to-head competition between them has directly benefited consumers through lower prices and better services, which strengthens the presumption of harm arising from the Defendants' large market shares in the three relevant markets. *See, e.g.*, *H & R Block*, 833 F. Supp. 2d at 81-82; *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 64-65, 71-72 (D.D.C. 2015); PFF § V. Moreover, economic modeling also shows likely anticompetitive price effects in the three relevant markets affected by the merger, further bolstering the presumption of harm. *See, e.g.*, *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 65 (D.D.C. 2018); PFF ¶¶ 60-62, 65-67, 72, 76-77.

### E.       Defendants Cannot Rebut Plaintiffs' Prima Facie Case

#### 1.       Einstein Is Not a Weakened Competitor

**21.**      The "weakened competitor" argument requires a "substantial showing that the acquired

firm's weakness, which cannot be resolved by any competitive means, would cause that firm's

market share to reduce to a level that would undermine the government's *prima facie* case."

*Univ. Health*, 938 F.2d at 1221; *see also Gen. Dynamics*, 415 U.S. at 501-04. This argument is

"probably the weakest ground of all for justifying a merger." *Kaiser Aluminum & Chem. Corp. v.

FTC*, 652 F.2d 1324, 1338-41 (7th Cir. 1981) (stating further that "the *financial weakness* of the

acquired firm, while it may be a relevant factor in some cases, certainly *cannot be the primary

justification of a merger*") (emphasis added). The argument is the "Hail-Mary pass of

presumptively doomed mergers." *ProMedica*, 749 F.3d at 572. "Thus, to succeed, Defendants

must make a 'substantial showing' of an imminent, steep plummet . . . in market share . . . such

that market concentration falls below levels that trigger the presumption of anticompetitive

harm." *ProMedica*, 2011 WL 1219281, at *58; *see also Univ. Health*, 938 F.2d at 1220-21.

Defendants have not met the stringent requirements for the "weakened competitor" defense. PFF

§ VI. A.

#### 2.       The Possibility of Entry or Repositioning Is Not Sufficient to Rebut
####          Plaintiffs' Prima Facie Case

**22.**      Entry or repositioning must be "timely, likely and sufficient in its magnitude, character,

and scope" to counteract the anticompetitive effects of a merger." *United States v. Energy Sols.,

Inc.*, 265 F. Supp. 3d 415, 443 (D. Del. 2017). "Entry is timely only if it is rapid enough to deter

or render insignificant the anticompetitive effects of the merger." *Id.* Entry is likely if it "would

be profitable and feasible," given "all the attendant costs and difficulties." *Id*. "The history of

entry into the relevant market is a central factor in assessing the likelihood of entry in the future."

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 56 (D.D.C. 1998). Entry is sufficient only if it can replace the competition that existed prior to the merger. *See id* at 58.

23.     The higher the barriers to entry, as in this case, the less likely it is that the "timely, likely, and sufficient" test can be met. *United States v. Visa, U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001). "Barriers to entry include, among other things, regulatory requirements, high capital costs, or technological obstacles." *Energy Sols.*, 265 F. Supp. 3d at 443. Defendants have not met their burden of showing that entry or repositioning would be timely, likely, and sufficient in any of the three relevant markets. PFF §§ VI. B, VI. C.

### 3.     Defendants' Purported Efficiencies Do Not Outweigh the Harm to Competition

24.     "[P]ossible economies cannot be used as a defense to illegality." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967). Although the Third Circuit has "never formally adopted the efficiencies defense," it has explained that an efficiencies defense has "several requirements . . . found in the *Merger Guidelines*." *Penn State Hershey*, 838 F. 3d at 347-48. "In order to be cognizable, the efficiencies must, first, offset the anticompetitive concerns in highly concentrated markets." *Id*. at 348. "Second, the efficiencies must be merger specific—meaning they must be efficiencies that cannot be achieved by either company alone." *Id*. (citation and internal quotation marks omitted). "Third, the efficiencies must be verifiable, not speculative." *Id*. (internal quotation marks omitted). Defendants have failed to carry their burden of showing efficiencies that will offset the Proposed Transaction's likely harm, are merger specific, and are verifiable. PFF § VI. D.

### 4.    Defendants' Argument that Einstein Is a Failing Firm Does Not Suffice to Rebut Plaintiffs' Prima Facie Case

25.    Defendants have failed to prove any of the required elements of the failing firm defense for Einstein that: "(1) the allegedly failing firm would be unable to meet its financial obligations in the near future; (2) it would not be able to reorganize successfully under Chapter 11 of the Bankruptcy Act; and (3) it has made unsuccessful good faith efforts to elicit reasonable alternative offers that would keep its tangible and intangible assets in the market and pose a less severe danger to competition than does the proposed merger." *In re Otto Bock HealthCare N. Am., Inc.*, Dkt. No. 9378, 2019 WL 5957363, at *35 (FTC 2019) (citing *Merger Guidelines* § 11 and *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 136-38 (1969)); PFF § VI. E.

## IV.    THE EQUITIES FAVOR A PRELIMINARY INJUNCTION

26.    Issuing a preliminary injunction is in the public interest. Maintaining the status quo and allowing the FTC to adjudicate the legality of this transaction is particularly important because if the transaction is consummated, "it is extraordinarily difficult to unscramble the egg, [and] it will be too late to preserve competition if no preliminary injunction has issued." *Penn State Hershey*, 838 F.3d at 353 (footnote and internal quotation marks omitted).

27.    Defendants have offered no valid equities weighing against a preliminary injunction. Defendants' merger agreement affords ample time for a full merits adjudication, as it does not expire until the later of December 31, 2021 or 60 days after a final decision by a U.S. Court of Appeals on any government action to block the merger. PFF ¶ 3. Because "the benefits of a merger are available after the trial on the merits, they do not constitute public equities weighing against a preliminary injunction," *ProMedica*, 2011 WL 1219281, at *60, in this case. The equities weigh in favor a entering a preliminary injunction against the Proposed Transaction pending the outcome of the FTC's administrative proceeding.

Respectfully Submitted,

October 12, 2020

/s/ *Mark Seidman*
MARK SEIDMAN
CHARLES DICKINSON
JAMES H. WEINGARTEN
RYAN ANDREWS
GUSTAV CHIARELLO
GUIA DIXON
JAMIE FRANCE
CHRISTOPHER HARRIS
ALBERT TENG
JONATHAN WRIGHT
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3570
mseidman@ftc.gov
cdickinson@ftc.gov
jweingarten@ftc.gov
randrews@ftc.gov
gchiarello@ftc.gov
gdixon@ftc.gov
jfrance@ftc.gov
charris1@ftc.gov
ateng@ftc.gov
jwright1@ftc.gov

*Attorneys for Plaintiff Federal Trade*
*Commission*

/s/ Abigail Wood
ABIGAIL WOOD, PA 325273
JAMES A. DONAHUE, PA 42624
TRACY WERTZ, PA 69164
JENNIFER THOMSON, PA 89360
STEPHEN KOVATIS, PA 209495
STEPHEN SCANNELL (*pro hac vice*), IL
633307
Office of the Attorney General
Commonwealth of Pennsylvania
Strawberry Square
Harrisburg, PA 17120
(717) 787-4530
awood@attorneygeneral.gov
jdonahue@attorneygeneral.gov
twertz@attorneygeneral.gov
jthomson@attorneygeneral.gov
skovatis@attorneygeneral.gov
sscannell@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of*
*Pennsylvania*

## **CERTIFICATE OF SERVICE**

I, Mark Seidman, HEREBY CERTIFY that, on the 12th of October, 2020, I served or caused to be served a copy of the foregoing on counsel of record via the Court's electronic case filing (ECF) system.


/s/ Mark Seidman_____
Mark Seidman

*Attorney for Plaintiff Federal Trade Commission*