**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FEDERAL TRADE COMMISSION and
COMMONWEALTH OF PENNSYLVANIA,

*Plaintiffs,*

v.

THOMAS JEFFERSON UNIVERSITY and
ALBERT EINSTEIN HEALTHCARE
NETWORK,

*Defendants*.

Civil Action No. 2:20-cv-01113
**PUBLIC REDACTED VERSION**

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# <u>TABLE OF CONTENTS</u>

**Page**

FINDINGS OF FACT.................................................................................................... 1

I.   Background ........................................................................................................ 1

    A.   The Parties ............................................................................................... 1

    B.   Einstein's Search for a Partner................................................................. 1

    C.   The Merger and its Importance to the Community................................... 2

II.   Plaintiffs Have Not Established a Prima Facie Case Entitling Them to a
    Presumption of Illegality for either Inpatient GAC Services or Inpatient
    Rehabilitation Services. .................................................................................... 4

    A.   Plaintiffs Ignore Commercial Realties in the Provision of Inpatient GAC
        Services and Overstate Market Concentration........................................ 4

        1.   Plaintiffs' Structural Case Ignores Commercial Realities in the
            Montgomery Area. ..................................................................... 4

        2.   Plaintiffs' Structural Case Ignores Commercial Realities in the
            Northern Philadelphia Area. ...................................................... 7

        3.   Plaintiffs' Methodologies for Defining Markets and Measuring
            Market Shares Are Flawed and Overstate Market Concentration. ........... 9

    B.   Plaintiffs Have Not Properly Defined a Relevant Product or Geographic
        Market for Inpatient Rehab Services in the Philadelphia Area.......................... 11

        1.   The Relevant Product Market Should Include Both Inpatient
            Rehabilitation Facilities and High-End Skilled Nursing Facilities.......... 11

            a.   IRFs and High-Ends SNFs Provide Equivalent Services. ........... 11

            b.   IRFs and High-End SNFs Treat the Same Types of
                Patients. ....................................................................................... 13

            c.   IRFs and High-End SNFs Compete to Attract the Same
                Patients........................................................................................ 13

            d.   Reimbursement Changes Are Further Increasing
                Competition Among IRF and SNF Providers of Inpatient
                Rehab Services............................................................................. 15

            e.   The Relevant Product Market is not Limited to IRFs.................. 16

# TABLE OF CONTENTS
(continued)

Page

2.    Plaintiffs Have Not Properly Defined a Relevant Geographic Market for Inpatient Rehab Services. ...................................................... 16

    a.    Plaintiffs' Alleged Geographic Market for Inpatient Rehab Services is Inconsistent with Commercial Realities. .................. 16

    b.    Plaintiffs' Alleged Geographic Market is Inconsistent with the Parties' Service Areas. ........................................................... 18

    c.    Plaintiffs' Alleged Geographic Market is Not Robust................ 19

III.    Anticompetitive Effects from this Merger are Not Likely.............................................. 20

    A.    Plaintiffs Failed to Present Sufficient Reliable Evidence for Their Prediction of a Material Price Increase for GAC Services. ................................. 20

    1.    Commercial Insurers Have Significant Bargaining Leverage Today. .................................................................................... 20

    2.    Commercial Insurers Will Continue to Have a Significant Bargaining Advantage Post-Merger, As Adding Einstein Will Not Change The Bargaining Dynamics. ........................................... 22

    3.    Payors Will Not Pay More For a Combined Jefferson-Einstein, and Some Will Pay *Less* Post-Merger. ........................................... 26

    B.    Plaintiffs Over-Estimate Price Effects for GAC Services. .................................. 27

    C.    There is Insufficient Evidence for Plaintiffs' Predicted Material Price Increase for Inpatient Rehab Services.................................................................. 28

    1.    Commercial Insurers Have Outsized Leverage in Negotiations with Inpatient Rehab Providers......................................................... 28

    2.    There Is No Reliable Evidence that the Merger Will Result in a Price Increase for Inpatient Rehabilitation Services............................... 29

IV.    Efficiencies and Other Mitigating Factors Outweigh Any Possible Harm Estimated by Plaintiffs. ................................................................................... 30

    A.    The Merger Will Generate Merger-Specific Efficiencies and Cost Savings in the Combined System. ....................................................................... 30

    1.    The Parties' Rationalization & Integration Plan, and Jefferson's Track Record of Achieving Savings through Mergers. ........................... 30

# TABLE OF CONTENTS

(continued)

Page

2.      Analysis of the Parties' Cost Saving Estimates Under the Guidelines. ............................................................................ 31

B.      Other Mitigating Factors Outweigh Any Potential Harm. ................................... 34

V.      Einstein is a Weakened Competitor. ........................................................................... 36

A.      Einstein's Financial Condition and Weakened Competitive Position Undermine Any Presumption of Illegality. ........................................................ 36

B.      Einstein's Financial Problems Are Significant and It Lacks Needed Cash. ........ 36

C.      Einstein's Ability to Compete Will Be Curtailed Because It Cannot Make Capital Investments Due to Its Worsening Financial State. ................................ 38

D.      There Are No Other Competitive Means Available to Address Einstein's Weakening Position Other Than Merging with Jefferson. .................................. 39

CONCLUSIONS OF LAW ............................................................................................... 42

I.      Plaintiffs fail to show likelihood of success on the merits. ........................................ 42

A.      Plaintiffs Have the Burden of Persuasion at All Times. ..................................... 42

B.      Plaintiffs Failed to Establish a Presumption the Merger is Anticompetitive. ....... 43

C.      Plaintiffs Have Not Established that Anticompetitive Effects Are Likely. .......... 45

D.      Substantial Consumer Benefits Will Result from this Merger and Outweigh Plaintiffs' Estimate of Potential Harm. ................................................ 45

E.      Plaintiffs Have Overstated Einstein's Future Competitive Significance. ............ 47

II.      The Balance of Equities Weigh Against the Injunction. ................................................. 48

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)...........................................................................................42

*FTC v. Advocate Healthcare Network*,
No. 15-cv-11473 ..................................................................................................6

*FTC v. Arch Coal, Inc.*,
329 F. Supp. 2d 109 (D.D.C. 2004).................................................................47

*FTC v. Freeman Hosp.*,
911 F. Supp. 1213 (W.D. Mo.), *aff'd*, 69 F.3d 260 (8th Cir. 1995)...................44, 49

*FTC v. Penn State Hershey Medical Center*,
No. 16-2365 (June 1, 2016) ...............................................................................46

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016)...................................................................... *passim*

*Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 423 (M.D. Pa. 2003), *aff'd*, 423
F.3d 184 (3d Cir. 2005) .....................................................................................44

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th
Cir. 1991) ............................................................................................................44

*New York v. Deutsche Telekom AG (T-Mobile/Sprint)*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020)..............................................................46

*Novak v. Somerset Hosp.*,
625 Fed. App'x 65 (3d Cir. 2015).....................................................................44

*PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*,
615 F.3d 412 (5th Cir. 2010) .............................................................................44

*Sharif Pharmacy, Inc. v. Prime Therapeutics*,
*LLC*, 950 F.3d 911 (7th Cir. 2020) ....................................................................44

*United States v. Baker Hughes Inc.*,
908 F.2d 981 (D.C. Cir. 1990)......................................................................42, 43

*United States v. Citizens & S. Nat'l Bank*,
422 U.S. 86 (1975)..............................................................................................42

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974)..........................................................................42, 45, 47, 48, 49

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)...................................................................................44

*United States v. Int'l Harvester Co.*,
  564 F.2d 769 (7th Cir. 1977) ...................................................................47

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963)...................................................................................43

*Weiss v. York Hosp.*,
  745 F.2d 786 (3d Cir. 1984)......................................................................44

**STATUTES, RULES & REGULATIONS**

42 C.F.R. § 412.29(b) ..................................................................................13

15 U.S.C. § 18.............................................................................................42

15 U.S.C. § 53(b) ........................................................................................42

**OTHER AUTHORITIES**

Department of Justice and Federal Trade Commission, *Horizontal Merger
  Guidelines* (2010)............................................................................. passim

John George, *Holy Redeemer opens first Philadelphia outpatient care center, eyes
  further expansion*, PHILA. BUS. J. (Jan. 8, 2020) ....................................8

Lisa Schencker, *Mercy Hospital & Medical Center Closing*, CHICAGO TRIB.
  (July 29, 2020) ..........................................................................................41

MaryKate Wust, *Pavilion Powers Ahead to Combat COVID-19*, PENN TODAY
  (Mar. 26, 2020) ...........................................................................................8

## <u>GLOSSARY OF ABBREVIATED TERMS</u>

Abbreviations used in Defendants' Proposed Findings of Fact and Conclusions of Law have the following meanings:

1. *Exhibits and Transcripts*

| | |
|---|---|
| PX | Plaintiffs' Exhibit |
| DX | Defendants' Exhibit |
| JX | Joint Plaintiffs' and Defendants' Exhibit |
| DDX | Defendants' Demonstrative Exhibit |
| Hr'g Tr. | Hearing Transcript |
| Dep. Tr. | Deposition Transcript |

2. *Names and Terms*

| | |
|---|---|
| Abington | Abington Memorial Hospital (Jefferson) |
| Abington-Lansdale | Abington-Lansdale Hospital (Jefferson) |
| Aetna | Aetna Inc. |
| Bryn Mawr | Bryn Mawr Hospital (Main Line) |
| CHS | Community Health Systems |
| Cigna | Cigna Corp. |
| CMS | Centers for Medicare and Medicaid Services |
| Doylestown | Doylestown Health |
| Einstein or EHN | Albert Einstein Healthcare Network |
| EMCEP | Einstein Medical Center Elkins Park (Einstein) |
| EMCM | Einstein Medical Center Montgomery (Einstein) |
| EMCP | Einstein Medical Center Philadelphia (Einstein) |
| FTC | Federal Trade Commission |
| GAC | General acute care |
| Good Shepherd or GSRH | Good Shepherd Rehabilitation Network |
| Grand View | Grand View Health |
| Guidelines | Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines (2010) |
| HHI | Herfindahl-Hirschman Index |
| HMS | Hospital Merger Simulation Model |
| HMT | Hypothetical Monopolist Test |
| Holy Redeemer | Holy Redeemer Health System |
| HUP | Hospital of the University of Pennsylvania (Penn) |
| IBC | Independence Blue Cross |
| IRF | Inpatient rehabilitation facility |
| Jefferson or TJU | Thomas Jefferson University or Jefferson Health |
| Kaufman Hall | Kaufman Hall & Associates |
| Magee | Magee Rehabilitation Hospital (Jefferson) |

| | |
|---|---|
| Main Line or MLH | Main Line Health System |
| Merger | Proposed merger between Jefferson and Einstein |
| Moss | MossRehab (Einstein) |
| Parties | Jefferson and Einstein, collectively |
| Penn | University of Pennsylvania Health System or Penn Medicine |
| PSA | Primary Service Area |
| R&I Plan | Rationalization and Integration Plan |
| Shannondell | Rehab at Shannondell |
| SNF | Skilled nursing facility |
| SSNIP | Small but significant non-transitory increase in price |
| Suburban | Suburban Community Hospital |
| Temple | Temple University Health System |
| Tenet | Tenet Healthcare |
| TJUH | Thomas Jefferson University Hospital (Jefferson) |
| Tower | Tower Health |
| Trinity | Trinity Health Mid-Atlantic |
| United | United HealthCare |
| UPMC | University of Pittsburgh Medical Center |
| UPP | Upward Pricing Pressure Model |
| WTP | Willingness-to-pay Model |

## 3. *Hearing Witnesses*

| | |
|---|---|
| Lisa Ahern | Defendants' Expert |
| Dr. Cory Capps | Defendants' Expert |
| Dr. James Daley | Good Shepherd Rehabilitation Network |
| Peter DeAngelis | Chief Financial and Administrative Officer, Thomas Jefferson University |
| Barry Freedman | President and CEO, Albert Einstein Healthcare Network |
| Christine Hammer | Plaintiffs' Expert |
| Barbara Hauswald | Genesis HealthCare |
| Dr. Stephen Klasko | President and CEO, Thomas Jefferson University |
| Ruth Lefton | Former Chief Operating Officer and President, Albert Einstein Medical Center and MossRehab |
| Andre Maksimow | Kaufman Hall & Associates |
| Keith Markowitz | Cigna Corp. |
| Christopher McTiernan | Former Chief Payor Relations Officer, Albert Einstein Healthcare Network; Health Partners Plan (current) |
| Laurence Merlis | EVP, Strategic Partnerships, Ventures & Innovation, Thomas Jefferson University |
| Dr. Bruce Meyer | President, Thomas Jefferson University |
| Todd Patnode | Defendants' Expert |

| | |
|---|---|
| Dr. Subramanian Ramanarayanan | Defendants' Expert |
| Margaret Seminara | Senior Director Post-Acute Services, Albert Einstein Healthcare Network |
| Dr. Loren Smith | Plaintiffs' Expert |
| Lisa Staback-Haney | St. Mary Rehabilitation Hospital |
| Paul Staudenmeier | Independence Blue Cross |

**4.** *Deponents*

| | |
|---|---|
| Daniel Ahern | Tower Health |
| Gerard Blaney | Executive Vice President and Chief Financial Officer, Albert Einstein Healthcare Network |
| James Brexler | Doylestown Health |
| Lane Brown | Program Director – Magee Rehabilitation Hospital, Thomas Jefferson University |
| Michael Buongiorno | Main Line Health System |
| Jack Carroll | Former Chief Executive Officer – Magee Rehabilitation Hospital, Thomas Jefferson University |
| Elizabeth Duffy | Albert Einstein Healthcare Network |
| Alberto Esquenazi | Chief Medical Officer-MossRehab, Chairman, Department of Physical Medicine and Rehabilitation, Albert Einstein Healthcare Network |
| John Flynn | Vice President, Payor Relations and Contracting, Thomas Jefferson University |
| Daniel Freed | Rehab at Shannondell |
| Philip Green | PDG Consulting, LLC, advisor to Jefferson executive team |
| Lori Gustave | University of Pennsylvania Health System |
| Michael Laign | Holy Redeemer Health System |
| Scott Latimer | Vice President, Financial Planning and Strategic Transactions, Albert Einstein Healthcare Network |
| Christopher Morris | Aetna Inc. |
| Donna Phillips | Bryn Mawr Rehab Hospital (Main Line) |
| Lawrence Reichlin | Board of Trustees, Albert Einstein Healthcare Network |
| Phyllis Schlichtmann | Kessler Institute for Rehabilitation |
| Andrew Shelak | Suburban Community Hospital and Roxborough Memorial Hospital (Prime Healthcare Services) |
| Cynthia Winings | United HealthCare |

## FINDINGS OF FACT

I.    **BACKGROUND**

    A.    **The Parties**

1.    Jefferson Health, the clinical entity within Jefferson, is a non-profit health system in the Philadelphia metropolitan area.[1]  Among its GAC hospitals, Jefferson operates Abington Hospital, Abington-Lansdale Hospital, and Thomas Jefferson University Hospital.[2]  Jefferson provides inpatient rehab services at Magee Rehabilitation Hospital and Abington.[3]

2.    Einstein, which was founded over 150 years ago, is a non-profit health system that operates three GAC hospitals, Einstein Medical Center Philadelphia, Einstein Medical Center Elkins Park, and Einstein Medical Center Montgomery.[4]  Einstein provides inpatient rehab services through MossRehab, including at its EMCP and EMCEP locations.[5]

    B.    **Einstein's Search for a Partner**

3.    Over the past several years, Einstein's financial condition has steadily deteriorated, including regular operating losses since 2017, and it is projected to incur much greater losses in the future.[6]  This is largely because Einstein's flagship hospital, EMCP, serves an underserved community with one of the highest government payor mixes of any non-public hospital in the country.[7]  After suffering yearly losses and successive credit rating downgrades, Einstein is unable to match the investments of its competitors, or even to fund essential repairs and

---

[1] Jefferson Health, "We are Jefferson," https://hospitals.jefferson.edu/content/dam/health/PDFs/general/about-us/We-Are-Jefferson-1-08-20.pdf; JX0079-005, 010.

[2] Jefferson Health, "We are Jefferson," https://hospitals.jefferson.edu/content/dam/health/PDFs/general/about-us/We-Are-Jefferson-1-08-20.pdf.

[3] *Id.*

[4] Einstein Healthcare Network, "Einstein Predecessor, The Jewish Hospital, Honored with Historical Marker," https://einsteinperspectives.com/einstein-progenitor-jewish-hospital-honored-historical-marker; Einstein Healthcare Network, "Locations," https://www.einstein.edu/locations/.

[5] MossRehab Einstein Healthcare Network, "Locations," https://www.mossrehab.com/locations.

[6] Hr'g Tr. 261:5-9, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-005, 019).

[7] Hr'g Tr. 182:19-183:9, Sept. 16, 2020 (R. Lefton, EHN); Hr'g Tr. 262:12-263:8, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-007-008); Hr'g Tr. 160:10-20, Sept. 29, 2020 (Dr. Capps, Defs.' Expert) (discussing DDX005-044-045).

maintenance or to update or replace its aging facilities, plant and equipment.[8]

4.      Following unsuccessful efforts on its own to find a strategic partner able to keep it viable, Einstein retained a preeminent health care consulting firm.[9]  Einstein and its advisors initially considered more than twenty potential partners and sent an information memorandum to many of them.[10]  At the end of the search, Jefferson was identified as the only candidate both willing and able to preserve Einstein and its mission.[11]  No other viable purchasers have since appeared, including at this Court's evidentiary hearing, to express an interest in acquiring all of Einstein—and keep it from the fate of Hahnemann and other now-closed safety-net hospitals in the area.[12]

### C.      The Merger and its Importance to the Community

5.      Jefferson and Einstein entered into a System Integration Agreement (the "Agreement") on September 14, 2018, through which Jefferson will become the sole member of Einstein.[13]

6.      Due to Einstein's financial condition, the Parties engaged in "a very disciplined integration effort" to "identify the opportunities [] to be able to achieve specific savings based on the merger."[14]  If they did not identify savings from the Merger totaling at least 3% of Einstein's EBIDA (approximately $40 million), each would have a right to terminate the Agreement.[15]

7.      Through hundreds of meetings with approximately 150 physician leaders and executives, the Parties developed the Rationalization and Integration Plan, which identified and quantified savings from the Merger exceeding the target in the Agreement.[16]

---

[8] Hr'g Tr. 187:24-188:24, Sept. 16, 2020 (R. Lefton, EHN); Hr'g Tr. 275:3-18, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-014-015); DX8200, T. Patnode Report ¶ 32, Fig. 2.
[9] Hr'g Tr. 119:5-120:11, 120:22-121:19, 122:14-123:20, 124:1-14, 130:14-131:6, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 220:10-221:5, Sept. 16, 2020 (A. Maksimow, Kaufman Hall)
[10] Hr'g Tr. 126:1-11, Sept. 16, 2020 (B. Freedman, EHN); DX9531-002-004; DX8545.
[11] Hr'g Tr. 134:3-11, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 32:18-33:7, 34:14-35:3, 55:4-8, Sept. 29, 2020 (S. Klasko, TJU).
[12] Hr'g Tr. 23:16-26:21, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 134:3-25, Sept. 29, 2020 (B. Freedman, EHN).
[13] *See* JX0078.
[14] Hr'g Tr. 91:10-18, Sept. 30, 2020 (L. Merlis, TJU).
[15] *Id.* 93:8-94:14; JX0078-039-040.
[16] Hr'g Tr. 94:15-95:1, Sept. 30, 2020 (L. Merlis, TJU); JX0078-081; JX0024-004, 006.

8.     The Merger provides Einstein with the resources necessary to preserve EMCP and continue Einstein's mission of serving its local communities with the level of services of an academic medical center.  In fact, Jefferson is Einstein's only hope of doing so.[17]

9.     It also furthers the Parties' shared mission of ensuring that Philadelphia's most disadvantaged residents have nearby access to high-quality health care.[18]  Indeed, Jefferson has committed to keeping EMCP open for inpatient care, as its CEO explained.[19]

10.    This commitment is consistent with Jefferson's non-profit mission and the significant investments it makes each year in charity and unreimbursed care and community-based services, which exceed such spending levels of all other health systems in the area.[20]

11.    The Merger will also ensure the continued viability of the long-standing academic affiliation between Jefferson and Einstein.[21]  Einstein is Jefferson's largest teaching affiliate, providing hundreds of clinical clerkships to Jefferson students.[22]  Upending those relationships would cause a ripple effect on the availability of clinical training opportunities for students from other Philadelphia-area schools, particularly those that train today at Jefferson's hospitals.[23]

12.    Without this Merger, Einstein must dramatically cut its services at EMCP, leading to job losses and even further reductions in maintenance and needed investment, precipitating a "death spiral" that would jeopardize access to health care for many of Philadelphia's underserved

---

[17] Hr'g Tr. 126:21-127:3, 134:3-25, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 32:18-35:3, Sept. 29, 2020 (S. Klasko, TJU).

[18] Hr'g Tr. 9:13-18, 10:7-10, 12:15-22, 15:19-16:15, 32:18-33:7, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 310:2-18, Sept. 14, 2020 (P. DeAngelis, TJU); Hr'g Tr. 104:20-105:14, Sept. 16, 2020 (B. Freedman, EHN); JX0022-012; JX0094-002; DX9496-002.

[19] Hr'g Tr. 31:23-32:17, 33:12-35:3, 54:22-55:8, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 170:3-24, 177:21-178:6, Sept. 16, 2020 (B. Freedman, EHN).

[20] Hr'g Tr. 10:11-23, 12:15-22, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 285:21-287:12, Sept. 14, 2020 (P. DeAngelis, TJU).

[21] Hr'g Tr. 31:1-17, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 310:19-25, Sept. 14, 2020 (P. DeAngelis, TJU); Hr'g Tr. 170:6-24, Sept. 16, 2020 (B. Freedman, EHN); JX0022-012, 013, 015-018; JX0094-002; DX9496-002.

[22] Hr'g Tr. 29:21-30:13, Sept. 29, 2020 (S. Klasko, TJU).

[23] Id. 31:4-32:17; JX0022-012-013.

residents.[24]  This would threaten its Level I Trauma designation and status as a teaching site.[25]

13.     The Philadelphia area has already lost four hospitals that predominantly served the

economically disadvantaged.[26]  Consistent with the public interest, this Merger preserves access

for disadvantaged populations and an important training site for Philadelphia's health

professionals—and it is the last chance to save the underserved North Philadelphia community

from being the next canary "trapped in the coalmine."[27]

## II.     PLAINTIFFS HAVE NOT ESTABLISHED A PRIMA FACIE CASE ENTITLING THEM TO A PRESUMPTION OF ILLEGALITY FOR EITHER INPATIENT GAC SERVICES OR INPATIENT REHABILITATION SERVICES.

### A.     Plaintiffs Ignore Commercial Realties in the Provision of Inpatient GAC Services and Overstate Market Concentration.

#### 1.     Plaintiffs' Structural Case Ignores Commercial Realities in the Montgomery Area.

14.     Plaintiffs' alleged "Montgomery Area" geographic market, which they build around

EMCM, ignores important competitors that are options for patients in that area that constrain the

Parties.[28]  EMCM's primary competitors are Suburban Community, Main Line's Paoli, Bryn

Mawr, and Lankenau hospitals, and Tower's Phoenixville and Pottstown hospitals,[29] but

Plaintiffs exclude Lankenau and Pottstown hospitals from their geographic market.

15.     ███████, ██████, and ██████ view EMCM as their primary competitor.[30] ██████

viewed EMCM's opening in 2012 as a ████████████ resulting in significant volume shifts



---

[24] Hr'g Tr. 134:12-25, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 25:3-26:18, Sept. 29, 2020 (S. Klasko, TJU).
[25] See Hr'g Tr. 203:7-206:24, Sept. 16, 2020 (R. Lefton, EHN); Hr'g Tr. 105:15-106:2, 124:25-125:7, Sept. 16, 2020 (B. Freedman, EHN).
[26] Hr'g Tr. 24:18-25:2, Sept. 29, 2020 (S. Klasko, TJU).
[27] Id. 25:3-26:18, 31:1-32:17, 33:12-34:20.
[28] Compl. ¶ 53 [Dkt. 7].  That alleged market includes EMCM, Abington, Abington-Lansdale, Main Line's Paoli and Bryn Mawr, Tower's Phoenixville and Chestnut Hill, Suburban Community, Roxborough Memorial, and Physicians Care Surgical Hospital.  Id.; PX8000, Dr. Smith Report ¶ 141.
[29] See, e.g., DX8506; DX8509; DX8512; DX8556.
[30]

away from its ███████, ████████████, and ████████████ hospitals.[31]

16.     Plaintiffs include Jefferson's Abington hospitals in their alleged Montgomery Area geographic market, but EMCM and Abington are not close competitors. Abington is not even located within EMCM's 75% PSA, which is almost entirely west of I-476.[32] Interstate 476 divides the eastern and western portions of Montgomery County—EMCM and the Abington hospitals are on opposite sides, and patients on one side generally do not travel to the other side for GAC services.[33] Nearly 70% of EMCM's patients live west of I-476, and 96% of Abington's patients live east of I-476.[34] Thus, EMCM and Abington primarily attract different sets of patients—and compete with different hospitals.[35]

17.     The primary competitors of Jefferson's Abington and Abington-Lansdale hospitals are Holy Redeemer, Doylestown, and Grand View.[36]

18.     Holy Redeemer, Doylestown, and Grand View each similarly view the two Abington hospitals as their primary competitors.[37] Each is located east of I-476 and draws the majority of their patients from eastern Montgomery County, Bucks County, and northeast Philadelphia.[38]

19.     Plaintiffs' treatment of EMCM and Abington as close competitors runs contrary to patients' preference to receive care locally, which both the FTC and market participants define as

---

[31] ████████████████████████████████████████████████████████████████████

[32] Hr'g Tr. 131:5-13, 132:6-11, Sept. 29, 2020 (Dr. Capps, Defs.' Expert) (discussing DDX005-029).

[33] Hr'g Tr. 65:13-24, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 132:21-134:3, Sept. 29, 2020 (Dr. Capps, Defs.' Expert); ██████████████████████████████████████████████████████

████████████████████████████████████████

[34] Hr'g Tr. 65:25-66:6, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 133:6-23, Sept. 29, 2020 (Dr. Capps, Defs.' Expert) (discussing DDX005-32).

[35] Hr'g Tr. 65:13-24, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 132:4-134:3, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).

[36] Hr'g Tr. 64:23-65:2, 66:14-18, Sept. 29, 2020 (B. Meyer, TJU); DX9417; DX9445; DX9466; DX9472.

[37] JX0054, M. Laign (Holy Redeemer) Dep. Tr. 57:6-58:16; JX0050, J. Brexler (Doylestown) Dep. Tr. 22:6-23:15; 25:2-26:2, 26:17-28:2, 30:15-21; JX0068, M. Horne (Grand View) Dep. Tr. 67:9-68:4, 114:7-18,186:14-187:6, 190:22-192:7, 210:4-211:20, 212:10-213:9, DX0704-040; DX0601-078; DX0602; DX1506-024; DX1512-103; DX1524-024-026, 030.

[38] JX0054, M. Laign (Holy Redeemer) Dep. Tr. 52:4-16, 60:1-8, 130:9-131:14; JX0050, J. Brexler (Doylestown) Dep. Tr. 18:7-19:9; JX0068, M. Horne (Grand View) Dep. Tr. 129:15-131:9.

less than a 30-minute drive.[39]  Plaintiffs assert that patients who receive GAC services "strongly prefer" to receive them "close to where they live."[40]  But EMCM and Abington are too far apart, with typical drive times of 26-50 minutes, to be local alternatives to one another.[41]

20.     Dr. Cory Capps, Defendants' expert, conducted an event study of the impact EMCM's opening in 2012 had on market shares; Dr. Capps found that very little of EMCM's post-opening share increase came from Abington and Abington-Lansdale.[42]  The actual data shows no "seesaw" between the shares of EMCM, Abington, and Abington-Lansdale, demonstrating that those hospitals are not close substitutes.[43]  Instead, Einstein's share grew at the expense of other hospitals, particularly those west of I-476, such as ███████ hospitals.[44]

21.     Likewise, Jefferson's own internal analyses found that the opening of EMCM had "no discernable impact on [Abington]"; instead, EMCM's growth came at the expense of hospitals far to the west of Abington such as Suburban, Bryn Mawr, Paoli, and Phoenixville.[45]  Indeed, three years after EMCM opened, EMCM only had a 3% inpatient market share in Abington's PSA—less than Doylestown, Grand View, Holy Redeemer, and St. Mary.[46]

22.     Although one Abington physician predicted a potential loss of obstetrics deliveries to EMCM in 2017, that prediction was not borne out by the actual data.[47]

---

[39] JX0054, M. Laign (Holy Redeemer) Dep. Tr. 42:11-43:4, 132:5-9; JX0050, ██████████████ ███████████; *FTC v. Advocate Healthcare Network*, No. 15-cv-11473, Hr'g Tr. 454:18-455:8, Apr. 13, 2016 (Dr. Tenn, Pls.' Expert); Brief for Appellants at 10, *FTC v. Penn State Hershey Medical Center*, No. 16-2365 (June 1, 2016).

[40] Compl. ¶¶ 54-55 [Dkt. 7].

[41] DX8000, Dr. Capps Report ¶ 294; JX0032, B. Duffy (EHN) Dep. Tr. 161:19-162:4.

[42] Hr'g Tr. 136:16-137:24, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).

[43] *Id.* 136:22-137:24.

[44] ████████████████████████████████████████████████████████████████████; Hr'g Tr. 137:25-138:11, Sept. 29, 2020 (Dr. Capps, Defs.' Expert); ██████████████████████████████,

[45] DX9488-001; *see also* DX9383-025 (retrospective analysis showing that Abington experienced a total loss of 0.5% market share between fiscal years 2013 and 2017 in EMCM's PSA); *see also* Hr'g Tr. 119:3-15, 131:23-134:1, Sept. 30, 2020 (L. Merlis, TJU).

[46] DX9610-010; *see also* Hr'g Tr. 119:3-15, Sept. 30, 2020 (L. Merlis, TJU).

[47] DX9534 (demonstrating that Abington did not experience decrease in commercial births in zip codes near EMCM between 2017 and 2018); DX9610-008 (noting that in the Women & Children service line, Abington experienced a 2.5% growth due to deliveries in 2016 and "[n]o other competitor facility experienced a growth in [inpatient] cases in this service line"); *see also* Hr'g Tr. 124:20-125:16, 129:6-20, 135:16-137:6, Sept. 30, 2020 (L. Merlis, TJU).

23.    Plaintiffs also ignore the impact of significant competitors located outside their alleged geographic market that draw numerous patients from the areas around EMCM.[48]  For example, Penn's PSA encompasses EMCM, and Penn draws large patient volumes from the Montgomery Area; Penn is further enhancing its competitive presence in Montgomery County through its outpatient locations, physician relationships, and its clinical affiliations with Grand View and St. Mary, all of which pull patients to Penn's three hospitals in Philadelphia.[49]

24.    Montgomery County is also a key growth area for Grand View and Doylestown.[50]  Like Penn and Main Line,[51] Grand View and Doylestown are seeking to expand their reach for GAC services there by strategically placing physicians to generate more referrals to their hospitals.[52] Likewise,        has placed ambulatory services near EMCM in King of Prussia, Plymouth Meeting, Norristown, and Lafayette Hill.[53]

### 2.    Plaintiffs' Structural Case Ignores Commercial Realities in the Northern Philadelphia Area.

25.    Plaintiffs' alleged "Northern Philadelphia Area" geographic market, which they build around EMCP, also ignores important competitors that are attractive options for patients in that area that constrain the Parties.[54]

26.    EMCP views Penn's downtown hospitals and Holy Redeemer, none of which are

---

[48] Hr'g Tr. 68:7-69:13, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 151:14-152:25, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[49] JX0065, L. Gustave (Penn) Dep. Tr. 38:5-20, 53:14-54:16, 63:2-19; JX0068, M. Horne (Grand View) Dep. Tr. 71:10-72:12; Hr'g Tr. 21:22-22:7, Sept. 29, 2020 (S. Klasko, TJU); DX9444-002;
                                                      DX9428; DX9431.
[50] JX0050, J. Brexler (Doylestown) Dep. Tr. 120:7-121:2; DX0602-3; JX0068, M. Horne (Grand View) Dep. Tr. 76:21-77:14.
[51]                                                      ; JX0034, M. Buongiorno (MLH) Dep. Tr. 164:16-165:12.
[52] JX0050, J. Brexler (Doylestown) Dep. Tr. 37:3-13, 99:18-100:1, 109:20-110:9; DX0604;                    ; JX0068, M. Horne (Grand View) Dep. Tr. 76:21-77:14, 151:15-152:6; DX1506-021; DX1524-010, 074.
[53]
[54] Compl. ¶ 52 [Dkt. 7].  That alleged market includes EMCP, EMCEP, Abington, Jefferson Frankford, Temple University Hospital, Fox Chase Cancer Center, Jeanes Hospital, Chestnut Hill Hospital, St. Christopher's Hospital for Children, Roxborough Hospital, and CTCA-Philadelphia.  *Id.*; PX8000, Dr. Smith Report ¶ 141.

included in Plaintiffs' Northern Philadelphia Area, as significant competitors.[55]

27.    Penn operates three, nationally-ranked hospitals less than 11 miles and only a 19 to 28 minute drive from EMCP,[56] and the PSA for all three hospitals includes EMCP.[57]  Penn's SVP for Business Development testified that Penn competes for patients in the areas surrounding EMCP.[58]  Penn recently opened part of its new $1.5 billion hospital, the Penn Pavilion, adding 250 inpatient beds to serve patients in the area.[59]

28.    Holy Redeemer, less than 8 miles and only an 18 to 26 minute drive from EMCP,[60] also competes for patients from North Philadelphia.  Its PSA encompasses the North Philadelphia community,[61] which it has served for a "long time" and where it seeks a "greater presence."[62]

29.    Plaintiffs instead include Abington in their proposed market.  Abington, however, is located outside of EMCP's PSA, on the northern edge of the Northern Philadelphia Area in a different county, serves largely higher-income patients, and has a much more favorable mix of commercially-insured patients than EMCP.[63]  Given the lack of commercial patients who choose to receive GAC services at EMCP, Abington does not view EMCP as a competitor.[64]

30.    EMCP has, among large hospitals nationwide, one of the highest percentages of government-insured inpatients—reaching higher than 87%—and many of the remaining

---

[55] *See, e.g.*, DX8510; DX8508.
[56] PX8002, Dr. Smith Rebuttal Report Table 2.
[57] JX0065, L. Gustave (Penn) Dep. Tr. 34:21-35:5.
[58] *Id.* 34:16-36:5.
[59] Hr'g Tr. 139:17-140:17, Sept. 29, 2020 (Dr. Capps, Defs.' Expert); DX9334-019; MaryKate Wust, *Pavilion Powers Ahead to Combat COVID-19*, PENN TODAY (Mar. 26, 2020), https://penntoday.upenn.edu/news/pavilion-powers-ahead-combat-covid-19.
[60] PX8002, Dr. Smith Rebuttal Report Table 2.
[61] DX0704-036-037.
[62] John George, *Holy Redeemer opens first Philadelphia outpatient care center, eyes further expansion*, PHILA. BUS. J. (Jan. 8, 2020), https://www.bizjournals.com/philadelphia/news/2020/01/08/holy-redeemeropens-first-philadelphia-outpatient html ("We, as a health system, have been serving Northeast Philadelphia for a long time . . . . It's part of our service area.").
[63] Hr'g Tr. 138:12-20, Sept. 29, 2020 (Dr. Capps, Defs.' Expert); DX8000, Dr. Capps Report Fig. 15.
[64] Hr'g Tr. 66:25-67:22, Sept. 29, 2020 (B. Meyer, TJU).

commercial patients at EMCP arrive through the Emergency Department.[65] Indeed, EMCP's commercial population is declining, and it is seen by the public as an "inner city institution" or "safety net hospital" in need of dire capital investments; as a result, competitors are "able to attract and recruit the commercial population away from [EMCP]."[66]

### 3. Plaintiffs' Methodologies for Defining Markets and Measuring Market Shares Are Flawed and Overstate Market Concentration.

31.     Plaintiffs' expert, Dr. Loren Smith, employed a four-step method to construct his candidate geographic markets.[67] Methodological flaws in how he defines his relevant geographic markets and how he measures market shares cause him to overstate market concentration.

32.     First, Dr. Smith illogically relies on drive *distances* rather than drive *times* to identify the set of competitor hospitals.[68]  Consistent with the testimony from payors and ordinary course documents, drive times are a more reliable measure of patient preference and, thus, a more appropriate measure for defining candidate geographic markets.[69]  Dr. Smith admits that the academic literature uses "drive times more often" than drive distances.[70]

33.     If Dr. Smith had used drive times to construct his markets, he would have included one additional hospital in the Montgomery Area and six more in the Northern Philadelphia Area.[71] This results in lower post-merger market concentration numbers in both alleged markets.[72]

34.     Second, Dr. Smith's finding that his candidate markets are highly concentrated is based

---

[65] Hr'g Tr. 108:5-14, 111:10-21, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 63:17-64:5, 67:6-22, Sept. 29, 2020 (B. Meyer, TJU).
[66] Hr'g Tr. 111:7-21, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 118:20-119:6, Sept. 14, 2020 (P. Staudenmeier, IBC); *see also* Hr'g Tr. 205:11-18, 206:16-24, Sept. 16, 2020 (R. Lefton, EHN); Hr'g Tr. 155:18-24, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[67] Hr'g Tr. 94:24-95:15, Sept. 15, 2020 (Dr. Smith, Pls.' Expert).
[68] *Id.* 43:9-12; Hr'g Tr. 105:5-107:17, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[69] Hr'g Tr. 108:8-23, Sept. 14, 2020 (P. Staudenmeier, IBC); Hr'g Tr. 49:20-50:12, 50:20-22, Sept. 14, 2020 (K. Markowitz, Cigna);                                                                                          DX0308-027;
[70] Hr'g Tr. 43:13-16, Sept. 16, 2020 (Dr. Smith, Pls.' Expert).
[71] Hr'g Tr. 110:15-22, 111:15-112:12, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[72] *Id.* 127:16-128:8.

on calculating market shares using hospital locations, not the patients who reside in those areas.[73]

35.     Dr. Smith's hospital-based market shares include all patients for each hospital located *inside* the geographic market regardless of whether the patients reside inside it or outside it.[74] His approach completely ignores competing hospitals located *outside* the area no matter how many patients residing within it choose those hospitals.[75] Dr. Smith admits that, if a hospital is located in a ZIP code outside, but directly adjacent to, his geographic market, he ascribes a zero percent market share to that hospital even though it attracts many patients who reside in it.[76]

36.     Dr. Smith ignores the competitive significance of these outside hospitals despite the fact that approximately 70% of patients who seek care at a hospital within each market would choose a hospital located outside of that market as their second choice.[77]  Not only does he ignore all hospitals just outside his two alleged markets, he also overstates the competitive significance and market shares of hospitals, such as Abington, that are located just inside the border and that, consequently, draw a significant number of their patients from outside of the market.[78]

37.     In the case of Abington, Dr. Smith's hospital-based approach results in double-counting its patients.  He counts all of Abington's patients when computing market shares for his alleged Montgomery Area market, and then he counts all of those same Abington patients again when computing market shares for his alleged Northern Philadelphia Area market.[79]

38.     In contrast, a patient-based approach to measuring market shares avoids the "all-in" or "all-out" limitation of hospital-based shares by focusing on the hospitals that patients residing in

---

[73] Hr'g Tr. 49:18-20, Sept. 16, 2020 (Dr. Smith, Pls.' Expert).
[74] Hr'g Tr. 113:16-25, Sept. 29, 2020 (Dr. Capps, Defs.' Expert) (discussing DDX005-17, 19).
[75] Hr'g Tr. 50:13-51:1, Sept. 16, 2020 (Dr. Smith, Pls.' Expert); Hr'g Tr. 113:16-25, 117:13-118:14, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[76] Hr'g Tr. 51:2-7, Sept. 16, 2020 (Dr. Smith, Pls.' Expert); *see also* Hr'g Tr. 120:3-10, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[77] Hr'g Tr. 114:20-115:23, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[78] *Id.* 114:1-19.
[79] *Id.* 120:21-121:19 (discussing DDX005-23).

the relevant geographic market actually choose for care.[80]  Patient-based market shares are

commonly used by economists and the antitrust agencies; they more reliably measure the value

that hospitals offer to insurers and their members, consistent with the two-stage model of

hospital competition endorsed by both Plaintiffs' and Defendants' experts.[81]

39.     If one corrects these errors in Dr. Smith's analysis by using drive times instead of drive

distances to define the relevant geographic markets, and by using patient-based shares instead of

hospital-based shares to measure market shares, the post-merger HHI numbers in each of Dr.

Smith's geographic markets are below the 2,500 threshold.  As a result, there is no presumption

of harm to competition from the Merger under the Guidelines.[82]

### B.      Plaintiffs Have Not Properly Defined a Relevant Product or Geographic Market for Inpatient Rehab Services in the Philadelphia Area.

#### 1.      The Relevant Product Market Should Include Both Inpatient Rehabilitation Facilities and High-End Skilled Nursing Facilities.

##### a.      *IRFs and High-Ends SNFs Provide Equivalent Services.*

40.     Inpatient rehab services include physical, occupational, and speech therapy, as well as

certain nursing and physician services.[83] Both IRFs and SNFs provide inpatient rehab services.[84]

41.     CMS requires that IRFs provide a minimum of three hours of therapy per day, five days

per week, using an interdisciplinary care team, multiple modalities of therapy (*e.g.*, physical,

occupational, and speech therapy), and at least three face-to-face physician visits per week.[85]

---

[80] *Id.* 121:20-122:13.

[81] Hr'g Tr. 50:5-8, Sept. 16, 2020 (Dr. Smith, Pls.' Expert); Hr'g Tr. 122:14-125:15, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).

[82] Hr'g Tr. 127:1-128:20, Sept. 29, 2020 (Dr. Capps, Defs.' Expert) (discussing DDX005-027).

[83] *See* DX8100, Dr. Ramanarayanan Report ¶¶ 23, 74; Hr'g Tr. 211:19-212:3, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 5:18-5:20, Sept. 30, 2020 (Dr. Ramanarayanan, Defs.' Expert).

[84] Hr'g Tr. 211:24-212:3, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 182:6-182:17, Sept. 14, 2020 (B. Hauswald, Genesis); Hr'g Tr. 249:1-6, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).

[85] *See* DX8100, Dr. Ramanarayanan Report ¶ 24; Hr'g Tr. 14:8-15, Sept. 15, 2020 (J. Daley, GSRH).

Like IRFs, many SNFs provide inpatient rehab services that meet each of these requirements.[86]

42.      There is little difference in the services provided at IRFs and various high-end SNFs,[87] or the "intensity" of such services, which refers only to the number of minutes of therapy per day, and are tailored to patient needs.[88]  Although SNFs have been reimbursed for providing *at least* 2.4 hours of therapy per day five days per week,[89] there is no "upper limit" that prevents SNFs from providing additional minutes of therapy.[90]

43.      High-end SNFs in the Philadelphia Area also provide staffing beyond what CMS regulations require,[91] including (1) physical, occupational, and speech therapists; (2) nursing staff, including RNs; (3) social workers; and (4) physicians, whether employed or contracted.[92]

44.      The equipment and therapy gyms that high-end SNFs use to administer inpatient rehab services are also similar to those offered at IRFs.[93]  Barbara Hauswald, VP of Strategic Development at Genesis, explained that the "Powerback facility and Powerback gyms, in addition to being larger than traditional gyms . . . also have more advanced equipment than other skilled nursing facilities."[94]  Another high-end SNF, Shannondell, touts its rehab facilities as "best-in-class."[95]  Further, inpatient rehab services are "high touch," not "high tech," and do not

---

[86] Hr'g Tr. 215:1-216:18, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 182:6-182:17, Sept. 14, 2020 (B. Hauswald, Genesis).

[87] Hr'g Tr. 72:9-20, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 49:19-52:16, Sept. 15, 2020 (J. Daley, GSRH).

[88] *See, e.g.*, Hr'g Tr. 185:6-185:10, Sept. 14, 2020 (B. Hauswald, Genesis); Hr'g Tr. 214:13-25, 219:11-13, Sept. 29, 2020 (M. Seminara, Einstein); JX0067, ▮▮▮▮▮▮▮▮▮▮▮▮; DX0503-003.

[89] *See* DX8100, Dr. Ramanarayanan Report ¶ 27; Hr'g Tr. 15:25-16:10, Sept. 30, 2020 (Dr. Ramanarayanan, Defs.' Expert).

[90] Hr'g Tr. 219:3-219:12, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 58:21-24, Sept. 15, 2020 (J. Daley, GSRH).

[91] Hr'g Tr. 189:5-189:12, 216:21-217:18, Sept. 14, 2020 (B. Hauswald, Genesis).

[92] Hr'g Tr. 215:10-216:17, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 72:12-15, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 188:17-189:4, 216:16-217:18, Sept. 14, 2020 (B. Hauswald, Genesis); Hr'g Tr. 21:5-12, 43:22-44:6, Sept. 15, 2020 (J. Daley, GSRH); ▮▮▮▮▮▮▮▮.

[93] Hr'g Tr. 218:7-219:2, Sept. 29, 2020 (M. Seminara, EHN) ("the end result is the same. The treatment provided is the same"). *Id*. at 228:3-11. *See also* Hr'g Tr. 217:19-218:14, Sept. 14, 2020 (B. Hauswald, Genesis)

[94] Hr'g Tr. 217:22-218:1, Sept. 14, 2020 (B. Hauswald, Genesis).

[95] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

require the use of any particularized equipment or therapy gyms specific to IRFs.[96]

        b.    *IRFs and High-End SNFs Treat the Same Types of Patients.*

45.    SNFs treat patients with the same conditions as those in IRFs, including patients with one

or more of the 13 conditions in CMS's "60 percent rule"—*i.e.*, at least 60% of patients in an IRF

are treated for one or more of the 13 conditions.[97] Party executives testified that "the majority" of

Moss' patients and 50% of Magee's patients could be treated in either an IRF or a SNF setting.[98]

46.    Defendants' expert, Dr. Subbu Ramanarayanan, examined data on patients treated at IRFs

and certain SNFs to evaluate the overlap between the two settings.[99]  After controlling for

conditions, intensity, and complexity of therapy,[100] he identified six high-end SNFs that have a

*greater* degree of overlap in patient conditions with Moss than the overlap seen between Moss

and other IRFs in the eight county area: Abramson Residence, Care One at Evesham,

Shannondell, and PowerBack's Moorestown, Lombard Street, and Voorhees facilities.[101]

47.    High-end SNFs, treating the same types of patients as IRFs, achieve equivalent long-term

outcomes, regardless of any small difference in therapy intensity.[102]

        c.    *IRFs and High-End SNFs Compete to Attract the Same Patients.*

48.    Nurse liaisons from both IRFs and SNFs compete for patient referrals from GAC

hospitals, "fighting for the same population."[103]  The patient referral process is akin to a "race" in

---

[96] DX8100, Dr. Ramanarayanan Report ¶ 106; *see also* Hr'g Tr. 218:7-219:2, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 303:13-18, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).

[97] *See* Hr'g Tr. 46:8-17, Sept. 15, 2020 (J. Daley, GSRH); DX8100, Dr. Ramanarayanan Report ¶ 35; 42 C.F.R § 412.29(b).

[98] Hr'g Tr. 218:3-6, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 72:16-20, Sept. 29, 2020 (B. Meyer, TJU); *see also* JX0004-016 (SNFs "[o]ften seeing the same patients as we are").

[99] Hr'g Tr. 250:7-252:10, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-006-008).

[100] *Id.*; *see, e.g.*, Hr'g Tr. 192:5-7, 196:13-22, 199:21-200:2, Sept. 14, 2020 (B. Hauswald, Genesis).

[101] Hr'g Tr. 250:7-252:10, 254:9-15, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-006-008).

[102] Hr'g Tr. 219:13-220:5, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 50:18-51:19, Sept. 15, 2020 (J. Daley); Hr'g Tr. 220:21-24, Sept. 14, 2020 (B. Hauswald, Genesis).

[103] Hr'g Tr. 71:13-22, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 214:3-214:12, 220:5-221:212, 223:14-223:21, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 263:10-264:4, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); *see also* ███████; JX0045, P. Schlichtmann (Kessler) Dep. Tr. 146:6-15.

which the first facility to approve a patient will have a greater chance of winning the admission.[104] IRFs lose patient admissions to SNFs as a result of this competition,[105] as reflected in logs maintained by the Parties' nurse liaisons.[106]

49.     Patients that qualify for IRF admission—meeting the criteria set by the IRF and the insurer—often choose to receive treatment at SNFs instead for a number of reasons, including attractiveness of the post-acute facilities, availability of private rooms, better food, convenient parking, a physician referral or relationship with a certain post-acute facility, and proximity to home or to family members.[107]

50.     The competitive landscape for inpatient rehab services in the Philadelphia area is "vicious," and includes IRFs and high-end SNFs, as shown in the ordinary course documents of industry participants.[108]



51.     High-end SNFs also view IRFs as their competition.

---

[104] Hr'g Tr. 221:12-23, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 71:5-22, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 263:4-264:6, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).
[105] Hr'g Tr. 226:9-20, Sept. 29, 2020 (M. Seminara, EHN); ███████████████████; Hr'g Tr. 46:25-47:20, Sept. 15, 2020 (J. Daley, GSRH).
[106] *See, e.g.*, JX0003 (for the denial code 2, "chose another facility," comments included: "Shannondell," "SNF," "pt wants SNF"); DX8660-005 (patient "[c]hose Shannondell"); DX9483; DX9484; DX9485; DX9486 ("Admitted to SNF").
[107] Hr'g Tr. 57:14-22, Sept. 15, 2020 (J. Daley, GSRH); Hr'g Tr. 213:12-19, 223:14-225:6, Sept. 29, 2020 (M. Seminara, EHN); DX8100, Dr. Ramanarayanan Report ¶ 48; Hr'g Tr. 213:24-214:19, Sept. 14, 2020 (B. Hauswald, Genesis).
[108] Hr'g Tr. 229:6-229:17, Sept. 29, 2020 (M. Seminara, EHN); *see also* ████████████; DX2109-008; DX8553-002-003 (listing "substitution of product - SNFs" as a "threat" in the "hypercompetitive Philadelphia market").
[109] ████.
[110] ████████████████████████.

████████████████████████████████████[111] and Genesis' 10-K filing

with the SEC indicates that it views IRFs among its competitors.[112]

52.     Even if a patient meets IRF admission criteria, the patient must still obtain pre-

authorization from her insurer.[113] ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████[114]

        **d.**    *Reimbursement Changes Are Further Increasing Competition Among IRF and SNF Providers of Inpatient Rehab Services.*

53.     In 2014, Congress passed the Improving Medicare Post-Acute Care Transformation Act,

which is aimed at "site-neutral" payments for rehab care based on the characteristics of the

patient and the services provided rather than the *setting* in which those services are received.[115]

54.     CMS has made significant progress towards site-neutrality.[116] In October 2019, CMS

implemented the Patient Driven Payment Model ("PDPM"), which increases the financial

incentives for SNFs to take on more medically complex patients.[117]  MedPAC, a government

agency, noted that one month into PDPM, "one market analyst reported that SNFs were already

taking higher acuity patients who otherwise may have gone to inpatient rehabilitation

facilities."[118] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████[119]

---

[111] ███████████████████████████

[112] DX2109-008; *see also* Hr'g Tr. 212:3-5, Sept. 14, 2020 (B. Hauswald, Genesis).

[113] DX8100, Dr. Ramanarayanan Report ¶ 48.

[114] ████████████████████████████████████████████████████████████

██████████████; JX0045, P. Schlichtmann (Kessler) Dep. Tr. 81:22-81:14; ████████████

████████████████, 101:9-19; Hr'g Tr. 207:10-14, 210:2-5, Sept. 14, 2020 (B. Hauswald,

Genesis); ███████████.

[115] Hr'g Tr. 265:22-265:5, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).

[116] *Id.* 265:22-265:24; *see also* Hr'g Tr. 219:17-22, Sept. 29, 2020 (M. Seminara, EHN).

[117] Hr'g Tr. 266:6-13, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).

[118] DX0226-009.

[119] ███████████; *see also* DX8553-003; DX8659-025.

       e.    *The Relevant Product Market is not Limited to IRFs.*

55.    Plaintiffs' alleged inpatient rehab services product market has never been litigated.[120]

56.    Dr. Smith asserts that the relevant product market excludes services provided at SNFs, but he did not conduct any empirical analysis on that point. Instead, Dr. Smith reviewed and "weighed" the documents and testimony in the record to define his product market.[121] Dr. Smith admitted that the evidence showed that up to 50% of IRF patients could be treated at SNFs.[122]

57.    Dr. Smith also asserted that competition from high-end SNFs alone could not defeat a price increase by a hypothetical monopolist of inpatient rehab services provided by IRFs.[123] However, Dr. Smith *assumes* that SNFs provide distinct services from IRFs as a predicate for that analysis, guaranteeing his conclusion that SNFs should be excluded from the market.[124]

      **2.**    **Plaintiffs Have Not Properly Defined a Relevant Geographic Market for Inpatient Rehab Services.**

        a.    *Plaintiffs' Alleged Geographic Market for Inpatient Rehab Services is Inconsistent with Commercial Realities.*

58.    Plaintiffs exclude key competitors that constrain the Parties. Moss's primary IRF competitors are Reading Rehab, Bryn Mawr Rehab, Penn Partners, Magee, Nazareth, Kessler Marlton, and St. Mary Rehab.[125] Magee likewise competes with Penn Partners, Kessler Marlon, St. Mary Rehab, Bryn Mawr Rehab, Moss, Holy Redeemer, Phoenixville, Chestnut Hill, Crozer Chester, as well as SNFs in the area.[126]

59.    However, Plaintiffs include Penn Rehab and Nazareth as the *only* competitors to the

---

[120] Hr'g Tr. 5:19-22, Sept. 16, 2020 (Dr. Smith, Pls.' Expert); Hr'g Tr. 249:21-22, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).
[121] Hr'g Tr. 14:21-15:13, Sept. 16, 2020 (Dr. Smith, Pls.' Expert).
[122] *Id.* 14:3-9.
[123] Hr'g Tr. 266:25-267:22, Sept. 16, 2020 (Dr. Ramanarayanan, Defs.' Expert)
[124] Hr'g Tr. 23:9-13, Sept. 16, 2020 (Dr. Smith, Pls.' Expert).
[125] Hr'g Tr. 208:1-4, Sept. 29, 2020 (M. Seminara, EHN); DX8521; DX8562; DX8655; DX8654; DX8653; DX8665; DX8666; DX8652.
[126] Hr'g Tr. 70:23-71:12, Sept. 29, 2020 (B. Meyer, TJU); DX9402-018-020.

Parties in their alleged geographic market and exclude strong IRF competitors to Moss and

Magee, including but not limited to Bryn Mawr Rehab, St. Mary Rehab, and Kessler Marlton.[127]

60.     Both Moss and Magee view Bryn Mawr Rehab as one of their most significant

competitors, if not their number one competitor.[128]  Moss' strategic plans uniformly assess

competition with Bryn Mawr Rehab, tracking any market share losses or gains.[129]  Magee's

strategic plans describe Bryn Mawr Rehab as its "primary competitor" in terms of rehab

"facilities," while noting that it is "second in market share overall" and enjoys a "greater market

place presence" due to its size and inclusion in Main Line's network.[130]

61.     Bryn Mawr Rehab similarly views Moss and Magee as key competitors.  The CEO of

Bryn Mawr Rehab testified that its referrals mainly come from Chester, Philadelphia, Bucks,

Delaware, and Montgomery Counties, in close competition with Moss, Magee, Penn Rehab, St.

Mary Rehab, Good Shepherd, and Crozer's Taylor Hospital.[131]    ████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ [132]

62.     Moss and Magee both also consider St. Mary Rehab to be a key competitor.  Moss has

explicitly chosen *not* to seek price increases with payors *because of* the potential to lose volume

to St. Mary Rehab.[133]  Magee's internal plans describe St. Mary Rehab as a significant and

growing competitor, and finding that its new facility "bled… off" patients from Magee.[134]

---

[127] Compl. ¶ 56 [Dkt. 7].
[128] DX8652.
[129] DX8521 (Email from R. Lefton, former COO of Moss, to M. Seminara stating, "Peg: Please share w liaisons that we are losing market share to BMR."); DX8654; DX8517-036-037; DX8653.
[130] DX9337-028; DX9402-004.
[131] JX0025, D. Phillips (Bryn Mawr Rehab) Dep. Tr. 133:5-10, 133:21-136:7.
[132] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
[133] DX8562 (internal Einstein email regarding rate negotiations, determining that Einstein "should leave Rehab prices flat" because "with the increased competition and new St. Mary's joint venture, we could experience significant volume loss.").
[134] DX9402-004; JX0033, J. Carroll (TJU) Dep. Tr. 212:8-18.

63.     The CEO of St. Mary Rehab, who expressed her concern that post-merger St. Mary Rehab would lose additional referrals to its IRF from Jefferson, testified that St. Mary Rehab "compete[s] with the other [IRFs] in our area" and considers Moss its "biggest competitor" among others like Magee, Penn, St. Lawrence Rehab, and local hospital-based IRF units.[135]

64.     Both Moss and Magee also view Kessler Marlton as a top competitor, ever since Kessler acquired the facility in late 2016.[136]  Moss executives have described Kessler Marlton as Moss' second biggest competitor after Bryn Mawr Rehab.[137]  Magee's strategic plans specifically describe Marlton's acquisition by Kessler as a competitive threat.[138]

65.     Internal strategic plans for Kessler Marlton list Magee and Moss as competitive threats, along with other IRFs and subacute rehab providers.[139]  The CEO of Kessler Marlton confirmed that it competes in the same region as Moss and Magee, with Philadelphia in its PSA.[140]

> b.     *Plaintiffs' Alleged Geographic Market is Inconsistent with the Parties' Service Areas.*

66.     Inclusion of competitors like Bryn Mawr, St. Mary, and Kessler in the geographic market more accurately aligns with how the Parties view their competition for inpatient rehab services. Moss defines its service area in the ordinary course of business as including Philadelphia, Bucks, Chester, Delaware, and Montgomery Counties.[141]  Magee analyzes competition in a nine-county area: the same five-county Pennsylvania area as Moss, plus Burlington, Camden, and Gloucester Counties in New Jersey and New Castle County in Delaware.[142]

---

[135] Hr'g Tr. 149:17-21; 167:15-19; 173:23-174:20, Sept. 14, 2020 (L. Staback-Haney, St. Mary Rehab).
[136] DX8655 (email from R. Lefton to A. Esquenazi regarding the announcement of Kessler's acquisition of Marlton Rehab, exclaiming, "I hate having them in the market."); DX8665; DX8666.
[137] DX8652.
[138] DX9402-018; JX0033, J. Carroll (TJU) Dep. Tr. 256:3-19.
[139] *See, e.g.*, DX1106-003.
[140] JX0045, P. Schlichtmann (Kessler) Dep. Tr. 147:3-6.
[141] Hr'g Tr. 281:23-282:3, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); DX8100, Dr. Ramanarayanan Report ¶ 122.
[142] DX9402-004; Hr'g Tr. 282:4-7, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); DX8100, Dr. Ramanarayanan Report ¶ 122.

67.     Only 26% of Moss' discharges come from Plaintiffs' alleged market.[143]  Even fewer of

Magee's discharges—only 15%—come from Plaintiffs' alleged market.[144]

c.      *Plaintiffs' Alleged Geographic Market is Not Robust.*

68.     Plaintiffs' analyses suffer from data and statistical flaws that significantly impact

Plaintiffs' proposed geographic market.[145]  First, Dr. Smith over-counted the number of

commercially-insured patients for Magee, by mistakenly including patients with auto insurance

as being commercially insured.[146]  This error overstates the market shares for Magee at the

expense of other competitors.[147]  Second, his rehab analyses aggregate data for 2016 to 2018,

leading Dr. Smith to understate the competitive significance of Kessler, a key competitor to the

merging parties, which did not expand into the area until November 2016.[148]

69.     Once Dr. Smith's data errors are corrected, Magee and Bryn Mawr Rehab are statistically

equivalent competitors to Moss at Elkins Park.[149]

70.     If one then follows Dr. Smith's own algorithm but corrects for his data errors, it leads to a

drastically different geographic market, demonstrating that Dr. Smith's defined geographic

market—and Plaintiffs' alleged geographic market—is not robust.[150]

71.     Specifically, because Bryn Mawr Rehab must be added to the geographic market in

Step 2 of Dr. Smith's algorithm, all other rehab providers located closer in terms of drive

---

[143] Hr'g Tr. 282:8-22, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-019).
[144] *Id.* 282:22-23.
[145] *Id.* 273:3-6; DX8100, Dr. Ramanarayanan Report § IV.B.3.
[146] Hr'g Tr. 273:15-274:3, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); DX8100, Dr. Ramanarayanan Report ¶ 138.
[147] Hr'g Tr. 273:15-274:3, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); DX8100, Dr. Ramanarayanan Report ¶ 138.
[148] Hr'g Tr. 274:4-12, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); *see also* DX8100, Dr. Ramanarayanan Report ¶ 138.
[149] Hr'g Tr. 274:13-275:20, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-017).
[150] *Id.* 276:12-277:13; *see also* Hr'g Tr.130:16-131:3, Sept. 15, 2020 (Dr. Smith, Pls.' Expert); DX8100, Dr. Ramanarayanan Report ¶¶ 148-149.

distance should be added in Step 3 of Dr. Smith's algorithm.[151]  Correctly implementing the

algorithm thus results in the addition of several IRFs to the geographic market: Bryn Mawr

Rehab, St. Mary Rehab, Kessler Marlton, Grand View, Crozer's Taylor Hospital, Mercy

Fitzgerald, Phoenixville, Virtua Lourdes, Moss at Doylestown, and Moss at Jefferson Bucks.[152]

72.       Once corrected, the HHI market concentration levels in the geographic market are below

the 2,500 threshold and any presumption of competitive harm from the Merger is eliminated

under the Guidelines.[153]  This is true even if the relevant product market is restricted to IRFs only

and is not expanded, as it should be, to include high-end SNFs.[154]

## III.   ANTICOMPETITIVE EFFECTS FROM THIS MERGER ARE NOT LIKELY.

### A.   Plaintiffs Failed to Present Sufficient Reliable Evidence for Their Prediction of a Material Price Increase for GAC Services.

#### 1.   Commercial Insurers Have Significant Bargaining Leverage Today.

73.       Prices and contract terms are a result of negotiation between commercial insurers and

healthcare providers, which are based in part on the bargaining leverage that each possesses.[155]

74.       Among the four major health insurers in the Philadelphia area, IBC is the "dominant"

payor, with more than 50% market share and agreements with every health system in the area.[156]

This dominance gives IBC significant leverage over providers during negotiations, as well as a

competitive advantage over other insurers.[157]

---

[151] Hr'g Tr. 276:17-23, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); Hr'g Tr. 27:18-28:10, Sept. 16, 2020 (Dr. Smith, Pls.' Expert). *See also Guidelines* § 4.1.1 (explaining in Example 6 that closer competitors should be included in a relevant market even if a smaller market satisfies the HMT).
[152] Hr'g Tr. 276:17-277:2, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-018).
[153] *Id.* 285:16-286:11 (discussing DDX006-021); *see also Guidelines* § 5.3.
[154] Hr'g Tr. 286:12-287:2, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-021).
[155] Hr'g Tr. 18:1-8, Sept. 14, 2020 (K. Markowitz, Cigna); Hr'g Tr. 79:17-80:2, 81:21-82:2, Sept. 14, 2020 (P. Staudenmeier, IBC); Hr'g Tr. 232:12-15, Sept. 14, 2020 (P. DeAngelis, TJU).
[156] Hr'g Tr. 26:25-27:7, 28:12-14, 57:9-59:2, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 104:17-105:1, Sept. 14, 2020 (P. Staudenmeier, IBC); Hr'g Tr. 61:11-23 Sept. 14, 2020 (K. Markowitz, Cigna); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮; DX0306; DX0317-10; PX1303.
[157] Hr'g Tr. 43:13-44:9, 46:4-15, Sept. 30, 2020 (C. McTiernan, former EHN); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

75.     By contrast, Einstein and Jefferson lack bargaining leverage in negotiations with any commercial payor, as shown by their respective recent system-wide renegotiations with IBC.[158]

76.     IBC analyzed the potential consequences of terminating Jefferson, while assuming that Jefferson would come back in-network in either three or six months.[159]  In each scenario, IBC determined the harm to Jefferson would be substantially greater than the harm to IBC—by tens of millions of dollars.[160]  IBC determined that excluding Jefferson would not negatively impact IBC's network adequacy.[161]  And IBC flatly told Jefferson that IBC did not need it.[162]

77.     After IBC threatened to terminate it, Jefferson accepted contract renewal terms that resulted in a negative impact of over $50 million system-wide (compounding to $150-200 million with inflation), because it could not risk the financial impact of going out-of-network.[163]  Jefferson continues to fear "retaliation" and "retribution" from IBC.[164]

78.     In its recent negotiations with IBC, Einstein accepted an agreement that resulted in an estimated $20 million loss of revenue, including rate decreases, because it could not afford to go out of network or face potential termination, as IBC had recently threatened with Tower.[165]

79.     The other major commercial insurers—Aetna, United, and Cigna—are also significant

_____

█████████████████████████████████████████████████████████;
JX0036, P. Green (PDG Consulting) Dep. Tr. 71:7-72:4, 78:11-25, 95:23-96:20; Hr'g Tr. 61:11-23, 62:11-21, Sept. 14, 2020 (K. Markowitz, Cigna); ███████.

[158] Hr'g Tr. 26:25-27:7, 28:12-14, 57:9-59:2, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 43:15-44:9, Sept. 30, 2020 (C. McTiernan, former EHN); JX0036, P. Green (PDG Consulting) Dep. Tr. 78:11-25, 95:23-96:20; JX0037, J. Flynn (TJU) Dep. Tr. 77:22-78:8, 99:25-101:4, 139:9-24; DX9491 ("[O]ur renegotiated contract with IBC does NOT insulate us from IBC retaliation going forward"); PX1303 ("[W]ith respect to payors, we need to stop giving the impression that United, Aetna, Cigna, etc. are less predatory than IBC.").

[159] Hr'g Tr. 109:16-110:14, 111:16-112:6, Sept. 14, 2020 (P. Staudenmeier, IBC); DX0323-005; DX0307; DX0308.
[160] Hr'g Tr. 109:16-110:14, 111:16-112:6, Sept. 14, 2020 (P. Staudenmeier, IBC); DX0323-005.
[161] Hr'g Tr. 108:24-109:3, Sept. 14, 2020 (P. Staudenmeier, IBC); DX0307; DX0308-027.
[162] Hr'g Tr. 26:25-27:24, 57:23-58:14, Sept. 29, 2020 (S. Klasko, TJU).
[163] Hr'g Tr. 290:23-292:4, 294:4-295:15, 295:23-303:6, 304:9-308:19, 317:19-318:5, Sept. 14, 2020 (P. DeAngelis, TJU); Hr'g Tr. 27:8-28:11, 57:9-59:2, Sept. 29, 2020 (S. Klasko, TJU); see DX0312; DX0313; PX1375-004; DX9436-004; PX1141; DX9440-002; PX1303.
[164] Hr'g Tr. 26:25-27:24, 57:16-59:17, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 290:23-292:4, 294:20-295:15, 298:21-300:8, Sept. 14, 2020 (P. DeAngelis, TJU); JX0036, P. Green (PDG Consulting) Dep. Tr. 87:11-89:9; PX1303; PX1375; JX0090.
[165] Hr'g Tr. 43:13-46:15, 49:20-51:22, Sept. 30, 2020 (C. McTiernan, former EHN).

sources of revenue for Jefferson and Einstein, giving each insurer significant bargaining leverage.[166]  The Parties view the other major payors with the same fears they have for IBC.[167]

80.     Neither Jefferson nor Einstein has ever gone out-of-network with any major insurer, because this would be devastating financially due to their reliance on commercial revenues to subsidize the losses they incur on serving Medicaid, Medicare, and uninsured patients.[168]

81.     Jefferson's growth over the past few years has not changed this bargaining power reality: while negotiating system-wide for all of its hospitals, Jefferson has neither attempted nor been able to use its size to extract higher rates or more favorable contract terms from commercial payors.[169]  Rather, rate changes are typically at or below the rate of healthcare inflation.[170]

82.     Einstein also lacks bargaining leverage with payors and typically receives, at best, only rate of inflation increases in payments.[171]

### 2.     Commercial Insurers Will Continue to Have a Significant Bargaining Advantage Post-Merger, As Adding Einstein Will Not Change The Bargaining Dynamics.

83.     While the Merger necessarily adds some scale to Jefferson, Einstein is not a "must have" for payors, because it serves very few patients who can afford commercial insurance and payors have multiple alternatives to it.[172]  Thus, the Merger will not meaningfully enhance the Parties' bargaining leverage in negotiations and substantially lessen competition.[173]

---

[166] Hr'g Tr. 287:23-288:4, 288:14-290:1, Sept. 14, 2020 (P. DeAngelis, TJU); Hr'g Tr. 26:19-27:7, 28:12-14, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 39:2-40:7, 56:23-57:22, Sept. 30, 2020 (C. McTiernan, former EHN).
[167] Hr'g Tr. 26:25-27:7, 28:12-14, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 57:12-22, Sept. 30, 2020 (C. McTiernan, former EHN); *see, e.g.*, PX1303-002.
[168] Hr'g Tr. 287:23-288:4, 288:19-289:2, 305:10-308:19, Sept. 14, 2020 (P. DeAngelis, TJU); Hr'g Tr. 28:12-29:10, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 39:2-40:7, 41:22-10, 44:24-46:15, 56:23-57:22, Sept. 30, 2020 (C. McTiernan, former EHN).
[169] Hr'g Tr. 301:10-303:6, Sept. 14, 2020 (P. DeAngelis, TJU).
[170] *Id.* 311:20-313:9.
[171] Hr'g Tr. 46:4-15, 56:23-58:7, Sept. 30, 2020 (C. McTiernan, former EHN).
[172] *See supra* and *infra*, Sections I, II.A, and V; Hr'g Tr. 35:4-36:23, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 61:23-62:1, Sept. 30, 2020 (C. McTiernan, former EHN); Hr'g Tr. 111:10-21, Sept. 16, 2020 (B. Freedman, EHN).
[173] Hr'g Tr. 32:18-33:7, 35:4-36:23, Sept. 29, 2020 (S. Klasko, TJU) (testifying that it "would be an absurd theory" to think that Jefferson "would be able to charge more because [it] had Einstein"); Hr'g Tr. 84:25-85:5, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 293:4-294:3, 308:24-311:15, Sept. 14, 2020 (P. DeAngelis, TJU); JX0036, P. Green

84.     IBC has acknowledged that it has substitutes for EMCM other than Abington and Abington-Lansdale.[174]  In a 2017 analysis, IBC concluded that, if it terminated Jefferson, its patients would go to Penn's HUP and Pennsylvania Hospital, St. Mary, and Holy Redeemer.[175]  IBC did not model any assumptions that patients would go to Einstein in such a scenario.[176]

85.     IBC also conceded that it could sell a network that excluded EMCM, EMCP, Abington, and Abington-Lansdale without facing network adequacy or patient access issues.[177]

86.     ███████████████████████████████████████████████████████████
        ███████████████████████████████████████████.[178]

87.     In early 2020, ██████████████████████████████████████████████
        ███████████████████████████████████.[179] ██████████████████████
        ██████████████████████████████████████████████████████████
        ██████████████████████████████████████████████████████████
        ██████████████████████████████████████████[180]██████████████████
        ██████████████████████████████████████████████████████████
        ██████████████████████[181]███████████████████████████████████
        ████████████████████████████████████████████[182]

88.     When assessing its members' hospital preferences, ██████████████████████
        ██████████████████████████████████████████████████████████



---

(PDG Consulting) Dep. Tr. 104:9-106:5 (testifying that "the least important thing that [Einstein] brought to [Jefferson] was any sort of leverage with any payer or insurance company" and gaining leverage "can't possibly be the motivating reason for the transaction").
[174] *See, e.g.*, Hr'g Tr. 85:4-14, Sept. 14, 2020 (P. Staudenmeier, IBC).
[175] *Id.* 112:11-113:4; DX0323-011.
[176] Hr'g Tr. 112:11-113:4, Sept. 14, 2020 (P. Staudenmeier, IBC).
[177] *Id.* 87:22-88:5.
[178] ████████████████████████████████
[179] ████████████████████████
[180] ████████████████████████████████
[181] ██████████████████████████████
[182] ██████████████████████████████████████

███████ [183] ████████████████████████████████████████████████

████████████████████████████████████ [184]

89.     Cigna has identified St. Mary, Doylestown, and Grand View as competitors of Abington and Abington-Lansdale.[185]  Cigna considers Suburban to be an adequate substitute for EMCM.[186]

90.     Most insurers recognize that Jefferson's closest competitor is Penn—a major health system that Plaintiffs largely ignore.[187]  During negotiations, ███████████████████████

████████████████████████████████████ [188]

91.     Jefferson's and Einstein's participation in narrow and tiered networks also reveals that they are not close substitutes for each other.[189]  Jefferson has never offered a discount in order to exclude only Einstein from a narrow network or to have Einstein placed in a less preferential tier in a tiered network.[190]  Rather, to the extent Einstein is excluded or placed in a less preferential tier, it is one among a long list of other providers sought to be disfavored.[191]

92.     Like Jefferson, Einstein has also never offered a discount in order to exclude only Jefferson from a narrow network or to have Jefferson placed in a less preferential tier in a tiered product.[192]  Rather, Einstein frequently, albeit unsuccessfully, attempts to exclude "most everybody else" from being included in a narrow network or placed in a preferred tier.[193]

---

[183] ████████████████████████████████████████████.
[184] ████████████████████████████.
[185] Hr'g Tr. 55:1-20, 59:8-60:18, Sept. 14, 2020 (K. Markowitz, Cigna); DX0205-004; DX0206-005, 007; DX0204-001.
[186] Hr'g Tr. 63:17-64:1, 64:13-21, Sept. 14, 2020 (K. Markowitz, Cigna); DX0209-013.
[187] *See, e.g.*, Hr'g Tr. 67:6-17, Sept. 14, 2020 (K. Markowitz, Cigna); ██████████████████████
████████████████████.
[188] ████████████████████████████████████████████████████████████████████
████████████████████ *see also* ████████; DX0323-011, 015; DX0323-007, 008, 012.
[189] *See supra* notes 190-193.
[190] JX0037, J. Flynn (TJU) Dep. Tr. 145:6-146:21.
[191] *Id.* 146:22-147:19, 148:24-152:25; *see, e.g.*, JX0083-002; ██████████.
[192] Hr'g Tr. 64:17-19, Sept. 30, 2020 (C. McTiernan, former EHN).
[193] *Id.* 63:9-64:19, 72:21-73:14.

93.     IBC's representative, Paul Staudenmeier, testified that *every* hospital merger is, in his view, bad for consumers and that he has not seen a hospital consolidation that benefitted them.[194] But IBC has done no analysis about the potential financial impact or cost savings of *this* merger, and Mr. Staudenmeier conceded that IBC has not analyzed whether it can negotiate better rates with Jefferson or Einstein as a result of any competition with one another.[195]

94.     His testimony about hospital mergers generally is contrary to that of multiple witnesses who testified that neither Jefferson nor Einstein can realistically go out of network with IBC— the "dominant" insurer in the Philadelphia area—and would compromise with IBC instead.[196] Such speculation is also contradicted by Aria's actual prices since its merger with Jefferson.[197]

95.     Rather than being genuinely concerned about potential price increases, IBC is more concerned that the Merger "would take Jefferson from being less of a potential competitor to IBC [to] more of an actual competitor" to IBC.[198]  IBC executives have even discussed excluding Jefferson in response to potential competition from Jefferson as an insurer/provider.[199]

96.     ███████████████████████████████████████████████████████████
████████████████████.[200]

97.     Only Cigna ███████████ have speculated that the Merger may increase the Parties' ability to seek higher rates in future negotiations.[201]  But this speculation is belied by their business records and testimony that each has adequate alternatives to Jefferson and Einstein.[202]

---

[194] Hr'g Tr. 123:20-124:23, Sept. 14, 2020 (P. Staudenmeier, IBC).
[195] *Id.* 123:1-16.
[196] Hr'g Tr. 287:23-288:4, 288:19-289:2, 305:10-308:19, Sept. 14, 2020 (P. DeAngelis, TJU); Hr'g Tr. 26:25-29:10, 57:9-59:2, Sept. 29, 2020 (S. Klasko, TJU); Hr'g Tr. 43:13-46:15, Sept. 30, 2020 (C. McTiernan, former EHN).
[197] Hr'g Tr. 148:7-149:21, Sept. 29, 2020 (Dr. Capps, Defs.' Expert) (discussing DDX005-039).
[198] Hr'g Tr. 113:9-118:7, Sept. 14, 2020 (P. Staudenmeier, IBC); DX0332-019, 023;  DX9601; *see also* Hr'g Tr. 56:4-20, Sept. 30, 2020 (C. McTiernan, former EHN); JX0037, J. Flynn (TJU) Dep. Tr. 176:1-178:6.
[199] Hr'g Tr. 113:9-118:7, Sept. 14, 2020 (P. Staudenmeier, IBC); DX0332-005, 013.
[200] ███████████████████████████████████████████
[201] Hr'g Tr. 44:14-22, Sept. 14, 2020 (K. Markowitz, Cigna); ████████████████████████████
████.
[202] *See, e.g.*, Hr'g Tr. 55:2-20, 59:21-60:18, 63:17-64:1, 64:13-21, Sept. 14, 2020 (K. Markowitz, Cigna); DX0205-004; DX0206-005, 007; DX0204-001; ███████████████████████████

98.     Plaintiffs also have not presented any evidence that employers in either the Northern

Philadelphia or Montgomery Areas cannot market a health plan without Einstein or

Jefferson.  Indeed, one large employer, Lower Merion School District (with employees across

the five-county area), testified it was not concerned about the Merger, with many GAC options

for its employees who could be well-served by a health plan without Einstein or Jefferson.[203]

### 3.     Payors Will Not Pay More For a Combined Jefferson-Einstein, and Some Will Pay *Less* Post-Merger.

99.     IBC will pay substantially *lower* rates to EMCP if the Merger goes through.[204]

Recognizing Einstein's weak financial position and the importance of EMCP to the community

as a safety net hospital, IBC has paid a premium in order to support Einstein's mission—fearing

a situation where IBC would "push[] Einstein over the edge."[205]  IBC claims, therefore, that it

currently pays EMCP higher rates relative to other systems in the Philadelphia marketplace.[206]

100.     In 2019, IBC agreed to maintain EMCP's higher rates in the short-term and then to

reduce those rates for the period after the Merger would be consummated, at which time Einstein

could rely on Jefferson rather than IBC for financial support.[207]  Mr. Staudenmeier testified that

this approach would help avoid a "financial tragedy" at Einstein.[208] ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[209]

---

██████████████████████████████████████████; *see also* Hr'g Tr. 60:2-5, Sept. 30, 2020 (C. McTiernan, former EHN) (Cigna accounts for approximately 1% of Einstein's revenue); Hr'g Tr. 289:23-290:1, Sept. 14, 2020 (P. DeAngelis, TJU) (Cigna accounts for approximately 1-2% of Jefferson's revenue).

[203] JX0051, E. Demkin (LMSD) Dep. Tr. 15:8-17, 39:6-12, 50:11-25, 62:5-64:25; DX2409.

[204] Hr'g Tr. 43:13-46:15, 49:20-51:22, Sept. 30, 2020 (C. McTiernan, former EHN).

[205] Hr'g Tr. 101:5-15, 118:19-119:18, Sept. 14, 2020 (P. Staudenmeier, IBC).

[206] *Id.* 119:19-21; Hr'g Tr. 43:13-24, Sept. 30, 2020 (C. McTiernan, former EHN); DX8669.

[207] Hr'g Tr. 119:22-122:3, Sept. 14, 2020 (P. Staudenmeier, IBC); Hr'g Tr. 43:13-24, 47:22-49:19, Sept. 30, 2020 (C. McTiernan, former EHN); DX8669.

[208] Hr'g Tr. 121:10-17, Sept. 14, 2020 (P. Staudenmeier, IBC).

[209] ████████████████████████████████████████████.

**B.      Plaintiffs Over-Estimate Price Effects for GAC Services.**

101.    Dr. Smith admits that market shares and HHIs are not measures of direct competition.[210]

102.    Dr. Smith further admits that his UPP model, which is generally viewed as a merger screen, produced a "gross" estimate of potential price effects that does not account for mitigating factors such as new entry and expansion, repositioning of competitors, and merger efficiencies.[211]  He also admitted that a UPP model *always* predicts a gross price increase whenever there is *any* competition between two merging firms.[212]  His WTP model likewise only estimates gross, not net, price effects and does not account for any mitigating factors.[213]

103.    Dr. Smith's price predictions only estimate potential harm for commercial patients and ignore the positive effects of the transaction on Medicare and Medicaid patients.[214]

104.    Moreover, Dr. Smith's price predictions are subject to significant data limitations; for example, the discharge data he relies upon ends in 2018.  As such, his "predictions" do not account for market activities of the Parties' competitors since the start of 2019 (let alone, following the Merger) nor the effects of Einstein's financial condition.[215]

105.    Dr. Smith also did not utilize any data to determine the relative bargaining strength of the Parties and the commercial insurers.  Instead, he assumed in his model that the bargaining "split" is shared evenly, despite unrebutted evidence that Jefferson and Einstein lack leverage and cannot afford to be out of network with any of the major insurers.[216]

106.    Even without accounting for mitigating factors that would either deter or offset any predicted price increase, Dr. Smith's predicted price increase is small in comparison to other

---

[210] Hr'g Tr. 45:16-18, Sept. 16, 2020 (Dr. Smith, Pls.' Expert).
[211] *Id.* 70:17-22; *see also* Hr'g Tr. 145:3-16, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[212] Hr'g Tr. 69:22-70:6, Sept. 16, 2020 (Dr. Smith, Pls.' Expert).
[213] Hr'g Tr. 143:20-144:2, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[214] Hr'g Tr. 64:18-23, Sept. 16, 2020 (Dr. Smith, Pls.' Expert).
[215] *Id.* 55:15-19; Hr'g Tr. 139:8-16, 151:7-13, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[216] Hr'g Tr. 66:17-19, Oct. 1, 2020 (Dr. Smith, Pls.' Expert).

hospital merger challenges and susceptible to "false positives," *i.e.*, predicting harmful effects that, in reality, do not materialize.[217]

107.    For example, when applied to Jefferson's 2016 merger with Aria, Dr. Smith's UPP model predicts a price increase at Aria post-merger (6.4%), which is similar in size to his estimated price increase at Einstein post-merger (6.9%).[218]  Contrary to the prices predicted using that UPP model, it is undisputed that Aria's *actual* prices post-merger with Jefferson did not increase.[219]

108.    Dr. Smith claims that "any anticompetitive effects [] would be relatively more significant for customers" at *Einstein's* hospitals.[220]  However, Dr. Smith overstates the Merger's overall harm by including estimated price increases at Jefferson hospitals that, according to him, *do not* compete with Einstein hospitals and are *outside* his alleged geographic markets.[221]  For example, TJUH is not in either geographic market, but he nonetheless includes an additional $3.2 million predicted price increase (out of $23.3 million total) at TJUH due to the Merger.[222]

### C.    There is Insufficient Evidence for Plaintiffs' Predicted Material Price Increase for Inpatient Rehab Services.

#### 1.    Commercial Insurers Have Outsized Leverage in Negotiations with Inpatient Rehab Providers.

109.    Very few commercially-insured patients require inpatient rehab services.  Out of the 800,000 total commercial patients that Einstein and Jefferson treated in 2018, Plaintiffs' alleged market for inpatient rehab services focus on a mere ***185*** patients—less than 0.03%.[223]  This small fraction of commercial patients means inpatient rehab services play a very minor role in the Parties' operations, contracts, and commercial payor negotiations.[224]

---

[217] Hr'g Tr. 145:17-147:2, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[218] *Id.* 147:3-148:6.
[219] *Id.* 148:7-150:5.
[220] PX8002, Dr. Smith Rebuttal Report ¶ 52.
[221] DX8000, Dr. Capps Report ¶¶ 484-485; PX8000, Dr. Smith Report ¶¶ 158-160.
[222] DX8000, Dr. Capps Report ¶ 484; PX8000, Dr. Smith Report ¶¶ 184-185.
[223] Hr'g Tr. 288:9-289:23, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-024).
[224] *Id.*

110.    Employers and consumers pay little attention to inpatient rehab services when choosing health plan products.  For example, one large employer, Lower Merion School District, does not select health plans it offers to its employees based on the rehab providers that are in-network.[225] Mr. Staudenmeier of IBC validated this, testifying that "inpatient rehab services isn't something you look at when you're selecting your health plan."[226]

111.    Likewise, inpatient rehabilitation services are not a significant component of forming a network for payors and represent a very small portion of payors' costs.[227]

112.    In addition, mandatory pre-authorization enables commercial insurers to steer inpatient rehab patients to alternative lower-cost providers.[228]



[229]

[230]  Kessler Marlton's CEO similarly testified that commercial insurers are steering rehab patients to lower-cost settings.[231]

### 2.    There Is No Reliable Evidence that the Merger Will Result in a Price Increase for Inpatient Rehabilitation Services.

113.    Dr. Smith uses the UPP model to predict a potential price increase for inpatient rehab services.[232]  However, Dr. Smith's use of the UPP model is based on a theoretical approach (rather than actual price data) and premised on an unsupported assumption that IRFs and insurers

---

[225] JX0051, E. Demkin (LMSD) Dep. Tr. 59:10-14.
[226] Hr'g Tr. 97:3-4, Sept. 14, 2020 (P. Staudenmeier, IBC); *see also* DX8553-002 (listing as a weakness that "PAC is often an afterthought").
[227] Hr'g Tr. 66:3-67:5, Sept. 14, 2020 (K. Markowitz, Cigna); Hr'g Tr. 65:1-66:8, Sept. 30, 2020 (C. McTiernan, former EHN); ▮▮▮▮▮.
[228] Hr'g Tr. 226:17-227:3, Sept. 29, 2020 (M. Seminara, EHN); ▮▮▮▮▮; JX0045, P. Schlichtmann (Kessler) Dep. Tr. 80:22-81:14; ▮▮▮▮▮.
[229] ▮▮▮▮▮.
[230] ▮▮▮▮▮.
[231] JX0045, P. Schlichtmann (Kessler) Dep. Tr. 80:22-81:14.
[232] Hr'g Tr. 136:25-137:3, Sept. 15, 2020 (Dr. Smith, Pls.' Expert); *see also* Hr'g Tr. 295:9-14, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).

have equal bargaining leverage.[233]  This assumption is inapplicable to inpatient rehab services.[234]

114.    Dr. Ramanarayanan, in contrast, uses actual IRF pricing data that were provided to Plaintiffs and Defendants during the course of discovery to predict price effects.[235]

115.    Dr. Ramanarayanan's WTP merger simulation model using real-world IRF prices demonstrates that there is no positive relationship between IRF prices and the bargaining leverage for IRFs and insurers in the greater Philadelphia area.[236]

116.    Dr. Ramanarayanan's WTP merger simulation also demonstrates that there is no reliable evidence that the Merger will result in a price increase for inpatient rehab services.[237]

## IV.    EFFICIENCIES AND OTHER MITIGATING FACTORS OUTWEIGH ANY POSSIBLE HARM ESTIMATED BY PLAINTIFFS.

### A.    The Merger Will Generate Merger-Specific Efficiencies and Cost Savings in the Combined System.

#### 1.    The Parties' Rationalization & Integration Plan, and Jefferson's Track Record of Achieving Savings through Mergers.

117.    The Parties engaged a healthcare consultant to facilitate and support their efforts to identify potential efficiencies and savings opportunities from the Merger, as described above.[238]

118.    Following months of work and hundreds of meetings with the Parties' key leaders and executives, they created their R&I Plan, which identified $45.8 to $84.2 million in annual net cost savings from their Merger.[239]  The Parties' R&I Plan identified potential savings in central services (staffing, supply chain, human resources (employee benefit plans), lines of insurance, information services and technology, financial services, and biomedical services), ancillary

---

[233] Hr'g Tr. 35:8-19, 38:1-13, Sept. 16, 2020 (Dr. Smith, Pls.' Expert); Hr'g Tr. 244:3-7, 296:297:3, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); *see also* Hr'g Tr. 145:3-11, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[234] Hr'g Tr. 296:10-22, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).
[235] *Id.* 244:8-12, 296:23-297:3 (discussing DDX006-023).
[236] *Id.* 244:8-12, 294:1-21, 300:16-301:1 (discussing DDX006-025-027).
[237] *Id.* 294:1-21, 300:16-301:1 (discussing DDX006-027).
[238] Hr'g Tr. 96:11-17, Sept. 30, 2020 (L. Merlis, TJU); *supra* Section I.C.
[239] Hr'g Tr. 94:15-95:1, Sept. 30, 2020 (L. Merlis, TJU); JX0024-011, 023.

services (pharmacy services and laboratory services), and clinical areas of consolidation (the Elkins Park site and the behavioral health, complex elective neurosurgery, complex cardiac surgery, complex ENT surgery, surgical oncology, and transplant services areas).[240]

119.    Jefferson has a proven track record of achieving significant cost savings and integrating new partners following its prior mergers.[241]  To date, Jefferson has realized over $325 million in total cost savings following mergers with Abington Health (2015), Aria Health (2016), Kennedy Health (2017), and Magee (2018).[242]  Jefferson's annual reports identify enterprise-wide savings of $9.5 million in FY2016, $66 million in FY2017, $135 million in FY2018, and $117 million in FY2019.[243]  Jefferson reinvested much of these savings in its community benefit programs.[244]

120.    Applying its experience, Jefferson created its System Integration Playbook, describing guiding principles for integration planning, internal governance, and detailed considerations for integration of corporate departments and clinical services.[245]

### 2.    Analysis of the Parties' Cost Saving Estimates Under the Guidelines.

121.    Defendants' efficiencies expert, Lisa Ahern, analyzed the cost savings the Parties had identified in their R&I Plan under the framework of the Guidelines.[246]  Ms. Ahern's career has been spent advising health care providers on business and integration planning in functional and clinical areas, including following mergers, and she has significant experience analyzing proposed efficiencies in the manner prescribed by the Guidelines.[247]

122.    Ms. Ahern evaluated the Parties' ordinary course data; discussed operating and

---

[240] DX8300-1, L. Ahern Report ¶ 45, Table 2.
[241] Hr'g Tr. 78:21-79:4, 80:4-14, Sept. 30, 2020 (L. Merlis, TJU).
[242] Id. 78:21-79:4, 115:2-7.
[243] Id. 85:9-86:24; DX9344; DX9345; DX9348; DX9351; DX9532; DX9533.
[244] Hr'g Tr. 89:1-18, Sept. 30, 2020 (L. Merlis, TJU).
[245] Id. 81:1-21, 82:6-84:12; DX9371-004-008.
[246] Hr'g Tr. 163:16-164:2, Sept. 30, 2020 (L. Ahern, Defs.' Expert); *see generally* DX8300-1, L. Ahern Report.
[247] Hr'g Tr. 153:13-17, 154:17-155:23, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶¶ 1-2.

integration plans with executives; calculated efficiencies and one-time costs for each functional

area; and confirmed her results with functional leaders at the Parties.[248] Ms. Ahern reviewed

Jefferson's track record of achieving savings through its past mergers, along with Jefferson's

Playbook, and found Jefferson's actual experience and plans corroborated her methodology.[249]

123.    Applying this methodology, Ms. Ahern found that the Merger will result, conservatively,

in $58.1 million in annual recurring, verifiable, and merger-specific net efficiencies within four

years post-merger.[250]

124.    The savings Ms. Ahern verified are consistent with her own real-world experience

working with health care providers on post-merger integrations.[251]  For example, when

identifying efficiencies resulting from supply chain integration, Ms. Ahern relied on her "real

world" experience working with health care providers in contracting with their suppliers as the

basis for her "exact match" analysis.[252]  Ms. Ahern's experience is also consistent with

Jefferson's past practice following prior mergers.[253]

125.    Jefferson's prior track record of achieving savings through its past mergers also

corroborated its ability to realize the opportunities set forth in the Parties' R&I Plan; Ms. Ahern

reviewed this track record, along with Jefferson's Playbook, to further substantiate the Parties'

ability to achieve the identified savings opportunities.[254]

126.    The $58.1 million in total efficiencies are merger-specific because they can only be

achieved through this Merger and are unique to the Parties' business practices and plans, as

---

[248] Hr'g Tr. 168:2-169:9, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶ 42.

[249] Hr'g Tr. 160:4-21, 162:8-15, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶ 10.

[250] Hr'g Tr. 167:12-18, 172:8-24, 177:22-178:22, 197:7-16, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶ 8.

[251] Hr'g Tr. 176:13-177:21, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶ 43.

[252] Hr'g Tr. 176:3-177:21, Sept. 30, 2020 (L. Ahern, Defs.' Expert).

[253] Hr'g Tr. 174:13-176:2, 176:13-19, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶¶ 64-66.

[254] Hr'g Tr. 160:4-21, 162:8-15, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶ 10.

shown in their ordinary course data and documents.[255]  Einstein's CEO testified that it has done everything it can alone to cut costs—only through a Jefferson merger are these efficiencies achievable.[256]  There is no credible evidence to suggest another partner exists that could achieve efficiencies of the type and scope identified here.[257]

127.    The Parties' plans to reduce costs from clinical service consolidation will enhance services, not reduce output.[258]  Unrebutted testimony establishes that these plans will increase rehab services at Moss at Elkins Park and expand access to outpatient and specialist services that are not provided there today.[259]  The plans to rationalize complex neurosurgery, cardiovascular, and transplant procedures will also improve quality and patient experience without diminishing access.[260]  Dr. Smith admits that there may be benefits from the clinical rationalization plans of the Parties,[261] but he did not analyze the additional benefits from these plans and he has no experience measuring the quality or access benefits that will inure to patients from them.[262]

128.    Plaintiffs' efficiencies expert, Christine Hammer, is an accountant who has no prior experience working for or advising any type of health care provider.[263]  Ms. Hammer, however, expressly agreed that at least $16 million of the $58.1 million of efficiencies were verifiable and merger-specific (including in the areas of staffing, purchasing, human resources (employee benefit plans), insurance, and financial services), and her testimony did not dispute other savings identified by Ms. Ahern (e.g., medical benefit plan savings).[264]

---

[255] Hr'g Tr. 167:12-18, 172:1-4, 179:21-180:2, 189:18-20194:20-23, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶ 43.
[256] Hr'g Tr. 134:12-25, Sept. 16, 2020 (B. Freedman, EHN); DX8300-1, L. Ahern Report ¶ 43.
[257] Hr'g Tr. 134:3-25, Sept. 16, 2020 (B. Freedman, EHN); DX8300-1, L. Ahern Report ¶ 44.
[258] Hr'g Tr. 80:11-81:3, 82:21-83:10, Sept. 29, 2020 (B. Meyer, TJU); DX8300-1, L. Ahern Report ¶ 154.
[259] Hr'g Tr. 80:11-81:3, 82:21-83:10, Sept. 29, 2020 (B. Meyer, TJU); Hr'g Tr. 191:2-11, Sept. 30, 2020 (L. Ahern, Defs.' Expert); DX8300-1, L. Ahern Report ¶ 154.
[260] Hr'g Tr. 77:11-23, Sept. 29, 2020 (B. Meyer, TJU).
[261] Hr'g Tr. 83:18-84:23, Oct. 1, 2020 (Dr. Smith, Pls.' Expert).
[262] Id. 58:20-59:2, 79:24-82:14.
[263] Hr'g Tr. 266:1-267:18, Sept. 30, 2020 (C. Hammer, Pls.' Expert).
[264] Id. 240:12-20; PX8003, C. Hammer Rebuttal Report ¶¶ 12, 14.

33

129.     Ms. Hammer made numerous errors in her analysis rejecting certain efficiencies,

reflecting her lack of experience in the health care provider space.[265]  For example, Ms. Hammer

assumed a "best contract" was a more appropriate way of calculating supply chain efficiencies,

ignoring hospital industry practice and Jefferson's own experience.[266]  As for financial services,

Ms. Hammer acknowledged that Jefferson's larger investment portfolio would result in lower

fees, but she failed to quantify what those savings would be and credit them.[267]

130.     At the same time, Ms. Hammer's approach is inconsistent with the Guidelines.  For

example, Ms. Hammer verified portions of certain merger-specific savings, such as for

laboratory products, but nonetheless did not credit them to the Parties.[268]

131.     The Guidelines recognize, and Dr. Smith admitted, that it is proper to include both

variable *and* fixed cost savings as efficiencies that offset alleged competitive harm.[269]  His claim

that $58.1 million in efficiencies is insufficient to "offset" his $26.4 million in predicted harm is

based on a narrow view of the variable costs of serving a single additional patient.  Economic

logic and the Guidelines indicate that incremental costs are those that vary with a hospital's

addition or loss of a contract with an insurer—not just from serving one more patient.[270]  Dr.

Smith's crediting of only a limited set of incremental cost reductions verified by Ms. Ahern does

not capture the full set of incremental costs relevant to negotiations with payors.[271]

**B.     Other Mitigating Factors Outweigh Any Potential Harm.**

132.     In addition to efficiencies, there are other mitigating factors here that were not considered

---

[265] Hr'g Tr. 266:23-267:18, Sept. 30, 2020 (C. Hammer, Pls.' Expert).
[266] Hr'g Tr. 174:13-176:2, 179:3-20, Sept. 30, 2020 (L. Ahern, Defs.' Expert); Hr'g Tr. 270:12-19, 272:14-273:20, Sept. 30, 2020 (C. Hammer, Pls.' Expert).
[267] Hr'g Tr. 187:6-15, Sept. 30, 2020 (L. Ahern, Defs.' Expert); Hr'g Tr. 274:1-275:5, Sept. 30, 2020 (C. Hammer, Pls.' Expert).
[268] PX8003, C. Hammer Rebuttal Report ¶ 31.
[269] Hr'g Tr. 80:23-81:23, Oct. 1, 2020 (Dr. Smith, Pls.' Expert)
[270] Hr'g Tr. 202:12-203:8, Sept. 29, 2020 (Dr. Capps, Defs.' Expert); *Guidelines* § 2.2.1.
[271] Hr'g Tr. 202:12-203:8, Sept. 29, 2020 (Dr. Capps, Defs.' Expert); DX8000, Dr. Capps Report ¶¶ 461-464.

by Dr. Smith in his analysis of predicted price effects from the Merger.[272]  For example, repositioning by competitor systems—such as ███████████████████████ or Main Line opening an eight-story patient pavilion at Bryn Mawr—will increase inpatient volume to ███ and Main Line's GAC hospitals at the expense of Einstein, Jefferson, and others.[273]

133.    While competing health systems have recently made or are in the process of making capital investments and expansions costing tens or hundreds of millions of dollars, Einstein has lagged far behind by making only modest investments, such as the installation of a metal detector at EMCP and a trailer at EMCM for observation patients.[274]

134.    EMCP's unfavorable payor mix, causing its lack of competitive investments, also places the safety-net hospital at greater risk of closure.[275]  Very few comparably-sized hospitals nationwide have a payor mix as unfavorable as EMCP's, and hospitals in the Philadelphia area with a similar payor mix have either closed or are at risk of closure absent outside assistance.[276]

135.    IRF entry and expansion does not require substantial time or expense.  St. Mary Rehab constructed a new, state-of-the-art 50-bed freestanding IRF in only 13 months for approximately $20 million.[277]  Tower opened its 14-bed hospital-based IRF at Phoenixville for $4 million.[278]

136.    Moreover, in the event of a potential price increase post-merger, high-end SNFs are also able to rapidly enhance their capabilities to further expand the scope and intensity of their inpatient rehab services.[279] ██████████████████████████████████

---

[272] Hr'g Tr. 150:6-151:13, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).

[273] *Id.* 139:17-141:14; *see also* DX8509; JX0065, L. Gustave (Penn) Dep. Tr. 67:21-68:6, 72:12-20; ███████; JX0034, M. Buongiorno (MLH) Dep. Tr. 146:18-149:7, 164:16-165:12.

[274] Hr'g Tr. 141:15-142:19, Sept. 29, 2020 (Dr. Capps, Defs.' Expert); Hr'g Tr. 62:13-24, Sept. 16, 2020 (Dr. Smith, Pls.' Expert).

[275] Hr'g Tr. 154:21-155:24, 161:5-162:2, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).

[276] *Id.* 159:4-162:2.

[277] Hr'g Tr. 152:10-14, 155:17-22, Sept. 14, 2020 (L. Staback-Haney, St. Mary Rehab); Hr'g Tr. 305:2-10, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-029).

[278] Hr'g Tr. 304:15-22, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert) (discussing DDX006-029).

[279] *See supra* Section II.B.1; Hr'g Tr. 218:7-219:2, 227:14-228:10, Sept. 29, 2020 (M. Seminara, EHN); Hr'g Tr. 303:8-304:14, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert).

████████████████████████████████████████████████[280]

137.    Jefferson has established programs and investments to improve quality across its system, including its prior merger partners.[281]  Jefferson has reviewed Einstein's quality performance and is confident that with the Merger, it will be able to improve quality at Einstein's facilities, while sustaining EMCP's role as a vital community resource.[282]

## V.    EINSTEIN IS A WEAKENED COMPETITOR.

### A.    Einstein's Financial Condition and Weakened Competitive Position Undermine Any Presumption of Illegality.

138.    Einstein is a weakened competitor and its competitive position is declining.[283]  Its financial condition prohibits the investments necessary to attract more commercial patients.[284] Einstein struggles to maintain services and quality; its peers are investing aggressively.[285]

139.    Einstein's market share of commercial patients calculated using historical data overstate Einstein's current and future competitive significance.[286]

### B.    Einstein's Financial Problems Are Significant and It Lacks Needed Cash.

140.    Despite undertaking financial improvement measures, Einstein's expenses continue to outpace its revenue.[287]  Meanwhile, Einstein's obligations are mounting.[288]

141.    While Einstein's mission is to provide quality care to vulnerable patient populations,[289]

---

[280] ████████.
[281] Hr'g Tr. 72:25-75:3, Sept. 29, 2020 (B. Meyer, TJU).
[282] Id. 75:4-76:3.
[283] Hr'g Tr. 302:10-18, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); Hr'g Tr. 141:15-142:25, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[284] Hr'g Tr. 255:25-256:36, Sept. 16, 2020 (T. Patnode, Defs.' Expert); Hr'g Tr. 106:24-107:6, 111:14-21, Sept. 16, 2020 (B. Freedman, EHN).
[285] Hr'g Tr. 255:24-256:19, 275:8-11, Sept. 16, 2020 (T. Patnode, Defs.' Expert); Hr'g Tr. 141:15-142:25, Sept. 29, 2020 (Dr. Capps, Defs.' Expert) (discussing DDX005-035); Hr'g Tr. 112:9-16, Sept. 16, 2020 (B. Freedman, EHN).
[286] Hr'g Tr. 302:19-21, Sept. 29, 2020 (Dr. Ramanarayanan, Defs.' Expert); Hr'g Tr. 139:17-141:14, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[287] Hr'g Tr. 286:4-7, Sept. 16, 2020 (T. Patnode, Defs.' Expert).
[288] Id. 270:5-272:7 (discussing DDX003-017).
[289] Hr'g Tr. 182:3-8, Sept. 16, 2020 (R. Lefton, EHN); Hr'g Tr. 104:20-105:14, Sept. 16, 2020 (B. Freedman, EHN).

the primary cause of its financial distress is its flagship hospital in North Philadelphia, EMCP.[290]

142.    EMCP's payor mix does not generate enough revenue to cover its costs.  EMCP, with an 87% government payor mix—above the 90th percentile nationally—represents 65% of Einstein's revenues.[291]  Each government-insured patient that Einstein cares for generates a negative margin.[292]  These losses have averaged approximately $30 million per year since 2017.[293]

143.    EMCP's payor mix is worsening and unlikely to improve.[294]

144.    Over a decade ago, Einstein recognized that it had to diversify its assets in order to subsidize EMCP.[295]  It did so by incurring over $453 million in bond debt to build EMCM.[296]

145.    Einstein's profits from EMCM and its other business units are insufficient to offset EMCP's losses; the capacity constraints of EMCM and Moss limit creation of additional profit.[297]  Expansion requires cash that EHN lacks, limiting its future competitive significance.[298]

146.    Einstein cannot access capital due to its poor credit profile:  Einstein's credit rating is non-investment grade, and any new debt issuance would be subordinated to its existing $441 million in bond debt.[299]  Market surveys indicate that Einstein cannot issue new debt.[300]

147.    Einstein has conserved cash to prioritize near term financial obligations, but its deferred expenses can no longer be ignored.[301] Einstein minimally funds its pension plan, and its facilities

---

[290] Hr'g Tr. 261:20-22, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-006, 007).
[291] *Id.* Tr. 262:12-263:8 (discussing DDX003-007-008); Hr'g Tr. 108:6-22, Sept. 16, 2020 (B. Freedman, EHN); DDX005-044.
[292] DDX003-006; Hr'g Tr. 39:24-40:2, Sept. 30, 2020 (C. McTiernan, former EHN).
[293] Hr'g Tr. 264:4-14, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-006).
[294] Hr'g Tr. 110:17-11:6, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 141:19-142:19, Sept. 29, 2020 (Dr. Capps, Defs.' Expert).
[295] Hr'g Tr. 113:21-114:10, Sept. 16, 2020 (B. Freedman, EHN).
[296] *Id.* 110:12-16; DX8791.
[297] Hr'g Tr. 112:1-8, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 268:14-21, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-011-012).
[298] Hr'g Tr. 268:22-269:23, Sept. 16, 2020 (T. Patnode, Defs.' Expert); Hr'g Tr. 112:1-5, Sept. 16, 2020 (B. Freedman, EHN).
[299] Hr'g Tr. 269:6-10, 269:21-23, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-017); Hr'g Tr. 109:6-12, Sept. 16, 2020 (B. Freedman, EHN).
[300] Hr'g Tr. 269:11-23, Sept. 16, 2020 (T. Patnode, Defs.' Expert); DX8780.
[301] Hr'g Tr. 277:12-17, 278:13-22 Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-017).

and equipment are deteriorating due to inadequate capital spending.[302]  Despite conserving cash, Einstein's cash balance has deteriorated by $82.5 million, or almost 21%, since 2016.[303]

148.    Einstein cannot reduce its salaries and benefit expenses without losing clinical staff to area rivals that pay more.[304]  At the same time, Einstein has not received rate increases from the government or commercial insurers that keep up with inflationary costs.[305]  In fact, Einstein's largest commercial payor, IBC, reduced the rates it will pay to Einstein beginning 2021.[306]

### C.    Einstein's Ability to Compete Will Be Curtailed Because It Cannot Make Capital Investments Due to Its Worsening Financial State.

149.    Einstein's asset replacement ratio—which measures capital expenditures as a percentage of depreciation expense—has declined from 90% to 60% in the last five years.[307]  A ratio under 100% indicates that Einstein is not replacing its assets as they degrade.[308]  Its local peers have asset ratios well over 100%, reflecting the growth and competitiveness of rival health systems.[309]

150.    Unable to make adequate investments in its aging infrastructure, Einstein has experienced operational disruptions.[310]  For example, Einstein's deferral of maintenance on EMCP's electrical substation lead to a fire that cut power to EMCP and required the hospital to run on emergency generators for days, reducing its capacity to care for patients.[311]

151.    Einstein lacks the resources to retain or attract more commercial patients; expecting that its employees will continue to "make 2 plus 2 equal 10 every day" is not a viable plan.[312]

---

[302] *Id.* 270:5-10; Hr'g Tr. 191:8-193:19, Sept. 16, 2020 (R. Lefton, EHN) (describing major facility issues that resulted from an inability to proactively fix infrastructure).
[303] Hr'g Tr. 277:8-22, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-013, 017).
[304] Hr'g Tr. 201:17-202:7, Sept. 16, 2020 (R. Lefton, EHN).
[305] *Id.* 185:6-18; Hr'g Tr. 50:13-18, Sept. 30, 2020 (C. McTiernan, former EHN).
[306] Hr'g Tr. 50:19-51:13, Sept. 30, 2020 (C. McTiernan, former EHN) (testifying that net effect of new IBC contract is loss of $20 million in revenue).
[307] Hr'g Tr. 275:12-18, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-014).
[308] *Id.* 271:3-11; Hr'g Tr. 112:9-16, Sept. 16, 2020 (B. Freedman, EHN).
[309] Hr'g Tr. 275:12-18, Sept. 16, 2020 (T. Patnode, Defs.' Expert) (discussing DDX003-014, 015).
[310] Hr'g Tr. 188:17-24, Sept. 16, 2020 (R. Lefton, EHN).
[311] *Id.* 191:23-192:7.
[312] *Id.* 184:21-23.

152.    Einstein is caught in a vicious cycle caused by its inability to invest in its facilities, which drives away commercial customers and limits Einstein's ability to expand at EMCM.[313]

153.    Einstein's financial condition has deteriorated to a point that it will not be able to continue as a stand-alone entity without cutting services.[314]  Einstein will be required to identify service lines to discontinue, forcing patients (commercial or otherwise) to seek care elsewhere.[315]

**D.    There Are No Other Competitive Means Available to Address Einstein's Weakening Position Other Than Merging with Jefferson.**

154.    Throughout the past decade, Einstein sought to offset the growing losses at EMCP through internal initiatives including (a) reducing its workforce to as lean as possible under regulatory requirements; (b) engaging in dozens of margin improvement efforts; and (c) diversifying its patient portfolio by opening EMCM.[316]

155.    Einstein also considered whether it could offload its profitable assets such as EMCM and Moss, but after a lengthy evaluation involving Kaufman Hall, Einstein determined that the significant debt tied to these assets would result in a negligible principal sale that would leave EMCP without sufficient liquid capital to avoid an imminent "death spiral."[317]

156.    Einstein's board of trustees determined that remaining independent was no longer an option, and they needed a strategic partner to survive.[318]

157.    Einstein's early partner search efforts proved unsuccessful.  From 2010 to 2015, it explored opportunities with a number of area health systems including Temple, Tenet, and

---

[313] Hr'g Tr. 111:14-21, Sept. 16, 2020 (B. Freedman, EHN); JX0035, G. Blaney (EHN) Dep. Tr. 65:25 ("We're going to work our way out of existence because we don't have enough capital to compete.").
[314] Hr'g Tr. 255:7-11, Sept. 16, 2020 (T. Patnode, Defs.' Expert).
[315] Hr'g Tr. 206:21-24, Sept. 16, 2020 (R. Lefton, EHN); Hr'g Tr. 37:16-19, Sept. 30, 2020 (C. McTiernan, former EHN); Hr'g Tr. 285:16-23, Sept. 16, 2020 (T. Patnode, Defs.' Expert); Hr'g Tr. 134:19-25, Sept. 16, 2020 (B. Freedman, EHN).
[316] Hr'g Tr. 110:2-16; 113:19-114:12, Sept. 16, 2020 (B. Freedman, EHN).
[317] Id. 117:18-118:8; DX8671-012.
[318] Hr'g Tr. 115:17-20, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 221:2-5, Sept. 16, 2020 (A. Maksimow, Kaufman Hall).

CHS.[319]  None of these opportunities led to a successful partnership.

158.    In 2016, Einstein's board of trustees retained Kaufman Hall, a national healthcare M&A firm, to evaluate Einstein's strategic goals and to advise Einstein as to its strategic options, including whether it could remain a viable independent entity.[320]  Kaufman Hall concluded that Einstein could not remain independent and it initiated a formal search for a partner.[321]

159.    In exercising their fiduciary duties, Einstein's trustees determined that a suitable partner must (1) commit to supporting Einstein's mission of serving the impoverished community around EMCP; (2) have sufficient scale to reduce its expenses through synergies; (3) have access to capital in order to keep Einstein competitive; and (4) support Einstein's academic mission.[322]

160.    After developing a detailed plan, Einstein and Kaufman Hall considered more than 20 potential partners before narrowing down to a list of 17.[323]  They then contacted these entities, supplying interested entities with a confidential information memorandum and questionnaire.[324]

161.    Einstein decided not to pursue a public auction process because Kaufman Hall advised that a broad, targeted but confidential search would achieve the same effective result without the added strains of disruption to physicians and staff that would come with a public process.[325]  A public auction process would have accelerated Einstein's deteriorating financial state.[326]

162.    Einstein engaged in discussions with UPMC, but UPMC expressed concern about its financial state and imposed contingencies on a merger that Einstein could never meet.[327] Additionally, IBC, worried about UPMC's competing insurance products, threatened Einstein

---

[319] Hr'g Tr. 119:5-120:11; 120:22-121:19; 122:23-123:7; 130:14-131:6, Sept. 16, 2020 (B. Freedman, EHN).
[320] DX8605.
[321] Hr'g Tr. 220:16-221:5, Sept. 16, 2020 (A. Maksimow, Kaufman Hall).
[322] Hr'g Tr. 124:17-125:12, Sept. 16, 2020 (B. Freedman, EHN).
[323] Id. 126:1-1; DX9531-002-004.
[324] See DX8545.
[325] Hr'g Tr. 246:11-248:7, Sept. 16, 2020 (A. Maksimow, Kaufman Hall); JX0038, L. Reichlin (EHN) Dep. Tr. 52:19-53:8.
[326] Hr'g Tr. 246:22-247:18, Sept. 16, 2020 (A. Maksimow, Kaufman Hall).
[327] See DX8504; Hr'g Tr. 133:1-22, Sept. 16, 2020 (B. Freedman, EHN).

with effectively removing them from its network if Einstein merged with UPMC.[328]

163.    Einstein considered for-profit systems as well, but these systems generally do not have the strong balance sheet needed to revitalize Einstein's facilities, and many, including Prospect, have a history of abandoning safety net hospitals, a key concern for Einstein's trustees.[329]

164.    Einstein had similar concerns about Trinity's desire and financial ability to keep EMCP in the market.  When Einstein began searching for a partner, Trinity was in divestment mode and had sold Mercy Suburban Hospital to a for-profit entity.[330]  More recently, Trinity announced the closure of Mercy Philadelphia, another area safety net hospital, as well as their Mercy hospital on the South Side of Chicago with a challenging payor mix similar to EMCP's.[331]

165.    Others, solicited by Plaintiffs, were only interested in Einstein's attractive assets, not the whole system.[332]  When asked about ███████ interest in acquiring EMCP, ███████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████[333]  Tower has also reported significant losses in recent years.[334]

166.    After an exhaustive decade-long search, Jefferson remains the only strategic partner with a strong balance sheet that is committed to maintaining Einstein's academic and charitable mission of caring for the North Philadelphia community.[335]

---

[328] Hr'g Tr. 131:13-132:5, Sept. 16, 2020 (B. Freedman, EHN); Hr'g Tr. 53:4-55:4, Sept. 30, 2020 (C. McTiernan, former EHN).

[329] Hr'g Tr. 223:3-20, Sept. 16, 2020 (A. Maksimow, Kaufman Hall); Hr'g Tr.151:22-152:1, Sept. 16, 2020 (B. Freedman, EHN); *see* DX9529 (Prospect's FY2019 financials illustrating distressed cash balance and closing of two safety net hospitals); DX1408 (letter from Congressional members to Prospect's private equity stakeholders).

[330] Hr'g Tr. 222:16-223:2, Sept. 16, 2020 (A. Maksimow, Kaufman Hall).

[331] Hr'g Tr. 177:11-20, Sept. 16, 2020 (B. Freedman, EHN); DX1610; Lisa Schencker, *Mercy Hospital & Medical Center Closing*, Chicago Trib. (July 29, 2020), https://www.chicagotribune.com/business/ct-biz-mercy-hospital-closing-20200729-dql6xd36g5dazkzviq3upyukvi-story html (Trinity announced closure of another safety net hospital located in Chicago, Illinois in late July 2020).

[332] *See* DX8505 (Penn only expressed interest in acquiring EMCM and Moss).

[333] ██████████████████████████████████████.

[334] Hr'g Tr. 177:4-7, Sept. 16, 2020 (B. Freedman, EHN).

[335] *Id.* 134:3-11; Hr'g Tr. 55:4-8, Sept. 29, 2020 (S. Klasko, TJU).

<u>CONCLUSIONS OF LAW</u>

I.   <u>PLAINTIFFS FAIL TO SHOW LIKELIHOOD OF SUCCESS ON THE MERITS.</u>

    A.   **Plaintiffs Have the Burden of Persuasion at All Times.**

1.   Section 7 of the Clayton Act prohibits mergers and acquisitions the effect of which "may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18.

2.   Under § 13(b) of the FTC Act, the FTC bears the burden of persuasion that a requested injunction is "in the public interest" after "weighing the equities and considering the Commission's likelihood of ultimate success" in proving a violation of Section 7. 15 U.S.C. § 53(b); *see also FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016).

3.   "The Clayton Act is concerned with 'probable' effects on competition, not with 'ephemeral possibilities.'" *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 122 (1975) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)).  To establish a likelihood of success, Plaintiffs must therefore show that "there is reasonable probability that the merger will substantially lessen competition." *Brown Shoe*, 370 U.S. 294, 325 (1962).

4.   Plaintiffs "must (1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *Penn State Hershey*, 838 F.3d at 337-38.  Only if Plaintiffs properly define a relevant product and geographic market, and demonstrate undue concentration in that market, are they entitled to a presumption that the Merger is anticompetitive. *Id.*; *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990).

5.   Defendants can rebut a presumption that the Merger is anticompetitive based solely on Plaintiffs' claimed market shares and concentration by showing that anticompetitive effects are unlikely. *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974).  Defendants' rebuttal burden is one of production. *Baker Hughes*, 908 F.2d at 982-83, 991.  If Defendants rebut this presumption, "the burden of producing additional evidence of anticompetitive effect

shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Id.*; *accord Penn State Hershey*, 838 F.3d at 337.

### B.    Plaintiffs Failed to Establish a Presumption the Merger is Anticompetitive.

6.    Plaintiffs failed to meet their burden to properly define any relevant geographic market for GAC services, nor any product *or* geographic market for inpatient rehab services.  These failures are fatal.  *See Penn State Hershey*, 838 F.3d at 338.

7.    ***GAC Services***.  To establish a geographic market, Plaintiffs must show the "area in which a potential buyer may rationally look for the goods or services he seeks."  *Id.* at 338 (internal quotations omitted).  The "Hypothetical Monopolist Test" is one method of doing so.  *Id.* at 339; *Guidelines* § 4.2.1.  The Guidelines instruct that close competitors be included in the geographic market, even if a hypothetical monopolist excluding them could impose a "SSNIP."  *Guidelines* §§ 4.2.1, 4.1.1 Ex. 6.  The Guidelines also use the HHI metric, which is calculated by summing the squares of the relevant firms' market shares, as a measure to calculate market concentration. Mergers that result in post-merger HHIs above 2,500 through an increase in HHI of over 200 are presumed to enhance market power.  *Guidelines* § 5.3.

8.    The alleged Northern Philadelphia and Montgomery Areas betray these instructions. Each ignores the "commercial realities of the industry" and arbitrarily excludes nearby, substitute hospitals to which insurers "can practicably turn" to obtain GAC services.  *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963).  And when correcting for Dr. Smith's flaws—by using drive times over drive distances and using patient-based shares over hospital-based shares—the post-merger HHI in each alleged geographic market is below the 2,500 threshold.  Plaintiffs are therefore not entitled to a presumption of enhanced market power.  *See FTC v. Freeman Hosp.*, 911 F. Supp. 1213, 1222 (W.D. Mo.), *aff'd*, 69 F.3d 260 (8th Cir. 1995). Moreover, neither payor nor employer testimony demonstrates insurers "could not successfully

market a plan" without Einstein or Jefferson in the Northern Philadelphia or Montgomery Areas;

rather, faced with a SSNIP, insurers would "avoid the price increase by looking to hospitals

outside [Plaintiffs'] proposed market." *Penn State Hershey*, 838 F.3d at 342-343.

9.      ***Inpatient Rehab Services***.  Plaintiffs' proposed relevant product market of "inpatient

acute rehabilitation services" fails out of the gate.  It systematically excludes SNFs offering

services that are "reasonably interchangeable . . . for the same purposes" with those included in

Plaintiffs' proposed market.  *Novak v. Somerset Hosp.*, 625 Fed. App'x 65, 67 (3d Cir. 2015).

10.      Courts have aggregated disparate services into a "cluster" market "if the cluster is itself

an object of consumer demand," *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d

911, 918 (7th Cir. 2020) (quotation omitted), and if "that combination reflects commercial

realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572-73 (1966).  Such product markets

are defined based on the nature of the product or service, not based on the identity of their

suppliers.  *See PSKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 418 (5th Cir.

2010); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir.

1991); *Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 423 (M.D. Pa. 2003), *aff'd*, 423 F.3d

184 (3d Cir. 2005).  Here, Plaintiffs improperly limit the cluster of inpatient rehab services to

those only provided by IRFs and exclude interchangeable services provided by SNFs.

Undisputed testimony establishes that both IRFs and SNFs are part of the "purchase decision"—

where to obtain inpatient rehab services—patients make, and should be included in any product

market for rehab services.  *Weiss v. York Hosp.*, 745 F.2d 786, 826-27 (3d Cir. 1984).

11.      Plaintiffs' alleged geographic market for inpatient rehab services also fails.  Plaintiffs

exclude key competitors of Moss and Magee, contrary to ordinary course documents and

testimony.  When correcting for Dr. Smith's flaws—by removing erroneously included auto-

insurance patients from Magee's market share and properly accounting for Kessler's expansion

—the HHI market concentration levels are below the 2,500 threshold, even for IRFs alone.

### C. Plaintiffs Have Not Established that Anticompetitive Effects Are Likely.

12.     Setting aside Plaintiffs' failure to make a prima facie case on market-share statistics, which are not themselves "conclusive indicators of anticompetitive effects," "a further examination" of Philadelphia's market realities, including its "structure, history and probable future," demonstrates that such effects are unlikely. *General Dynamics*, 415 U.S. at 498.

13.     Plaintiffs' central claim of anticompetitive harm is that the merged entity will be able to "unilaterally" charge higher prices to commercial insurers. Plaintiffs' underlying economic analysis is flawed, unreliable, and contrary to the evidence. Payors' current ability to resist price increases (or impose price decreases) on the Parties will not change post-merger, as each payor has identified substitutes to both Einstein and Jefferson. Any suggestion that the addition of Einstein with its 80% government-payor mix will materially increase Jefferson's bargaining leverage is unrealistic. In addition, inpatient rehab services play a minor role in health-plan negotiations, and payors have significant leverage to steer patients to preferred facilities.

14.     Competitive responses by Jefferson's and Einstein's competitors (*i.e.*, "repositioning"), such as adding new inpatient beds and outpatient facilities to attract area patients, will further constrain the Parties' ability to raise prices. *See Penn State Hershey*, 838 F.3d at 351-52.

15.     Plaintiffs' economic analysis (namely Dr. Smith's UPP model) completely overlooks these and other factors, and further suffers from data limitations—for instance, by ignoring all post-2018 market developments. It is unreliable and is insufficient evidence of a price increase.

### D. Substantial Consumer Benefits Will Result from this Merger and Outweigh Plaintiffs' Estimate of Potential Harm.

16.     Defendants' showing of procompetitive efficiencies that will generate substantial cost savings and sustain EMCP further weighs against Plaintiffs' claim of anticompetitive effects.

17.     Courts have often considered such procompetitive efficiencies when analyzing the effects

of a merger, to determine whether they overcome a presumption of illegality.  *See New York v. Deutsche Telekom AG (T-Mobile/Sprint)*, 439 F. Supp. 3d 179, 207-08 (S.D.N.Y. 2020).

18.      Anti-competitive effects can be offset by efficiencies that are "merger specific," *i.e.*, "cannot be achieved by either company alone"; "verifiable, not speculative"; and do not arise from "anticompetitive reductions in output or service."  *Penn State Hershey*, 838 F.3d at 348-49.

19.      The efficiencies here meet these criteria.  Efficiencies are procompetitive if they, for example, "lower[] prices or improv[e] the quality of services."  *Penn State Hershey*, 838 F.3d at 350.  Here, the efficiencies would reduce costs and allow the combined Jefferson-Einstein to reduce its prices to commercial insurers, improve quality of care, and sustain EMCP (including in the face of declining government reimbursement rates).  *See Penn State Hershey*, 838 F.3d at 350.  Efficiencies are merger-specific where "they 'cannot be achieved by either company alone' as otherwise those benefits could be achieved 'without the concomitant loss of a competitor.'"  *Penn State Hershey*, 838 F.3d at 348.  The efficiencies in this case cannot be achieved by Einstein or Jefferson alone, nor is there any other partner who could achieve such efficiencies with Einstein.  Efficiencies are verifiable if they are "not speculative" and are "shown in what economists label 'real' terms." *Penn State Hershey*, 838 F.3d at 348–49 (internal quotations omitted).  The efficiencies here have been verified by expert analysis, and are supported by Jefferson's track record of achieving efficiencies in prior mergers.  *See Guidelines* § 10 ("efficiency claims substantiated by analogous past experience are those most likely to be credited"); *Commentary on the Horizontal Merger Guidelines* at 52.  Lastly, the efficiencies in this case do not arise from any sort of anticompetitive reductions in output or service. Defendants' plans to reduce costs and rationalize clinical services will preserve Einstein's hospitals and will enhance the services it offers patients while improving overall quality.

20.      "[E]fficiencies are most likely to make a difference in merger analysis when the likely

adverse competitive effects, absent the efficiencies, are not great." *Guidelines* § 10.  That is surely the case here, to the extent there are *any* adverse competitive effects.  Models correcting for Dr. Smith's errors show, at most, a post-merger price increase of $23.3 million for GAC services (with no price increase for inpatient rehab services), which would be more than outweighed by the $58.1 million in efficiencies verified by Ms. Ahern.[336]

### E.    Plaintiffs Have Overstated Einstein's Future Competitive Significance.

21.    Defendants may rebut a presumption of illegality by showing "the acquired firm's current market shares overstate its future competitive significance due to its weak financial condition." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 153 (D.D.C. 2004); *see also United States v. Int'l Harvester Co.*, 564 F.2d 769, 773-79 (7th Cir. 1977); *T-Mobile/Sprint*, 439 F. Supp. 3d at 217.

22.    "Courts have identified a variety of conditions that may render statistical market share evidence misleading, including a firm's lack of resources required to compete long-term, financial difficulties that constrain the firm from improving its competitive position, and poor brand image and sales performance."  *T-Mobile/Sprint*, 439 F. Supp. 3d at 217.

23.    Einstein has suffered consistent losses year after year; its credit rating has been reduced to "junk bond" status, limiting access to needed capital; and Einstein has deferred maintenance and avoided the investments necessary to remain competitive.  Defendants have shown that if the Merger does not proceed, Einstein's competitive significance will continue to erode, as it is forced to cut services or close facilities.  The only path to avoid these realities is the Merger. Combined with the efficiencies likely to be gained from the Merger and the other dynamics of the Philadelphia market ignored by Plaintiffs' economists, Einstein's precarious "future ability to compete" shows that any anticompetitive effect estimated by Plaintiffs' models is overstated and outweighed by other factors.  *General Dynamics*, 415 U.S. at 503.

---

[336] PX8000, Dr. Smith Report ¶ 185.

## II.   **THE BALANCE OF EQUITIES WEIGH AGAINST THE INJUNCTION.**

24.   Even if Plaintiffs could show a likelihood of success, the Court "must still weigh the

equities in order to decide whether enjoining the merger would be in the public interest." *Penn*

*State Hershey*, 838 F.3d at 352.   Regardless of Plaintiffs' likelihood of success, the balance of

equities weighs against enjoining the Merger.   The equities analysis turns on "whether the harm

that the Hospitals will suffer if the merger is delayed will . . . harm the public more than if the

injunction is not issued." *Id*.   Private and public equities may be considered.   *Id*.

25.   Issuance of the injunction here will derail the Merger.   This would result in the further

erosion of Einstein's financial position, leading Einstein to cut services, dismantle the system,

and eventually close EMCP.   Conversely, denying the injunction would strengthen Einstein's

financial position and preserve—even *improve*—the medical care it provides.

26.   Denying the injunction would also preserve the academic affiliation between Jefferson

and Einstein, and the many clinical training opportunities for Jefferson students that this

represents.   Preserving the financial viability of Einstein and its status as an academic medical

center avoids a potentially harmful drop in the overall number of such opportunities for

Philadelphia-area students, which could have a ripple effect for other local academic institutions.

27.   The private equities are therefore obvious:   The Merger is necessary for Einstein to

survive, and enjoining it will severely impact the communities it serves as well as clinical

education in Philadelphia. *See Penn State Hershey*, 838 F.3d at 353.   But the public equities are

even more compelling.   Denying the injunction would protect the non-commercial patients that

represent as much as 88% of EMCP's patient base who are not accounted for in Plaintiffs'

analysis.   Courts take into account persons impacted if a healthcare provider will "no longer be

in business" by the time the FTC concludes a hearing on the merits. *Freeman Hosp.*, 911 F.

Supp. at 1227-28.   And the Supreme Court has highlighted the importance of examining the

changing dynamics and "probable future" of the market in which a merger takes place.  *General Dynamics*, 415 U.S. at 498, 502, 510-11.  Doing so is especially important here where hospitals, like EMCP, serving mostly non-commercial patients routinely face financial ruin.

Dated:  October 12, 2020

Respectfully Submitted,

/s/ Virginia A. Gibson
Virginia A. Gibson (ID# 32520)
Stephen A. Loney, Jr. (ID# 202535)
Garima Malhorta (ID# 327158)
Alexander Bowerman (ID# 321990)
HOGAN LOVELLS US LLP
1735 Market Street, Floor 23
Philadelphia, PA 19103
Telephone:  267-675-4600
Facsimile:  267-675-4601
virginia.gibson@hoganlovells.com
stephen.loney@hoganlovells.com
garima.malhotra@hoganlovells.com
alexander.bowerman@hoganlovells.com


Robert F. Leibenluft (admitted *pro hac vice*)
Leigh L. Oliver (admitted *pro hac vice*)
Justin W. Bernick (admitted *pro hac vice*)
Kimberly D. Rancour (admitted *pro hac vice*)
Kathleen K. Hughes (admitted *pro hac vice*)
Molly R. Pallman (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone:  202-637-5600
Facsimile:  202-637-5910
robert.leibenluft@hoganlovells.com
leigh.oliver@hoganlovells.com
justin.bernick@hoganlovells.com
kimberly.rancour@hoganlovells.com
kathleen.hughes@hoganlovells.com
molly.pallman@hoganlovells.com

*Counsel for Defendant Albert Einstein
Healthcare Network*


Howard Bruce Klein (ID#34230)
Law Offices Of Howard Bruce Klein, PC
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Telephone: 215-972-1411
Facsimile: 215-701-4549
klein@hbklein.com

*Counsel for Defendants Albert Einstein
Healthcare Network and Thomas Jefferson
University*

/s/ Paul H. Saint-Antoine
Paul H. Saint-Antoine  (ID# 56224)
Carol F. Trevey (ID# 312087)
John S. Yi  (ID# 318979)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone:  215-988-2700
Facsimile:  215-988-2757
paul.saint-antoine@faegredrinker.com
carol.trevey@faegredrinker.com
john.yi@faegredrinker.com

Kenneth M. Vorrasi (admitted *pro hac vice*)
John L. Roach, IV (admitted *pro hac vice*)
Jonathan H. Todt  (admitted *pro hac vice*)
Alison M. Agnew (admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, DC  20005
Telephone:  202-842-8800
Facsimile:  202-842-8465
kenneth.vorrasi@faegredrinker.com
lee.roach@faegredrinker.com
jonathan.todt@faegredrinker.com
alison.agnew@faegredrinker.com

Daniel J. Delaney (admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
191 N. Wacker Drive, Suite 3700
Chicago, IL 60606
Telephone: 312-569-1000
Facsimile: 312-569-3000
daniel.delaney@faegredrinker.com

*Counsel for Defendant Thomas Jefferson
University*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of October, 2020, a true and correct copy of the foregoing was served electronically upon all parties to this action.

*/s/ Paul H. Saint-Antoine*
Paul H. Saint-Antoine
