**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** *et al*.<br>Plaintiffs,<br>v.<br>**THOMAS JEFFERSON UNIVERSITY,** *et al.*<br>Defendants. | Civil Action No. 2:20-cv-1113-GLP |

## SUPPLEMENTAL BRIEF OF NON-PARTY AETNA, INC. IN SUPPORT OF ITS MOTION TO PARTIALLY SEAL AETNA EXHIBITS

Pursuant to the Court's July 27, 2022 Order, non-party Aetna, Inc. ("Aetna") respectfully submits this supplemental brief and accompanying exhibits to provide the Court with "specific examples and articulated reasoning to address how its compelling, countervailing interests outweigh the presumption of public access" to its documents, Dkt. 294, and to assist this court in performing the "document-by-document" review it must conduct under *In re Avandia, see In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 924 F.3d 662, 680 (3d Cir. 2019). To assist the Court, Aetna has provided a declaration by Laura Knorr (attached as Exhibit 7) explaining the seriousness of the injury likely to result from public disclosure of Aetna's documents, and Aetna is respectfully submitting proposed redacted versions of all six exhibits (attached as Exhibits 1 through 6). Those proposed redactions reflect a considered assessment of the relevant documents, taking into account the presumption in favor of public access as well as the context of how they were relied upon by the parties and the Court.

Specifically, Aetna requests an order partially sealing six Aetna documents introduced and accepted into evidence in these proceedings. None of the parties to this litigation previously opposed partially sealing these documents, which contain Aetna's competitively sensitive business information—including its reimbursement rates, contract negotiation strategies, strategic business plans, and contracting information. And public disclosure of this information would both harm

Aetna's competitive standing and harm the public at large by raising healthcare costs as well as increasing the risk of anticompetitive behavior by third parties. If Aetna's competitors gain access to the relevant confidential information, like Aetna's pricing and long-term strategies, they will have little incentive to lower their own prices below Aetna's and they could make strategic decisions to thwart Aetna's ability to compete by knowing its plans. Likewise, if Aetna's providers can see who else has bid to be included in Aetna's networks, what those bids were, and Aetna's negotiation strategies and long-term plans, they may bid less aggressively, raising Aetna's costs and putting Aetna at a competitive disadvantage. Competition would decrease, resulting in higher healthcare costs for employers and patients in the Philadelphia region.

As a result, Aetna and the public's interests in protecting this confidential information through limited redactions outweigh any presumption in favor of public access. Moreover, the exhibits were offered and admitted *in toto* even though neither the parties nor the Court appear to have relied on vast swaths of information in the exhibits—which drastically reduces any public interest in the disclosure of that content. Thus, at a minimum, the Court should seal all confidential information that did not form the basis for the parties' arguments or the Court's analysis.[1]

## Background

In response to various subpoenas, nonparty Aetna produced highly confidential, competitively sensitive information subject to the Stipulated Protective Order (Dkt. 55) in this matter. An Aetna employee, Christopher Morris, then-Vice President of Provider Networks for the Eastern Pennsylvania and Delaware region, also sat for two depositions. Aetna's documents and Morris' deposition transcripts contain four categories of highly confidential information:

---

[1] Aetna does not request further sealing of any documents currently accessible on the public electronic docket.

(1) Aetna's reimbursement rates, bidding practices, and pricing information; (2) its negotiation tactics; (3) its strategic analyses and long-term plans; and (4) its contracts with providers and clients. *See* Knorr Decl. at 2-5.   Consistent with the Stipulated Protective Order, Aetna believed that all of the information and testimony it provided to aid the parties and the court would remain confidential—at least until it was provided notice and an opportunity to object *before* the parties offered any such information into evidence.

Before a hearing scheduled to begin on September 14, 2020, the parties notified Aetna that they intended to introduce some of Aetna's documents and testimony into evidence. *See* Dkt. 171. On September 4, 2020, the Court issued a Final Pre-Trial Order requiring Aetna and other nonparties to submit motions to seal their confidential documents by September 8, 2020. *See* Dkt. 136. Aetna—along with many other non-parties—moved to either partially redact or seal its documents, explaining that they contained competitively sensitive information and that Aetna would be harmed if these documents were posted on the public docket. Dkt. 171.

After the Court received 35 different motions to seal on September 8, 2020, the parties agreed to pare down their exhibit lists at the Court's request. *See* Dkt. 229. On September 9, 2020, they identified 18 exhibits designated by nonparties as either "confidential" or "highly confidential." Dkt. 225. None of these documents were Aetna's, *id.,* so the Court denied Aetna's motion to seal its highly confidential information as moot. *See* Dkt. 229.

Unlike Aetna, nonparty Independence Blue Cross ("IBC") was afforded an opportunity to object to the introduction of its confidential information and then to negotiate a narrowed approach that shielded that information from public disclosure. As a result, only portions of IBC's exhibits relevant to the proceedings were entered into evidence. After an IBC witness was questioned about certain IBC documents at the hearing, IBC moved to "preclude the admission of confidential

business records that were not the subject of testimony and, instead, permit the admission of excerpted or redacted versions that contain the specific content that was the subject of testimony." Dkt. 255.  The Plaintiffs took no position on IBC's motion, and IBC negotiated with Defendant Jefferson to introduce "additional portions of each of those exhibits beyond the pages identified in [IBC's] Motion."  Dkt. 271.  The Court then admitted excerpts of IBC's confidential documents into evidence—rather than admitting the documents in whole.  *Id.*

Aetna did not have a similar opportunity to negotiate with the parties about the use of its documents because, as far as Aetna knew, its confidential documents were not going to be used at all.  But, on December 7, 2020, two letters from the parties to the Court were docketed by court staff.  Dkt. 274.  Both letters were dated October 12, 2020—two months earlier—and asked the Court to admit additional nonparty exhibits into evidence, including six Aetna documents.  Dkts. 274 & 265.  In violation of this Court's Protective Order, *see* Dkt. 55, the parties never notified Aetna that they intended to move these documents into evidence.  As a result, Aetna was denied the opportunity to object on confidentiality grounds—or to negotiate with the parties over which content in the exhibits should be admitted into evidence.  One day after the parties' letters were docketed, on December 8, 2020, the Court admitted the Aetna exhibits into evidence without sealing or redacting them.[2]  Dkt. 276.  Below is a brief description of each of these exhibits:

- **Document 1**: FTC Investigational Hearing Transcript of Aetna Representative Christopher Morris dated November 6, 2019 (DX9609 / PX7010). This is a 95-page transcript.

- **Document 2**: Deposition Transcript of Aetna Representative Christopher Morris in his Personal and 30(b)(6) Capacities dated July 30, 2020 (DX8822 / PX7050 / JX0062). This is a 277-page transcript.

---

[2] Despite being admitted into evidence, Aetna's unredacted documents were never publicly docketed.  On August 26, 2021, the Third Circuit granted Aetna's motion to stay publicly docketing its confidential information pending its appeal.  *See* 3d Cir. No. 21-1817, ECF No. 25.

- **Document 3**: Email from Jefferson Representative Jack Flynn to Aetna Representative Christopher Morris regarding "2017 Product Offerings," dated August 23, 2016 (DX0108 / PX 3007). This email discusses a negotiation between Aetna and Jefferson to establish a new provider network.

- **Document 4**: Excel spreadsheet with pricing information, titled "Efficiency Relativities OE no PModel 2017 Narrow Optionv2.xlsx" (DX0126). This is a spreadsheet containing Aetna's payments to Philadelphia area providers for inpatient, ambulatory, and emergency care. In addition to actual spending, it also contains expectations of how much Aetna will spend. The chart contains both list prices for services and the allowed amount—meaning that it reveals the discounts on services that Aetna negotiated with each provider. Moreover, this chart shows Aetna's volume per hospital provider, which would be highly valuable information for providers to know in a negotiation. For example, a provider with higher market share in an Aetna network will know it possesses greater bargaining leverage in the negotiation because of the greater disruption that would be caused by that provider exiting the network. This increased bargaining leverage would enable the provider to obtain higher reimbursement rates, to the detriment of employers and patients.

- **Document 5**: Email invitation from Aetna Employee Stephanie Mayes to numerous Aetna-employee recipients, dated November 30, 2016, regarding a "Network Meeting" on the same date, with attached internal competition analysis documents (DX0127). The attached regional competition analysis includes the "relative discount position," which is pricing information reflective of negotiated rates, similar to that contained in Document 4.

- **Document 6**: Email from Aetna Consultant Ruchita Kewalramini to numerous Aetna-employee recipients, dated June 16, 2017, regarding an upcoming internal workshop, and attaching a long-term strategy deck titled "PA Market Growth Strategy: Workshop I" (DX0136). Among other topics, this document includes discussions of potential strategic partnerships between Aetna and other Pennsylvania hospital systems.

As soon as Aetna discovered that these documents were admitted into evidence, it filed a renewed motion to seal and requested that the Court hold a hearing. *See* Dkt. 286. Aetna also learned that the parties directly quoted from some of its highly confidential documents in papers they filed with the Court, including the parties' expert reports.[3] The Court denied Aetna's motion on March 26, 2021, holding that "Aetna . . . [has] not sufficiently explained 'how public

---

[3] When Aetna filed its renewed motion to seal, it did not have access to the parties' submissions. Aetna has since obtained from the parties lists of its cited materials, and Aetna's redactions proposed herein take into account the parties' use of Aetna's documents.

dissemination of the pertinent materials *now* would cause the competitive harm [it] claim[s]."  Dkt. 290 (quoting *Leucadia, Inc. v. Applied Extrusion Techs.*, Inc., 998 F.2d 157, 167 (3d Cir. 1993)). On February 16, 2022, the Third Circuit vacated the Court's March 26, 2021 order and remanded the case for a hearing on Aetna's motion to seal.  *Fed. Trade Comm'n v. Thomas Jefferson Univ.*, No. 21-1817, 2022 WL 473024, at *4 (3d Cir. Feb. 16, 2022).  In doing so, the Third Circuit recognized that "Aetna—a non-party—was forced to file a rushed motion after several unexplained foot faults by the parties."  *Id.* *3-4.  The Court thus held that Aetna should have an opportunity to explain at a hearing why its documents should be sealed.  *Id.* at *4.

On July 27, 2022, this Court ordered a hearing on Aetna's motion to seal to be held on September 21, 2022.  It also ordered Aetna to file this supplemental brief with "specific examples and articulated reasoning to address how its compelling, countervailing interests outweigh the presumption of public access."  Dkt. 294.

## Argument

Aetna respectfully submits this brief to assist the Court in its document-by-document review of the exhibits at issue and its weighing of the public and private harm of disclosure against the presumption of public access.  *See In re Avandia*, 924 F.3d at 672-73.  Aetna has taken into account the presumption in favor of public access by proposing only targeted redactions aimed at protecting competitively sensitive information.  The harm to Aetna and the public in denying Aetna's motion is clear:  Aetna's documents contain competitively sensitive information that—if revealed now on the public docket—would harm Aetna's ability to compete.  In turn, Aetna's reduced ability to compete, along with the actions its competitors and counterparties might take if armed with this information, would harm the public.  Instead of vigorously competing by offering the lowest prices they can, competitors who know Aetna's costs and pricing could simply price

their products to match or slightly undercut Aetna.  Competitors who know Aetna's strategic plans could copy or thwart them.  And healthcare providers who know Aetna's negotiations strategies and other providers' past bids could raise Aetna's costs by submitting less aggressive bids.  Thus, Aetna will suffer, but so will employers and patients in the Philadelphia region forced to pay more for healthcare.  This harm to Aetna and the public is sufficient to overcome the public's presumptive right to access judicial records, which "is not absolute."  *Bank of Am. Nat. Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 344 (3d Cir. 1986).  Courts often seal documents that contain confidential business information—especially where the public has no need to see the information to understand the court's decision and particularly in merger litigation cases like this where the competitively sensitive information was produced by nonparties like Aetna.

In light of the strong presumption in favor of public access to judicial documents and in response to this Court's July 27, 2022 Order, Aetna has proposed only those redactions that it believes would shield protected information without infringing on the public's right to understand the basis for this Court's adjudication of the underlying merger litigation.  Aetna's limited redactions allow the public to see non-confidential portions of Aetna's documents and to trace citations within the Court's opinion and the parties' filings.  Simultaneously, Aetna's proposed redactions protect its most competitively sensitive information—including information that appears to have been irrelevant to the proceedings—which furthers both Aetna's and the public's interests.  The Court should avoid private harm to Aetna and public upheaval in the Philadelphia region's insurance market by granting Aetna's motion to partially seal its documents.

## I.    The Presumption of Public Access to Judicial Documents Has Long-Established Exceptions for Competitively Sensitive Information.

The common law right of public access "promotes public confidence in the judicial system by enhancing testimonial trustworthiness and the quality of justice dispensed by the court."

*Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988).  Public access "diminishes possibilities for injustice, incompetence, perjury, and fraud" and "provide[s] the public with a more complete understanding of the judicial system and a better perception of its fairness."  *In re Avandia*, 924 F.3d at 672 (quoting *Littlejohn*, 851 F.2d at 678).  But the right to public access "is not absolute." *Bank of Am.*, 800 F.2d at 344.  It is rebuttable, and it has long yielded to countervailing considerations, especially the protection of confidential business information which, if disclosed, would harm the public or a litigant's competitive standing.  *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (explaining that "courts have refused to permit their files to serve as . . . sources of business information that might harm a litigant's competitive standing."); *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 166 (3d Cir. 1993) ("Documents containing trade secrets or other confidential business information may be protected from disclosure.").

There are "settled standards" a court should apply to balance the right of public access against the potential public and private harm of disclosure.  *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001).  The movant must "show that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking disclosure."  *In re Avandia*, 924 F.3d at 672.  If the "interest in secrecy outweighs the presumption" of public access, *Bank of Am.*, 800 F.2d at 344, the court may seal judicial records after conducting a "document-by-document review," *In re Avandia*, 924 F.3d at 673.  This review must include a "particularized, deliberate assessment of the standard as it applies to each disputed document."  *Id.* at 677 n.11.  Relevant factors in the court's analysis include "a demonstrable risk of current harm" to the movant and the public, "the movant's status as a nonparty," and the "adjudicatory significance" of the documents sought to be sealed.  *See Thomas Jefferson Univ.*, No. 21-1817, 2022 WL 473024, at *4 (J. Rendell, concurring) (*citing Leucadia*, 998 F.2d at 167, *then citing*

*Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 662 (3d Cir. 1991), *then citing*

*Apple v. Samsung Elecs. Co.*, 727 F.3d 1214, 1226 (Fed Cir. 2013)).

II.     **Aetna's Proposed Redactions Cover Competitively Sensitive Information, the Disclosure of Which Would Cause Serious Harm to Aetna and the Public.**

The information that Aetna seeks to protect through its proposed redactions falls squarely within the historical exceptions to the strong presumption in favor of public access to judicial documents.   The six Aetna documents submitted into evidence by the parties contain four categories of competitively sensitive information:

- **Category 1**: **Reimbursement Rate, Bidding, and Pricing Information**. As explained in the Knorr Declaration, public disclosure of this information would facilitate collusion between providers on reimbursement rates and dampen their incentives to offer low rates to Aetna. *See* Knorr Decl. at 2-3. As an example, if Provider A learns that the rates offered by Provider B to Aetna are higher, then Provider A's incentive to continue offering the lower rate would be lessened and its offered prices likely would rise. *Id.* The resulting higher reimbursement rates paid to providers would lead to higher healthcare costs for employers, government agencies, and patients in the Philadelphia region. *Id.* Higher provider prices would also impair Aetna's ability to offer competitive rates in the insurance marketplace. *Id.*

- **Category 2: Negotiating Strategies.** Aetna's proprietary negotiating strategies help the company obtain lower rates from healthcare providers, to the benefit of Aetna's clients and members. Knorr Decl. at 3-4. If providers were to learn of Aetna's strategies, they would be advantaged in future negotiations with Aetna, leading to higher healthcare costs for consumers. *Id.* Higher provider rates would also decrease the competitiveness of Aetna's health insurance offerings to employers in the Philadelphia region—which would, in turn, harm consumers. *Id.*

- **Category 3: Strategic Analyses and Plans.** Aetna regularly conducts strategic analyses and planning to assess its strengths, weaknesses, and opportunities. Knorr Decl. at 4-5.   This information is used to develop ideas to improve Aetna's competitiveness in the marketplace through new or improved products and services. *Id.* If providers or Aetna's insurance competitors were to learn Aetna's strategic plans, Aetna's competitive standing would suffer and it may lose any competitive advantage to be gained from implementing these plans in the future—which would, in turn, result in reduced competition to the detriment of employers, government agencies, patients, and Aetna. *Id.*

- **Category 4: Contracting Information.** Nearly every Aetna contract with providers and clients contains confidentiality provisions given the sensitive nature of the information.   Knorr Decl. at 5.   As with the competitive issues created by disclosing

reimbursement rates, public disclosure of contract information would facilitate collusion between providers on contracting terms or dampen the incentives of providers to agree to certain provisions favorable to Aetna and consumers. *Id.* Less favorable terms in turn would harm Aetna's clients and members. *Id.*

This is precisely "the kind of information that courts will protect" because publicly disclosing it will hurt Aetna's competitive standing and, in turn, harm the public by reducing competition. *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984); *see Nixon*, 435 U.S. at 598 (1978). For example, in *Apple v. Samsung Elecs. Co.*, 727 F.3d 1214 (Fed Cir. 2013), the Federal Circuit reversed a district court's ruling refusing to seal pricing information, confidential financial information, and market research reports because the parties "ha[d] a significant interest in preventing the release of their detailed financial information." *Id.* at 1225. So too here. Aetna does not disclose the proprietary information contained in these documents by any other means. Aetna does not share it with the medical providers it routinely negotiates with or its insurance industry competitors. As a result, disclosing Aetna's pricing information, contract negotiations tactics, strategic analyses, and contracting terms on the public docket would make it more difficult for Aetna to secure favorable contract terms and lower medical rates for its clients and members. And Aetna would be "at a competitive disadvantage" compared to its current position. *Id.*; Knorr Decl. at 7.

It is particularly relevant that Aetna disclosed this information in the context of antitrust merger litigation. The FTC initiates merger litigation to protect consumers and competition, and the parties to merger litigations naturally seek *current* competitive information from nonparties like Aetna—including forward-looking strategic plans and projections—relevant to the competitive effects of the proposed merger in the future. Not surprisingly, the FTC recognizes that such information is competitively sensitive and should be protected. *See* FTC Freedom Of Information Act & Privacy Act Handbook ("FTC Handbook") at 4 (Feb. 2017),

https://bit.ly/35jAwXU ("Disclosure of this information often could cause competitive harm to those businesses.").

Indeed, Aetna's information was useful to the parties here precisely because it sheds light on Aetna's current competitive position and future competitive plans. Even in 2022, much of Aetna's information dating back to 2016 is still competitively sensitive. Some of the information relates to negotiation tactics that Aetna still uses today or to strategies, product plans, and network plans that Aetna is still considering. Knorr Decl. at 9. Further, given their knowledge of the industry and their own data, competitors and medical providers could use Aetna's previous pricing, reimbursement rate, and contract information to predict what Aetna's pricing, reimbursement rate, and contracts look like today. *Id.* The Federal Circuit recognized as much in *Apple*. *See* 727 F.3d at 1224 (holding that the district court abused its discretion in not sealing financial information where, *inter alia*, "the district court did not see 'how past profit and unit sales data can be used to meaningfully predict . . . *future* business plans.'") (citation omitted) (emphasis in original).

Nor is this a situation where only Aetna's interests are at stake. If Aetna's confidential information is disclosed to its competitors, it would undermine Aetna's ability to compete in the market and result in higher prices for consumers—exactly the result the FTC wanted to avoid by initiating the underlying litigation here. *See* TARA ISA KOSLOV & ELIZABETH JEX, FTC OFFICE OF POLICY PLANNING, PRICE TRANSPARENCY OR TMI?, (July 2, 2015), https://bit.ly/3B3uQzw (explaining that "information disclosures allow competitors to figure out what their rivals are charging, which dampens each competitor's incentive to offer a low price, or increases the likelihood that they can coordinate on higher prices."). If "providers know who the other bidders are and what they have bid in the past, they may bid less aggressively, leading to higher overall prices." *Id.* Refusing to seal Aetna's confidential information here could significantly chill third-

party companies' willingness to provide critical information to antitrust regulators.  *See* FTC Handbook at 4 ("[B]usinesses are more willing to provide information to the FTC if they know that the government will protect their sensitive information."); *see also* Knorr Decl. at 9.  Congress, too, has recognized that the public interest favors non-disclosure of sensitive commercial or financial information and has exempted documents "provided to the government under an assurance of privacy" from Freedom of Information Act requests.  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019); *see* 5 U.S.C. § 552(b)(4).

That is why courts have often held that a company's secrecy interest outweighs any presumption of public access in the context of FTC merger litigation.  *See, e.g.*, *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 149 (D. Del. 2020) (holding that sealing of courtroom was proper under *Avandia*), *vacated on other grounds*, No. 20-1767, 2020 WL 4915824 (3d Cir. July 20, 2020); *FTC v. Tronox Ltd.*, 18-cv-1622, Dkt. 80 at 8–9 (D.D.C. July 26, 2018) (sealing courtroom for testimony about "competitively sensitive information"); *FTC v. Wilhelmsen*, 18-cv-414, Dkt. 62 at 85 (D.D.C. May 29, 2018) (same); *FTC v. Sysco*, 15-cv-256, Dkt. 183 at 465–66 (D.D.C. June 26, 2015) (same).  Indeed, recognizing Aetna's need to protect its confidential information, a district court overseeing FTC litigation related to a hospital merger in New Jersey recently sealed Aetna documents substantially similar to those at issue here.  *See FTC v. Hackensack Meridian Health, Inc.*, 20-cv-18140, Dkt. 350 (D.N.J. June 17, 2021).  And, within this litigation, the Court sealed nonparty United's confidential documents because they "include information that derives economic value from not being generally known by others who might obtain economic value from its disclosure including detailed contract rate information and analyses of the impact of contract negotiations on . . . United customers."  ECF 290 at 2 n.3; *see* ECF 287.  It also allowed nonparty

IBC to submit excerpted versions of its exhibits into evidence to protect its confidential information.  *See* Dkt. 271.

Finally, the fact that Aetna is a nonparty to this litigation makes partially sealing its documents even more appropriate.  Aetna could not control which of its documents were introduced into evidence or which of its documents might be relied on by the Court.  It had no ability to limit the use of its confidential information and was at the mercy of the parties.  *Cf. Apple*, 727 F.3d at 1226 (holding that detailed financial information should have been sealed when parties chose to introduce "less-detailed financial information" into evidence and the detailed information "was not considered by the jury and is not essential to the public's understanding of the jury's damages award").  As a result, courts have recognized that confidentiality interests are heightened for non-parties.  *See Thomas Jefferson Univ.*, No. 21-1817, 2022 WL 473024, at *4 (J. Rendell, concurring) (noting that Aetna's "status as a nonparty" is a "salient consideration[]" here) (citing *Westinghouse Elec. Corp.*, 949 F.2d at 662); *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 478 (6th Cir. 1983) ("[T]he privacy rights of . . . third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records."); *In re Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) ("[T]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation."); *United States v. Kravetz*, 706 F.3d 47, 62 (1st Cir. 2013) (similar).

## III.   The Portions of Aetna's Documents That Were Irrelevant To The Court's Adjudication of this Case Should Be Partially Sealed.

Had the parties respected the procedures set forth in the Court's Protective Order, then Aetna likely could have negotiated a practical solution that would have reduced the burden on this Court.  Specifically, the parties should have narrowed the scope of their exhibits by excerpting the portion of Aetna's documents they intended to rely upon and then moved only those portions into

evidence.  Instead, they submitted Aetna's documents, including, for example, nearly 400 pages

of deposition testimony, into evidence wholesale.  In the end, the parties' submissions and the

Court's opinion cited only 48 pages of the relevant exhibits.

The exhibits therefore contain a massive amount of Aetna's private, competitively sensitive

information that appears to have played no meaningful role in the parties' arguments or the Court's

opinion.  For example, the parties moved Document 1, a 95-page transcript, into evidence, but

their submissions to the Court relied on only seven of those pages in their submissions, and the

Court relied on only one page in its opinion denying the Government's request for a preliminary

injunction.[4]  Document 2 contains 277 pages, but the parties and the Court relied on only 37 of

those pages.[5]  Document 3 was never even cited by the parties or the Court.  While Document 4

was cited generically, it is an Excel spreadsheet and the parties' citations do not specify what

---

[4] *See* Capps Rpt. at 54 n.222 & Ramanarayanan Rpt. at 99 n.381 (citing Document 1 at 27); Capps Rpt. at 307, n.362 (citing Document 1 at 48-49); Smith Rpt. at n.188 (citing Document 1 at 86-88); Ramanarayanan Rpt. at 26 n.119 (citing Document 1 at 87); Ramanarayanan Rpt. at 42 n.195 & 101 n.393 (citing Document 1 at 89); *see* ECF 277 at 38 (citing Document 1 at 93).

[5] *See* Def. Proposed FOF/COL at 25 n.200 & ECF 277 at 38 (citing Document 2 at 31-32); Capps Rpt. at 54 n.221 (citing Document 2 at 37-40); Capps Rpt. at 123 n. 419 (citing Document 2 at 55-56); Def. Proposed FOF/COL at 24 n.184 (citing Document 2 at 61-63); Smith Rebuttal Rpt. n. 327; Capps Rpt. at 307 n.360 (citing Document 2 at 62-63); Def. Proposed FOF/COL at 24 n.183 (citing Document 2 at 63-64); *id.* (citing Document 2 at 66-67); ECF 277 at 17-18 (citing Document 2 at 107); Def. Proposed FOF/COL at 24 n.187 (citing Document 2 at 107); *id.* at 20 n.157 (citing Document 2 at 109); Ramanarayanan Rpt. at 100 n.383 (citing Document 2 at 109-113); ECF 277 at 12-13 (citing Document 2 at 113); Def. Proposed FOF/COL at 20 n.156 (citing Document 2 at 115-16); ECF 277 at 11-12 (citing Document 2 at 115-16); *id.* & Def. Proposed FOF/COL at 20 n.156 (citing Document 2 at 124); Ramanarayanan Rpt. at 26 n.114 (citing Document 2 at 144); *id.* at 25 n.111 (citing Document 2 at 144-45); *id.* at 26 n. 118 (citing Document 2 at 148-49); *id.* at 32 n.155 (citing Document 2 at 150-51); *id.* at 32 n.157 (citing Document 2 at 151-52); Smith Rebuttal Report n. 336 (citing Document 2 at 184); *id.* (citing Document 2 at 201-02); *id* nn. 330, 337, & 342 (citing Document 2 at 204-05); *id.* n. 329 (citing Document 2 at 242-43).

specific information was relevant.[6]  Document 5 contains 18 pages, but the parties and Court only cited one.[7]  Document 6 contains 49 pages, but the parties cited only two pages and the Court did not rely on it at all.[8]

In short, of the 509 pages containing Aetna's private, confidential information in Documents 1, 2, 3, 5, and 6,[9] the parties and the Court specifically cited only 48 pages.  The bulk of the pages contained in the documents—461, or more than 90%—appear to have played no meaningful role in the Court's adjudication of the dispute, and consequently the public does not need access to them to understand the parties' arguments or the Court's decision.  *See Thomas Jefferson Univ.*, No. 21-1817, 2022 WL 473024, at *4 (J. Rendell, concurring) (noting that "the exhibits lack of significance in the litigation" is an "important factor[] that would impact [the Court's] ruling"); *Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1226 (Fed. Cir. 2013) (reversing denial of motion to seal when the "information at issue . . . is not necessary to the public's understanding of the case" and "the public therefore has minimal interest in this information"); *cf. N. Jersey Media Grp. Inc v. United States*, 836 F.3d 421, 433 (3d Cir. 2016) (explaining that a document's "lack of adjudicatory significance" cuts against the public's right of access under the First Amendment).  Indeed, because these pages were not relied upon by the Court

---

[6] *See* Def. Proposed FOF/COL at 23-24 nn. 183-84 (citing Document 4); Capps Rpt. at 107 n. 361 (citing native Excel version of Document 4).

[7] *See* Dkt. 277 at 12 (citing Document 5 at 2); Def. Proposed FOF/COL at 20, n. 156 (same). Although the Defendants' Proposed Findings of Fact and Conclusions of Law does not specify which page of Document 5 it relies on, the proposition it attempts to support is found on page 2 of Document 5.

[8] *See* Defs' Proposed FOF/COL at 20-21 n.157 (citing Document 6 at 21); *id.* at 24 n.187 (citing Document 6 at 22).

[9] Document 4 is excluded because it is an Excel spreadsheet the parties cited generally, making the number of pages a less meaningful metric.

or the parties, they are arguably not even "judicial records" subject to the right of public access. *See N. Jersey Media Grp. Inc.*, 836 F.3d at 435 ("To be considered a judicial record, to which the common law right of access properly attaches, 'the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document.'" (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995))); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 783 (3d Cir. 1994). The Court need not resolve that broader question because the interest in protecting the confidential information that neither the parties nor the Court relied upon far exceeds any public interest in access to that information.

Indeed, had the parties followed the Court's order, the process could have been streamlined through a negotiation to narrow the content submitted into evidence—which would have then reduced the burden on this Court. Indeed, that appears to be what happened with IBC, another nonparty who produced evidence in the case. IBC worked with Defendant Jefferson to slim down the exhibits and submit *only* those portions that they believed were pertinent to the Court's adjudication of the case. *See* Dkt. 271. That is precisely how things should have proceeded for Aetna. The parties' failure to follow this Court's order requiring them to inform Aetna ahead of time and their subsequent failure to exercise any discretion in how they introduced the exhibits should hardly prejudice Aetna and the public by resulting in the wholesale unsealing of records that played only a limited and targeted role in the Court's adjudication.

While lacking adjudicatory significance, these 461 uncited pages contain confidential, competitively sensitive Aetna information from all of the four categories identified above which should be sealed:

- **Uncited portions of Document 1, contain information in all four categories.** *See, e.g.,* Document 1 at 41-44; 56-60 (discussing Aetna's pricing); *id.* at 12-16, 33-36, 73-

76, 79 (discussing Aetna's negotiations), *id.* at 35, 45-50; 57, 78-80 (discussing Aetna's strategic business decisions)*, id.* at 73-79 (discussing Aetna's contracting practices).

- **Uncited portions of Document 2 contain information in all four categories.** *See, e.g.,* Document 2 at 50 (discussing an actuarial model about Aetna's pricing); *id.* at 155-56 (discussing contract negotiations); *id.* at 262-68 (discussing Aetna's strategy); *id.* at 129-136 (discussing contracts).

- **Document 3 was never cited by the parties or Court, but it contains information in Categories 1 and 2.** *See* Document 3 at 1-2 (negotiation between Aetna and Jefferson about new provider network).

- **Uncited portions of Document 5 contain information in Categories 1, 2, and 3.** *E.g.,* Document 5 at 8 (showing an internal Aetna cost analysis); *id.* at 7-8 (showing information related to Aetna contract negotiations); *id.* at 14 (discussing Aetna's strategic initiatives).

- **Uncited portions of Document 6 contain information in Categories 1, 2, and 3.** *E.g.,* Document 6 at 19-20 (discussing costs, reimbursement rates, and contract negotiations); *id.* at 8, 19-20 (discussing Aetna strategy).

Publicly disclosing the entirety of these 461 pages would harm Aetna and the public immensely without providing any apparent benefit to the public at all. Therefore, Aetna has identified specific parts of these pages that will cause specific harm if revealed to the public and Aetna's competitors. The balance clearly tilts in favor of partially sealing this competitively sensitive content.

## IV.   While Many Portions of Aetna's Documents Cited By the Court Or Parties Should Be Publicly Accessible, a Small Amount Should Remain Partially Sealed.

The public has a greater interest in the content relied on by the Court or cited by the parties. Recognizing that interest, Aetna has not sought to redact any portion of the Court's opinion that cites its documents. *See* ECF 277 at 11-13, 17-18, 38, 58 n.15. Likewise, for the portions of Aetna's documents that were cited by the Court or the parties, Aetna's limited proposed redactions seek to balance the public's interest in understanding judicial proceedings against Aetna's and the public's interest in protecting against the disclosure of competitively sensitive information.

Some examples help illustrate the balance struck by Aetna's proposed redactions. In many cases, Aetna has not proposed redacting its documents at all. Take, for instance, page 38 of the

Court's opinion. There, the Court writes that "Aetna has no concerns about the merger." Dkt. 277 at 38. It cites Document 1, the transcript of Mr. Morris's investigational hearing, where Mr. Morris explains Aetna's view of the merger. *See* Document 1 at Tr. 93:15-21. Even though Aetna's views on the merger are not otherwise publicly known and are potentially competitively sensitive—because they reveal Aetna's own private assessment of its ability to compete in a post-merger world—Aetna believes that the public's interest outweighs its privacy interest here. Similarly, the Court quotes Document 2 for the fact that "Jefferson and Penn had expressed concerns 'about IBC retaliating' if they made certain coverage arrangements 'with Aetna or any other carrier.'" Dkt. 277 at 12-13 (citing Document 2 at Tr. 113:5–22). Again, the fact that Jefferson and Penn expressed retaliation concerns to Aetna is not otherwise publicly known, and it reflects confidential information Aetna learned during its contract negotiations. Nevertheless, because the Court expressly relied on this section of Aetna's document, Aetna believes the public's interest outweighs its own secrecy interest and it does not request that this part of the transcript be sealed.

In other instances, however, limited redactions are necessary to prevent over-disclosure of Aetna's competitively sensitive information. For example, the Court's opinion cited an Aetna document for the proposition that "[m]ost insurers recognize Penn Medicine as Jefferson's closest competitor." Dkt. 277 at 17-18. Aetna agrees that this statement does not need to be redacted. However, the underlying document relied on by the Court should be redacted in a targeted fashion. In the portion of the transcript cited by the Court, Mr. Morris discussed competition between Penn Medicine and Jefferson, but he also discussed Aetna's strategic plans, including actions (and justifications for those actions) that Aetna considered taking because of that competition. *See* Document 2 at Tr. 107:18-108:4. This information is irrelevant to the proposition the Court was supporting, and unsealing it would provide the public (and Aetna's competitors and contracting

partners) with significantly more confidential, Aetna-specific information than necessary to understand the proceedings.  The point is that Penn Medicine and Jefferson compete with each other; the public does not need to know how Aetna reacts to that competition.

Similarly, in another part of its opinion, the Court wrote that IBC "is the area's dominant commercial insurer, with more than fifty percent market share covering approximately 1.3 million lives and coverage agreements with every area health system." Dkt. 277 at 11-12.  In light of the public's interest in disclosure, Aetna does not request redaction of this portion of the opinion, and it is not proposing redactions to the portion of Mr. Morris's deposition transcript supporting this proposition.  *See* Document 2 at Tr. 115:16-116:19.   However, the opinion also cited a portion of Document 5 containing an internal Aetna Strengths, Weaknesses, Opportunities, and Threats ("SWOT") analysis.  Dkt. 277 at 12.  That document shows that Aetna conducted a SWOT analysis and, among other competitively sensitive information, examines the impact on Aetna of IBC's dominance in the marketplace.  It also provides a playbook to Aetna's competitors and providers on Aetna's self-perceived strengths, weaknesses, opportunities, and threats.  That should be sealed. The public only needs to know that IBC was a dominant player in the marketplace; it does not need access to Aetna's complete internal scouting report in the middle of intense and ongoing competition.   Disclosing this information would not help the public understand the Court's decision-making process, and it would unnecessarily reveal Aetna's strategic plans and thinking to its competitors.[10]

Aetna has struck a similar balance for documents cited by the litigants: The public should be able to understand the arguments the parties are making, but Aetna should not be forced to

---

[10] This same reasoning applies to other redactions Aetna has proposed.  Some of Mr. Morris's deposition testimony reveals whether Aetna considered IBC's dominant position to be a strength, weakness, opportunity, or threat.  *See* Document 2 at Tr. 124:10-17.

disclose confidential information beyond what is necessary to aid the public's understanding.  For example, like the Court's opinion, the Defendants' Proposed Findings of Fact and Conclusions of Law cites Document 2 for the proposition that Aetna does not have concerns about the proposed merger.  *See* Def. Proposed FOF/COL at 25 n.200 (citing Document 2 at Tr. 31:13-32:5, 32:11-16).  Aetna does not seek to redact this information.

However, some redactions are necessary.  The parties' generic reliance on Document 4 cannot require that this extremely confidential document be unsealed.  Document 4 is an Excel spreadsheet containing Aetna's confidential pricing information to various facilities, and the parties cited it to show which hospitals and facilities Aetna considered to be substitutes, which provides valuable information to providers on the viability of Aetna's alternatives that can be used to gain bargaining leverage.  *See id.* at 23-24 nn.183-84; Capps Rpt. at 107 n.361.  And Document 4 reveals much more than this; it also includes the discounts on services Aetna negotiated with each provider and shows Aetna's volume per hospital provider.  If providers obtained this information, they could use it to deduce how much leverage they have when negotiating with Aetna due to the amount of disruption their removal from the network would cause to Aetna members.  Because there is no way to redact the spreadsheet without revealing Aetna's extremely detailed and confidential pricing information—information that, if disclosed, would provide significantly more detail than is necessary to establish which hospitals and facilities Aetna views as substitutes—Aetna has proposed redacting the majority of this document.

Aetna has proposed similar redactions for the other sections of its documents cited by the parties to ensure that the public's right to access judicial records is properly balanced against Aetna and the public's interests.  For example:

- **Page 23-24 and Footnotes 183-184 of the Defendants' Proposed Findings of Fact and Conclusions of Law**: Defendants cite to portions of Document 2 that discuss

Aetna members' hospital preferences.  On the publicly redacted version of this document (Dkt. 270), any mention of Aetna and the underlying transcript has already been redacted.  Aetna has proposed redacting certain sections of the transcript cited by the Defendants that discuss Aetna's internal modelling about how many patients would be "steered" to other hospitals (and which hospitals they would go to) if their preferred hospitals gave Aetna smaller discounts.  *See* Document 2 at Tr. 61:7-63:6; 63:8-64:3; 66:8-14; 66:20-67:10.  If Aetna's providers learned this information, they would gain negotiating leverage by knowing how Aetna internally decides whether to accept certain discounts.

- **Page 123 and Footnote 419 of Cory S. Capps' Expert Report**: Dr. Capps described payers' views of the role of physicians in driving inpatient referrals.  As an example, he cites to a section of Document 2 where Mr. Morris discusses how Aetna considered the role of physicians in driving inpatient referrals in an internal analysis.  *See* Document 2 at Tr. 55:13-56:18.  Mr. Morris's testimony names specific providers, details *why* Aetna was internally considering inpatient referrals in its modelling, and provides significantly more detail than is necessary to support Dr. Capps' simple proposition.  The public does not need access to this detailed information to understand Dr. Capps' opinion.  And, if left unsealed, this portion of the transcript would give Aetna's competitors insight into Aetna's decision-making processes and strategies, putting Aetna at a competitive disadvantage.

- **Page 307 and Footnote 362 of Cory S. Capps' Expert Report**: Dr. Capps quotes testimony from Document 1 where Mr. Morris discusses which provider facilities offer Aetna the highest discounts.  *See* Document 1 at Tr. 48:13-49:4.  The testimony names specific providers.  Aetna proposes redacting this testimony because it gives Aetna's competitors insight into Aetna's costs, which puts Aetna at a competitive disadvantage, and it gives Aetna's providers insight into the discounts their rivals have negotiated with Aetna.

- **Page 54 and Footnote 362 of Cory S. Capps' Expert Report and Page 99 and Footnote 381 of Subramaniam Ramanarayanan's Expert Report**: Both experts cite Document 1 and include information about the exact number of members Aetna has in the five-county Philadelphia metropolitan area.  *See* Document 1 at Tr. 27:16-23.  Aetna has proposed redacting these exact figures, which it does not publicly disclose.  Aetna's competitors could use these figures to get more accurate information on their own (and Aetna's) position in the market and produce more accurate estimates of Aetna's scale and cost structure, which would disadvantage Aetna in future bids by providing these rivals with asymmetric information on Aetna's ability to bid aggressively given its scale and costs.

- **Pages 25 and 26 and Footnotes 111 and 114 of Subramaniam Ramanarayanan's Expert Report**: Dr. Ramanarayanan cites a portion of Document 2 where Mr. Morris discusses contracts with providers where, in order for the providers to be reimbursed, Aetna requires that patients obtain prior authorization from Aetna to be treated at certain types of facilities in certain circumstances.  *See* Document 2 at Tr. 144:4-

145:22.  This testimony discusses details of Aetna's contracts that are not publicly disclosed, and providers could use this information to gain an upper hand in negotiations (*e.g.*, by pushing back on a prior-authorization requirement it knows Aetna does not have for competing providers or by seeking to get the same prior-authorization terms applicable to competing providers).

- **Page 32 and footnotes 155 and 157 of Subramaniam Ramanarayanan's Expert Report:** Dr. Ramanarayanan cites Mr. Morris's testimony in Document 2 when opining on how reimbursement rates are typically structured in the insurance industry.  The cited section of Mr. Morris's testimony discusses Aetna's negotiation tactics, and Mr. Morris answered questions like "if [a certain proposition were true], would that be part of . . . [Aetna's] negotiation?"  *See* Document 2 at Tr. 150:3-7.  Mr. Morris was also asked how Aetna reimburses providers, and he explains in detail how Aetna structures various reimbursements based on individual contracts.  *Id.* at Tr. 150:11-152:18.  If publicly disclosed, this Aetna-specific information could be used by providers in their negotiations with Aetna to raise Aetna's costs, and it is not necessary for the public to have access to it to understand Dr. Ramanarayanan's opinion.  Dr. Ramanarayanan cites similar testimony in Document 1 for the same purpose, and Aetna also purposes that that some of this testimony be redacted.  *See* Document 1 at Tr. 89:21-90:6.

- **Page 100 and Footnote 383 of Subramaniam Ramanarayanan's Expert Report**: Dr. Ramanarayanan cites Document 2 for the proposition that "Penn and Jefferson had expressed concerns that IBC would retaliate against them if they were to partner with Aetna on an initiative."  As discussed above, the Court also relied on this proposition, and Aetna does not believe that portions of Mr. Morris's transcript directly supporting it should be sealed.  However, Dr. Ramanarayanan's report cites to pages 109 to 113 of Document 2 even though the proposition is entirely supported by page 113:5–22 (*i.e.*, the lines the Court itself cited and which Aetna does not propose redacting).  The other pages contain details about how Aetna thought IBC might retaliate against Penn and Jefferson and how Aetna would act given potential IBC retaliation.  Because this information reflects Aetna's internal strategic planning and is unnecessary to understand Dr. Ramanarayanan's opinion, Aetna has proposed that some of it be redacted.

## <u>Conclusion</u>

Because Aetna's interest and the public's interest in confidentiality outweigh the presumption of public access to certain portions of the Aetna exhibits introduced into evidence, the Court should adopt Aetna's limited redactions and partially seal those documents.

Respectfully Submitted,

Dated:       September 7, 2022              By: /s/ *Michael H. McGinley*

Rani A. Habash
   (*pro hac vice*)
DECHERT LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300

Michael H. McGinley
   (Pa. Bar No. 325545)
Justin M. Romeo
   (Pa. Bar No. 326684)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-4000

*Attorneys for Non-Party AETNA, INC.*

Mike Cowie
DECHERT LLP
1900 K Street, N.W.
Washington, DC
(202) 261-3300
         *Of counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that September 7, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: September 7, 2022

/s/ *Michael H. McGinley*
Michael H. McGinley